## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| RPG INVESTMENT HOLDINGS, LLC, a Delaware Limited Liability Company, | ) ) ) ) | FILED: AUGUST 6, 2008<br>08CV4422<br>JUDGE ANDERSEN<br>MAGISTRATE JUDGE VALDEZ |
| Plaintiff, | ) ) | Case No. _____ |
| v. | ) ) | Judge _____<br>Magistrate _____ JFB |
| AMERICAN GREETINGS CORP., an Ohio Corporation, | ) ) ) | JURY DEMAND |
| Defendant. | ) ) ) | |

## COMPLAINT

Plaintiff RPG Investment Holdings, LLC ("RPGI"), by its attorneys Michael F. Braun, James L. Komie, and Robert D. Snow, Jr. of Schuyler Roche, P.C., complains of Defendant American Greetings Corp. ("AG"), as follows:

## INTRODUCTION

1.      By virtue of this action, the Plaintiff seeks to prevent a Defendant competitor, AG, from using control of debt that the Defendant purchased in violation of a written confidentiality agreement between the parties to, literally, destroy the Plaintiff and its affiliates, RPG Holdings, Inc. ("RPG Holdings") and Recycled Paper Greetings, Inc. ("RPG")(collectively RPG Holdings and RPG are referred to as the "affiliates").  After years of trying unsuccessfully to force RPG out of the retail paper greeting card marketplace (hereinafter the "greeting card market"), the Defendant, in violation of a written confidentiality agreement induced RPG's lenders to sell to the Defendant over 50% of RPG's outstanding senior debt at the very moment RPG was in the process of successfully renegotiating its overall debt.

2.      As a result of its wrongful conduct, AG is now in a position to exercise control over RPG, its competitor, where it can effectively block RPG from restructuring its debt. Moreover, RPGI has been advised that, at this moment, AG is "strategizing" on how to use its control over the debt it acquired to put RPG out of business.

3.      AG has engaged in these illegal actions because (i) all prior efforts to drive RPG out of the relevant marketplace have failed, (ii) RPGI rejected AG's recent offer to acquire RPG, (iii) RPGI refused to take actions in concert with AG that would harm RPG's creditors, and (iv) RPG's everyday business and operations are having a growing, negative impact on AG.

## The Parties

4.      Plaintiff RPG Investment Holdings, LLC ("RPGI") is a Delaware Limited Liability Company with its principal place of business at Two Canal Park, Cambridge, Massachusetts 02141. RPGI is the parent of RPG Holdings and RPG Holdings is the parent of RPG.

5.      Defendant American Greetings Corp. ("AG"), upon information and belief, is an Ohio corporation with a principal place of business at One American Road, Cleveland, Ohio.

## Jurisdiction and Venue

6.      This Court has personal jurisdiction over AG because it engages in a continuous and ongoing course of business in the State of Illinois and within the territorial limits of this District, such that AG is subject to general personal jurisdiction in this District. Subject matter jurisdiction exists under 28 U.S.C. §1332 because the amount in controversy exceeds $75,000, and RPGI and AG are citizens of different states.

7.      Venue is proper in this Court, pursuant to 28 U.S.C. §§1391(a)(1), because AG resides here in that it is subject to the personal jurisdiction in Illinois.

2

**Statement of Facts**

8.      RPGI is the sole shareholder of RPG Holdings.

9.      RPG Holdings is a Delaware corporation with its principal place of business in Illinois. RPG Holdings is the sole shareholder of RPG.

10.     RPG is an Illinois corporation with its principal place of business in Illinois. RPG is in the greeting card business and presently employs several hundred employees in its Chicago-based corporate headquarters alone.

11.     RPG was founded in 1971, and is in the business of selling greeting cards; the majority of which are so-called "humorous" cards.

12.     The original business concept was to introduce greeting cards on 100% recycled paper and thereby persuade consumers and the card industry generally to accept the environmental wisdom of using recycled paper for greeting cards. RPG pioneered the humorous card segment and has developed a loyal customer base.

13.     The "industry giants" are RPG's two main competitors, Hallmark and AG, which together dominate the greeting card industry.

14.     Begun in a college dormitory, over the course of thirty-plus years, RPG has grown to become the number three greeting card company, although its market share remains small compared to the industry giants, Hallmark and AG.

