**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| RPG Investment Holdings, LLC, | Civil Action No. 08CV4422 |
| Plaintiff, | Judge Wayne R. Anderson |
| v. | (Emergency Judge Ruben Castillo) |
| American Greetings Corporation, | Magistrate Judge Maria Valdez |
| Defendant. | |

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S**
**EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER**

Of Counsel:
David F. Adler
Pearson N. Bownas
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114-1190
(216) 586-3939

Lee Ann Russo
larusso@jonesday.com
Mark P. Rotatori
mprotatori@jonesday.com
JONES DAY
77 W. Wacker Drive
Chicago, Illinois 60601-1692
(312) 782-3939

John M. Newman, Jr.
jmnewman@jonesday.com
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114-1190
(216) 586-3939

Counsel for Defendant
AMERICAN GREETINGS CORPORATION

# Table of Contents

Table of Authorities ..................................................................................................... -iii-

I.    INTRODUCTION ...................................................................................................... 1

II.   BACKGROUND ........................................................................................................ 2

    A.  I-Holdings And Its Non-Party Affiliates ........................................................... 2

    B.  American Greetings And Its Dealings With I-Holdings ...................................... 3

    C.  American Greetings' Acquisition of RPGH and RPG's Debt ............................. 4

    D.  I-Holdings Files Its "Emergency" Motion ......................................................... 4

    E.  American Greetings' August 13 Proposal ........................................................... 5

III.  TEMPORARY RESTRAINING ORDER STANDARD ............................................ 5

IV.  I-HOLDINGS HAS NOT CLEARLY SHOWN THAT IT WILL BE
    IRREPARABLY HARMED WITHOUT THE TRO ................................................. 6

    A.  The Supposed Irreparable Harm Would Not Occur To I-Holdings .................... 6

    B.  Even The Supposed Harm To Others Is Too Speculative .................................. 8

V.   I-HOLDINGS HAS NOT ESTABLISHED IT IS LIKELY TO
    SUCCEED ON THE MERITS OF ITS CLAIMS ................................................... 10

    A.  I-Holdings Has Not Shown It Is Likely To Establish An
        Injury To Support The Merits Of Either Cause Of Action ............................... 10

    B.  I-Holdings Has Not Shown It Is Likely To Establish A
        Breach Of The Confidentiality Agreement ...................................................... 11

    C.  I-Holdings Has Not Shown It Is Likely To Establish A
        Reasonable Expectancy Of A Business Relation Or Interference
        By American Greetings ..................................................................................... 12

        1.  I-Holdings Has Not Shown A Likelihood Of Proving A
           Reasonable Expectancy Of Prospective Business Relations ...................... 12

        2.  I-Holdings Has Not Demonstrated A Likelihood Of Proving
           Interference Or Injury ................................................................................ 14

CLI- 1641126v1

VI.   THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST DO NOT
      FAVOR ISSUING THE RESTRAINING ORDER ........................................................ 14

VII.  CONCLUSION .................................................................................................................. 15

## Table of Authorities

*Cases*                                                                                    *Page(s)*

*American Dairy Queen Corp. v. Brown-Port Co.*,
621 F.2d 255 (7th Cir. 1980) ...................................................................................7

*American Hospital Association v. Harris*,
625 F.2d 1328 (7th Cir. 1980) ................................................................................6

*Baskin-Robbins Inc. v. Patel*,
264 F. Supp. 2d 607 (N.D. Ill. 2003)......................................................................10

*Bodenstab v. J.R. Blank & Assoc's., Inc.*,
No. 88 C 555, 1990 WL 139139 (N.D. Ill. Sept. 14, 1990) ....................................13

*Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications Corp.*,
No. 12150, 1991 WL 277613 (Del. Ch. Dec. 30, 1991)..........................................8

*DePuy, Inc. v. Zimmer Holdings, Inc.*,
384 F. Supp. 2d 1237 (N.D. Ill. 2005).....................................................................8

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*,
356 F.3d 1256 (10th Cir. 2004) ..............................................................................10

*Dowd & Dowd, Ltd. v. Gleason*,
284 Ill. App. 3d 915, 672 N.E.2d 854 (1st Dist. 1996) ...........................................13

*Federal Insurance Co. v. Parello*,
767 F. Supp. 157 (N.D. Ill. 1991)..........................................................................7-8

*First American Real Estate Solutions, L.P. v. Moore*,
No. 05 C 2300, 2005 WL 1910902 (N.D. Ill. Aug. 10, 2005).................................6

*Fishman v. Estate of Wirtz*,
807 F.2d 520 (7th Cir. 1987) ..................................................................................13

*Geyer v. Ingersoll Pub. Co.*,
621 A.2d 784 (Del. Ch. 1992) .................................................................................8

*Great Lakes Higher Education Corp. v. Cavazos*,
698 F. Supp. 1464 (W.D. Wisc. 1988) .....................................................................7

*H-M Wexford LLC v. Encorp, Inc.*,
832 A.2d 129 (Del. Ch. 2003) ................................................................................11

*Cases*                                                                                                    *Page(s)*

*In re The Topps Co. Shareholders Litigation,*
926 A.2d 58 (Del. Ch. 2007) ..............................................................................................4

*International Union, Allied Industrial Workers of America v. Local Union No. 589,*
693 F.2d 666 (7th Cir. 1982) ...............................................................................................9

*Long v. Board of Education, Dist. 128,*
167 F. Supp. 2d 988 (N.D. Ill. 2001).....................................................................................5

*Minnesota Power & Light Co. v. Hockett,*
No. 00-1898, 2001 WL 873823 (7th Cir. Aug. 1, 2001) ..........................................................10

*Praefke Auto Elec. & Battery Co., Inc. v. Tecumseh Prods. Co., Inc.,*
255 F.3d 460 (7th Cir. 2001) ...........................................................................................6, 8

*Quadro Enters., Inc. v. Avery Dennison Corp.,*
No. 97 C 5402, 2000 WL 1029176 (N.D. Ill. July 26, 2000).....................................................13

