**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| RPG INVESTMENT HOLDINGS, LLC, a Delaware Limited Liability Company, <br><br> Plaintiff, <br><br> v. <br><br> AMERICAN GREETINGS CORP., An Ohio Corporation, <br><br> Defendant. | 08-cv-4422 |

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF RPGI'S EMERGENCY
MOTION FOR A TEMPORARY RESTRAINING ORDER**

The informal group (the "Second Lien Group")[1] of certain unaffiliated lenders under the Second Lien Credit Agreement (as defined herein) hereby files this memorandum of law in opposition to the portion of plaintiff RPG Investment Holdings, LLC's ("RPGI") Emergency Motion for a Temporary Restraining Order (the "TRO Motion") seeking to enjoin defendant American Greetings Corp. ("AG") from (i) contacting the lenders of non parties Recycled Paper Greetings, Inc. ("RPG") or RPG Holdings, Inc. ("RPG Holdings," and, collectively with RPG, the "Companies"), or (ii) exercising rights under the First or Second Lien Credit Agreements (as defined herein).

**PRELIMINARY STATEMENT**

The plaintiff in this litigation, RPGI, is the beneficial equity holder of RPG, the operating company in which the Second Lien Group holds more than 97% of second lien loans. RPG is

---

[1] The institutions composing the Second Lien Group are funds managed by AEA Investors LLC, Guggenheim Investment Management, LLC, Plainfield Asset Management LLC, and Camulos Capital LP.

facing tough times. It is currently in default under its credit agreements and it has recognized that it faces a competitive disadvantage in the marketplace because of a significantly over-leveraged capital structure. Yet in the face of these circumstances, plaintiff RPGI seeks an order that would prevent potentially productive discussions among RPG's principal stakeholders and that could lead to a successful out-of-court restructuring. At this critical juncture, open communications among all of RPG's stakeholders are necessary and must not be impeded.

Plaintiff's motivation for bringing this potentially ruinous proceeding is clear. As the beneficial equity holder of a company whose value may not exceed the amount of all of its debt, plaintiff probably has no remaining economic interest in RPG to show for a significant equity investment. Thus, through this litigation, plaintiff shoots its two remaining bullets: one aimed at forcing parties to deal exclusively with it to the exclusion of RPG's largest senior creditor, and the other aimed at extracting value through purported contract damages and tortious interference theories in the event no value comes through its equity interest.

With respect to the damages theory, plaintiff's need for a temporary restraining order is belied by its own delay in bringing the litigation. At the August 7, 2008 hearing, plaintiff's counsel was asked by the Court "when do you think the violation occurred?", to which counsel replied, "[w]e learned of the violation, your Honor, sometime in late June or early July that they were acquiring our debt." *See* Transcript of the Proceedings held before the Hon. Ruben Castillo on August 7, 2008 ("Hrg. Tr."), p. 5:11-15. If AG's purported activities were truly posing irreparable harm to plaintiff, RPG or RPG's constituents, plaintiff or RPG would have brought this action long ago.

With respect to the relevance of this litigation on the all-important restructuring negotiations, one should consider the spurious allegations sprinkled throughout the Complaint.

2

Plaintiff alleges that RPG's restructuring efforts "almost certainly, would have been resolved successfully and in private had AG not interfered with RPG's lending relationships." Compl. ¶ 41.  The Second Lien Group regrets to report that little progress had been made in restructuring efforts prior to the referenced June-July time-frame of AG's alleged activities.  Similarly, no meaningful progress can be reported during the past several weeks, largely for the reason that plaintiff's threats of litigation, and now actual litigation, have prevented free dialogue among all of the major creditor constituencies, including, specifically, AG.  A consensual out-of-court restructuring simply cannot happen without direct meaningful discussions amongst _all_ parties.  Indeed, given its meager economic stake in RPG, plaintiff is the party least entitled to dictate who deserves a seat at the table.  Accordingly, plaintiff's request to restrain defendant AG from communicating with RPG's second lien lenders, including the Second Lien Group, and from exercising rights that would allow it to accomplish an out-of-court restructuring, must be denied.

## **RELEVANT FACTUAL BACKGROUND**

Plaintiff RPGI is the sole shareholder of RPG Holdings, which is the sole shareholder of RPG.  Upon information and belief, RPGI is controlled by its majority shareholders Monitor Clipper Equity Partners II, L.P. and Monitor Clipper Equity Partners (NQP) II, L.P. (collectively "Monitor Clipper") which, for all intents and purposes, exercise operating control over RPG.