15.     RPGI and RPG Holdings acquired, directly or indirectly, RPG on December 5, 2005.

16.     The acquisition was financed in part with proceeds from: (i) a "First Lien Credit Agreement," dated as of December 5, 2005 (the "First Lien Credit Agreement"), among RPG Holdings, RPG (successor by merger to RPG Acquisition Corp.), the so-called "First Lien

3

Lenders" and Credit Suisse, Cayman Islands Branch, as administrative agent and as collateral

agent; and (ii) the "Second Lien Credit Agreement," dated as of December 5, 2005 (the "Second

Lien Credit Agreement" and, together with the First Lien Credit Agreement, the "Credit

Agreements"), among RPG Holdings, RPG (successor by merger to RPG Acquisition Corp.), the

so-called "Second Lien Lenders" (together, with the First Lien Lenders, the "Lenders") and

Credit Suisse, Cayman Islands Branch, as administrative agent and as collateral agent.

17.     The First Lien Credit Agreement is secured by a first priority lien on substantially

all of the assets of RPG, RPG Holdings, and RPG's subsidiaries, and the Second Lien Credit

Agreement is secured by a second priority lien on substantially all of the assets of RPG, RPG

Holdings, and RPG's subsidiaries.  RPG Holdings has agreed to certain obligations if RPG does

not completely fulfill its obligations with respect to credit extended to RPG under the First

and/or Second Lien Credit Agreements.

18.     In early May 2008, AG, on its own initiative, and without any prompting

whatsoever from RPGI or its affiliates, requested that RPGI meet with AG, the purpose for

which RPGI later learned was to discuss a possible transaction between RPGI and AG.

19.     AG is a direct competitor of RPG.

20.     Before any meeting could occur, both parties insisted that a confidentiality

agreement be executed.

21.     AG and RPGI then negotiated and executed a Confidentiality Agreement dated

May 16, 2008.  A true and accurate copy of the Confidentiality Agreement is attached hereto as

Exhibit A.

22.     The Confidentiality Agreement provides that the "Confidential Information" exchanged may not be used to "obtain[] a competitive advantage over the other party." <u>See</u> Exhibit A, ¶2.

23.     The Confidentiality Agreement also provides in relevant part that:

> Without each Party's prior written consent, neither Party nor its
> Representatives shall . . . ***make any contact of any nature***... (including
> inquiries or requests concerning Confidential Information) with any
> ...bank or other lender to the other Party or any of its affiliates other than
> in the ordinary course of such Party's business and not related in any way
> to such Party's consideration of a Transaction.

<u>See</u> Exhibit A, ¶8 (emphasis supplied).

24.     That particular provision -- especially the language regarding AG not even *contacting* any bank or lender of RPGI or its affiliates -- was central to RPGI's willingness to meet with AG, as AG was advised.

25.     The "no contact" term was critical because, at the time AG asked to meet with RPGI, RPG was, and currently is, negotiating a restructuring of the Credit Agreements with RPG's lenders.

26.     AG was advised that RPGI's and its affiliates' beneficial relationships with RPG's lenders, and the ability to effectively manage their obligations under the Credit Agreements, were critical to RPG's continued success.

27.     AG, as noted, is a direct competitor of RPG, and because of its market size, AG has the ability to bring remarkable economic resources to bear against RPG.  Put bluntly, RPGI

was unwilling to take the risk that, if discussions with AG failed, AG would use its resources to interfere with RPGI's and its affiliates' lending relationships.

28.     The Confidentiality Agreement is to remain in effect for two years from its effective date (until May 16, 2010).  See Exhibit A, ¶16.  That time period was chosen to allow RPGI and its affiliates the ability to restructure the Credit Agreements and to move forward, under a new arrangement, with RPG's lenders.  While the Confidentiality Agreement was in effect, AG was prohibited from contacting RPG's lenders.

29.     Given the importance of the protections afforded by the Confidentiality Agreement, AG and RPGI agreed also that each of them would "be entitled, without the requirement of a posting of a bond or other security to seek equitable relief, including an injunction or specific performance, in the event of any breach of the provisions of this confidentiality agreement."  See Exhibit A, ¶3.

30.     On May 19, 2008, following the execution of the Confidentiality Agreement, AG and RPGI met to discuss a possible transaction.