*Recycled Paper Greetings, Inc. v. Davis,*
533 F. Supp. 2d 798 (N.D. Ill. 2008)....................................................................................5

*River Park, Inc. v. City of Highland Park,*
281 Ill. App. 3d 154, 667 N.E.2d 499 (2d Dist. 1996) ............................................................13

*Schenley Distillers Corp. v. United States,*
326 U.S. 432 (1946) ........................................................................................................8

*Shaffer v. Globe Protection, Inc.,*
721 F.2d 1121 (7th Cir. 1983) .............................................................................................9

*Singer Co. v. P.R. Mallory & Co., Inc.,*
671 F.2d 232 (7th Cir. 1982) ...............................................................................................9

*SMC Corp., Ltd. v. Lockjaw, LLC,*
481 F. Supp. 2d 918 (N.D. Ill. 2007)...................................................................................5-7

*Special Situations Cayman Fund, L.P. v. Dot Com Entertainment Group, Inc.,*
No. 03-CV0811E(F), 2003 WL 23350128 (W.D.N.Y. Dec. 5, 2003) ...........................................8

*Warner Cable Communications, Inc. v. City of Niceville,*
911 F.2d 634 (11th Cir. 1990) ..............................................................................................9

*Other*                                                                                          *Page(s)*

Anne Marrs Huber & Thomas H. Young, "The Trading of Bank Debt In and Out Of Chapter 11," 15 J. Bankr. L. & Prac. 15 (2006) (available on Westlaw as "15 JBKRLP 1 ART. 3")...................................................................................4, 12

1 Martin Lipton & Erica H. Steinberger, Takeover & Freezeouts § 6.06[4] (2008)......................4

11A Charles Alan Wright, *et al.*, Fed. Prac. & Proc. § 2948.1 (2d ed. 1995)................................6

## I.     INTRODUCTION

Plaintiff RPG Investment Holdings, LLC ("I-Holdings") says it learned of American Greetings Corporation's ("American Greetings" or "AG") alleged breach of the parties' contract over five weeks ago.  Now, I-Holdings says it needs an "emergency" restraining order ("TRO"), contending that AG has somehow placed I-Holdings in imminent and irreparable harm's way.  But I-Holdings does not allege that AG has (or has not) done *anything* in the past five weeks that makes I-Holdings' position any different from how it stood over a month ago.

I-Holdings speculates about what might happen to someone else – to non-party Recycled Paper Greetings ("RPG"), a company I-Holdings indirectly controls – if RPG does not somehow restructure its defaulted debt soon.  I-Holdings says RPG is struggling and may even go out of business.  But, quite apart from considerations of delay, that is not irreparable harm *to I-Holdings*.  I-Holdings' stake is purely financial.  It spent money to acquire RPG and naturally wishes to maximize that investment.  Injury to the value of a monetary investment, however, can be fixed with an award of monetary damages.  Settled Seventh Circuit precedent prevents I-Holdings from relying on alleged non-monetary harm to others as its own irreparable harm.

Even this alleged non-party irreparable harm is not – and cannot be – attributed to anything AG has (or has not) done.  For many weeks, AG has owned a substantial portion of RPG's debt under one of the two credit agreements that I-Holdings says need restructuring.  Yet I-Holdings says not one word about how AG is preventing that restructuring.  The most it can say is that AG is "working on a strategy" – *i.e.*, it is *thinking* about what it might do, but *not* actually *doing anything*.  This is not the stuff of which imminent irreparable harm is made.

By itself, the fact that I-Holdings faces no imminent irreparable harm means the TRO motion must be denied.  But there is more.  I-Holdings has not shown a sufficient likelihood of

success on the merits of its claims. For one thing, its claims are doomed on the merits because, to satisfy the actual injury requirement of each claim, I-Holdings points only to the same speculative harm to others that also foils its attempt to show irreparable harm.

I-Holdings also cannot put the "breach" in its contract claim. Its contract with AG is a "confidentiality agreement," not a standstill agreement. So although I-Holdings complains that AG purchased RPG's publicly available debt – an everyday type of market transaction – it makes no valid showing that the predicate agreement prohibited the purchases.

As for the tortious interference claim, I-Holdings fails the "reasonable expectancy" test: It alleges merely that it is "confident" that, but for AG's supposed (but unspecified) interference, RPG would be able to restructure its debt (in some unspecified, but presumably I-Holdings-promoted, manner). Under controlling law, confidence is no substitute for evidence of a "reasonable expectancy" that a specifically identified agreement would be reached. And even if I-Holdings could show a reasonable expectancy, it offers nothing but conjecture on the element of interference: Again, I-Holdings has not alleged, and cannot allege, that AG has done or will do *anything* that would constitute interference with an eventual restructuring of RPG's debt.

A plaintiff cannot obtain a TRO unless, among other things, it makes a clear showing both that it will suffer irreparable harm without the TRO and that it is likely to succeed on the merits of its claims. I-Holdings fails to show either. Nor does it show that the equities or public interest are on its side. The Court should deny the TRO motion.

## II.   BACKGROUND

### A.   I-Holdings And Its Non-Party Affiliates

RPG is an Illinois corporation that makes and sells greeting cards. (Compl. ¶10.) It is a debtor under First and Second Lien Credit Agreements (*id.* ¶¶ 16-17), and is in default on those

agreements. (*Id.* ¶ 48.) The alleged threat to RPG's ability to refinance its debt, and the risk that it will therefore go out of business, are the bases for this lawsuit, and for the TRO motion in particular. (*Id.* ¶¶ 2, 42, 56-59; TRO Memo. at 9-11.) RPG, however, is not a plaintiff here.

RPG Holdings, Inc. ("RPGH") is a Delaware corporation and the sole shareholder of RPG. (Compl. ¶ 9.) It is also a debtor in default under the First and Second Lien Credit Agreements. (*Id.* ¶¶ 16-17.) But RPGH is not a plaintiff here, either.