Defendant AG purportedly controls more than 50% of the debt issued under the First Lien Credit Agreement dated as of December 5, 2005 among RPG Holdings, RPG, the First Lien Lenders, and Credit Suisse, Cayman Islands Branch, as administrative agent and as collateral agent (the "First Lien Credit Agreement").  The First Lien Credit Agreement is secured by a first priority lien on substantially all of the assets of RPG, RPG Holdings, and RPG's subsidiaries.

The Second Lien Group is comprised of certain unaffiliated lenders under the Second Lien Credit Agreement, dated as of December 5, 2005, among RPG Holdings, RPG, the Second Lien Lenders, and Credit Suisse, Cayman Islands Branch, as administrative agent and as collateral agent[2] (the "Second Lien Credit Agreement," and, collectively with the First Lien Credit Agreement, the "Credit Agreements"). The Second Lien Credit Agreement is secured by a second priority lien on substantially all of the assets of RPG, RPG Holdings, and RPG's subsidiaries. Members of the Second Lien Group control more than 97% of the debt issued under the Second Lien Credit Agreement.

RPG and RPG Holdings are currently in default under both the First and Second Lien Credit Agreements. Upon information and belief, in or about March 2008, RPG acknowledged that it was suffering from a significantly over-leveraged capital structure. In an effort to solve these problems, RPG and certain of its principal stakeholders attempted to engage in negotiations, resulting in six separate restructuring proposals made during April, June and July 2008: (i) a proposal of RPG, dated April 24, 2008; (ii) a proposal of the Second Lien Group, dated June 19, 2008; (iii) a proposal of RPG and RPG Holdings (which was supported by RPGI), dated July 15, 2008; (iv) a proposal of AG, dated July 25, 2008; (v) a proposal of Credit Suisse, in its capacity as agent under the First Lien Credit Agreement, dated July 29, 2008; and (vi) a proposal by the Second Lien Group, dated August 2, 2008. Each of these proposals (including the proposal made by RPG and RPG Holdings and supported by RPGI) assumed that the Companies' Second-Lien Debt was the fulcrum debt obligation in the Companies' capital structure, and attributed no economic value to RPGI's indirect equity interest in RPG. The volume of proposals evidences the desire of numerous parties to interface in a meaningful

---

[2] Pursuant to a Successor Agent Agreement dated June 2, 2008, Wells Fargo Bank, National Association succeeded Credit Suisse as the administrative and collateral agent under the Second Lien Credit Agreement.

4

manner. However, the threat by RPGI of litigation, and now the commencement of actual litigation and the specter of a temporary restraining order has thoroughly frustrated the ability of the parties to have any meaningful negotiations.

On August 6, 2008, RPGI filed its complaint in this action, asserting claims against AG for breach of contract and tortious interference of contractual and beneficial relations, and demanding specific performance of contractual obligations. RPGI alleges in the complaint that AG has breached a confidentiality agreement it entered into with RPGI in May 2008 by, among other things, contacting RPG's lenders for the purpose of acquiring over 50% of RPG's First Lien Debt. In connection with the complaint, RPGI seeks, by way of the TRO Motion, a temporary restraining order enjoining AG from contacting any of RPG's lenders, or exercising any rights or remedies afforded by the First and Second Lien Credit Agreements.

Following a hearing on the TRO Motion held on August 7, 2008, AG agreed that it would not communicate with holders of the second lien debt, including the Second Lien Group, through and including August 19, 2008. Accordingly, the possibility of a potential out-of-court restructuring of RPG's balance sheet has been further significantly frustrated.

The problems of over-leverage recognized by RPG and its advisors in March has become more acute with the passage of time. Accordingly, the delay in meaningful discussions between RPG's two largest creditor groups resulting from RPGI's tactical litigation strategy is causing irreparable harm to the second lien lenders of RPG.