31.     Zev Weiss, AG's Chief Executive Officer, was present at the meeting.

32.     During the May 19 meeting, RPGI and AG talked about RPG's lenders, about the Credit Agreements and, especially, about the commitment to staying the course with the RPG lenders and restructuring the Credit Agreements.

33.     Despite RPGI's expressed commitment to RPG's lenders, Zev Weiss suggested at the meeting that, in substance, RPGI allow AG to act as a front for RPGI.  In that capacity, Weiss said, AG would go into the marketplace and buy loans from the unsuspecting lenders at, hopefully, substantially discounted prices.  (Technically, the targeted loans concerned either the

First Lien Credit Agreement (the "First Lien Loans") and/or loans under the Second Lien Credit Agreement (the "Second Lien Loans") (together, with the First Lien Loans, the "Loans.").)

34.     RPGI responded by advising Weiss that, under no circumstances, would RPGI participate in any effort to mislead RPG's lenders generally, let alone attempt to trick those lenders into selling the Loans to an entity acting, ultimately, in concert with RPGI or its affiliates. RPGI again advised AG that RPGI and its affiliates were committed to maintaining a successful and mutually beneficial relationship with the Lenders, and that it was confident in the ability to achieve a restructuring of the Credit Agreements that would allow RPG to continue moving forward successfully as a growing, independent company.

35.     In response, Weiss declared, and the following quote is almost verbatim: "I am not the kind of person who would go around you and buy the debt. I just want you to know that, if we cannot do a deal, we will not do a deal at all. That is consistent with the way we do business."

36.     The May 19 meeting ended without even a general consensus that discussions should continue. Shortly after the May 19, 2008 meeting, RPGI notified AG that there was no basis for further discussion.

37.     About five weeks after the May 19 meeting, or in late June/early July, RPGI heard that an entity out of Cleveland Ohio -- the city, coincidentally, where AG has its corporate headquarters -- was suddenly contacting RPG's lenders as part of an effort to acquire a substantial portion of the Loans.

38.     RPGI has since been told that AG -- either in its own name or using straws to act on its behalf -- has now acquired over 50% of the First Lien Loans, and that AG is presently working on a "strategy" concerning how it will use its wrongfully obtained leverage.

39.    Neither AG nor its agents ever obtained RPGI's or any of its affiliates' "prior written consent" before contacting RPG's lenders, as required by the Confidentiality Agreement. See Exhibit A, ¶8.

40.    All of this comes at the moment when, as noted, RPGI and its affiliates are working towards a successful and significant restructuring of the Credit Agreements. It also comes at a time when RPG is poised to gain access to testing its cards in a number of major, national retail stores. If AG is allowed to continue interfering, RPG's restructuring efforts will be unsuccessful. This could lead to disastrous consequences, including the loss of artists, customers, jobs and new business prospects. Additionally, and equally devastating, failed restructuring efforts could lead to AG acquiring operating control of RPG and thereby eliminating one of its last remaining competitors.

41.    Moreover, because of AG's wrongful conduct, RPGI, in the form of this action, have been forced to publicly disclose RPG's restructuring efforts; efforts that, almost certainly, would have been resolved successfully and in private had AG not interfered with RPG's lending relationships.

### AG's Goal has been to Keep RPG out of the Market

42.    AG, unlike RPGI, its affiliates and RPG's lenders, does not care if RPG survives as an independent greeting card company. Indeed, it wants just the opposite result. From all appearances, AG's ultimate "strategy" is to put RPG out of business altogether or force RPG into a fire sale. Either result will place the jobs of hundreds of RPG employees at risk, and deprive the public of access to the wonderful cards of one of the last, nationally-operating, free-standing, greeting card companies, RPG.

43.     RPGI's and its affiliates' fears are well-founded, as they are based on *years* of fending off efforts by AG to drive RPG from the marketplace.  What is at issue here is the most recent, and potentially the most egregious act, in a long chain of anticompetitive activities.

44.     AG has fought to keep RPG out of stores, upon information and belief, primarily by using contracts and extraordinary "rebates" to block RPG from even getting into retail locations.  Specifically, AG, upon information and belief, has used, and continues to use, a combination of exclusive contracts, so-called "rebate" programs, and/or contracts that call for the retailer to at all times insure that AG has a defined (very large) percentage of available store space.