The plaintiff is I-Holdings. It is neither a debtor nor a greeting card company. It simply owns the shares of RPGH (which owns the shares of RPG). (*Id.* ¶¶ 8-9.) So far as the complaint and TRO papers tell us, I-Holdings does not make anything, sell anything, or employ anyone.

The corporate and debt structures of these entities, therefore, looks like this:



(*Id.* ¶¶ 4, 8-10, 16-17.)

**B.    American Greetings And Its Dealings With I-Holdings**

AG is a greeting card company based in Cleveland. (*Id.* ¶¶ 5, 14.) In May 2008, AG and I-Holdings met to discuss a possible transaction. (*Id.* ¶¶ 18-21, 30.) Before they met, they entered into a Confidentiality Agreement. (*Id.*, Ex. A.) That agreement, naturally, protected

confidential business information exchanged in the discussions against disclosure to others. (*Id.*, Ex. A.) The agreement did not, however, contain a standstill provision.[1]

### C.    American Greetings' Acquisition Of RPGH And RPG's Debt

An active, open market exists for bank debt like that created by RPGH and RPG's First and Second Lien Credit Agreements. *See, e.g.*, Anne Marrs Huber & Thomas H. Young, "The Trading of Bank Debt In and Out of Chapter 11," 15 J. Bankr. L. & Prac. 15, 15 (2006) (discussing the "significant market" for bank debt: by the end of the 1990s, "one could buy [bank debt] from virtually any bank or brokerage firm") (available on Westlaw as "15 JBKRLP 1 ART. 3"). Over five weeks ago, I-Holdings learned that AG had acquired a substantial portion of RPG's first lien debt. (Compl. ¶¶ 37-38; August 7, 2008 Transcript at 5:11-6:2 (Exhibit 2).) I-Holdings has not said that AG has done anything, since acquiring that debt, to enforce its creditors' rights. I-Holdings pleads nothing more than that AG "is presently working on a 'strategy'" – *i.e.*, it is thinking about what it may do. (Compl. ¶ 38.)

### D.    I-Holdings Files Its "Emergency" Motion

After sitting idle for weeks, I-Holdings inexplicably raced into Court on August 6th with an "emergency" TRO motion. It identified no triggering event that caused it suddenly to snap to action or that explained its previous indolence. It does assert that AG's acquisition of RPG debt violates the Confidentiality Agreement (TRO Memo. at 4); that AG wants to put RPG out of business, and so will (not "has," but "will") use its debt-holder status to block all refinancing efforts (Compl. ¶¶ 42, 57); and that this will harm RPG's "ability to continue to operate

---

[1] So-called "standstill" provisions, which are common in confidentiality agreements entered into to facilitate merger talks, explicitly prohibit the prospective acquirer from purchasing securities of the target company or making takeover proposals to the target unless expressly requested by the target. *E.g.*, 1 Martin Lipton & Erica H. Steinberger, Takeover & Freezeouts § 6.06[4], at 6-218 (2008) (Exhibit 1); *In re The Topps Co. S'holders Litig.*, 926 A.2d 58, 66, 91 (Del. Ch. 2007) (standstill agreement is commonly used "to ensure that confidential information is not misused by bidders"; here it prohibited, among other things, potential acquirer from "seek[ing] to control [potential target] in any manner" for two years).

independently in the marketplace." (*Id.* ¶ 57.) These supposed effects on non-party RPG, says I-Holdings, warrant its requested TRO. (*E.g., id.* ¶¶ 56-57, 59; TRO Memo. at 9-11.)

     **E.**    **American Greetings' August 13 Proposal**

With AG having made a roughly $40 million investment in RPG's First Lien debt, there is no rational basis for thinking AG would stand in the way of a restructuring acceptable to the other creditor constituencies. In that regard, and in line with our representations on the record at the initial hearing on this matter (August 7, 2008 Transcript at 4:13-18 (Exhibit 2)), contemporaneously with the filing of this opposition brief, AG delivered to I-Holdings what it believes is a fair and equitable proposal for RPG's restructuring. Consistent with AG's August 8, 2008 letter to the Court, AG has not communicated its proposal to the Second Lien debt holders (nor, in light of the allegations I-Holdings has now made, to any of its co-First Lien debt holders). In AG's view, however, it would be in RPG's best interests if the proposal were to be put in the creditors' hands and AG were given the opportunity to discuss it with all interested RPG constituents.

**III.**    **TEMPORARY RESTRAINING ORDER STANDARD**

"A temporary restraining order or a preliminary injunction is an extraordinary and drastic remedy, which should not be granted unless the movant carries the burden of persuasion by a clear showing." *Recycled Paper Greetings, Inc. v. Davis*, 533 F. Supp. 2d 798, 803 (N.D. Ill. 2008) (denying preliminary relief). To obtain a temporary restraining order, the moving party "must show (1) they have some likelihood of success on the merits; (2) no adequate remedy at law exists; (3) they will suffer irreparable harm which, absent injunctive relief, outweighs the harm the non-movant will suffer if the [restraining order] is granted; and (4) the [restraining order] will not harm the public interest." *SMC Corp., Ltd. v. Lockjaw, LLC*, 481 F. Supp. 2d 918, 924 (N.D. Ill. 2007); *see also, e.g., Long v. Bd. of Edu., Dist. 128*, 167 F. Supp. 2d 988, 990

(N.D. Ill. 2001). The Court employs a "sliding scale" analysis, so that the weaker plaintiff's

showing of irreparable harm, the stronger its showing of likelihood of success on the merits must

be, and vice versa. *Lockjaw*, 481 F. Supp. 2d at 924.[2]

## IV.    I-HOLDINGS HAS NOT CLEARLY SHOWN THAT IT WILL BE IRREPARABLY HARMED WITHOUT THE TRO.

"Perhaps the single most important prerequisite for the issuance of a [TRO] is a

demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a

decision on the merits can be rendered . . . ." 11A Charles Alan Wright, *et al.*, Fed. Prac. & Proc.