**ARGUMENT**

I. **RPGI WILL SUFFER NO HARM IF AG IS PERMITTED TO COMMUNICATE WITH SECOND-LIEN LENDERS AND EXERCISE RIGHTS UNDER THE CREDIT AGREEMENTS**

As RPGI correctly states, a moving party must show (among other elements not addressed here) that it faces a threat of irreparable harm absent an injunction. *See* TRO Motion p. 2 (*citing Foodcomm Int'l v. Barry,* 328 F.3d 300, 303 (7th Cir. 2003); *AlliedSignal, Inc. v. B.F. Goodrich Co.*, 183 F.3d 568, 573 (7th Cir. 1999)). Indeed, a showing of irreparable harm in the absence of injunctive relief by the party requesting such relief is "[p]erhaps the single most important prerequisite" in determining whether such relief should be issued. Charles Alan Wright, et al., 11A Fed. Prac. & Proc. § 2948.1 (2d ed. 1995). Thus, if the moving party cannot make this showing, injunctive relief should be "denied on this ground alone." *Praefke Auto. Elec. & Battery Co. v. Tecumseh Prods. Co.*, 255 F.3d 460, 463 (7th Cir. 2001).

RPGI is unable to show that it will be irreparably harmed – or harmed at all – if the portion of its TRO Motion seeking to enjoin AG from contacting RPG's lenders or exercising rights under the Credit Agreements is denied. RPGI repeatedly asserts in its TRO Motion and Complaint that unless AG is enjoined from communicating with the Companies' lenders and exercising rights under the Credit Agreements, it will be irreparably harmed because RPG will be unable to successfully restructure its debt. *See, e.g.,* TRO Motion, p. 11, Compl. ¶40. In fact, however, just the opposite is true. If, as RPGI seeks, the holder of more than 50% of RPG's First Lien Debt is precluded, pending the outcome of this litigation, from engaging in discussions and exploring restructuring alternatives with RPG's other creditors, the chances of a successful consensual restructuring of RPG will be virtually zero. Conversely, the likelihood of such a

successful restructuring are significantly increased if the Second Lien Group is permitted to engage in discussions with both RPG and AG.

In reality, it is likely that RPGI will be unaffected regardless of whether RPG is able to restructure its balance sheet. As noted, each of the restructuring proposals made over the summer, including the proposal made by RPG and RPG Holdings and supported by RPGI, assumed that the Companies' second lien debt was the fulcrum debt obligation in the Companies' capital structure, and attributed no economic value to RPGI's indirect equity interest in RPG. Accordingly, RPGI's interest will likely remain the same regardless of RPG's fate. Conversely, as discussed in greater detail below, the Second Lien Group, RPG itself, and the public interest, will be severely and irreparably harmed if RPG's financial stability is damaged as a result of RPGI's actions.

II. **THE BALANCE OF THE EQUITIES WEIGHS AGAINST A TEMPORARY INJUNCTION PRECLUDING AG FROM COMMUNICATING WITH SECOND-LIEN LENDERS OR EXERCISING RIGHTS UNDER THE CREDIT AGREEMENTS**

Case law mandates that courts confronted with a motion for injunctive relief evaluate the balance of harms to the parties, as well as to non-parties and the general public at large. *See Storck USA, L.P. v. Farley Candy Co.*, 14 F. 3d 311, 314 (7th Cir. 1994); *Tenneco Automotive Operating Co. v. Hyrad Corp.*, No. 02 C 0728, 2002 WL 1632499, at *1 (N. Dist. Ill. July 23, 2002).[3] Here, the irreparable harm that will be caused to the Second Lien Group, RPG, and the public at large, including RPG's employees and other RPG creditors, clearly outweighs the questionable (at best) benefit RPGI argues it will attain if the relief it seeks is granted.

---

[3] For the Court's convenience, a copy of *Tenneco Automotive Operating Co. v. Hyrad Corp.*, No. 02 C 0728, 2002 WL 1632499, at *1 (N. Dist. Ill. July 23, 2002) is attached hereto as Exhibit 1.

If RPGI succeeds in stalling, even for a short period of time, restructuring negotiations among RPG's creditors, RPG will be left at a severe disadvantage in the marketplace. Recovery of the more than $80 million currently owed by RPG to the members of the Second Lien Group, as well as amounts owed to other RPG creditors, will be placed in serious jeopardy. In RPGI's own language, "the jobs of hundreds of RPG employees [will be placed] at risk," and the public will be "deprive[d] . . . of access to the wonderful cards of one of the last, nationally-operating, free-standing greeting card companies." Compl. ¶42. Clearly, injunctive relief that results in the weakening of an over-leveraged company is not in the public's best interest. Indeed, RPGI concedes that the possibility that RPG will be "put out of business" or fail to restructure its Credit Agreements constitutes irreparable harm. *See* Hrg. Tr., p. 6:18-21; Compl. ¶ 57.