45.     The common link to those artificial barriers is that they keep competitors such as RPG out of the stores, and/or keep competitors from achieving efficient scales of production and distribution.  In other words, rather than compete on the merits against smaller more innovative and growing competitors such as RPG -- i.e., letting consumers choose the better product -- AG has increasingly resorted to artificial, inefficient and exclusionary practices to protect its entrenched position.

46.     Still, RPG's combination of recycled paper and humorous messages -- featuring over 250 artists, including well-recognized brands such as The Far Side and Sandra Boynton -- have made it a popular alternative to the more traditional cards offered by AG.  Thus, AG's efforts notwithstanding, the quality of the RPG product has convinced more and more retailers to at least test out the possibility of putting RPG cards into retail stores.

47.     That same company, AG, is now the holder of over 50% of RPG's First Lien Loans.  It is the majority lien holder, moreover, at precisely the moment that RPG is attempting

to restructure its debt and at a time when RPG is making real progress in competing in the greeting card market, to the detriment of AG.

### AG now Wrongfully Controls the First Lien Loans

48.    RPG Holdings and RPG are currently in default of certain covenants under the Credit Agreements. As a result of such defaults, RPG, among other things, is not able to borrow additional amounts under the revolving credit facility established by the First Lien Credit Agreement. It is for this reason that RPG is in active negotiations with its lenders to restructure the Credit Agreements.

49.    In addition, as a result of such defaults: (i) the First Lien Lenders have the right to accelerate the First Lien Loans and to exercise other remedies pursuant to the First Lien Credit Agreement and related collateral documents, including seeking foreclosure on the collateral securing the First Lien Credit Agreement; and (ii) the Second Lien Lenders have the right to accelerate the Second Lien Loans and, subject to the inter-creditor agreement with the First Lien Lenders, to exercise other remedies pursuant to the Second Lien Credit Agreement and related collateral documents, including seeking foreclosure on the collateral securing the Second Lien Credit Agreement.

50.    Before AG wrongfully purchased RPG's debt, RPGI and its affiliates were confident that, the initial defaults notwithstanding, RPG's debt would be successfully restructured. As a general matter, RPGI, its affiliates, and RPG's lenders all understood that it was in everyone's interest for RPG to continue operations. Indeed, the single largest lender, prior to AG's arrival on the scene, had expressed its clear intention to move forward successfully with a restructuring.

51.     However, as noted, upon information and belief, AG, despite the terms of the Confidentiality Agreement, now owns and/or controls over 50 % of the First Lien Loans.  A 50% plus share of the First Lien Loans confers veto power upon AG because, pursuant to the First Lien Credit Agreement, the holders of more than 50% of the First Lien Loans and revolving credit facility commitments in the aggregate must agree to certain major decisions, including amending or waiving the existing defaults under the First Lien Credit Agreement, accelerating the First Lien Loans, and seeking foreclosure on the collateral securing the First Lien Credit Agreement.

52.     Moreover, by virtue of owning and/or controlling the First Lien Loans, AG, under the First Lien Credit Agreement, has rights of access to detailed pricing, financial and strategic information of RPG, including business plans, financial forecasts and the amount of cash that RPG has on hand, provided to the First Lien Lenders and the Second Lien Lenders on a confidential basis.  The detail in this information goes far beyond the confidential information provided to AG pursuant to the terms of the Confidentiality Agreement.

53.     The First Lien Credit Agreement also gives AG advance notice, and the ability to block, various RPG business transactions.  For example, AG has power to veto or approve:  the disposal of certain assets; corporate restructuring; new loans; and new acquisitions.

54.     AG, now, effectively, holds the right to exercise control over RPG.  Under the current circumstances, AG's control of the First Lien Loans puts AG in a position where it effectively controls the business, policies and competitive strategies of RPG.

55.     Even if AG were to attempt to insulate itself from day-to-day decision-making, AG would still exert decisive authority regarding such matters as funding capital investments and expansion plans.

56.     Failure to prohibit AG's access to RPG's sensitive competitive information will cause irreparable harm to RPG.

57.     AG's power to block RPGI's and its affiliates' efforts to restructure the existing Credit Agreements will cause irreparable harm to them, including RPG's ability to continue to operate independently in the marketplace.