§ 2948.1 (2d ed. 1995). If the moving party fails to show that it will suffer irreparable harm

without the TRO, then the Court's work is done and the motion must be denied. *Praefke Auto

Elec. & Battery Co., Inc. v. Tecumseh Prods. Co., Inc.,* 255 F.3d 460, 463 (7th Cir. 2001) (where

irreparable harm is not shown, preliminary injunction should be denied "on this ground alone").

Here, while I-Holdings has made a woefully insufficient showing as to likelihood of

success on the merits and the other TRO factors, it has shown zero likelihood that it will suffer

irreparable harm if its motion is denied. Because the failure on this threshold requirement ends

the Court's inquiry, we address it first. *See First Am. Real Estate Solutions, L.P. v. Moore*, No. 05

C 2300, 2005 WL 1910902, at *3 (N.D. Ill. Aug. 10, 2005) ("Court need not address the

remaining factors" when irreparable harm is not shown).

### A.    The Supposed Irreparable Harm Would Not Occur To I-Holdings.

The irreparable harm that supposedly would occur without a TRO is that non-plaintiffs

RPGH and RPG may be unable to refinance their debt, which may cause RPG to go out of

---

[2] A TRO also should be granted only when it will preserve the status quo. *See Am. Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1330 (7th Cir. 1980) The TRO I-Holdings requests, however, would require AG to take affirmative actions that could not be undone – *i.e.*, it would alter the status quo and award final relief. (Proposed TRO.) Even in its prohibitory features, I-Holdings' proposed order seeks relief that would continue in effect through mid-May 2010, much longer than even an otherwise justified TRO could last under any circumstances. (*Id.*)

- 6 -

business. (TRO Memo. at 9-11.) Indeed, I-Holdings' affidavit speaks only of "*RPG's restructuring efforts [being] unsuccessful*" and "*irreparable harm to RPG's ability to continue to operate independently.*" (Affidavit of Charles Yoon, Ex. 1 to TRO Memo. ("Yoon Aff."), ¶¶ 29, 37 (emphasis added).) I-Holdings cannot rely on this alleged harm to someone else to satisfy its own irreparable harm requirement. *Great Lakes Higher Edu. Corp. v. Cavazos*, 698 F. Supp. 1464, 1475 (W.D. Wisc. 1988) (the burden to demonstrate irreparable harm "is not satisfied by harm to a third party") (citing *Am. Dairy Queen Corp. v. Brown-Port Co.*, 621 F.2d 255, 259 n.4 (7th Cir. 1980)).

In *Dairy Queen*, a lessee (DQ) sought a preliminary injunction against a lessor to enforce a exclusive right to operate a fast-food retail store on the leased premises. DQ had subleased the property to GNR, which did not join the suit. *Id.* at 256-57. The district court issued the preliminary injunction, reasoning "that because of the sublessor-sublessee relationship . . ., DQ could assert and rely upon GNR's likely destruction absent the preliminary injunction to satisfy the" irreparable harm element. *Id.* The Seventh Circuit reversed, holding that "an injunction whether preliminary or permanent may issue only if DQ persuades the court that DQ will suffer substantial injury . . . if the injunction is denied." *Id.* at 258. The Seventh Circuit established the general rule that "the 'no adequate remedy at law/irreparable injury' prerequisite is not satisfied by the harm that may befall a nonparty." *Id.* at 259 n.4.

Here, the supposed irreparable harm would occur (if at all) only to non-parties RPGH and RPG.[3] It makes no difference that I-Holdings is their parent: "It is manifest that a subsidiary

---

[3] At the initial August 7 hearing on this matter, counsel for I-Holdings relied on this Court's decision in *SMC Corp., Ltd. v. Lockjaw, LLC*, 481 F. Supp. 2d 918 (N.D. Ill. 2007), as support for the TRO motion. In *Lockjaw*, however, the moving plaintiff was a distribution and sales company that had customer relationships, and the Court found that the plaintiff had made a clear showing of "irreparable injury to its customer relations and goodwill." 481 F. Supp. 2d at 921, 928. Here, by contrast, I-Holdings has not shown that it makes, distributes, or sells anything, has any customer relationships, or has any commercial goodwill to be protected.

and its parent are separate and distinct entities." *Fed. Ins. Co. v. Parello*, 767 F. Supp. 157, 160

(N.D. Ill. 1991). It is settled beyond doubt that a parent company cannot claim an injury to a

subsidiary as its own.[4]

If there were any potential harm to I-Holdings itself here (and that is a big "if"), it could

be adequately remedied by money damages. As a shareholder of RPGH, and an indirect

shareholder of RPG, I-Holdings' only conceivably injury would be harm to its investment – *i.e.*,

diminution in the value of its shares. That harm (if it actually existed) would yield to a damages

award. *Praefke Auto*, 255 F.3d at 463 (losses that "are purely financial, easily measured, and

readily compensated" are not irreparable); *Special Situations Cayman Fund, L.P. v. Dot Com

Entm't Group, Inc.*, No. 03-CV0811E(F), 2003 WL 23350128, at *2 n.16 (W.D.N.Y. Dec. 5,

2003) (denying preliminary injunction motion because "plaintiffs' ultimate harm would be a loss

in stock value, which may be adequately remedied by money damages").[5]

**B.    Even The Supposed Harm To Others Is Too Speculative.**

Not only would any supposed irreparable harm befall non-parties; it has not been shown

likely to occur in the first place. I-Holdings does not contend that AG has actually blocked, or

said it will block, any refinancing efforts. It only speculates about what AG *might* do, based on

---

[4] "[T]he commission of a tort or other wrong . . . against a corporation is not the infringement of a legally protected interest of its parent corporation . . . and so [the parent corporation] can't sue to redress it." *DePuy, Inc. v. Zimmer Holdings, Inc.*, 384 F. Supp. 2d 1237, 1239 (N.D. Ill. 2005) (Posner, J., sitting by designation)). *See also, e.g., Schenley Distillers Corp. v. United States*, 326 U.S. 432, 433-35 (1946) (parent company lacked standing to sue to overturn order denying subsidiary's application for interstate carrier permit, even though parent owned all of subsidiary's stock and managed and controlled subsidiary).