## CONCLUSION

For the foregoing reasons, the Second Lien Group respectfully requests that RPGI's request for a temporary injunction enjoining AG from communicating with RPG's or RPG Holdings' lenders or exercising rights under the Credit Agreements be denied

Dated: New York, New York
  August 13, 2008

                 Respectfully submitted,

*Of Counsel*              /s/ *Janice A. Alwin*

                 Steven B. Towbin (2848546)
Fred S. Hodara           Janice A. Alwin (6277043)
Abid Qureshi            Shaw Gussis Fishman Glantz Wolfson &
Akin Gump Strauss Hauer& Feld LLP.  Towbin LLC
590 Madison Avenue        321 North Clark Street, Suite 800
New York, New York  10022      Chicago, Illinois 60654
(212) 872-8040 (Telephone)      (312) 276-1333  direct phone
(212) 872-1002 (Telecopier)      (312) 275-0569  direct facsimile
fhodara@akingump.com       stowbin@shawgussis.com

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that service of the above and foregoing memorandum was accomplished (i) by electronic notice to CM/ECF registrants and (ii) by First Class U.S. Mail, postage prepaid on this 13th day of August, 2008.

*/s/ Janice A. Alwin*

### CM/ECF Service List:

- **Michael F. Braun**
  mbraun@srzlaw.com
- **James L. Komie**
  jkomie@srzlaw.com
- **Mark P. Rotatori**
  mprotatori@jonesday.com,babutkus@jonesday.com

- **Lee Ann Russo**
  larusso@jonesday.com
- **Robert D Snow , Jr**
  rsnow@srzlaw.com

### Mail Service List:

**Michael F. Braun**
Schuyler, Roche & Zwirner
130 East Randolph Street
Suite 3800
Chicago, IL 60601

**Robert D Snow, Jr**
Schuyler Roche and Zwirner
One Prudential Plaza
130 East Randolph Street
Suite 3800
Chicago, IL 60601

**Mark P. Rotatori**
Jones Day
77 West Wacker Drive
Suite 3500
Chicago, IL 60601-1692

**James L. Komie**
Schuyler, Roche & Zwirner
130 East Randolph Street
Suite 3800
Chicago, IL 60601

**Lee Ann Russo**
Jones Day
77 West Wacker Drive
Suite 3500
Chicago, IL 60601-1692

**With Courtesy Copies to:**

**Hon. Ruben Castillo**
**Chambers 2146**
**219 S Dearborn St**
**Chicago, IL 60604**

Westlaw.

Not Reported in F.Supp.2d                                                                                             Page 1
Not Reported in F.Supp.2d, 2002 WL 1632499 (N.D.Ill.)
**2002 WL 1632499 (N.D.Ill.)**

Tenneco Automotive Operating Co. Inc. v. Hyrad Corp.
N.D.Ill.,2002.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.
TENNECO AUTOMOTIVE OPERATING COMPANY INCORPORATED f/k/a Monroe Auto Equipment Company, Plaintiff,
v.
HYRAD CORPORATION, Defendant.
**No. 02 C 0728.**

July 23, 2002.

Licensee of patented technology sued licensor, seeking a preliminary injunction to preserve the contractual status quo pending arbitration of a dispute between the parties. On the licensor's motion to dismiss, the District Court, Guzman, J., held that licensee failed to prove irreparable harm.

Ordered accordingly.

West Headnotes

**T ⚷196**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(D) Performance, Breach, Enforcement, and Contest
            25Tk190 Stay of Proceedings Pending Arbitration
                25Tk196 k. Particular Cases. Most Cited Cases
   (Formerly 33k23.9 Arbitration)
Licensee of patented technology failed to prove irreparable harm requirement for a preliminary injunction to preserve the contractual status quo pending arbitration of a dispute with the licensor, in light of its inconsistent representations to different courts, and its unreasonable delay of at least 15 months in seeking injunctive relief.

*MEMORANDUM OPINION AND ORDER*

GUZMAN, J.
**\*1** Tenneco Automotive Operating Company Inc. ("Tenneco") has brought this action seeking a preliminary injunction to preserve the contractual status quo in its relationship with Hyrad Corporation ("Hyrad") while the parties arbitrate their dispute. Hyrad has moved pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the action. Because the parties are now in arbitration, Tenneco's complaint for injunctive relief is dismissed without prejudice, with leave to reinstate after the arbitrator issues his/her final award.