58.     AG is not a true creditor of RPG.  Upon information and belief, its interest is not to invest in RPG.  As RPG's competitor, it is in AG's interest to liquidate RPG, as doing so would eliminate a chief competitor and, simultaneously, expose RPG or its assets to being purchased at steeply discounted prices.

59.     The public will be injured in the absence of a preliminary injunction because there is imminent danger of the demise of RPG's operations.

## COUNT I
### (Breach of Contract)

60.     RPGI repeats and realleges each and all of the preceding allegations.

61.     AG is party to a written contract, the previously discussed Confidentiality Agreement, with RPGI.

62.     The Confidentiality Agreement is a valid and binding contract.

63.     RPGI has satisfied any and all conditions precedent to the enforcement of the Confidentiality Agreement.

64.     For the reasons detailed herein, AG breached the contractual obligations owed to RPGI.

65.     For example, AG improperly contacted Lenders to RPG in violation of its express agreement to refrain from doing so.

12

66.     AG has also breached the Confidentiality Agreement by using confidential information given to AG pursuant to and under the protection of the Confidentiality Agreement for purposes that are not permitted under that agreement.

67.     AG has also breached the implied covenant of good faith and fair dealing by taking the unfair and unreasonable actions described herein, which have the effect of preventing RPGI from receiving the fruits of the parties' bargain and frustrating the purpose of the Confidentiality Agreement.

68.     As a direct and proximate result, RPGI has sustained and will continue to sustain irreparable damage to, among other things, its reputation, its goodwill, its lending relationships and its independence.  By virtue of the forgoing, AG is also liable to RPGI in an amount to be determined at trial.

**COUNT II**
**(Specific Performance of Contractual Obligations)**

69.     RPGI repeats and realleges each and all of the preceding allegations.

70.     AG was party to a written contract, the previously discussed Confidentiality Agreement, with RPGI.

71.     The Confidentiality Agreement is a valid, binding and enforceable contract.

72.     The essential terms and elements of the Confidentiality Agreement, which prohibit AG from contacting RPGI or any of its affiliates' lenders in any manner without their prior written consent, are clear and definite.

73.     RPGI has fully complied with its obligations under the Confidentiality Agreement.

74.     RPGI has satisfied any and all conditions precedent to the enforcement of the Confidentiality Agreement.

13

75.     For the reasons detailed herein, AG has failed or refused to comply with its contractual obligations owed to RPGI and its affiliates; namely, AG has improperly contacted lenders to RPGI's affiliates, RPG Holdings and RPG.

76.     As a direct and proximate result, RPGI has sustained and will continue to sustain irreparable damage to, among other things, its reputation, its goodwill, its lending relationships and its independence.

77.     There is no adequate remedy at law which will redress the damage that RPGI has sustained and will continue to sustain as a result of AG's breach.

78.     AG has conceded that any breach of the Confidentiality Agreement by AG would entitle RPGI to specific performance. See Exhibit A, ¶3.

79.     By virtue of the forgoing, RPGI is entitled to specific performance of the Confidentiality Agreement requiring AG to refrain from all contact with RPG Holdings' and RPG's lenders without RPGI's or its affiliates' prior written consent.

<u>COUNT III</u>
**(Tortious Interference with Contractual and Beneficial Relations)**

80.     RPGI repeats and realleges each and all of the preceding allegations.

81.     RPGI and its affiliates had contractual and beneficial relationships with the Lenders.

82.     AG had and has actual awareness of those contractual and beneficial relationships.

83.     For the reasons stated above, AG, deliberately and without justification and by using unlawful means, has interfered and is planning and attempting to interfere with those contractual and beneficial relationships, and RPGI and its affiliates have been and will be damaged thereby.

14

84. By virtue of the foregoing, AG is liable to RPGI in an amount to be determined at trial.

## REQUESTS FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in its favor and against Defendant on all counts, and order the following relief:

1. The issuance of injunctive relief, including a temporary restraining order immediately restraining and enjoining AG, whether acting directly or indirectly, alone or in concert with other persons or entities until further Order of this Court, from: (a) contacting any lender of RPGI's affiliates or holder of RPGI's affiliates' debt until and including May 15, 2010; (b) exercising any rights or remedies afforded the First and/or Second Lien Lenders under the First and/or Second Lien Credit Agreements and related collateral documents, including but not limited to (i) the right to accelerate the First and/or Second Lien Loans, (ii) the right to foreclose on RPG collateral, (iii) the right to exercise control over RPGI's or its affiliates bank accounts, (iv) the right to object to the grant of senior liens on the collateral securing the Loans for the purpose of obtaining emergency financing, (v) the right to object to the use of cash collateral, (vi) the right to object to the sale or other disposition of collateral that is free and clear of all liens and claims; and (c) obtaining, reviewing and/or using any confidential information or trade secrets of RPGI or its affiliates which AG possesses, or might come to posses, by virtue of its ownership and/or control of the First Lien Loans.