[5] By I-Holdings' own admissions, RPG is most likely insolvent (or in the insolvency zone). That means there are fiduciary duties owed to RPG's creditors, including American Greetings. *See Geyer v. Ingersoll Pub. Co.*, 621 A.2d 784, 787-90 (Del. Ch. 1992) (holding that fiduciary duties to creditors arise when a company is unable to pay its debts as they come due); *Credit Lyonnais Bank Nederland, N.V. v. Pathe Comm's Corp.*, No. 12150, 1991 WL 277613, at *34 n.55 (Del. Ch. Dec. 30, 1991) (similar). RPG's absence as a plaintiff may well be explained by a belief that, given these serious fiduciary responsibilities, the risk of liability exposure to RPG's directors is too great for them to authorize RPG's participation, whereas I-Holdings may see itself (questionably, we believe) as more insulated. AG reserves its rights to assert claims based on the fiduciary duties owed to it.

its "belief" about AG's intentions. (TRO Memo. at 11; Compl. ¶ 58; Yoon Aff. ¶¶ 38, 43.) That speculation does not – especially in the face of AG's own major investment in RPG – establish a real risk of irreparable harm.

"[I]njunctive relief is not warranted" when "the asserted irreparable injury is merely speculative." *Int'l Union, Allied Indust. Workers of Am. v. Local Union No. 589*, 693 F.2d 666, 674 (7th Cir. 1982). The Seventh Circuit has reversed a preliminary injunction as "premature" when the alleged irreparable harm was based on an assumption about future events. *Singer Co. v. P.R. Mallory & Co., Inc.*, 671 F.2d 232, 235 (7th Cir. 1982) (reversing preliminary injunction that prohibited Singer from prosecuting Patent and Trademark Office application that, if approved, would have injured Mallory, because irreparable harm was "clearly speculative" in that "[t]he Patent Office . . . might well deny Singer's" application). In the analogous context of ripeness, other courts have rejected speculation about defendant-competitors' future conduct based on the same motive I-Holdings alleges AG has here. *See Warner Cable Communications, Inc. v. City of Niceville*, 911 F.2d 634, 640-42 (11th Cir. 1990) (city's dual role as "regulator and competitor" of cable company did not create ripe claim because, although cable company had "legitimate concerns," it failed to show that city had taken or threatened adverse regulatory action or would necessarily deny any future regulatory requests).

Here, too, I-Holdings alleges only that it believes AG may take some action in the future that may harm RPG. Even though AG has allegedly held RPG's debt for many weeks now (Yoon Aff. ¶¶ 26-27), I-Holdings cannot allege that AG has done anything more than think about what it might do. (*Id.* ¶ 27.)[6] And I-Holdings has offered nothing to demonstrate that AG has

---

[6] This delay of several weeks between when I-Holdings learned that AG had acquired the debt and its filing of the TRO motion belies I-Holdings' claimed need for extraordinary relief to prevent imminent harm. *E.g., Shaffer v. Globe Protection, Inc.*, 721 F.2d 1121, 1123 (7th Cir. 1983) (delay of two months before moving for preliminary injunction "is inconsistent with a claim of irreparable injury").

made, or will make, competitive use of any alleged confidential information to which it supposedly has access. Speculation about what might (and might not) happen in the future does not establish a risk of irreparable harm that warrants protection by the extraordinary remedy of a temporary restraining order.[7]

## V.    I-HOLDINGS HAS NOT ESTABLISHED IT IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS

Even if the Court were somehow to find that I-Holdings had established a real risk of irreparable harm to it, the Court should still deny the TRO motion because I-Holdings has not shown a sufficient likelihood of succeeding on the merits.

### A.    I-Holdings Has Not Shown It Is Likely To Establish An Injury To Support The Merits Of Either Cause Of Action.

The complaint asserts two causes of action: breach of contract and tortious interference. (Compl. ¶¶ 60-68, 80-84.)[8] I-Holdings acknowledges, as it must, that actual injury is an element it must prove to prevail on the merits of either claim. (TRO Memo. at 3 n.1.) In arguing likelihood of success, I-Holdings expressly relies on the same alleged injury on which it relies for irreparable harm. (*Id.*) As explained above, however, that injury would occur (if at all) only

---

[7] In a footnote, I-Holdings suggests that, under Delaware law, the "irreparabl[e] damage[ ]" and "specific performance" acknowledgement in the Confidentiality Agreement discharges its burden to prove irreparable harm. (TRO Memo. at 9 n.3.) That half-hearted footnote argument falls short for two reasons: (1) this motion is to be decided under federal, not Delaware, law, *Minn. Power & Light Co. v. Hockett*, No. 00-1898, 2001 WL 873823, at *2-*5 (7th Cir. Aug. 1, 2001), and under federal law, a before-the-fact contractual acknowledgement of irreparable harm is "not conclusive in the determination of ongoing irreparable harm," *Baskin-Robbins Inc. v. Patel*, 264 F. Supp. 2d 607, 611 (N.D. Ill. 2003); *accord, e.g., Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1266 (10th Cir. 2004) (similar); and (2) the provision on which I-Holdings relies is directed to entirely different circumstances, and hardly constitutes an acknowledgement by AG that irreparable harm exists in the situation now being presented. In the cited provision, each party acknowledges only "that the other party *may be*" – not "will be" – "irreparably damaged by any *unauthorized disclosure of any Confidential Information*." (Confidentiality Agreement, Ex. A to Compl., ¶ 3 (emphasis added).) The supposed irreparable harm I-Holdings seeks to prevent here (improperly, on behalf its subsidiaries) is future interference with refinancing efforts, not future disclosure of confidential information. (TRO Memo. at 9-11.)