*Factual Background*

On May 16, 1991, Monroe Auto Equipment, now Tenneco, entered into a Licensing Agreement with Hyrad. (Pl.'s Mem. in Opp'n Mot. Dismiss at 2.) The agreement granted Tenneco the exclusive license to use Hyrad's technology and patents owned to manufacture and sell adjustable shock absorbers for certain types of vehicles. (*Id.*) The agreement contains an arbitration provision. (*Id.* at 3.)

Over the years, contractual disputes arose between the parties. (*Id.* at 3.) These contractual disputes prompted Hyrad to file a declaratory judgment action on July 5, 2000 in the United States District Court for the Western District of Wisconsin ("the Wisconsin Court"). (Def.'s Mem. in Supp. Mot. Dismiss at 2.) Hyrad asked the Wisconsin Court to find that Tenneco had breached the Licensing Agreement. (*Id.*) On October, 30, 2000, the Wisconsin Court ordered the parties to arbitrate their dispute, and dismissed Hyrad's action. (Pl.'s Mem. in Opp'n Mot. Dismiss at 4.)

On January 29, 2002, Tenneco filed this action for preliminary injunction. At the time Tenneco filed its complaint, no arbitration proceedings had begun. (Def.'s Mem. in Supp. Mot. Dismiss at 4.) On February 11, 2002, Hyrad filed a motion to reopen the judgment in the Wisconsin court pursuant to Federal Rule of Civil Procedure 60(b) ("Rule 60(b)"). (Def.'s Ex. A at 7, Attached to Def.'s Reply to Pl.'s Mem. in Opp'n Mot. Dismiss.) Hyrad's Rule 60(b)**motion** was **denied**. (*Id.* at 11.)Tenneco then filed a demand for arbitration against Hyrad with the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 2
Not Reported in F.Supp.2d, 2002 WL 1632499 (N.D.Ill.)
**2002 WL 1632499 (N.D.Ill.)**

American Arbitration Association (AAA). (Def.'s Reply to Pl.'s Mem. in Opp'n Mot. Dismiss at 2.)

*Jurisdiction*

Jurisdiction in this court is proper pursuant to [28 U.S.C. § 1332](). There is complete diversity of citizenship between the parties. (Compl.¶ 2.) Tenneco is a corporation organized under the laws of the State of Delaware, with its principal place of business in Lake Forest, Illinois. (*Id.* at ¶ 4.) Hyrad is a corporation organized under the laws of the State of Arizona, with its principal place of business in Wisconsin Dells, Wisconsin. (*Id.* at ¶ 5.)

*Discussion*

Because the parties are now before the arbitrator, we find that the arguments raised in Hyrad's motion to dismiss are moot. In determining whether to a grant a **preliminary injunction**, four factors must be established. [*Ty, Inc. v. The Jones Group,* 237 F.3d 891, 895]() (7th Cir.2001); *see also* [*Meridian Mutual Ins. Co. v. Meridan Ins. Group,* 128 F.3d 1111, 1114]() (7th Cir.1997). First, the moving party must establish two factors: 1) that the case has a likelihood of success on the merits; and 2) that the party will suffer irreparable **harm** if the injunction is not granted, that no adequate remedy at law exists. *Id.* Third, if the party establishes these first two criteria, the court must conduct a balancing test. *Id.* The court must balance the **harm** that the non-moving party will suffer if the injunction is granted against the **harm** the moving party will suffer if the injunction is denied. *Id.* Finally, the court must balance the effect of the injunction on **non- parties**, the **public interest** factor. *Id.* These factors exist on a sliding scale, the more likely the moving party's likelihood of success, "the less the balance of irreparable **harms** need favor the plaintiff's position."*Id.*

**\*2** Because of the unique facts of this case, we address the alleged irreparable harm element being suffered by Tenneco. Because of it's repeated, inconsistent representations to different district courts, and because of its unreasonable delay in seeking injunctive relief, Tenneco fails to set forth sufficient facts to support its alleged irreparable harm requirement.

Tenneco has stated to this court that it had "never represented to the Wisconsin Court that it had already filed for arbitration" and that "Tenneco did not represent that it had filed a formal demand with AAA, nor did the Wisconsin Court's Order assume a demand had been filed."(Pl.'s Mem. in Opp'n Mot. Dismiss at 7.) On October 30, 2000, the Wisconsin Court dismissed Hyrad's declaratory judgment action. (Def.'s Ex. A at 11, Attached to Def.'s Reply to Pl .'s Mem. in Opp'n Mot. Dismiss.) Judge Crab, in her opinion dismissing Hyrad's [Rule 60(b)]() motion stated that she dismissed Hyrad's original declaratory judgment action "*on the mistaken belief that defendants'* [Tenneco] *actually had filed* a formal demand for arbitration," and that "Defendants' current protestations to the contrary are cynical and disingenuous."(*Id.* (emphasis added.) Judge Crab went on to add that

Defendants [Tenneco] never had any intention of seeking arbitration and they deduced early on that plaintiff was equally averse to arbitration. It is now quite clear that defendants have engaged in a game of intentional delay and avoidance, hoping to keep their business relationship with plaintiff in limbo as long as possible. (*Id.*)... [D]efendants had no intention of actually invoking the arbitration clause.