2. AG's and/or its agents' or representatives' disclosure, within 24 hours of the issuance of the Court's Order, in an affidavit, of whether it has used or disclosed any of RPGI's or its affiliates' confidential and/or trade secret information and, if so: identify the confidential

information used or disclosed; any party to such disclosure; the manner of such use; and the date of such use or disclosure.

       3.     AG's and/or its agents' or representatives' return, within 24 hours of the issuance of the Court's Order, to RPGI of any and all customer information, analyses, materials, records, documents, electronic files, data compilations, computer programs and/or databases, wherever and however contained or formatted, that were acquired by AG as a result of AG contacting any lender of RPG Holdings or RPG, and shall purge from all electronic recordkeeping systems (e.g., computers), all such information and confirm that it has done so in an affidavit.

       4.     A judgment against Defendant for all damages suffered by Plaintiff, including all costs, interest and attorneys' fees in the amount Plaintiff proves at trial; and

       5.     Such other and further relief to Plaintiff as the Court deems just and equitable.

Dated: August 6, 2008           Respectfully submitted,

                               RPG INVESTMENT HOLDINGS, LLC

                   By:     /s/ Michael F. Braun
                            One of the Attorneys for Plaintiff

Michael F. Braun(Atty No.: 6180471)
James L. Komie(Atty No.: 6198089)
Robert D. Snow, Jr.(Atty No.: 6275952)
Schuyler Roche, P.C.
One Prudential Plaza
Suite 3800
130 East Randolph Street
Chicago, Illinois 60601
(312)565-2400
(312)565-8300(facsimile)
527828

FILED: AUGUST 6, 2008
08CV4422
JUDGE ANDERSEN
MAGISTRATE JUDGE VALDEZ

JFB

# EXHIBIT A

## CONFIDENTIALITY AGREEMENT

### May 16, 2008

In connection with a possible transaction (the "Transaction") between RPG Investment Holdings, LLC ("RPGIH") or its affiliates and American Greetings Corp. ("AM") (individually, a "Party", and collectively, the "Parties"), each Party may disclose and/or deliver to the other Party certain information about its properties, employees, ownership, assets, finances, businesses, operations, plans and other confidential information (such Party when disclosing such information being the "Disclosing Party" and such Party when receiving such information being the "Receiving Party"). All such information furnished by the Disclosing Party or any of its Representatives (as defined below), whether furnished before or after the date hereof, whether oral or written, and regardless of the manner in which it is furnished, is referred to in this confidentiality agreement as "Confidential Information".

1.  The term "Confidential Information" also includes all notes, analyses, compilations, studies, interpretations or other documents prepared by the Receiving Party or any of its Representatives (as hereinafter defined) which contain, reflect or are based upon, in whole or in part, the information furnished to the Receiving Party or any of its Representatives by the Disclosing Party or any of its Representatives pursuant hereto. Confidential Information does not include, however, any information which (i) at the time of disclosure or thereafter is generally available to or known by the public (other than as a result of its disclosure by the Receiving Party or any of its Representatives in breach of this confidentiality agreement), or (ii) was or becomes available to the Receiving Party on a non-confidential basis from a Person, other than the Disclosing Party or any of its Representatives, who is not known by the Receiving Party to be otherwise bound by a confidentiality agreement, or is not otherwise prohibited from transmitting the information. The Confidential Information shall remain the property of the Disclosing Party. No rights to use, license or otherwise exploit the Confidential Information are granted to the Receiving Party, by implication or otherwise. The Receiving Party will not by virtue of our disclosure of the Confidential Information and/or your use of the Confidential Information acquire any rights with respect thereto, all of which rights shall remain exclusively with the Disclosing Party.