[8] There is a third count titled "Specific Performance of Contractual Obligation." (Compl. at 13 (Count II).) Specific performance, however, is a remedy, not a cause of action.

to others, namely RPGH and RPG. (See pages 6-8, above.) I-Holdings cannot base a successful

cause of action on alleged injuries to its subsidiaries. (See note 4 on page 8 above.)

**B.      I-Holdings Has Not Shown It Is Likely To Establish A Breach Of The**
**        Confidentiality Agreement.**

To establish a breach of contract, I-Holdings must also prove, among other things, a

breach by AG. *E.g., H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003). I-

Holdings has not shown a sufficient likelihood that it can do that.

AG supposedly breached the Confidentiality Agreement by contacting RPG's lenders.

(Compl. ¶ 65; TRO Memo. at 4.) But AG's alleged conduct in the course of buying RPG's

publicly available debt is unrelated to the purpose and plain terms of the agreement. The

Confidentiality Agreement was entered into "[i]n connection with a possible transaction"

between I-Holdings and AG. (Confidentiality Agreement, Ex. A. to Compl., at 1.) Paragraph

Eight, which was supposedly breached, is addressed to disclosures to others about the parties'

discussions. It begins by requiring all communications about the possible "Transaction" (a term

without a meaningful definition) to be directed to the person designated by each side for that

purpose. (*Id.* ¶ 8.) It then prohibits the parties from revealing to others that confidential

information is being shared and a possible "Transaction" is being discussed. (*Id.*) Qualified by

all of this, it then imposes a limited restriction on each side's ability to contact certain people

who, based on their relationship with the other side, could be spooked upon learning about a

potential "Transaction" – such as the other side's employees, suppliers, customers, and lenders.

(*Id.*) But this restriction has a limitation: It applies only "*other than* in the ordinary course of [a]

Party's business and not related in any way to such Party's consideration of a Transaction." (*Id.*

(emphasis added).)

AG's purchase of RPG's bank debt in the open market for such instruments lacked the

necessary connection to the possible "Transaction" with I-Holdings that was the subject of the Confidentiality Agreement or to any confidential information. That purchase occurred in market transactions, the kind that happen many times every day. *See, e.g.,* Huber & Young, *supra* page 4, at 15 ($117 billion in activity occurred on secondary bank debt market in 2001). I-Holdings does not allege that AG, in purchasing RPG's debt, communicated to anyone that I-Holdings had disclosed confidential information to, or was discussing a potential transaction with, AG. I-Holdings has not shown a likelihood of establishing that the Confidentiality Agreement prohibited AG acquisition of RPG's debt, or that AG otherwise breached the agreement in the course of that acquisition.[9]

### C. I-Holdings Has Not Shown It Is Likely To Establish A Reasonable Expectancy Of A Business Relation Or Interference By American Greetings.

I-Holdings has not shown that it is likely to establish three other required elements of its claim for tortious interference with prospective economic advantage.

#### 1. I-Holdings Has Not Shown A Likelihood Of Proving A Reasonable Expectancy Of Prospective Business Relations.

To be likely to succeed on its tortious interference with prospective business relations claim, I-Holdings must show that it is likely to establish, among other things, a "reasonable expectancy of entering into a valid business relationship" with RPGH and RPG's creditors. (*See* TRO Memo. at 5 (listing elements).) Even if I-Holdings' allegations are read as if they asserted that I-Holdings itself expected to participate directly in the refinancing relationship, those allegations would still fail to demonstrate a sufficient likelihood of success in proving a "reasonable expectancy of entering to a valid business relationship."

---

[9] Again, if I-Holdings had intended to prevent AG from acquiring RPG's debt in the market, then it could, and surely would, have insisted on a "standstill" agreement. (See note 1 on page 4, above.) I-Holdings, however, did not require AG to sign a standstill agreement. Its argument here is an attempt to bootstrap into the Confidentiality Agreement a standstill provision for which the parties never bargained.

The expectancy required to support this claim must both be anchored in specifics and be "more than a mere hope." *Quadro Enters., Inc. v. Avery Dennison Corp.*, No. 97 C 5402, 2000 WL 1029176, at *10 (N.D. Ill. July 26, 2000). "This tort requires more than a general expectation of doing business." *Bodenstab v. J.R. Blank & Assoc's., Inc.*, No. 88 C 555, 1990 WL 139139, at *6 (N.D. Ill. Sept. 14, 1990). "Indeed, the cases typically address situations where . . . the parties were at the threshold of establishing a contractual relationship." *Id.*

Here, I-Holdings says it was "confident that, the initial defaults notwithstanding, RPG's debt would be successfully restructured." (Compl. ¶ 50.) But it provides no specifics whatsoever about what the supposed restructuring would be, much less any details about the state of any negotiations – what issues (if any) had been resolved; what issues remained – that would likely prove its asserted confidence in its own (unspecified) deal to be well-placed. Without more, "confidence" in a successful restructuring is just another word for "hope" that others would like I-Holdings' proposal.

The "reasonable expectancy" cases on which I-Holdings relies are inapt. Those cases all involved some existing relationship that the plaintiff could reasonably have expected to continue, or some initial agreement that the plaintiff could reasonably have expected to blossom.[10] Here, in sharp contrast, I-Holdings has no existing relationship with the creditors to continue; to the contrary, "restructuring" inherently means change. What's more, none of those cases involves a relationship like the one here between an equity holder in a company and the company's debt holders. Unlike the relationship between the client and law firm in *Dowd & Dowd*, for example,

---

[10] TRO Memo. at 6-7 (citing *River Park, Inc. v. City of Highland Park*, 281 Ill. App. 3d 154, 667 N.E.2d 499 (2d Dist. 1996) (obtaining permit to develop golf course created sufficient expectancy to support claim against city that usurped development opportunity); *Dowd & Dowd, Ltd. v. Gleason*, 284 Ill. App. 3d 915, 672 N.E.2d 854 (1st Dist. 1996) (law firm's 14-year relationship with client created sufficient expectancy to support claim against a departing member of the firm); *Fishman v. Estate of Wirtz*, 807 F.2d 520 (7th Cir. 1987) (executed contract to buy basketball team, subject to league approval, created sufficient expectancy to support claim against team's former owner).)

the interests in the relationship between an equity holder and creditor – who essentially have their eyes on the same prize: the debtor company's assets – are not necessarily (and often not at all) aligned, and that relationship is not necessarily intended to renew indefinitely, particularly where, as here, a default has already occurred.