(*Id.* at 12.)

Tenneco waited fifteen months after the Wisconsin court's dismissal of Hyrad's action before filing this action on January 29, 2002. If Tenneco had an immediate concern for the irreparable harm it would suffer, it would not have waited a year and a half to ask for relief. Similarly, Tenneco represented to this court that the day it filed this action for a preliminary injunction, it also filed a Demand for Arbitration with the AAA. (Pl.'s Mem. in Opp'n to Mot. Dismiss at 4.) However, the Demand for Arbitration was not actually filed until February 11, 2002. (Def.'s Ex. A at 12, Attached to Def.'s Reply to Pl.'s Mem. in Opp'n Mot. Dismiss at 4.) However, the Demand for Arbitration was not actually filed until February 11, 2002. (Def.'s Ex. A at 12, Attached to Def.'s Reply to Pl.'s Mem. in Opp'n Mot. Dismiss.) Judge Crab noted that "what finally forced defendants' [Tenneco's] hand was plaintiff's motion to this court for relief from judgment: *on the same day that they filed their response,* defendants filed a formal demand for arbitration, apparently to hedge their bets. (*Id.* (emphasis added).)

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

The case of *Sauer-Getriebe KG v. White Hydraulics, Inc.,* 715 F.2d 348 (7th Cir.1983) is distinguishable from the instant case. In *Sauer-Getriebe,* White Hydraulics ("White") granted Sauer-Getriebe ("Sauer") the exclusive license to sell motors manufactured by White. *Id.* at 349.The contract contained an arbitration provision. *Id.* A contractual dispute developed between the parties, and Sauer sought preliminary and permanent injunctions in the district court, while the contractual rights of the parties were being determined in arbitration. *Id.* In reversing the district court's denial of the injunctions, the Court applied four factors justifying a preliminary injunction to the case. *Id.* at 351.The Court found that all the requirements for a preliminary injunction were met, and held that a grant of a preliminary injunction was proper, notwithstanding an agreement to arbitrate. *Id.* at 350.

**\*3** Unlike the instant case, Sauer did not make attempts to delay or avoid adjudication of the dispute, nor did Sauer take inconsistent positions. *Id.* In this case, Tenneco has done both. When seeking equity, the plaintiff can not come into court with unclean hands. In this case, Tenneco's unreasonable delay and inconsistent positions do not merit the grant of a preliminary injunction.[FN1]

> FN1. Because Tenneco can not establish the irreparable harm requirement for a preliminary injunction, it is not necessary to consider the remaining three factors needed for a preliminary injunction. Similarly, since the parties are now engaged in the arbitration process, *see* Def.'s Reply to Pl.'s Mem. in Opp'n Mot. Dismiss at 1, it is no longer necessary to address Hyrad's waiver argument.

Furthermore, Tenneco is not without an adequate remedy. An arbitrator, under the AAA rules, may grant injunctive relief. The AAA Rule 36 of the Commercial Dispute Resolution Procedures provides in relevant part:

(a) The arbitrator may take whatever interim measures he or she deems necessary, including injunctive relief and measures for the protection or conservation of property and disposition of perishable goods.

The arbitrator is not bound by legal rules, and may grant any appropriate relief. Thus, Tenneco may seek injunctive relief from the arbitrator.

*Conclusion*

Tenneco can not establish the requirement of irreparable harm in order to satisfy a grant of a preliminary injunction because of Tenneco's inconsistent representations to the different district courts, and because of its unreasonable delay in seeking relief. For the reasons stated above, Tenneco's request for a preliminary injunction is denied. Tenncco's complaint is dismissed without prejudice, with leave to reinstate after the arbitrator has issued his/her award.

SO ORDERED

N.D.Ill.,2002.
Tenneco Automotive Operating Co. Inc. v. Hyrad Corp.
Not Reported in F.Supp.2d, 2002 WL 1632499 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.