2.  Unless otherwise agreed to in writing by the Disclosing Party, the Receiving Party hereby agrees: (a) that the Confidential Information will be used solely for the purpose of evaluating and implementing the Transaction and for no other purpose, including without limitation obtaining a competitive advantage over the other party or enforcement or legal action of any type other than to enforce this Confidentiality Agreement; and (b) that such information will be kept confidential by the Receiving Party; provided that any such information may be disclosed to the Receiving Party's officers, directors, employees, accountants, attorneys, financial advisors, consultants, other agents or representatives and financing

BO1:\179541\02\3%J902!.DOC\69303.0001

sources (such Persons hereinafter collectively being referred to as "Representatives"). The Receiving Party agrees that Confidential Information shall only be provided to its Representatives who need such Confidential Information for the purpose of evaluating and implementing the Transaction, who have been informed of the confidential nature of the Confidential Information and the terms of this Confidentiality Agreement, and agree to be bound by the terms of this Confidentiality Agreement prior to disclosure to them of any Confidential Information. The Receiving Party shall be liable for any breach of this Confidentiality Agreement by its Representatives. Without the prior written consent of AM, RPGIH will not disclose any Confidential Information of AM to any employees of Recycled Paper Greetings, Inc. Notwithstanding the foregoing, AM recognizes and agrees that employees of Recycled Paper Greetings may be aware of discussions between RPGIH and AM and may be utilized to assist RPGIH in providing Confidential Information to AM.

3.    Given the nature of the Confidential Information and the Parties' current discussions, each Party acknowledges that the other Party may be irreparably damaged by any unauthorized disclosure of any Confidential Information. Without prejudice to the rights and remedies otherwise available to each Party, each Party shall be entitled, without the requirement of a posting of a bond or other security to seek equitable relief, including an injunction or specific performance, in the event of any breach of the provisions of this confidentiality agreement.

4.    In the event that the Receiving Party or any of its Representatives becomes legally compelled (by deposition, interrogatory, request for documents, subpoena, civil investigation, demand, order or similar process) to disclose any of the contents of the Confidential Information, or the fact that discussions or negotiations are taking place concerning a possible Transaction between RPGIH and AM, or any of the terms, conditions or other facts with respect to any such possible Transaction, including the status thereof, the Disclosing Party agrees that the Receiving Party and its Representatives may do so without liability, but the Receiving Party agrees to (i) promptly notify the Disclosing Party prior to any such disclosure to the extent practicable and (ii) cooperate with the Disclosing Party, at such party's expense, in any attempt it may make to obtain a protective order or other appropriate assurance that confidential treatment will be afforded the Confidential Information.

5.    Each Party may elect at any time to terminate further access to its Confidential Information. Following any such written request the Receiving Party and its Representatives agree (i) to promptly, in its discretion, redeliver or destroy all written Confidential Information and any other written material containing or reflecting any of the Confidential Information in its possession or its Representatives' possession, (ii) not to retain any copies, extracts or other reproductions in whole or in part, mechanical or electronic, of such written material, and (iii) to destroy all computer records, documents, memoranda, notes

and other writings prepared by the Receiving Party or its Representatives based on the Confidential Information.

6.    Each Party agrees that it is not entitled to rely on the accuracy or completeness of the Confidential Information and that each Party shall be entitled to rely solely on such representations and warranties as may be made in any definitive agreement relating to the Transaction, subject to the terms and conditions of such agreement. Accordingly, each Party acknowledges that, except as may be provided in such agreement, neither the other Party nor any of its Representatives makes any express or implied representation or warranty as to the accuracy or completeness of any of the Confidential Information.

7.    The Parties agree that, unless and until a binding agreement is entered into between RPGIH and AM with respect to the Transaction, neither RPGIH nor AM will be under any legal obligation of any kind whatsoever with respect to the Transaction by virtue of this or any other written or oral expression, except with respect to the matters specifically agreed to herein.  Nothing contained in any discussions between RPGIH and AM or in any Confidential Information shall be deemed to constitute a representation or warranty.  Except for the matters set forth in this Agreement or in any such binding agreement, neither party shall be entitled to rely on any statement, promise, agreement or understanding, whether oral or written, any custom, usage of trade, course of dealing or conduct.