> ## 2. I-Holdings Has Not Demonstrated A Likelihood Of Proving Interference Or Injury.

I-Holdings also has not shown it is likely to establish actual interference with a business expectancy or a resulting injury. As explained above, even though AG has allegedly owned the debt for several weeks now, I-Holdings cannot identify anything AG has done, or threatened to do, to interfere with any refinancing efforts. (See pages 8-10, above.) I-Holdings therefore has not shown it is likely to establish actual interference. With no interference, I-Holdings also is not likely to establish an injury.

## VI. THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST DO NOT FAVOR ISSUING THE RESTRAINING ORDER.

Because I-Holdings faces no risk of irreparable harm if its motion is denied, there are no equities in its favor to balance against any potential harm to AG. I-Holdings thus falls short of the mark on the TRO balance of equities factor.

Nor would a TRO serve the public interest. I-Holdings wants a TRO because it believes that would serve its own interests as the indirect holder of equity in RPG, shielding it from competing sources of restructuring for RPG. But that is not necessarily what is best for RPG itself and its ongoing business, or for RPG's debt holders (even putting aside AG). Indeed, AG has now made a proposal for restructuring RPG's debt. Surely the segment of the public with the most direct interests here would be well-served if they were all allowed to consider and discuss that proposal, a process that I-Holdings' TRO would prevent.

CLI-1641126v1

## VII.    CONCLUSION

For these reasons, the Court should deny I-Holdings' motion for a temporary restraining

order.

Dated:  August 13, 2008                    Respectfully submitted,


                                           /s/ Lee Ann Russo
Of Counsel:                                Lee Ann Russo
David F. Adler                             larusso@jonesday.com
Pearson N. Bownas                          Mark P. Rotatori
JONES DAY                                  mprotatori@jonesday.com
North Point                                JONES DAY
901 Lakeside Avenue                        77 W. Wacker Drive
Cleveland, Ohio 44114-1190                 Chicago, Illinois 60601-1692
(216) 586-3939                             (312) 782-3939

                                           John M. Newman, Jr.
                                           jmnewman@jonesday.com
                                           JONES DAY
                                           North Point
                                           901 Lakeside Avenue
                                           Cleveland, Ohio 44114-1190
                                           (216) 586-3939

                                           Counsel for Defendant
                                           AMERICAN GREETINGS CORPORATION

CLI-1641126v1

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I have caused a true and correct copy of the above and foregoing

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR**

**TEMPORARY RESTRAINING ORDER** to be served, as indicated, by electronic means

through CM/ECF and by first class mail upon the person named below on this 13th day of

August, 2008.

> Michael F. Braun, Esq.
> James L. Komie, Esq.
> Robert D. Snow, Jr., Esq.
> Schuyler Roche, P.C.
> One Prudential Plaza
> Suite 3800
> 130 East Randolph Street
> Chicago IL 60601

>                    /s/ Lee Ann Russo
>                    Lee Ann Russo

# EXHIBIT 1

# TAKEOVERS
# &
# FREEZEOUTS

## VOLUME 1

by

**Martin Lipton and Erica H. Steinberger**

**2008**

(Date originally published: 1978)

**Law Journal Press**
**105 Madison Avenue**
**New York, New York 10016**
*www.lawcatalog.com*

#00551
(Rel. 46)

**All Rights Reserved.**
Copyright © 1978, 1979, 1984, 1986, 1987, 1988,1989, 1990, 1991,
1992, 1993, 1994, 1995, 1996, 1997, 1998, 1999, 2000,
2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008
Martin Lipton and Erica H. Steinberger

**VISIT OUR WEB SITE AT**
**www.lawcatalog.com**

**Library of Congress Cataloging-in-Publication Data**
ISBN 978-1-58852-005-0

Lipton, Martin.
  Takeovers and Freezeouts
  Bibliography: p.
1. Tender offers (Securities)—Law and legislation—
United States. I. Steinberger, Erica H., Joint author. II. Title
  KF1477.L56        346´.73´0062      78-26095

§ 6.06[4]        TAKEOVERS & FREEZEOUTS        6-218

A standstill agreement may also be part of a confidentiality agreement between a target and a potential acquiror, in a negotiated transaction, or between a target and a White Knight, where a hostile third-party bid has been made. The agreement permits the potential acquiror to evaluate material information but prevents the purchase of target shares without approval:

> . . . these agreements promote the free exchange of information between business entities who are considering the possibility of mutually agreeable business combinations. They promote maximization of the value offered to shareholders of target companies by promoting friendly combinations without duly restricting the possibility of bidding contests. They permit the acquiring company to have a reasonable period of time in which to evaluate the target company. They also allow the target company to obtain the interest of more than one acquiring company and to select the most opportune time to sell the company. Such arrangements are relied upon by the investment banking industry and the business community.[137]

In addition, a target may enter into a standstill agreement as the result of the settlement of litigation, or in an attempt to avoid litigation, with a raider who has already accumulated shares. The settlement may permit the target to repurchase the shares or permit the raider to maintain its minority interest. In either case, the target generally wishes to

---

Note a somewhat unusual use of a standstill agreement in connection with Crouse-Hinds' acquisition of Belden Corporation in the face of a hostile bid for Crouse-Hinds Company by InterNorth, Inc. After the Crouse-Hinds Board determined the InterNorth offer was inadequate, it moved to accelerate its deal with Belden. The Belden transaction was changed from a merger to an exchange offer to be followed by a merger. As part of the change, Crouse-Hinds agreed to a standstill agreement in the event that the exchange offer was consummated but the subsequent merger was not. See Crouse-Hinds' prospectus, dated October 3, 1980, relating to the Exchange Offer for shares of Belden Corporation. The standstill agreement was part of the "Exchange Agreement" described on page 12 of the Prospectus.