8.    Each Party agrees that all (i) communications regarding the Transaction, (ii) requests for additional information, (iii) requests for facility tours or management meetings, and (iv) discussions or questions regarding procedures, will be submitted or directed to the Persons designated by each Party.  Without each Party's prior written consent, neither Party nor its Representatives shall (i) disclose to any Person the fact that the Disclosing Party has made the Confidential Information available to the Receiving Party, that either Party is considering a proposed Transaction or that discussions, negotiations or meetings are taking place or have taken place concerning a proposed Transaction, or any of the terms, conditions or other facts with respect to any such Transaction, including the status and/or timing thereof, or (ii) make any contact of any nature (including inquiries or requests concerning Confidential Information) with any employee, supplier, customer, labor union, landlord, lessor, bank or other lender to the other Party or any of its affiliates other than in the ordinary course of such Party's business and not related in any way to such Party's consideration of a Transaction. Each party represents and warrants to the other that it has the right to disclose to the other party any Confidential Information disclosed pursuant to this Confidentiality Agreement.

9.    This Agreement shall be governed and construed in accordance with the laws of the State of Delaware, without regard to conflicts-of-law principles.  You hereby irrevocably and unconditionally consent to submit to the jurisdiction of the courts of the State of Delaware and of the United States of America located in the State

BO1\17954\102\3%J9021.DOC\69303.0001                3

of Delaware for any action, suit or proceeding arising out of or relating to this agreement.

10.    The provisions of this Agreement shall be binding solely upon and inure to the benefit of the Parties hereto and their respective successors and assigns. Neither Party may assign any or all rights, power, privileges and obligations under this Agreement without the other Party's prior written consent.

11.    This confidentiality agreement represents the entire understanding and agreement of the Parties hereto and may be modified only by a separate written agreement executed by RPGIH and AM expressly modifying this confidentiality agreement. This Agreement supersedes and cancels any and all prior agreements between the parties hereto, express or implied, relating to the Transaction.

12.    No past, present or future director, officer, employee, member, shareholder, incorporator, partner, and/or affiliate of either Party hereto or any affiliate thereof shall have any liability for any obligations of such Party under this Agreement or for any claim based on, in respect of or by reason of such obligations or their creation

13.    In the event that any provision or portion of this Agreement is determined to be invalid or unenforceable for any reason, in whole or in part, the remaining provisions of this Agreement shall be unaffected thereby and shall remain in full force and effect to the fullest extent permitted by law, and such invalid or unenforceable term or provision shall be deemed replaced by a term or provision that is valid and enforceable and that comes closest to expressing the Parties' intention with respect to such invalid or unenforceable term or provision.

14.    The failure or refusal by either Party to insist upon strict performance of any provision of this Agreement or to exercise any right in any one or more instances or circumstances shall not be construed as a waiver or relinquishment of such provision or right, nor shall such failures or refusals be deemed a custom or practice contrary to such provision or right.

15.    For purposes of this confidentiality agreement: (a) "affiliate" shall mean, as to any Person, any other Person which, directly or indirectly, controls, or is controlled by, or is under common control with, such Person (for this purpose, "control" (including, with its correlative meanings, "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management or policies of a Person, whether through the ownership of securities or partnership or other ownership interests, by contract or otherwise); and (b) "Person" shall be broadly interpreted to include any individual, corporation, company, partnership, limited liability company, trust or other group or entity (including any court, government or agency, commission, board or authority thereof, federal, state or local, domestic, foreign or multinational).

16. This confidentiality agreement shall terminate upon the earlier to occur of (i) the closing of the Transaction contemplated by this confidentiality agreement, and (ii) two (2) years after the date hereof, provided that the Parties' obligations hereunder with respect to trade secrets will continue indefinitely.

17. This confidentiality agreement may be executed in any number of counterparts, each of which when so executed shall be deemed an original, but such counterparts shall together constitute one and the same agreement.

*Remainder of page intentionally left blank*

IN WITNESS WHEREOF, the Parties have executed this confidentiality agreement as of the date first written above.

**RPG INVESTMENT HOLDINGS, LLC**

**American Greetings Corp.**

By: _____
Name: _____
Title: _____

By: _____
Name: _____Bill Young_____
Title: _____Director, RPG Investment Holdings, LLC_____

BO1:\179541\02\3%J9021.DOC\69303.0001