[137] General Portland Inc. v. LaFarge Coppee S.A., CCH Fed. Sec. L. Rep. ¶ 99,148 (N.D. Tex. Aug. 28, 1981). See discussion of confidentiality agreements at § 6.06[4][b] supra.

# EXHIBIT 2

1

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3
    RPG INVESTMENT HOLDINGS, LLC,    )
 4  a Delaware Limited Liability     )
    Company,                         )
 5                                   )
                         Plaintiff,  )
 6  -vs-                             )   Case No. 08 C 4422
                                     )
 7  AMERICAN GREETINGS CORP., an     )   Chicago, Illinois
    Ohio Corporation,                )   August 7, 2008
 8                                   )   10:09 a.m.
                         Defendant.  )
 9

10                  TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE RUBEN CASTILLO
11
    APPEARANCES:
12
    For the Plaintiff:     MR. MICHAEL F. BRAUN
13                         MR. ROBERT D. SNOW, JR.
                           Schuyler, Roche & Zwirner
14                         130 East Randolph Street
                           Suite 3800
15                         Chicago, IL  60601
                           (312) 565-2400
16
    For the Defendant:     MS. LEE ANN RUSSO
17                         JONES DAY
                           77 West Wacker Drive
18                         Chicago, IL 60601
                           (312) 782-3939
19

20

21  Court Reporter:

22            KATHLEEN M. FENNELL, CSR, RMR, FCRR
                    Official Court Reporter
23              United States District Court
           219 South Dearborn Street, Suite 2144-A
24                 Chicago, Illinois  60604
                  Telephone:  (312) 435-5569
25          email:  Kathleen_Fennell@ilnd.uscourts.gov
```

2

```
1   APPEARANCES:   (Continued)

2   For the Defendant:      MR. JOHN M. NEWMAN, JR.
                            Jones Day
3                           901 Lakeside Avenue
                            Cleveland, OH  44114
4                           (216) 586-3939

5   Also Present:           MR. ABID QURESHI
                            Akin, Gump, Strauss, Hauer & Feld, LLP
6                           590 Madison Avenue
                            New York, NY  10022
7                           (212) 872-1000

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1    defendant.  When did you do that?

2         MR. BRAUN:  Yesterday afternoon, your Honor, when we

3    found out that this Court could hear us today.

4         THE COURT:  Okay.  What's the defendant's position on

5    the emergency motion?

6         MR. NEWMAN:  Your Honor, the defendant's position is

7    that there is no basis whatsoever for emergency relief that's

8    offered in any of the papers, and I can explain that further,

9    but there simply is no basis.  There's no event that's

10   impending, no -- that is being somehow forestalled, no event

11   that's impending that needs to be stopped or anything like

12   that.

13        This is a situation in which the plaintiff, which is

14   an equity holder, is wanting to protect its interests.  There

15   are debt holders' interests as well.  We're a debt holder, so

16   there's a commercial dispute, and we'd like to make some

17   proposals for restructuring, and we will, although the effort

18   here is to preclude us from talking to other debt holders.

19        THE COURT:  Okay.

20        MR. BRAUN:  May I respond, your Honor?

21        THE COURT:  Sure.

22        MR. BRAUN:  Your Honor, counsel's representation as

23   to what's happening here is a little bit off.  American

24   Greetings isn't simply a debt holder here.  It's our prime

25   competitor, and they became a debt holder in clear violation

5

1  of an agreement that they entered into with our client that
2  said they wouldn't contact our lenders.
3         Within six weeks of signing an agreement saying they
4  wouldn't contact our lenders, they went out and bought up
5  51 percent of our debt.
6         THE COURT:  When was the agreement reached?
7         MR. BRAUN:  Pardon me, your Honor?
8         THE COURT:  When was the agreement reached?
9         MR. BRAUN:  When was the agreement reached?  May 16th
10 of this year, your Honor.
11        THE COURT:  And when do you think the violation
12 occurred?
13        MR. BRAUN:  We learned of the violation, your Honor,
14 sometime in late June or early July that they were acquiring
15 our debt.
16        THE COURT:  Late June or early July.
17        MR. BRAUN:  Correct, your Honor.
18        THE COURT:  Okay.  Why is it that you're here right
19 now in early August?
20        MR. BRAUN:  Your Honor, we are in the process of
21 restructuring our debt.  We tried to restructure our debt
22 without having to seek judicial involvement.  That would have
23 been our preference, your Honor.
24        We're stymied.  We can't restructure our debt because
25 American Greetings is out there holding the majority of the

1    debt in violation of the confidentiality agreement that they

2    signed with us.

3         THE COURT:  If that is the case, if that is the case,

4    why wouldn't this be a damage case?

5         MR. BRAUN:  Because, your Honor, if we can't

6    restructure our debt, there is a very, very real likelihood

7    that, one, we're going to lose business opportunities with

8    respect to new clients that we'd want to sell our greeting

9    cards to.

10        Two --

11        THE COURT:  That happens all the time.

12        MR. BRAUN:  But the loss -- as your Honor recognized

13   in the *Lockjaw* opinion last year, the loss of customers, the

14   loss of business and the loss of good will are recognized by

15   this Court and by the 7th Circuit as being the type of

16   irreparable harm that warrants injunctive relief.

17        THE COURT:  Okay.

18        MR. BRAUN:  Okay?  The other possibility, your Honor,

19   is that we get put out -- is that we get put out of business.

20   And, again, *Lockjaw* and the 7th Circuit recognize that as

21   irreparable harm.

22        Essentially, your Honor, American Greetings has a gun

23   that's loaded, cocked, and the finger's on the trigger, and

24   that gun is pointed at my client's head.  They can't get --

25   they can't get new investors because they're holding the