**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| RPG INVESTMENT HOLDINGS, LLC, a Delaware Limited Liability Company,<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN GREETINGS CORP., an Ohio Corporation,<br><br>Defendant. | )<br>)<br>)<br>)<br>)  Case No. 08 CV 4422<br>)<br>)<br>)<br>) |

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF RPG INVESTMENT HOLDINGS' EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER**

Credit Suisse, Cayman Islands Branch ("Credit Suisse" or the "Agent"), as administrative and collateral agent under the First Lien Credit Agreement (the "Credit Agreement"), dated as of December 5, 2005, by and among RPG Holdings, Inc. ("RPG Holdings"), Recycled Paper Greetings, Inc. ("RPG"), and the lenders party thereto (collectively, the "First Lien Lenders"), by and through its undersigned counsel, hereby submits this memorandum of law in opposition to RPG Investment Holdings, LLC's ("RPGI") Emergency Motion for a Temporary Restraining Order (the "TRO Motion") solely to the extent that the TRO Motion seeks to enjoin defendant American Greetings Corp. ("AG") from (i) contacting the lenders of RPG or (ii) exercising or protecting its rights under the Credit Agreement. In support of its motion, Credit Suisse respectfully states as follows:

**PRELIMINARY STATEMENT**

The TRO Motion should be denied to the extent it seeks to prevent AG from exercising or protecting its contractual rights under the Credit Agreement. Upon information and belief, AG holds a majority of the first lien indebtedness under the Credit Agreement. Such

relief would effectively neuter the Agent and all of the other First Lien Lenders by eliminating their ability to exercise contractual rights and remedies under the Credit Agreement. In addition, the TRO Motion should also be denied to the extent it seeks to prevent AG from communicating with any of RPG's lenders, both the First Lien Lenders and the holders of RPG's second lien indebtedness (the "Second Lien Lenders"). Obviously, any consensual financial restructuring of RPG will require communication among all affected economic stakeholders, including AG. The Agent believes that completing a restructuring of the capital structure of RPG out-of-court would benefit all affected parties.

## BACKGROUND

Pursuant to Article 8 of the Credit Agreement, the First Lien Lenders appointed Credit Suisse as the Agent and authorized the Agent to take certain actions and exercise certain powers as and to the extent delegated to the Agent under the Credit Agreement. A copy of the Credit Agreement is annexed hereto as Exhibit A. Under the Credit Agreement, the Agent cannot take certain actions on behalf of the First Lien Lenders absent consent of the "Required Lenders," which is defined in the Credit Agreement as First Lien Lenders holding at least a majority of the outstanding indebtedness. Such actions include: (i) amending the Credit Agreement and waiving certain provisions thereof (subject to certain exceptions) (§ 9.08); (ii) accelerating the loans if an event of default occurs (which is a prerequisite for the Agent to pursue remedies should an event of default occur under the Credit Agreement) (§ 7.01); (iii) canceling revolving credit commitments (§ 7.01); and (iv) appointing a new administrative or collateral agent (Article 8). Significantly, the Required Lenders have the power to grant a waiver of § 4.01(c) of the Credit Agreement, which prevents RPG from borrowing any additional amounts under the revolver following the occurrence of a default.

In addition, § 9.08(b) of the Credit Agreement bars the Agent from taking certain actions without the consent of each affected First Lien Lender.  These actions include:  (i) forgiving indebtedness; (ii) decreasing the principal amount of the loans; (iii) extending the maturity date; (iv) decreasing the rate of interest; and (v) increasing the loan commitments.

RPG Holdings and RPG are both parties to the Credit Agreement.  They are not, however, parties to this litigation.   RPGI, the plaintiff in this litigation, alleges that it is the sole shareholder of RPG Holdings.  Complaint ¶ 8.  Upon information and belief, RPG Holdings is the sole shareholder of RPG.

RPGI alleges that, in late June and early July of 2008, AG acquired over 50 percent of the indebtedness owed under the Credit Agreement.  *Id.* at ¶¶ 37-38.

As RPGI acknowledges, RPG is currently in default under the Credit Agreement. *Id.* at ¶ 48.  As a result of this default, RPG cannot borrow additional amounts under the revolving credit facility created under the Credit Agreement.  *Id*; *see also* Credit Agreement, at § 4.01(c).

RPGI alleges that, after these defaults, RPG has been in negotiations with the lenders to restructure their obligations under the Credit Agreement and the Second Lien Credit Agreement, dated as of December 5, 2005, by and among RPG Holdings, RPG and the Second Lien Lenders.  To that end, several of RPG's economic stakeholders have exchanged term sheets proposing various restructuring alternatives.

On August 6, 2008, RPGI filed this action against AG alleging, among other things, that AG, in acquiring the debt under the Credit Agreement, violated the terms of a confidentiality agreement between RPGI and AG.  RPGI also filed the TRO Motion, which seeks an injunction barring AG from contacting any of the lenders, including the First Lien Lenders,

3

and from exercising its rights and remedies under the Credit Agreement, including without limitation the right to:  (i) accelerate loans; (ii) foreclose on collateral; (iii) control RPG's bank accounts; and (iv) object to certain events in an as yet unfiled bankruptcy case, including (a) the imposition of a priming lien for the purpose of securing emergency senior financing; (b) the use of cash collateral; and (c) a sale of the collateral free and clear of the liens securing the first lien indebtedness under the Credit Agreement (the "First Lien Debt").

## **ARGUMENT**

To obtain a temporary restraining order, RPGI must establish:  (i) a likelihood of success on the merits; (ii) the absence of an adequate remedy at law; (iii) that it will suffer irreparable harm that, absent injunctive relief, outweighs the harm suffered by the non-movant if the injunction is granted; and (iv) that the injunction will not harm the public interest.  *See, e.g., Christian Legal Society v.* Walker, 453 F.3d 853, 859 (7th Cir. 2006); *SMC Corp., Ltd. v. Lockjaw, LLC*, 481 F.Supp.2d 918, 924 (N.D. Ill. 2007).  In addition, for RPGI to obtain its requested TRO, the Court must apply a "sliding scale analysis" to determine whether the balance of harms weighs in favor of granting or denying the relief.  *Christian Legal Society*, 453 F.3d at 859.

The Agent takes no position on the likelihood of RPGI prevailing on the merits of its claim that AG breached the confidentiality agreement or committed related tortious acts.  But the Agent need not take a position on the merits of the underlying action to demonstrate that entry of a TRO is unwarranted.  The most significant preliminary inquiry for the Court is whether RPGI will suffer irreparable harm or otherwise lack an adequate remedy at law in the absence of the injunctive relief.  If not, "the [court's] inquiry is over."  *East St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 703 (7th Cir. 2005), *quoting Abbott*

*Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992).  An injury will be considered "irreparable" for the purposes of a preliminary injunction only if it cannot be remedied through a monetary award after trial.  *Id.*

        The Court should deny the TRO Motion because RPGI has failed to demonstrate that it suffered any harm by AG's acquisition of First Lien Debt.  RPGI has not alleged that AG has taken any action to prevent RPGI from engaging in negotiations with its lenders regarding the terms of a consensual restructuring.  Instead, RPGI raised the specter of what AG *might* do if and to the extent the Agent, at the direction of the Required Lenders, seeks to exercise its contractual rights against RPG as a result of RPG's defaults under the Credit Agreement.  Neither AG nor any of the other First Lien Lenders have taken any action to accelerate the obligations under the Credit Agreement or to exercise remedies.  If AG directed the Agent to exercise these rights, RPG would be given notice and have an opportunity to be heard.  Furthermore, RPGI cannot claim that such exercise would have resulted in irreparable harm.  Rather, the provision of these rights and remedies to the First Lien Lenders under the Credit Agreement was fully negotiated by RPG, and which were triggered because of RPG's defaults under the Credit Agreement.  Accordingly, RPGI cannot establish harm sufficient to warrant the entry of the injunction.

        Moreover, even if RPGI could demonstrate a threat of irreparable harm – and it cannot – it still would not be entitled to the injunction it seeks because the balance of harms tips decisively against it.  In weighing the balance of harms that would result from entry of a TRO against AG, it is manifest that the Agent, the First Lien Lenders (including those that are not a party to this dispute), the Second Lien Lenders and RPG itself would suffer the greatest harm if the TRO were granted.

First, the requested TRO would render the Credit Agreement inoperative, thereby depriving the First Lien Lenders of their contractual remedies.  Moreover, the requested TRO will damage RPG as the borrower.  As set forth above, certain actions – including the granting of a waiver of § 4.01(c) of the Credit Agreement which currently prevents RPG from borrowing additional amounts under the revolver due to the occurrence of a default – require the consent of First Lien Lenders holding a majority of the indebtedness, and in some cases, all of the First Lien Lenders.  If AG is enjoined from communicating with its fellow First Lien Lenders, then the First Lien Lenders could not, either as a majority or unanimously, authorize the Agent to waive RPG's defaults or to take any remedial actions.  Thus, RPG could never continue to borrow under the revolver, even if the majority of First Lien Lenders determined that it was in their best interest to permit RPG to do so.

As a matter of policy, the Court should not enter an order that would inadvertently interfere with the rights of parties that are strangers to the underlying action.  As described above, RPGI seeks to prevent AG from exercising the rights that inure to AG as a First Lien Lender under the Credit Agreement.  But the Credit Agreement must be allowed to function as drafted and consensually agreed to by the parties thereto.  Otherwise, non-parties to a fully-negotiated agreement would be able to unilaterally alter the terms without the consent of the parties who are bound by that contract.  Here, the alterations to the Credit Agreement proposed by RPGI would harm a significant number of parties that have no role or interest in the underlying dispute.  Accordingly, the balance of harms tips strongly towards denial of the TRO Motion.

Other parties in addition to the First Lien Lenders would be injured if the TRO Motion were granted.  RPGI argues that it will be harmed by AG's anticipated interference with

a consensual restructuring. But if AG cannot speak with the other lenders and RPG, no consensual out-of-court restructuring would be possible. It is obvious that a consensual restructuring of debt obligations must involve all of the economic stakeholders affected by such restructuring. Preventing AG – who RPGI admits owns over 50% of the First Lien Debt – from contacting the other lenders means that no negotiations can take place.

KL2 2570215.3

## CONCLUSION

For the foregoing reasons, the Agent respectfully requests that the Court deny RPGI's request for an order enjoining AG from communicating with RPG Holdings' or RPG's lenders, or exercising rights under the Credit Agreement.

Dated:  Chicago, Illinois
        August 15, 2008

                        Respectfully submitted,


                        KRAMER LEVIN NAFTALIS & FRANKEL LLP

                            Kenneth H. Eckstein
                            P. Bradley O'Neill
                            1177 Avenue of the Americas
                            New York, New York 10036
                            (212) 715-9100 (telephone)
                            (212) 715-8000 (fax)


                        FOLEY & LARDNER LLP

                        By: /s/ Derek L. Wright

                            Derek L. Wright (6276201)
                            Mark F. Hebbeln (6272385)
                            321 North Clark
                            Suite 2800
                            Chicago, IL 60654
                            Tel: (312) 832-4372
                            Fax: (312) 832-4700

                            Counsel for Credit Suisse, Cayman Islands Branch,
                            in its capacity as administrative agent and collateral
                            agent for the First Lien Lenders

KL2 2570215.3

EXECUTION COPY

---

$140,000,000

**FIRST LIEN CREDIT AGREEMENT**

**dated as of December 5, 2005**

among

**RPG HOLDINGS, INC.,**

**RPG ACQUISITION CORP.,**
**as Borrower**

**THE LENDERS PARTY HERETO**

and

**CREDIT SUISSE, CAYMAN ISLANDS BRANCH,**
**as Administrative Agent and Collateral Agent**

---

**CREDIT SUISSE, CAYMAN ISLANDS BRANCH,**
**as Sole Bookrunner and Sole Lead Arranger**

---

EXHIBIT A

# TABLE OF CONTENTS

PAGE

## ARTICLE 1
### DEFINITIONS

**Section 1.01**. *Defined Terms* ................................................................. 1
**Section 1.02**. *Terms Generally* ............................................................. 31
**Section 1.03**. *Classification of Loans and Borrowings* ......................... 32
**Section 1.04**. *Pro Forma Calculations* ................................................. 32

## ARTICLE 2
### THE CREDITS

**Section 2.01**. *Commitments* .................................................................. 32
**Section 2.02**. *Loans* ............................................................................. 33
**Section 2.03**. *Borrowing Procedure* ...................................................... 35
**Section 2.04**. *Repayment of Loans; Evidence of Debt* ......................... 35
**Section 2.05**. *Fees* ............................................................................... 36
**Section 2.06**. *Interest on Loans* ........................................................... 38
**Section 2.07**. *Default Interest* .............................................................. 38
**Section 2.08**. *Alternate Rate of Interest* ............................................... 38
**Section 2.09**. *Termination and Reduction of Commitments* ................. 39
**Section 2.10**. *Conversion and Continuation of Borrowings* ................. 39
**Section 2.11**. *Repayment of Tranche B Term Borrowings* ................... 41
**Section 2.12**. *Prepayment* .................................................................... 42
**Section 2.13**. *Mandatory Prepayments* ................................................ 43
**Section 2.14**. *Reserve Requirements; Change in Circumstances* .......... 45
**Section 2.15**. *Change in Legality* ......................................................... 47
**Section 2.16**. *Indemnity* ....................................................................... 48
**Section 2.17**. *Pro Rata Treatment* ........................................................ 48
**Section 2.18**. *Sharing of Setoffs* .......................................................... 49
**Section 2.19**. *Payments* ....................................................................... 49
**Section 2.20**. *Taxes* ............................................................................. 50
**Section 2.21**. *Assignment of Commitments under Certain Circumstances;*
    *Duty to Mitigate* ............................................................... 52
**Section 2.22**. *Swingline Loans* ............................................................. 53
**Section 2.23**. *Letters of Credit* ............................................................. 55

## ARTICLE 3
### REPRESENTATIONS AND WARRANTIES

**Section 3.01**. *Organization; Powers* .................................................... 60

EXHIBIT A

**Section 3.02.** *Authorization; No Conflicts* ........................................................ 60
**Section 3.03.** *Enforceability* ................................................................................ 61
**Section 3.04.** *Governmental Approvals* ............................................................... 61
**Section 3.05.** *Financial Statements* ..................................................................... 61
**Section 3.06.** *No Material Adverse Change* ........................................................ 62
**Section 3.07.** *Title to Properties; Possession Under Leases* ............................... 62
**Section 3.08.** *Subsidiaries* ................................................................................... 62
**Section 3.09.** *Litigation; Compliance with Laws* ............................................... 62
**Section 3.10.** *Agreements* .................................................................................... 63
**Section 3.11.** *Federal Reserve Regulations* ........................................................ 63
**Section 3.12.** *Investment Company Act; Public Utility Holding Company
Act* ........................................................................................................................... 64
**Section 3.13.** *Use of Proceeds* ............................................................................ 64
**Section 3.14.** *Tax Returns* .................................................................................... 64
**Section 3.15.** *No Material Misstatements* ............................................................ 64
**Section 3.16.** *Employee Benefit Plans* ................................................................ 65
**Section 3.17.** *Environmental Matters* .................................................................. 65
**Section 3.18.** *Insurance* ........................................................................................ 66
**Section 3.19.** *Security Documents* ....................................................................... 67
**Section 3.20.** *Location of Real Property* ............................................................. 67
**Section 3.21.** *Labor Matters* ................................................................................ 67
**Section 3.22.** *Reserved.* ....................................................................................... 68
**Section 3.23.** *Intellectual Property* ...................................................................... 68
**Section 3.24.** *Solvency* ......................................................................................... 68
**Section 3.25.** *Acquisition Documentation* ........................................................... 68
**Section 3.26.** *Permits* ........................................................................................... 68

## ARTICLE 4
### CONDITIONS OF LENDING

**Section 4.01.** *All Credit Events* ........................................................................... 69
**Section 4.02.** *First Credit Event* ......................................................................... 69

## ARTICLE 5
### AFFIRMATIVE COVENANTS

**Section 5.01.** *Existence; Businesses and Properties* ........................................... 73
**Section 5.02.** *Insurance* ........................................................................................ 74
**Section 5.03.** *Obligations and Taxes* ................................................................... 74
**Section 5.04.** *Financial Statements, Reports, Etc* ............................................... 74
**Section 5.05.** *Litigation and Other Notices* ........................................................ 76
**Section 5.06.** *Information Regarding Collateral* .................................................. 76
**Section 5.07.** *Maintaining Records; Access to Properties and Inspections;
Environmental Assessments* .................................................................................... 76
**Section 5.08.** *Use of Proceeds* ............................................................................ 78
**Section 5.09.** *Additional Collateral, Etc* ............................................................. 78
**Section 5.10.** *Further Assurances* ........................................................................ 80

(NY) 06216/188/CA/ca.first.lien.doc

EXHIBIT A

**Section 5.11.** *Interest Rate Protection* ................................................................ 81
**Section 5.12.** *Credit Rating* ............................................................................... 81
**Section 5.13.** *Post-closing Items* ........................................................................ 81

## ARTICLE 6
NEGATIVE COVENANTS

**Section 6.01.** *Indebtedness* ................................................................................. 82
**Section 6.02.** *Liens* .............................................................................................. 83
**Section 6.03.** *Sale and Lease-Back Transactions* .............................................. 86
**Section 6.04.** *Investments, Loans and Advances* ............................................... 86
**Section 6.05.** *Mergers, Consolidations, Sales of Assets and Acquisitions* .......... 87
**Section 6.06.** *Restricted Payments; Restrictive Agreements* ............................. 88
**Section 6.07.** *Transactions with Affiliates* ......................................................... 90
**Section 6.08.** *Business of Holdings, the Borrower and Subsidiaries;*
*Limitation on Hedging Agreements* ......................................................... 90
**Section 6.09.** *Other Indebtedness and Agreements; Amendments to*
*Acquisition Documentation* ....................................................................... 91
**Section 6.10.** *Capital Expenditures* ................................................................... 91
**Section 6.11.** *Interest Coverage Ratio* ............................................................... 92
**Section 6.12.** *Leverage Ratio* .............................................................................. 92
**Section 6.13.** *First Lien Leverage Ratio* ............................................................ 92
**Section 6.14.** *Fiscal Year* .................................................................................... 93
**Section 6.15.** *Fixed Charge Coverage Ratio* ...................................................... 93

## ARTICLE 7
EVENTS OF DEFAULT

**Section 7.01.** *Events Of Default* ......................................................................... 93
**Section 7.02.** *Borrower's Right To Cure* ............................................................ 96

## ARTICLE 8
THE AGENTS AND THE ARRANGER

## ARTICLE 9
MISCELLANEOUS

**Section 9.01.** *Notices* ....................................................................................... 100
**Section 9.02.** *Survival of Agreement* ................................................................ 101
**Section 9.03.** *Binding Effect* ............................................................................ 101
**Section 9.04.** *Successors and Assigns* .............................................................. 102
**Section 9.05.** *Expenses; Indemnity* .................................................................. 106
**Section 9.06.** *Right of Setoff* ............................................................................ 108
**Section 9.07.** *Applicable Law* .......................................................................... 108
**Section 9.08.** *Waivers; Amendment* ................................................................. 108
**Section 9.09.** *Interest Rate Limitation* ............................................................. 110
**Section 9.10.** *Entire Agreement* ....................................................................... 110

(NY) 06216/188/CA/ca.first.lien.doc

EXHIBIT A

**Section 9.11**. *WAIVER OF JURY TRIAL* ........................................................ 111
**Section 9.12**. *Severability* ................................................................................. 111
**Section 9.13**. *Counterparts* ............................................................................... 111
**Section 9.14**. *Headings* ..................................................................................... 111
**Section 9.15**. *Jurisdiction; Consent to Service of Process* ............................... 112
**Section 9.16**. *Confidentiality* ........................................................................... 112

Exhibits and Schedules

| | |
|---|---|
| Exhibit A | Form of Administrative Questionnaire |
| Exhibit B | Form of Affiliate Subordination Terms |
| Exhibit C | Form of Assignment and Acceptance |
| Exhibit D | Form of Borrowing Request |
| Exhibit E | Form of Guarantee and Collateral Agreement |
| Exhibit F | Form of Perfection Certificate |
| Exhibit G | Form of Non-Bank Certificate |
| Exhibit H | Form of Opinion of Weil, Gotshal & Manges LLP |
| Exhibit I | Form of Intercreditor Agreement |

Commitment Schedule

| | |
|---|---|
| Schedule 1.01(b) | Subsidiary Guarantors |
| Schedule 3.08 | Subsidiaries |
| Schedule 3.09 | Litigation |
| Schedule 3.17 | Environmental Matters |
| Schedule 3.18 | Insurance |
| Schedule 3.19(a) | UCC Filing Offices |
| Schedule 3.20 | Owned and Leased Real Property |
| Schedule 3.25 | Acquisition Documentation |
| Schedule 6.01 | Existing Indebtedness |
| Schedule 6.02 | Existing Liens |
| Schedule 6.04 | Existing Investments |
| Schedule 6.07 | Agreements with Affiliates |

EXHIBIT A

FIRST LIEN CREDIT AGREEMENT dated as of December 5, 2005 (this "**Agreement**"), among RPG HOLDINGS, INC., a Delaware corporation ("**Holdings**"), RPG ACQUISITION CORP., a Delaware corporation (the "**Borrower**"), the LENDERS from time to time party hereto, CREDIT SUISSE, CAYMAN ISLANDS BRANCH, as administrative agent (in such capacity and together with its successors, the "**Administrative Agent**") and as collateral agent (in such capacity and together with its successors, the "**Collateral Agent**"), and CREDIT SUISSE, CAYMAN ISLANDS BRANCH, as sole bookrunner and sole lead arranger (in such capacity, the "**Arranger**").

The parties hereto agree as follows:

## ARTICLE 1
### DEFINITIONS

**Section 1.01**. *Defined Terms.* As used in this Agreement, the following terms shall have the meanings specified below:

"**ABR**", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"**Acquired Entity**" shall have the meaning assigned to such term in the definition of "Permitted Acquisition".

"**Acquisition**" shall mean the acquisition by Parent from the Sellers of control of Recycled Paper Greetings, Inc., an Illinois corporation (the "**Company**") in accordance with the terms of the Stock Purchase Agreement and the transactions contemplated thereby, pursuant to which on the Closing Date, Parent will acquire all the Equity Interests of Holdings (a holding company created by the Sellers to hold 100% of the Equity Interests of the Company), and in connection therewith (i) the Borrower will be merged with and into the Company, with the Company surviving as a wholly-owned direct subsidiary of Holdings (and a wholly owned indirect subsidiary of Parent) and (ii) Parent will be required to pay on the date of consummation of the Acquisition an aggregate amount of $317,500,000 (the "**Acquisition Consideration**"), which shall be comprised in part of (x) up to $197,000,000 in cash in repayment of certain promissory notes issued by the Company and evidencing indebtedness owing to the Sellers and (y) other amounts to be used to repay third party indebtedness and bonuses to be paid to Sellers and certain employees of the Company.

"**Acquisition Consideration**" shall have the meaning assigned to such term in the definition of "Acquisition".

EXHIBIT A

"**Acquisition Documentation**" shall mean shall mean, collectively, the Stock Purchase Agreement and all schedules, exhibits, annexes and amendments thereto and all side letters and agreements affecting the terms thereof or entered into in connection therewith.

"**Adjusted LIBO Rate**" shall mean, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate per annum equal to the product of (a) the LIBO Rate in effect for such Interest Period and (b) Statutory Reserves.

"**Administrative Agent**" shall have the meaning assigned to such term in the preamble.

"**Administrative Agent Fees**" shall have the meaning assigned to such term in Section 2.05(b).

"**Administrative Questionnaire**" shall mean an Administrative Questionnaire in the form of Exhibit A, or such other form as may be supplied from time to time by the Administrative Agent.

"**Affiliate**" shall mean, when used with respect to a specified person, another person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the person specified; *provided*, *however*, that, (i) for purposes of Section 6.07, the term "**Affiliate**" shall also include any person that directly or indirectly owns 10% or more of any class of Equity Interests of the person specified or that is an officer or director of the person specified, (ii) the term "**Affiliate**" shall not include any other portfolio company of the Sponsor or any investor (including any investment fund or any general partner thereof) in the Sponsor and (iii) Credit Suisse and its Affiliates (other than the Sponsor, the Parent and the Parent's subsidiaries) shall be deemed not to be Affiliates of the Parent or any of its subsidiaries.

"**Affiliate Subordination Terms**" shall mean the Affiliate Subordination Terms in the form of Exhibit B pursuant to which intercompany obligations and advances owed by any Loan Party are subordinated to the Obligations.

"**Agents**" shall mean the Administrative Agent and the Collateral Agent.

"**Aggregate Revolving Credit Exposure**" shall mean the aggregate amount of the Lenders' Revolving Credit Exposures.

"**Agreement**" shall have the meaning assigned to such term in the preamble.

"**Alternate Base Rate**" shall mean, for any day, a rate per annum equal to the greater of (a) the Prime Rate in effect on such day and (b) the Federal Funds Effective Rate in effect on such day plus 1/2 of 1%. Any change in the Alternate Base Rate due to a change in the Prime Rate or the Federal Funds Effective Rate

EXHIBIT A

shall be effective as of the opening of business on the effective date of such change in the Prime Rate or the Federal Funds Effective Rate, respectively.

"**Applicable Rate**" shall mean, for any day (i) with respect to any ABR Tranche B Term Loan, ABR Revolving Loan or Swingline Loan, 2.50% per annum, (ii) with respect to any Eurodollar Tranche B Term Loan or Eurodollar Revolving Loan, 3.50% per annum, and (iii) with respect to any Commitment Fee, the applicable rate per annum set forth below under the caption "Commitment Fee Rate" based upon the Leverage Ratio as of the relevant date of determination:

| Leverage Ratio | Commitment Fee Rate |
| --- | --- |
| Category 1<br>Greater than 4.75 to 1.00 | 0.50% |
| Category 2<br>Greater than 3.75 to 1.00 but less than or equal to<br>4.75 to 1.00 | 0.375% |
| Category 3<br>Less than or equal to 3.75 to 1.00 | 0.250% |

Each change in the Applicable Rate resulting from a change in the Leverage Ratio shall be effective with respect to all Commitment Fees accruing on or after the date of delivery to the Administrative Agent of a certificate pursuant to Section 5.04(d), respectively, indicating such change until the date immediately preceding the next date of delivery of such financial statements and certificates indicating another such change. Notwithstanding the foregoing, until the Borrower shall have delivered the financial statements and certificates required by Section 5.04(b) and Section 5.04(d), respectively, for the period ended on January 31, 2006, the Leverage Ratio shall be deemed to be in Category 1 for purposes of determining the Applicable Rate with respect to Commitment Fees. In addition, (a) at any time during which the Borrower has failed to deliver the financial statements and certificates required by Section 5.04(a) or (b) and Section 5.04(d), respectively, or (b) at any time after the occurrence and during the continuance of an Event of Default pursuant to clauses (b), (c), (g) or (h) of Article 7 to but excluding the day such financial statements and certificates are delivered or such Event of Default is cured or waived, as applicable, the Leverage Ratio shall be deemed to be in Category 1 for purposes of determining the Applicable Rate.

"**Arranger**" shall have the meaning assigned to such term in the preamble.

"**Asset Sale**" shall mean the sale, lease, sub-lease, sale and leaseback, assignment, conveyance, transfer, issuance or other disposition (by way of merger, casualty, condemnation or otherwise) by Holdings, the Borrower or any of the Subsidiaries to any person of (a) any Equity Interests of any of the Subsidiaries or

3

EXHIBIT A

(b) any other assets of Holdings, the Borrower or any of the Subsidiaries, including Equity Interests of any person that is not a Subsidiary; *provided* that any asset sale or series of related asset sales described in clause (b) above having a value not in excess of $500,000 shall be deemed not to be an "**Asset Sale**" for purposes of Section 2.13(b); and *provided further* that none of the following shall be an "**Asset Sale**" for any purpose hereunder:  (i) sales of inventory in the ordinary course of business, (ii) dispositions of obsolete, worn out or surplus property or property no longer useful in the business of Holdings, the Borrower and its Subsidiaries in the ordinary course of business; (iii) sales or other dispositions of cash and Permitted Investments in the ordinary course of business; (iv) leases, subleases, licenses or sublicenses of property (which licenses and sublicenses shall, in the case of intellectual property rights, be non-exclusive) in the ordinary course of business which are not prohibited under this Agreement and do not materially interfere with the business of Holdings, the Borrower and its Subsidiaries; (v) transfers of property subject to any Recovery Event upon receipt of the Net Cash Proceeds received in respect of such event; (vi) dispositions in the ordinary course of business consisting of the abandonment of intellectual property rights which, in the reasonable good faith determination of the Borrower, are not material to the conduct of the business of Holdings, the Borrower and its Subsidiaries; (vii) sales, transfers or other dispositions of property to the extent that (A) such property is exchanged for credit against the purchase price of similar replacement property or (B) the proceeds of such disposition are promptly applied to the purchase price of such replacement property; (viii) dispositions consisting of the sale, assignment, transfer or discount of overdue or disputed accounts receivable, in each case in the ordinary course of business and without recourse, for purposes of collection or compromise thereof consistent with customary industry practice (and not as part of any bulk sale or financing transaction), and (ix) sales, assignments, transfers or other dispositions by Holdings, the Borrower or any of its Subsidiaries to the Borrower or any Subsidiary (including to the extent effected pursuant to a merger, consolidation, liquidation or dissolution permitted by Section 6.05(a)); *provided* that, if the transferor of such property is a Loan Party, the transferee thereof must be a Loan Party.

"**Assignment and Acceptance**" shall mean an assignment and acceptance entered into by a Lender and an assignee (with the consent of any person whose consent is required by Section 9.04), and accepted by the Administrative Agent, in the form of Exhibit C or such other form as shall be approved by the Administrative Agent.

"**Benefit Plan**" shall mean any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Tax Code or Section 307 of ERISA, and in respect of which the Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

EXHIBIT A

"**Board**" shall mean the Board of Governors of the Federal Reserve System of the United States of America.

"**Borrower**" shall have the meaning assigned to such term in the preamble.

"**Borrowing**" shall mean (a) Loans of the same Class and Type made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect, or (b) a Swingline Loan.

"**Borrowing Request**" shall mean a request by the Borrower in accordance with the terms of Section 2.03 and substantially in the form of Exhibit D, or such other form as shall be approved by the Administrative Agent.

"**Breakage Event**" shall have the meaning assigned to such term in Section 2.16.

"**Business Day**" shall mean any day other than a Saturday, Sunday or day on which commercial banks in New York City are authorized or required by law to close; *provided*, *however*, that when used in connection with a Eurodollar Loan (including with respect to all notices and determinations in connection therewith and any payments of principal, interest or other amounts thereon), the term "**Business Day**" shall also exclude any day on which banks are not open for dealings in dollar deposits in the London interbank market.

"**Capital Expenditures**" shall mean, for any period, with respect to any person, (a) the additions to property, plant and equipment and other capital expenditures of such person and its consolidated subsidiaries that are (or should be) set forth in a consolidated statement of cash flows of such person for such period prepared in accordance with GAAP and (b) Capital Lease Obligations incurred by such person and its consolidated subsidiaries during such period.

"**Capital Lease Obligations**" of any person shall mean the obligations of such person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such person under GAAP, and the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

A "**Change in Control**" shall be deemed to have occurred if (a) at any time prior to a Qualified IPO, the Permitted Holders shall fail to own directly or indirectly, beneficially and of record, Equity Interests representing at least a majority of the aggregate ordinary voting power and aggregate equity value represented by the issued and outstanding Equity Interests in Holdings; (b) after a Qualified IPO, any "person" or "group" (within the meaning of Rule 13d 5 of the Securities Exchange Act of 1934 as in effect on the date hereof) other than the Permitted Holders shall own directly or indirectly, beneficially or of record, Equity Interests representing either (i) more than 25% of either the aggregate

EXHIBIT A

ordinary voting power or the aggregate equity value represented by the issued and outstanding Equity Interests in Holdings or (ii) a greater percentage of either the aggregate ordinary voting power or the aggregate equity value represented by the issued and outstanding Equity Interests in Holdings then held, directly or indirectly, beneficially and of record, by the Permitted Holders; (c) a majority of the seats (other than vacant seats) on the board of directors of Holdings shall at any time be occupied by persons who are not Continuing Directors; (d) Holdings shall at any time fail to own directly or indirectly, beneficially and of record, 100% of each class of issued and outstanding Equity Interests in the Borrower free and clear of all Liens (other than Liens created by the Guarantee and Collateral Agreement and Liens securing the Indebtedness under the Second Lien Credit Agreement on a second priority basis); or (e) any change of control (or similar event, however denominated) with respect to Holdings, the Borrower or any Subsidiary shall occur under the Second Lien Credit Agreement or any other indenture or agreement in respect of Material Indebtedness to which Holdings, the Borrower or any Subsidiary is a party.

"**Change in Law**" shall mean (a) the adoption of any law, rule or regulation after the date of this Agreement, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by any Lender or the Issuing Bank (or, for purposes of Section 2.14, by any lending office of such Lender or by such Lender's or Issuing Bank's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement.

"**Charges**" shall have the meaning assigned to such term in Section 9.09.

"**Class**", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are Revolving Loans, Tranche B Term Loans or Swingline Loans and, when used in reference to any Commitment, refers to whether such Commitment is a Revolving Credit Commitment, Tranche B Term Loan Commitment or Swingline Commitment.

"**Closing Date**" shall mean the date of the first Credit Event.

"**Collateral**" shall mean all property and assets of the Loan Parties, now owned or hereafter acquired, upon which a Lien is purported to be created by any Security Document, and shall include the Mortgaged Properties.

"**Collateral Agent**" shall have the meaning assigned to such term in the preamble.

"**Company**" shall have the meaning assigned to such term in the definition of "Acquisition".

EXHIBIT A

"**Commitment**" shall mean, with respect to any Lender, such Lender's Revolving Credit Commitment, Tranche B Term Loan Commitment and Swingline Commitment.

"**Commitment Fee**" shall have the meaning assigned to such term in Section 2.05(a).

"**Commitment Letter**" shall mean the Commitment Letter dated as of November 2, 2005, between the Borrower and Credit Suisse, Cayman Islands Branch.

"**Commitment Schedule**" shall mean the Schedule attached hereto identified as such.

"**Confidential Information Memorandum**" shall mean the Confidential Information Memorandum of the Borrower dated November, 2005.

"**Consolidated Cash Interest Expense**" shall mean, for any period, the amount by which (a) Consolidated Interest Expense exceeds (b) the sum of, in each case to the extent included in Consolidated Interest Expense for such period, (i) non-cash amounts attributable to amortization of financing costs paid in a previous period, (ii) non-cash amounts attributable to amortization of debt discount or accrued interest not payable in cash for such period and (iii) any interest accrued during such period in respect of Indebtedness of the Borrower or any Subsidiary that is required to be capitalized.

"**Consolidated EBITDA**" shall mean, for any period, Consolidated Net Income for such period plus (a) without duplication and to the extent deducted in determining such Consolidated Net Income, the sum of (i) Consolidated Interest Expense for such period, (ii) consolidated tax expense for taxes based on income or profits and franchise or similar taxes for such period, (iii) all amounts attributable to depreciation and amortization for such period, (iv) fees and expenses accrued during such period in connection with the Transaction, (v) fees and expenses incurred during such period pursuant to the Corporate Services Agreement, (vi) customary non-capitalized fees, costs and expenses incurred during such period in connection with any equity or debt offering, recapitalization or Indebtedness (in each case, as permitted by this Agreement) or in connection with the consummation of Permitted Acquisitions, (vii) restructuring charges or reserves for such period (including with respect to ROCS retail store losses, owner-related expenses, extraordinary occupancy expenses and IT consulting, investment in new customer accounts and new rooftops (including fixture costs, slotting fees, free fills and buy back credits), officer consulting and transaction bonuses), (viii) net after tax losses for such period attributable to the early extinguishment of Indebtedness, (ix) net mark-to-market loss for such period pursuant to FAS 133 in connection with any Hedging Agreement permitted by this Agreement and (x) (A) non-cash, non-recurring charges for such period with respect to employee severance (up to $1,000,000 in any fiscal year), (B) other

EXHIBIT A

non-cash, non-recurring charges so long as such charges described in this clause (B) do not result in a cash charge in a future period (except as permitted under clause (x)(C)) and (C) non-recurring charges other than those referred to in the foregoing clauses (A) and (B) so long as such charges described in this clause (C) do not exceed $3,000,000 in the aggregate during any fiscal year (*provided* that to the extent that all or any portion of the income of any person is excluded from Consolidated Net Income pursuant to the definition thereof for all or any portion of such period any amounts set forth in the preceding clauses (i) through (x) that are attributable to such person shall not be included for purposes of this definition for such period or portion thereof), and minus (b) without duplication (i) all cash payments made during such period on account of reserves, restructuring charges and other non-cash charges added to Consolidated Net Income pursuant to clause (a) above in a previous period, (ii) tax credits of the Borrower and its Subsidiaries for such period in respect of taxes based on income and profits and franchise or similar taxes, (iii) net after-tax gains for such period (less all fees and expenses or charges relating thereto) attributable to the early extinguishment of Indebtedness, (iv) net mark-to-market gain for such period under FAS 133 in connection with any Hedging Agreement permitted by this Agreement and (iv) to the extent included in determining such Consolidated Net Income, any other extraordinary gains and all non-cash items of income for such period, all determined on a consolidated basis in accordance with GAAP; *provided* that for purposes of calculating Consolidated EBITDA for any period (A) the Consolidated EBITDA of any Acquired Entity acquired by the Borrower or any Subsidiary pursuant to a Permitted Acquisition during such period shall be included on a pro forma basis for such period (assuming the consummation of such acquisition and the incurrence or assumption of any Indebtedness in connection therewith occurred as of the first day of such period) and (B) the Consolidated EBITDA of any person or line of business sold or otherwise disposed of by the Borrower or any Subsidiary during such period for shall be excluded for such period (assuming the consummation of such sale or other disposition and the repayment of any Indebtedness in connection therewith occurred as of the first day of such period).

"**Consolidated Interest Expense**" shall mean, for any period, the sum of (a) the interest expense (including imputed interest expense in respect of Capital Lease Obligations and Synthetic Lease Obligations) of the Borrower and the Subsidiaries for such period (including all commissions, discounts and other fees and charges owed by the Borrower and the Subsidiaries with respect to letters of credit and bankers' acceptance financing), net of interest income, in each case determined on a consolidated basis in accordance with GAAP, plus (b) any interest accrued during such period in respect of Indebtedness of the Borrower or any Subsidiary that is required to be capitalized rather than included in consolidated interest expense for such period in accordance with GAAP. For purposes of the foregoing, interest expense shall be determined after giving effect to any net payments made or received by the Borrower or any Subsidiary with respect to interest rate Hedging Agreements.

EXHIBIT A

"**Consolidated Fixed Charges**" shall mean, for any period, the sum of (a) Consolidated Cash Interest Expense for such period and (b) the aggregate amount of all fixture costs, slotting fees, free fills and buy back credits paid during such period.

"**Consolidated Net Income**" shall mean, for any period, the net income or loss of the Borrower and the Subsidiaries for such period determined on a consolidated basis in accordance with GAAP; *provided* that there shall be excluded (a) the income of any Subsidiary to the extent that the declaration or payment of dividends or similar distributions by the Subsidiary of that income is not at the time permitted by operation of the terms of its charter or any agreement, instrument, judgment, decree, statute, rule or governmental regulation applicable to such Subsidiary, (b) the income or loss of any person accrued prior to the date it becomes a Subsidiary or is merged into or consolidated with the Borrower or any Subsidiary or the date that such person's assets are acquired by the Borrower or any Subsidiary, (c) the income of any person (other than a Subsidiary) in which any other person (other than the Borrower or a wholly owned Subsidiary or any director holding qualifying shares in accordance with applicable law) has an interest, except to the extent of the amount of dividends or other distributions actually paid to the Borrower or a wholly owned Subsidiary by such person during such period, and (d) any gains attributable to sales of assets out of the ordinary course of business.

"**Continuing Directors**" shall mean, at any time, any member of the board of directors of Holdings who (a) was a member of such board of directors on the Closing Date, after giving effect to the Acquisition, or (b) was nominated for election or elected to such board of directors with the approval of a majority of the Continuing Directors who were members of such board of directors at the time of such nomination or election.

"**Control**" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract or otherwise, and the terms "Controlling" and "Controlled" shall have meanings correlative thereto.

"**Corporate Services Agreement**" shall mean that certain Corporate Services Agreement dated as of the date hereof between the Company and the Sponsor, as in effect on the date hereof.

"**Credit Event**" shall have the meaning assigned to such term in Section 4.01.

"**Current Assets**" shall mean, at any time, the consolidated current assets (other than cash and Permitted Investments) of the Borrower and the Subsidiaries.

"**Current Liabilities**" shall mean, at any time, the consolidated current liabilities of the Borrower and the Subsidiaries at such time, but excluding,

9

EXHIBIT A

without duplication, (a) the current portion of any long term Indebtedness and (b) outstanding Revolving Loans and Swingline Loans.

"**Default**" shall mean any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would constitute an Event of Default.

"**dollars**" or "**$**" shall mean lawful money of the United States of America.

"**Domestic Subsidiaries**" shall mean all Subsidiaries incorporated, formed or organized under the laws of the United States of America, any state or commonwealth thereof or the District of Columbia.

"**Environmental Laws**" shall mean all former, current and future Federal, state, local and foreign laws (including common law), treaties, regulations, rules, ordinances, codes, decrees, judgments, directives and orders (including consent orders), in each case, relating to protection of the environment, natural resources, human health and safety as it relates to environmental protection or the presence, Release of, threatened Release, or exposure to, Hazardous Materials, or the generation, manufacture, processing, distribution, use, treatment, storage, transport, recycling or handling of, or the arrangement for such activities with respect to, Hazardous Materials.

"**Environmental Liability**" shall mean all liabilities, obligations, damages, losses, claims, actions, suits, judgments, orders, fines, penalties, fees, expenses and costs (including administrative oversight costs, natural resource damages and remediation costs), whether contingent or otherwise, arising out of or relating to (a) compliance or non compliance with any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Environmental Permit**" shall mean any Permit required under Environmental Law.

"**Equity Contribution**" shall mean, collectively, (a) the contribution by the Sponsor and certain other investors acceptable to the Arranger of at least $104,500,000 in cash to Parent as common equity having terms reasonably satisfactory to the Arranger and (b) the contribution of equity in Holdings held by Affiliates of the Sellers and cash to Parent in exchange for equity of Parent (which equity and cash contribution will not exceed $26,000,000).

"**Equity Cure Issuance**" shall have the meaning assigned to such term in the definition of "Equity Cure Proceeds".

EXHIBIT A

"**Equity Cure Proceeds**" shall mean, with respect to any exercise of the Borrower's rights under Section 7.02, the net cash proceeds received by the Borrower pursuant to a capital contribution to its common equity from Holdings, which capital contribution shall funded from a capital contribution to Holdings' common equity from Parent funded by the substantially concurrent sale or issuance by Parent of its Equity Interests to Permitted Holders (and any other person investing with the Permitted Holders) (an "**Equity Cure Issuance**"), net of all taxes and reasonable and customary fees, commissions, costs and other expenses incurred by the Borrower and the Subsidiaries in connection therewith. "Equity Cure Proceeds" shall not include any cash proceeds which exceed the amount permitted to be added to Consolidated EBITDA pursuant to Section 7.02.

"**Equity Interests**" shall mean shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity interests in any person, or any obligations convertible into or exchangeable for, or giving any person a right, option or warrant to acquire, such equity interests or such convertible or exchangeable obligations.

"**Equity Issuance**" shall mean (i) any issuance or sale by Holdings, the Borrower or any Subsidiary of any Equity Interests of Holdings, the Borrower or such Subsidiary, as applicable, in a public offering or private placement or sale that is underwritten, managed, arranged, placed or initially purchased by an investment bank (it being understood that the Sponsor is not an investment bank) or (ii) the receipt by Holdings, the Borrower or any Subsidiary of any capital contribution, as applicable, except for (a) in the case of the Borrower or any Subsidiary, any issuance or sale to, or any receipt of any capital contribution from, Holdings (in the case of the Borrower) or the Borrower or any other Subsidiary (in the case of any Subsidiary), (b) in each case, any issuance of directors' qualifying shares, (c) in each case, sales or issuances of common stock of Holdings to management or employees of Holdings, the Borrower or any Subsidiary under any employee stock option or stock purchase plan or employee benefit plan in existence from time to time in the ordinary course of business, (d) in each case, for sales or issuances of Equity Interests to the Sponsor and other persons making equity investments together with the Sponsor after the Closing Date, and (e) the proceeds of which are used to cure Events of Default in accordance with Section 7.02.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time.

"**ERISA Affiliate**" shall mean any trade or business (whether or not incorporated) that, together with the Borrower, is treated as a single employer under Section 414(b) or (c) of the Tax Code, or solely for purposes of Section 302 of ERISA and Section 412 of the Tax Code, is treated as a single employer under Section 414 of the Tax Code.

EXHIBIT A

"**ERISA Event**" shall mean (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Benefit Plan (other than an event for which the 30-day notice period is waived); (b) the existence with respect to any Benefit Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Tax Code or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(d) of the Tax Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Benefit Plan; (d) the incurrence by the Borrower or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Benefit Plan or the withdrawal or partial withdrawal of the Borrower or any of its ERISA Affiliates from any Benefit Plan or Multiemployer Plan; (e) the receipt by the Borrower or any of its ERISA Affiliates from the PBGC or a plan administrator of any notice relating to the intention to terminate any Benefit Plan or Plans or to appoint a trustee to administer any Benefit Plan; (f) the adoption of any amendment to a Benefit Plan that would require the provision of security pursuant to Section 401(a)(29) of the Tax Code or Section 307 of ERISA; (g) the receipt by the Borrower or any of its ERISA Affiliates of any notice, or the receipt by any Multiemployer Plan from the Borrower or any of its ERISA Affiliates of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA; (h) the occurrence of a "prohibited transaction" with respect to which the Borrower or any of the Subsidiaries is a "disqualified person" (within the meaning of Section 4975 of the Tax Code) or with respect to which the Borrower or any such Subsidiary could reasonably be expected to have a material liability; or (i) any other event or condition with respect to a Benefit Plan or Multiemployer Plan that could result in liability of the Borrower or any Subsidiary.

"**Eurodollar**", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"**Event of Default**" shall have the meaning assigned to such term in Article 7.

"**Excess Cash Flow**" shall mean, for any fiscal year of the Borrower, the excess of (a) the sum, without duplication, of (i) Consolidated EBITDA for such fiscal year and (ii) the decrease, if any, in Current Assets minus Current Liabilities from the beginning to the end of such fiscal year over (b) the sum, without duplication, of (i) the amount of any Taxes payable in cash by the Borrower and the Subsidiaries with respect to such fiscal year (or the amount of Taxes payable in cash by Holdings with respect to such fiscal year on account of the income of the Borrower and the Subsidiaries), (ii) Consolidated Cash Interest Expense for such fiscal year, (iii) Capital Expenditures made in cash in accordance with Section 6.10 during such fiscal year, except to the extent financed with the proceeds of Indebtedness, equity issuances, casualty proceeds,

EXHIBIT A

condemnation proceeds or other proceeds that would not be included in Consolidated EBITDA, (iv) permanent repayments of Indebtedness (other than prepayments of Loans under Section 2.12 and Section 2.13) made by the Borrower and the Subsidiaries during such fiscal year, but only to the extent that such prepayments by their terms cannot be reborrowed or redrawn and do not occur in connection with a refinancing of all or any portion of such Indebtedness, (v) Permitted Acquisitions made in cash during such fiscal year, except to the extent financed with the proceeds of Indebtedness (other than Revolving Loans), equity issuances, casualty proceeds, condemnation proceeds or other proceeds that would not be included in Consolidated EBITDA, (vi) the amount of any cash payments in respect of purchase price adjustments actually made by the Borrower after the Closing Date and during such fiscal year pursuant to the Stock Purchase Agreement to the extent included in Consolidated EBITDA for such period, (vii) fees and expenses paid in cash during such fiscal year in connection with the Transaction, (viii) fees and expenses paid in cash during such fiscal year pursuant to the Corporate Services Agreement, (ix) customary non-capitalized fees, costs and expenses paid in cash during such period in connection with any equity or debt offering, recapitalization or Indebtedness (in each case, as permitted by this Agreement) or in connection with the consummation of Permitted Acquisitions, (x) to the extent added to Consolidated Net Income in determining Consolidated EBITDA, non-recurring restructuring charges or reserves for such fiscal year (including with respect to ROCS retail store losses, owner-related expenses, extraordinary occupancy expenses and IT consulting, investment in new customer accounts and new rooftops (including fixture costs, slotting fees, free fills and buy back credits) officer consulting and transaction bonuses), (xi) to the extent added to Consolidated Net Income in determining Consolidated EBITDA, cash payments in respect of non-recurring losses or charges for such fiscal year (without duplication in respect of amounts excluded from Consolidated Net Income, net of any cash received in respect of extraordinary gains or income in respect of such fiscal year), (xii) to the extent added to Consolidated Net Income in determining Consolidated EBITDA, Net Cash Proceeds of permitted Equity Issuances received in respect of such fiscal year and (xiii) the increase, if any, in Current Assets minus Current Liabilities from the beginning to the end of such fiscal year.

"**Excluded Foreign Subsidiaries**" shall mean, at any time, any Foreign Subsidiary that is (or is treated as) for United States federal income tax purposes either (a) a corporation or (b) a pass-through entity owned directly or indirectly by another Foreign Subsidiary that is (or, for United States Federal income tax purposes, is treated as) a corporation.

"**Excluded Taxes**" shall mean, with respect to the Administrative Agent, any Lender, the Issuing Bank or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, (a) income or franchise taxes imposed on (or measured by) its net income or overall gross receipts as a result of a present or former connection between such recipient and the jurisdiction imposing such tax (or any political subdivision thereof), other than

EXHIBIT A

any such connection arising solely from such recipient having executed, delivered or performed its obligations or received a payment under, or enforced, this Agreement or any other Loan Document and (b) in the case of any Lender (other than an assignee pursuant to a request by the Borrower under Section 2.21(a)), any United States withholding tax that is imposed on amounts payable to such Lender at the time such Lender becomes a party to this Agreement (or designates a new lending office) or is attributable to such Lender's failure to comply with Section 2.20(d) (without regard to the proviso of the first sentence thereof or the third sentence thereof) or Section 2.20(e), except to the extent that such Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Borrower with respect to such withholding tax pursuant to Section 2.20(a).

"**Existing Note**" shall mean that certain Note dated January 12, 2005 by the Company in favor of Harris Trust and Savings Bank.

"**Facility**" shall mean each of (a) the Tranche B Term Loan Commitments and the Tranche B Term Loans made thereunder (the "**Term Loan Facility**") and (b) the Revolving Credit Commitments and the extensions of credit made thereunder (the "**Revolving Credit Facility**").

"**Federal Funds Effective Rate**" shall mean, for any day, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"**Fee Letter**" shall mean the Fee Letter dated as of November 2, 2005, among the Borrower and Credit Suisse, Cayman Islands Branch.

"**Fees**" shall mean the Commitment Fees, the Administrative Agent Fees, the L/C Participation Fees, the Issuing Bank Fees and the Prepayment Fees.

"**Financial Officer**" of any person shall mean the chief executive officer, chief financial officer, vice president of finance, principal accounting officer, treasurer or controller of such person.

"**First Lien Leverage Ratio**" shall mean, on any date, the ratio of (a) First Lien Secured Debt on such date to (b) Consolidated EBITDA for the period of four consecutive fiscal quarters most recently ended on or prior to such date, taken as one accounting period.

"**First Lien Secured Debt**" shall mean, as at any date of determination, Total Debt on such date minus, to the extent included therein, (a) all Indebtedness under the Second Lien Credit Agreement (or any refinancing thereof permitted

14

EXHIBIT A

hereunder and having the same priority of Liens afforded thereto) and (b) any unsecured Indebtedness.

"**Fixed Charge Coverage Ratio**" shall mean, on any date, the ratio of (a) Consolidated EBITDA to (b) Consolidated Fixed Charges, in each case, for the period of four consecutive fiscal quarters most recently ended on or prior to such date, taken as one accounting period.

"**Foreign Lender**" shall mean any Lender that is organized under the laws of a jurisdiction other than that in which the Borrower is located. For purposes of this definition, the United States of America, each state thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"**Foreign Subsidiary**" shall mean any Subsidiary that is not a Domestic Subsidiary.

"**GAAP**" shall mean generally accepted accounting principles in the United States.

"**Governmental Authority**" shall mean the government of the United States of America or any other nation, any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"**Granting Lender**" shall have the meaning assigned to such term in Section 9.04(i).

"**Guarantee**" of or by any person (the "**guarantor**") shall mean any obligation, contingent or otherwise, of (a) the guarantor or (b) another person (including any bank under a letter of credit) to induce the creation of which the guarantor has issued a reimbursement, counterindemnity or similar obligation, in either case guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation, contingent or otherwise, of the guarantor, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment of such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, (iv) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation or (v) to otherwise assure or hold harmless the owner of such Indebtedness or other obligation against loss in

EXHIBIT A

respect thereof; *provided*, *however*, that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.

"**Guarantee and Collateral Agreement**" shall mean the First Lien Guarantee and Collateral Agreement in the form of Exhibit E, to be executed and delivered by Holdings, the Borrower and each Subsidiary Guarantor.

"**Guarantors**" shall mean Holdings and the Subsidiary Guarantors.

"**Hazardous Materials**" shall mean any petroleum (including crude oil or fraction thereof) or petroleum products or byproducts, or any pollutant, contaminant or hazardous, toxic or other substances, materials or wastes defined, or regulated as such by, or pursuant to, any Environmental Law, or requires removal, remediation or reporting under any Environmental Law, including asbestos, or asbestos containing material, radon or other radioactive material, polychlorinated biphenyls and urea formaldehyde insulation.

"**Hedging Agreement**" shall mean any agreement with respect to any swap, forward, future, cap, collar, floor or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, fuel or other commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; *provided*, *however*, that no phantom stock or similar plan providing for payments and on account of services provided by current or former directors, officers, employees or consultants of Holdings, the Borrower or any Subsidiary shall be a Hedging Agreement.

"**Holdings**" shall have the meaning assigned to such term in the preamble.

"**Indebtedness**" of any person shall mean, without duplication, (a) all obligations of such person for borrowed money, (b) all obligations of such person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such person under conditional sale or other title retention agreements relating to property or assets acquired by such person, (d) all obligations of such person in respect of the deferred purchase price of property or services (other than (i) trade accounts payable incurred in the ordinary course of business and not past due for more than 60 days after the date on which such trade account was created and (ii) any earn-out obligation until such obligation appears on the liability section of the balance sheet of such person), (e) all obligations of such person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any Equity Interests in such person, (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such person, whether or not the Indebtedness secured thereby has been assumed, (g) all Guarantees by such person of Indebtedness of others, (h) all Capital Lease Obligations or Synthetic Lease Obligations of such person, (i) all obligations, contingent or

EXHIBIT A

otherwise, of such person as an account party in respect of letters of credit and letters of guaranty and (j) all obligations, contingent or otherwise, of such person in respect of bankers' acceptances. The Indebtedness of any person shall include the Indebtedness of any other person (including any partnership in which such person is a general partner) to the extent such person is liable therefor as a result of such person's ownership interest in such other person, except to the extent the terms of such Indebtedness provide that such person is not liable therefor.

"**Indemnified Taxes**" shall mean Taxes other than Excluded Taxes and Other Taxes.

"**Indemnitee**" shall have the meaning assigned to such term in Section 9.05(b).

"**Information**" shall have the meaning assigned to such term in Section 9.16.

"**Intellectual Property**" shall have the meaning assigned to such term in the Guarantee and Collateral Agreement.

"**Intellectual Property Collateral**" shall mean that portion of the Collateral that constitutes Intellectual Property.

"**Intellectual Property Security Agreement**" shall mean all Intellectual Property Security Agreements to be executed and delivered by the Loan Parties, each substantially in the applicable form required by the Guarantee and Collateral Agreement.

"**Intercreditor Agreement**" shall mean the Intercreditor Agreement dated as of the Closing Date, in substantially the form of Exhibit I, entered into by and between the Borrower, the Collateral Agent and Credit Suisse, Cayman Islands Branch, as Collateral Agent under, and as defined in, the Second Lien Credit Agreement.

"**Interest Coverage Ratio**" shall mean, on any date, the ratio of (a) Consolidated EBITDA for the period of four consecutive fiscal quarters most recently ended on or prior to such date, taken as one accounting period, to (b) Consolidated Interest Expense for the period of four consecutive fiscal quarters ended on or prior to such date, taken as one accounting period.

"**Interest Payment Date**" shall mean (a) with respect to any ABR Loan (including any Swingline Loan), the last Business Day of each March, June, September and December commencing with March 31, 2006 and (b) with respect to any Eurodollar Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Eurodollar Borrowing with an Interest Period of more than three months' duration, each day that would have been an Interest Payment Date had successive Interest Periods of three months' duration been applicable to such Borrowing.

EXHIBIT A

"**Interest Period**" shall mean, with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is 1, 2, 3 or 6 months thereafter (or 9 or 12 months thereafter if, at the time of the relevant Borrowing, an interest period of such duration is available to all Lenders participating therein), as the Borrower may elect; *provided, however*, that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day and (b) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period. Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"**Investments**" shall have the meaning assigned to such term in Section 6.04.

"**Issuing Bank**" shall mean, as the context may require, (a) Credit Suisse, Cayman Islands Branch, in its capacity as the issuer of Letters of Credit hereunder, and (b) any other Lender that may become an Issuing Bank pursuant to Section 2.23(i) or Section 2.23(k), with respect to Letters of Credit issued by such Lender. The Issuing Bank may, in its discretion, arrange for one or more Letters of Credit to be issued by Affiliates of the Issuing Bank, in which case the term "Issuing Bank" shall include any such Affiliate with respect to Letters of Credit issued by such Affiliate.

"**Issuing Bank Fees**" shall have the meaning assigned to such term in Section 2.05(c).

"**L/C Commitment**" shall mean the commitment of the Issuing Bank to issue Letters of Credit pursuant to Section 2.23.

"**L/C Disbursement**" shall mean a payment or disbursement made by the Issuing Bank pursuant to a Letter of Credit.

"**L/C Exposure**" shall mean, at any time, the sum of (a) the aggregate undrawn amount of all Letters of Credit at such time and (b) the aggregate amount of all L/C Disbursements that have not been reimbursed at such time. The L/C Exposure of any Revolving Credit Lender at any time shall equal its Pro Rata Percentage of the aggregate L/C Exposure at such time.

EXHIBIT A

"**L/C Fee Payment Date**" shall have the meaning assigned to such term in Section 2.05(c).

"**L/C Participation Fee**" shall have the meaning assigned to such term in Section 2.05(c).

"**Lenders**" shall mean (a) each person listed on the Commitment Schedule (other than any such person that has ceased to be a party hereto pursuant to an Assignment and Acceptance) and (b) any person that has become a party hereto pursuant to an Assignment and Acceptance. Unless the context otherwise requires, the term "Lenders" shall include the Swingline Lender.

"**Letter of Credit**" shall mean any letter of credit issued pursuant to Section 2.23.

"**Leverage Ratio**" shall mean, on any date, the ratio of (a) Total Debt on such date to (b) Consolidated EBITDA for the period of four consecutive fiscal quarters most recently ended on or prior to such date, taken as one accounting period.

"**LIBO Rate**" shall mean, with respect to any Eurodollar Borrowing for any Interest Period, the rate per annum determined by the Administrative Agent at approximately 11:00 a.m., London time, on the date that is two Business Days prior to the commencement of such Interest Period by reference to the British Bankers' Association Interest Settlement Rates for deposits in dollars (as set forth by the Bloomberg Information Service or any successor thereto or any other service selected by the Administrative Agent which has been nominated by the British Bankers' Association as an authorized information vendor for the purpose of displaying such rates) for a period equal to such Interest Period; *provided* that, to the extent that an interest rate is not ascertainable pursuant to the foregoing provisions of this definition, the "LIBO Rate" shall be the interest rate per annum determined by the Administrative Agent to be the average of the rates per annum at which deposits in dollars are offered for such relevant Interest Period to major banks in the London interbank market in London, England by the Administrative Agent at approximately 11:00 a.m. (London time) on the date that is two Business Days prior to the beginning of such Interest Period.

"**Lien**" shall mean, with respect to any asset, (a) any mortgage, deed of trust, lien (statutory or otherwise), pledge, hypothecation, encumbrance, collateral assignment, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

19

EXHIBIT A

"**Loan Documents**" shall mean this Agreement and the Security Documents.

"**Loan Parties**" shall mean Holdings, the Borrower and each Subsidiary that is or becomes a party to a Loan Document.

"**Loans**" shall mean the Revolving Loans, the Tranche B Term Loans and the Swingline Loans.

"**Majority Facility Lenders**" shall mean, with respect to any Facility, the holders of a majority of the aggregate unpaid principal amount of the Tranche B Term Loans or the Aggregate Revolving Credit Exposure, as the case may be, outstanding under such Facility (or, in the case of the Revolving Credit Facility, prior to the termination of the Revolving Credit Commitments, the holders of a majority of the Total Revolving Credit Commitment).

"**Margin Stock**" shall have the meaning assigned to such term in Regulation U.

"**Material Adverse Effect**" shall mean a material adverse condition or material adverse change in or materially affecting (a) (i) for purposes of all representations and warranties made as of the Closing Date, the financial condition or results of operations of the Borrower and the Subsidiaries, taken as a whole, and (ii) for all other purposes, the assets, liabilities, business, results of operations or financial projections of Holdings, the Borrower and the Subsidiaries, taken as a whole, or (b) the validity or enforceability of any of the Loan Documents or the rights and remedies of the Arranger, the Administrative Agent, the Collateral Agent or the Secured Parties thereunder; *provided* that, for purposes of all representations and warranties made as of the Closing Date, none of the following shall be deemed in itself, or in any combination, to constitute, a Material Adverse Effect: (i) any adverse change resulting from the public disclosure of the transactions contemplated by the Stock Purchase Agreement or the execution of the Stock Purchase Agreement or the consummation of the transactions contemplated thereby; (ii) any adverse change attributable to generally applicable economic conditions in the United States or in the industry in which the Borrower and its Subsidiaries participate, which do not disproportionately impact the Borrower and its Subsidiaries, taken as a whole; or (iii) any adverse change resulting from the commencement, occurrence or continuation of a war, armed hostilities or other act of terrorism directly or indirectly involving the United States of America or any part thereof.

"**Material Indebtedness**" shall mean Indebtedness (other than the Loans and Letters of Credit), or obligations in respect of one or more Hedging Agreements, of any one or more of Holdings, the Borrower and the Subsidiaries in an aggregate principal amount exceeding $5,000,000.  For purposes of determining Material Indebtedness, the "principal amount" of the obligations of Holdings, the Borrower or any Subsidiary in respect of any Hedging Agreement

EXHIBIT A

at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that Holdings, the Borrower for such Subsidiary would be required to pay if such Hedging Agreement were terminated at such time.

"**Maximum Rate**" shall have the meaning assigned to such term in Section 9.09.

"**Moody's**" shall mean Moody's Investors Service, Inc.

"**Mortgaged Properties**" shall mean each parcel of real property and improvements thereto with respect to which a Mortgage is granted pursuant to Section 5.09 or 5.10.

"**Mortgages**" shall mean the fee mortgages or deeds of trust and other security documents granting a Lien on any Mortgaged Property to secure the Obligations, each in a form reasonably satisfactory to the Collateral Agent.

"**Multiemployer Plan**" shall mean a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"**Net Cash Proceeds**" shall mean (a) with respect to any Asset Sale or Recovery Event, the proceeds thereof in the form of cash and Permitted Investments (including any such proceeds subsequently received (as and when received) in respect of noncash consideration initially received), net of (i) out-of-pocket expenses (including reasonable and customary broker's fees or commissions, legal fees, survey costs, title insurance premiums, search and recording charges, transfer and similar taxes incurred by the Borrower and the Subsidiaries in connection therewith and the Borrower's good faith estimate of income taxes paid or payable in connection with such sale or event, after taking into account any available tax credits or deductions and any tax sharing arrangements), (ii) amounts provided as a reserve, in accordance with GAAP, against any liabilities, indemnification obligations or purchase price adjustment associated with such Asset Sale (*provided* that, to the extent and at the time any such amounts are released from such reserve, such amounts shall constitute Net Cash Proceeds) and (iii) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness which is secured by the asset sold in such Asset Sale or the subject of such Recovery Event and which is required to be repaid with such proceeds (other than any such Indebtedness assumed by the purchaser of such asset); *provided*, *however*, that, if (x) the Borrower shall deliver a certificate of a Responsible Officer of the Borrower to the Administrative Agent at the time of receipt thereof setting forth the Borrower's intent to reinvest such proceeds in productive assets of a kind then used or usable in the business of the Borrower and the Subsidiaries within 270 days of receipt of such proceeds and (y) no Default or Event of Default shall have occurred and shall be continuing at the time of such certificate or at the proposed time of the application of such proceeds, such proceeds shall not constitute Net Cash Proceeds except to the extent not so used at the end of (or not contracted to be used within 90 days after the end of)

EXHIBIT A

such 270-day period, at which time such proceeds shall be deemed to be Net Cash Proceeds; and (b) with respect to any incurrence of Indebtedness or any Equity Issuance, the cash proceeds thereof, net of all taxes and reasonable and customary fees, commissions, costs and other expenses incurred by the Borrower and the Subsidiaries in connection therewith.

"**Non-Consenting Lender**" shall have the meaning assigned to such term in Section 9.08(c).

"**Non-Funding Lender**" shall have the meaning assigned to such term in Section 9.08(c).

"**Obligations**" shall mean all obligations defined as "Obligations" in the Guarantee and Collateral Agreement and the other Security Documents.

"**Other Taxes**" shall mean any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies (including interest, fines, penalties and additions to tax) arising from any payment made under any Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Loan Document.

"**Parent**" shall mean RPG Investment Holdings LLC, a Delaware limited liability company.

"**PBGC**" shall mean the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"**Perfection Certificate**" shall mean the Perfection Certificate substantially in the form of Exhibit F or any other form approved by the Collateral Agent.

"**Permits**" shall mean any and all franchises, licenses, permits, approvals, notifications, certifications, registrations, authorizations, exemptions, qualifications, easements, rights of way, and other rights, privileges and approvals required under any Requirement of Law.

"**Permitted Acquisition**" shall mean the acquisition by the Borrower or any Subsidiary of all or substantially all the assets of a person, business unit, division or line of business of such person, or all of the Equity Interests of a person (referred to herein as the "**Acquired Entity**"); *provided* that (i) the Acquired Entity shall be a going concern and shall be in a similar line of business as that of the Borrower and the Subsidiaries as conducted during the current and most recently concluded calendar year; (ii) at the time of such transaction (A) both before and after giving effect thereto, no Event of Default or an event described in Section 7.01(c) that would, with the passage of time, constitute an Event of Default shall have occurred and be continuing; (B)(1) the Borrower would be in compliance with the covenants set forth in Sections 6.11, 6.12, 6.13 and 6.15, (2) the Leverage Ratio would be at least 0.25 less than the maximum

EXHIBIT A

Leverage Ratio then permitted under Section 6.12 at such time, and (3) the Leverage Ratio would be less than 6.3 to 1.0, in case of clauses (1), (2) and (3), as of the most recently completed period ending prior to such transaction for which the financial statements and certificates required by Section 5.04(a) or 5.04(b) were required to be delivered or for which comparable financial statements have been filed with the Securities and Exchange Commission, after giving pro forma effect to such transaction and to any other event occurring after such period as to which pro forma recalculation is appropriate (including any other transaction described in this definition occurring after such period) as if such transaction (and the occurrence or assumption of any Indebtedness in connection therewith) had occurred as of the first day of such period; and (C) after giving effect to such acquisition, there must be at least $5,000,000 of unused and available Revolving Credit Commitments; (iii) Holdings, the Borrower and the Subsidiaries shall not incur or assume any Indebtedness in connection with such acquisition, except as permitted by Section 6.01; and (iv) the Borrower shall comply, and shall cause the Acquired Entity to comply, with the applicable provisions of Sections 5.09 and 5.10 and the Security Documents.

"**Permitted Holdco Debt**" shall have the meaning assigned to such term in Section 6.01(j).

"**Permitted Holders**" shall mean the Sponsor and its Affiliates and their respective principals, employees, partners, officers, members and directors, and management.

"**Permitted Investments**" shall mean:

(a)    direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one year from the date of acquisition thereof;

(b)    investments in commercial paper maturing within 365 days from the date of acquisition thereof and having, at such date of acquisition, a rating of at least A-1 from S&P or P-1 from Moody's;

(c)    investments in certificates of deposit, banker's acceptances and time deposits maturing within 365 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, the Administrative Agent or any domestic office of any commercial bank organized under the laws of the United States of America or any state thereof that has a combined capital and surplus and undivided profits of not less than $500,000,000;

EXHIBIT A

(d)     repurchase agreements with a term of not more than 90 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria of clause (c) above;

(e)     investments in "money market funds" within the meaning of Rule 2a-7 of the Investment Company Act of 1940, as amended, substantially all of whose assets are invested in investments of the type described in clauses (a) through (d) above; and

(f)     other short term investments utilized by Foreign Subsidiaries in accordance with normal investment practices for cash management in investments of a type analogous to the foregoing.

"**Permitted Refinancing Indebtedness**" shall mean Indebtedness issued or incurred (including by means of the extension or renewal of existing Indebtedness) to refinance, refund, extend, renew or replace existing Indebtedness ("**Refinanced Indebtedness**"); *provided* that (a) the principal amount of such refinancing, refunding, extending, renewing or replacing Indebtedness is not greater than the outstanding principal amount of such Refinanced Indebtedness plus the amount of any premiums or penalties and accrued and unpaid interest paid thereon, reasonable fees and expenses and existing commitments unutilized thereunder, in each case associated with such refinancing, refunding, extension, renewal or replacement, (b) such refinancing, refunding, extending, renewing or replacing Indebtedness has a final maturity that is no sooner than, and a weighted average life to maturity that is no shorter than, such Refinanced Indebtedness, (c) if such Refinanced Indebtedness or any Guarantees thereof are subordinated to the Obligations, such refinancing, refunding, extending, renewing or replacing Indebtedness and any Guarantees thereof remain so subordinated on terms no less favorable to the Lenders, (d) the obligors in respect of such Refinanced Indebtedness immediately prior to such refinancing, refunding, extending, renewing or replacing and any new or additional Subsidiaries that become Loan Parties after the Closing Date are the only obligors on such refinancing, refunding extending, renewing or replacing Indebtedness and (e) such refinancing, refunding, extending, renewing or replacing Indebtedness contains covenants and events of default and is benefited by Guarantees, if any, which, taken as a whole, are determined in good faith by a Responsible Officer of the Borrower to be no less favorable to the Borrower or the applicable Subsidiary and the Lenders in any material respect than the covenants and events of default or Guarantees, if any, in respect of such Refinanced Indebtedness.

"**person**" shall mean any natural person, corporation, trust, business trust, joint venture, joint stock company, association, company, limited liability company, partnership, Governmental Authority or other entity.

"**Pledged Collateral**" shall mean all Collateral evidenced by certificates or instruments that are required to be delivered to the Collateral Agent pursuant to the terms of the Guarantee and Collateral Agreement.

(NY) 06216/188/CA/ca.first.lien.doc

EXHIBIT A

"**Prepayment Fee**" has the meaning set forth in Section 2.05(d).

"**Prime Rate**" shall mean the rate of interest per annum announced from time to time by Credit Suisse as its prime rate in effect at its principal office in New York City; each change in the Prime Rate shall be effective as of the opening of business on the date such change is announced as being effective. The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually available.

"**Pro Rata Percentage**" shall mean, with respect to any Revolving Credit Lender, at any time, the percentage of the Total Revolving Credit Commitment represented by such Lender's Revolving Credit Commitment. In the event all of the Revolving Credit Commitments shall have expired or been terminated, the Pro Rata Percentage of any Revolving Credit Lender shall be determined on the basis of the Revolving Loans then outstanding.

"**Qualified Employees**" shall mean the directors, officers, members of management, employees or consultants of Holdings, the Borrower or the Subsidiaries.

"**Qualified IPO**" shall mean an underwritten initial public offering of common stock of (and by) Holdings pursuant to an effective registration statement filed with the Securities and Exchange Commission in accordance with the Securities Act of 1933, as amended, which initial public offering results in gross cash proceeds to Holdings of $50,000,000 or more.

"**Real Property**" shall mean all Mortgaged Property and all other real property owned or leased from time to time by Holdings, the Borrower and the Subsidiaries.

"**Recovery Event**" shall mean any settlement of or payment in respect of any property or casualty insurance claim or any taking under power of eminent domain or by condemnation or similar proceeding of or relating to any property or asset of Holdings, the Borrower or any Subsidiary.

"**Refinancing**" shall have the meaning assigned to such term in the definition of "Transactions."

"**Register**" shall have the meaning assigned to such term in Section 9.04(d).

"**Regulation T**" shall mean Regulation T of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation U**" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

EXHIBIT A

"**Regulation X**" shall mean Regulation X of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Related Fund**" shall mean, with respect to any Lender that is a fund that invests in bank loans, any other fund that invests in bank loans and is advised or managed by the same investment advisor as such Lender or by an Affiliate of such investment advisor.

"**Related Parties**" shall mean, with respect to any specified person, such person's Affiliates and the respective directors, officers, employees, agents and advisors of such person and such person's Affiliates.

"**Release**" shall mean any release, spill, seepage, emission, leaking, pumping, injection, pouring, emptying, deposit, disposal, discharge, dispersal, dumping, escaping, leaching, or migration into, onto or through the environment or within or upon any building, structure, facility or fixture.

"**Repayment Date**" shall have the meaning given such term in Section 2.11(a).

"**Required Lenders**" shall mean, at any time, Lenders having Loans (excluding Swingline Loans), L/C Exposure, Swingline Exposure and unused Revolving Credit Commitments and Tranche B Term Loan Commitments representing at least a majority of the sum of all Loans outstanding (excluding Swingline Loans), L/C Exposure, Swingline Exposure and unused Revolving Credit Commitments and Tranche B Term Loan Commitments at such time.

"**Required Prepayment Percentage**" shall mean (a) in the case of any Asset Sale or Recovery Event, 100%; (b) in the case of any Equity Issuance, 50% or, if on the date of the applicable prepayment, the Leverage Ratio is less than 4.75 to 1.00, 25%; (c) in the case of any issuance or other incurrence of Indebtedness, 100%; and (d) in the case of any Excess Cash Flow, 75% or, if on the date of the applicable prepayment, the Leverage Ratio is less than 4.75 to 1.00 but greater than 4.50 to 1.00, 50%, or, if on the date of the applicable prepayment, the Leverage Ratio is less than or equal to 4.50 to 1.00 but greater than 3.50 to 1.00, 25% or, if on the date of the applicable prepayment, the Leverage Ratio is less than or equal to 3.50, 0%.

"**Requirement of Law**" shall mean as to any person, the governing documents of such person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such person or any of its Real Property or personal property or to which such person or any of its property of any nature is subject.

"**Responsible Officer**" shall mean the chief executive officer, president, any vice president, the chief financial officer, the treasurer or the assistant treasurer, the controller or other similar officer of a Loan Party and, as to any document delivered on the Closing Date, the secretary or the assistant secretary.

EXHIBIT A

"**Restricted Indebtedness**" shall mean Indebtedness of Holdings, the Borrower or any Subsidiary, the payment, prepayment, repurchase or defeasance of which is restricted under Section 6.09(b).

"**Restricted Payment**" shall mean any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in Holdings, the Borrower or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, defeasance, retirement, acquisition, cancellation or termination of any Equity Interests in Holdings, the Borrower or any Subsidiary or any option, warrant or other right to acquire any such Equity Interests in Holdings, the Borrower or any Subsidiary.

"**Revolving Credit Borrowing**" shall mean a Borrowing comprised of Revolving Loans.

"**Revolving Credit Commitment**" shall mean, with respect to each Lender, the commitment, if any, of such Lender to make Revolving Loans (and to acquire participations in Letters of Credit and Swingline Loans) hereunder as set forth on the Commitment Schedule, or in the Assignment and Acceptance pursuant to which such Lender assumed its Revolving Credit Commitment, as applicable, as the same may be (a) reduced from time to time pursuant to Section 2.09 and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 9.04.

"**Revolving Credit Exposure**" shall mean, with respect to any Lender, at any time, the aggregate principal amount at such time of all outstanding Revolving Loans of such Lender, plus the aggregate amount at such time of such Lender's L/C Exposure, plus the aggregate amount at such time of such Lender's Swingline Exposure.

"**Revolving Credit Lender**" shall mean a Lender with a Revolving Credit Commitment or an outstanding Revolving Loan.

"**Revolving Credit Maturity Date**" shall mean December 5, 2010.

"**Revolving Loans**" shall mean the revolving loans made by the Revolving Credit Lenders to the Borrower pursuant to Section 2.01(b).

"**S&P**" shall mean Standard & Poor's Ratings Group, Inc.

"**Second Lien Credit Agreement**" shall mean the Second Lien Credit Agreement dated as the date hereof, among Holdings, the Borrower, the lenders from time to time party thereto, Credit Suisse, Cayman Islands Branch, as sole bookrunner and sole lead arranger, and Credit Suisse, Cayman Islands Branch, as administrative agent and as collateral agent, as it may be amended, restated, supplemented or otherwise modified from time to time in accordance with the provisions of the Intercreditor Agreement.

EXHIBIT A

"**Secured Parties**" shall have the meaning assigned to such term in the Guarantee and Collateral Agreement.

"**Security Documents**" shall mean the Guarantee and Collateral Agreement, the Intercreditor Agreement, the Mortgages, the Intellectual Property Security Agreements and each of the other security agreements, pledges, mortgages, consents and other instruments and documents executed and delivered pursuant to any of the foregoing or pursuant to Section 5.09 or 5.10.

"**Sellers**" shall mean Michael Keiser and Philip Friedmann.

"**SPC**" shall have the meaning assigned to such term in Section 9.04(i).

"**Sponsor**" shall mean Monitor Clipper Partners, LLC and its Affiliates, including affiliated investment funds, general partners thereof and limited partners thereof.

"**Statutory Reserves**" shall mean a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum (without duplication) reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board to which the Administrative Agent or any Lender (including any branch, Affiliate or other fronting office making or holding a Loan) is subject for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board). Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. Statutory Reserves shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"**Stock Purchase Agreement**" shall mean the stock purchase agreement dated as of November 2, 2005, among the Company, the Sellers and the Parent.

"**subsidiary**" shall mean, with respect to any person (herein referred to as the "**parent**"), any corporation, partnership, limited liability company, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or more than 50% of the general partnership interests are, at the time any determination is being made, owned, controlled or held by the parent or (b) that is, at the time any determination is made, otherwise Controlled by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"**Subsidiary**" shall mean any subsidiary of the Borrower.

EXHIBIT A

"**Subsidiary Guarantor**" shall mean, initially, each Subsidiary specified on Schedule 1.01(b) and, at any time thereafter, shall include each other Subsidiary that is not an Excluded Foreign Subsidiary.

"**Swingline Commitment**" shall mean the commitment of the Swingline Lender to make loans pursuant to Section 2.22, as the same may be reduced from time to time pursuant to Section 2.09. The initial aggregate amount of the Swingline Commitments is $5,000,000.

"**Swingline Exposure**" shall mean, at any time, the aggregate principal amount at such time of all outstanding Swingline Loans. The Swingline Exposure of any Revolving Credit Lender at any time shall equal its Pro Rata Percentage of the aggregate Swingline Exposure at such time.

"**Swingline Lender**" shall mean Credit Suisse, Cayman Islands Branch, in its capacity as lender of Swingline Loans hereunder.

"**Swingline Loan**" shall mean a swingline loan made by the Swingline Lender pursuant to Section 2.22.

"**Synthetic Lease Obligations**" shall mean all monetary obligations of a person under (a) a so-called synthetic, off-balance sheet or tax retention lease or (b) an agreement for the use or possession of any property (whether real, personal or mixed) creating obligations which do not appear on the balance sheet of such person, but which, upon the insolvency or bankruptcy of such person, would be characterized as Indebtedness of such person (without regard to accounting treatment).

"**Synthetic Purchase Agreement**" shall mean any swap, derivative or other agreement or combination of agreements pursuant to which Holdings, the Borrower or any Subsidiary is or may become obligated to make (a) any payment in connection with a purchase by any third party from a person other than Holdings, the Borrower or any Subsidiary of any Equity Interest or Restricted Indebtedness or (b) any payment (other than on account of a permitted purchase by it of any Equity Interest or Restricted Indebtedness) the amount of which is determined by reference to the price or value at any time of any Equity Interest or Restricted Indebtedness; *provided* that no phantom stock or similar plan providing for payments only to current or former directors, officers or employees of Holdings, the Borrower or the Subsidiaries (or to their heirs or estates) shall be deemed to be a Synthetic Purchase Agreement.

"**Tax Code**" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"**Taxes**" shall mean any and all present or future taxes, levies, imposts, duties, deductions, charges, liabilities or withholdings imposed by any Governmental Authority.

EXHIBIT A

"**Total Debt**" shall mean, at any time, the aggregate amount of Indebtedness of the Borrower and the Subsidiaries outstanding at such time, in the amount that would be reflected on a balance sheet prepared at such time on a consolidated basis in accordance with GAAP.

"**Total Revolving Credit Commitment**" shall mean, at any time, the aggregate amount of the Revolving Credit Commitments, as in effect at such time. The initial Total Revolving Credit Commitment is $20,000,000.

"**Tranche B Lender**" shall mean a Lender with a Tranche B Term Loan Commitment or an outstanding Tranche B Term Loan.

"**Tranche B Maturity Date**" shall mean December 5, 2011.

"**Tranche B Term Borrowing**" shall mean a Borrowing comprised of Tranche B Term Loans.

"**Tranche B Term Loan**" shall mean a term loan made by the Tranche B Lenders to the Borrower pursuant to Section 2.01(a).

"**Tranche B Term Loan Commitment**" shall mean, with respect to each Lender, the commitment, if any, of such Lender to make Tranche B Term Loans hereunder as set forth on the Commitment Schedule, or in the Assignment and Acceptance pursuant to which such Lender assumed its Tranche B Term Loan Commitment, as applicable, as the same may be reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 9.04. The initial aggregate amount of the Tranche B Term Loan Commitments is $120,000,000.

"**Transactions**" shall mean, collectively, (a) the execution, delivery and performance by the Loan Parties of the Loan Documents to which they are a party, (b) the borrowings hereunder and under the Second Lien Credit Agreement and the use of proceeds of each of the foregoing and the issuance of Letters of Credit, (c) the granting of Liens pursuant to the Security Documents and pursuant to the security documents relating to the Second Lien Credit Agreement, (d) the Equity Contribution, (e) the repayment by the Borrower of all amounts outstanding under the Existing Note, the termination of the Existing Note and the release of all Liens and guarantees granted in respect thereof (the "**Refinancing**"), (f) the consummation of the Acquisition, including the payment of the Acquisition Consideration, (g) the execution, delivery and performance by the Loan Parties (as defined in the Second Lien Credit Agreement) of the Second Lien Credit Agreement and the other Loan Documents (as defined in the Second Lien Credit Agreement) to which they are a party, (h) the payment of fees and expenses incurred in connection with the foregoing (not to exceed $12,950,000 in the aggregate), including a fee payable to the Sponsor, and (i) any other transactions related to or entered into in connection with any of the foregoing.

EXHIBIT A

"**Type**", when used in respect of any Loan or Borrowing, shall refer to the Rate by reference to which interest on such Loan or on the Loans comprising such Borrowing is determined.  For purposes hereof, the term "**Rate**" shall include the Adjusted LIBO Rate and the Alternate Base Rate.

"**UCC**" shall mean the Uniform Commercial Code.

"**Uniform Customs**" shall have the meaning assigned to such term in Section 9.07.

"**wholly owned subsidiary**" of any person shall mean a subsidiary of such person of which securities (except for directors' qualifying shares) or other ownership interests representing 100% of the Equity Interests are, at the time any determination is being made, owned, controlled or held by such person or one or more wholly owned subsidiaries of such person or by such person and one or more wholly owned subsidiaries of such person; a "**wholly owned Subsidiary**" shall mean any wholly owned subsidiary of the Borrower.

"**Withdrawal Liability**" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

**Section 1.02**. *Terms Generally.*  The definitions in Section 1.01 shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including", and words of similar import, shall not be limiting and shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  The words "asset" and "property" shall be construed as having the same meaning and effect and to refer to any and all rights and interests in tangible and intangible assets and properties of any kind whatsoever, whether real, personal or mixed, including cash, securities, Equity Interests, accounts and contract rights.  The words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision of this Agreement unless the context shall otherwise require.  All references herein to Articles, Sections, Exhibits and Schedules shall be deemed references to Articles and Sections of, and Exhibits and Schedules to, this Agreement unless the context shall otherwise require.  Except as otherwise expressly provided herein, (a) any definition of, or reference to, any Loan Document or any other agreement, instrument or document in this Agreement shall mean such Loan Document or other agreement, instrument or document as amended, restated, supplemented or otherwise modified from time to time (subject to any restrictions on such amendments, restatements, supplements or modifications set forth herein) and (b) all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; *provided*, *however*, that if the Borrower notifies the Administrative Agent that the

31

EXHIBIT A

Borrower wishes to amend any covenant in Article 6 or any related definition to eliminate the effect of any change in GAAP occurring after the date of this Agreement on the operation of such covenant (or if the Administrative Agent notifies the Borrower that the Required Lenders wish to amend Article 6 or any related definition for such purpose), then the Borrower and the Administrative Agent shall negotiate in good faith to amend such covenant and related definitions (subject to the approval of the Required Lenders) to preserve the original intent thereof in light of such change in GAAP; *provided* that the Borrower's compliance with such covenant shall be determined on the basis of GAAP in effect immediately before the relevant change in GAAP became effective, until such covenant is amended.

Section 1.03. *Classification of Loans and Borrowings.* For purposes of this Agreement, Loans may be classified and referred to by Class (*e.g.*, a "**Revolving Loan**") or by Type (*e.g.*, a "**Eurodollar Loan**") or by Class and Type (*e.g.*, a "**Eurodollar Revolving Loan**"). Borrowings also may be classified and referred to by Class (e.g., a "**Revolving Borrowing**") or by Type (*e.g.*, a "**Eurodollar Borrowing**") or by Class and Type (*e.g.*, a "**Eurodollar Revolving Credit Borrowing**").

Section 1.04. *Pro Forma Calculations.* For purposes of computing each of the Leverage Ratio, the First Lien Leverage Ratio, the Interest Coverage Ratio and the Fixed Charge Coverage Ratio for any purpose hereunder, such ratio (and any financial calculations or components required to be made or included therein) shall be determined, with respect to the relevant period, after giving pro forma effect to the Acquisition, each Permitted Acquisition and Asset Sale of a Person, line of business or division consummated during such period and each retention of a producer or a broker in which an upfront payment has been made to such Person in order to secure his or her services (including, in each case, any incurrence, assumption, refinancing or repayment of Indebtedness), as if such Acquisition, Permitted Acquisition, Asset Sale, retention and related transactions had been consummated on the first day of such period, in each case (i) based on historical results and (ii) prepared in accordance with Regulation S-X under the Securities Act of 1933, as amended, together with those adjustments that (a) have been certified by a Financial Officer of the Borrower as having been prepared in good faith based upon reasonable assumptions and (b) are based on reasonably detailed written assumptions reasonably acceptable to the Administrative Agent.

## ARTICLE 2
### THE CREDITS

Section 2.01. *Commitments.* Subject to the terms and conditions hereof and relying upon the representations and warranties set forth herein, (a) each Tranche B Lender agrees, severally and not jointly, to make a Tranche B Term Loan to the Borrower on the Closing Date in a principal amount not to exceed its Tranche B Term Loan Commitment and (b) each Revolving Credit Lender agrees,

(NY) 06216/188/CA/ca.first.lien.doc

EXHIBIT A

severally and not jointly, to make Revolving Loans to the Borrower, at any time and from time to time on and after the Closing Date and until the earlier of the Revolving Credit Maturity Date and the termination of the Revolving Credit Commitment of such Revolving Credit Lender in accordance with the terms hereof, in an aggregate principal amount at any time outstanding that will not result in such Revolving Credit Lender's Revolving Credit Exposure exceeding such Revolving Credit Lender's Revolving Credit Commitment. Within the limits set forth in clause (b) of the preceding sentence and subject to the terms, conditions and limitations set forth herein, the Borrower may borrow, pay or prepay and reborrow Revolving Loans. Amounts paid or prepaid in respect of Tranche B Term Loans may not be reborrowed.

Section 2.02. *Loans.* (a) Each Loan (other than Swingline Loans) shall be made as part of a Borrowing consisting of Loans of the same Class and Type made by the Lenders ratably in accordance with their respective Commitments of the applicable Class; *provided, however,* that the failure of any Lender to make any Loan required to be made by it shall not in itself relieve any other Lender of its obligation to lend hereunder (it being understood, however, that no Lender shall be responsible for the failure of any other Lender to make any Loan required to be made by such other Lender). Except for Loans deemed made pursuant to Section 2.02(f) and subject to Section 2.22, the Loans comprising any Borrowing shall be in an aggregate principal amount that is (i) an integral multiple of $100,000 and not less than $500,000 or (ii) equal to the remaining available balance of the applicable Commitments.

(b)     Subject to Sections 2.08 and 2.15, each Borrowing shall be comprised entirely of ABR Loans or Eurodollar Loans as the Borrower may request pursuant to Section 2.03; *provided* that all Borrowings made on the Closing Date must be made as ABR Borrowings, and no Borrowings may be converted into or continued as a Eurodollar Borrowing having an Interest Period in excess of one month prior to the date that is 60 days after the Closing Date. Each Lender may at its option make any Eurodollar Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; *provided* that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement. Borrowings of more than one Type may be outstanding at the same time; *provided, however,* that the Borrower shall not be entitled to request any Borrowing that, if made, would result in more than ten Eurodollar Borrowings outstanding hereunder at any time. For purposes of the foregoing, Borrowings having different Interest Periods, regardless of whether they commence on the same date, shall be considered separate Borrowings.

(c)     Except with respect to Loans deemed made pursuant to Section 2.02(f) and subject to Section 2.22, each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds to such account in New York City as the Administrative Agent may designate not later than 12:00 Noon, New York City time, and the

EXHIBIT A

Administrative Agent shall promptly make available the amounts so received by wire transfer of immediately available funds to an account designated by the Borrower in the applicable Borrowing Request or, if a Borrowing shall not occur on such date because any condition precedent herein specified shall not have been met, return the amounts so received to the respective Lenders.

(d)    Unless the Administrative Agent shall have received notice from a Lender prior to the date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's portion of such Borrowing, the Administrative Agent may assume that such Lender has made such portion available to the Administrative Agent on the date of such Borrowing in accordance with paragraph (c) of this Section and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower on such date a corresponding amount.  If the Administrative Agent shall have so made funds available then, to the extent that such Lender shall not have made such portion available to the Administrative Agent, such Lender and the Borrower severally agree to repay to the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to the Borrower to but excluding the date such amount is repaid to the Administrative Agent at (i) in the case of the Borrower, the interest rate applicable at the time to the Loans comprising such Borrowing or (ii) in the case of such Lender, a rate determined by the Administrative Agent to represent its cost of overnight or short term funds (which determination shall be conclusive absent manifest error).  If such Lender shall repay to the Administrative Agent such corresponding amount, such amount shall constitute such Lender's Loan as part of such Borrowing for purposes of this Agreement.  If the Borrower pays such amount to the Administrative Agent, the amount so paid shall constitute a repayment of such Borrowing by such amount.

(e)    Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to request any Eurodollar Revolving Credit Borrowing if the Interest Period requested with respect thereto would end after the Revolving Credit Maturity Date.

(f)    If the Issuing Bank shall not have received from the Borrower the payment required to be made by Section 2.23(e) with respect to a Letter of Credit within the time specified in such Section, the Issuing Bank will promptly notify the Administrative Agent of the L/C Disbursement and the Administrative Agent will promptly notify each Revolving Credit Lender of such L/C Disbursement and its Pro Rata Percentage thereof.  Each Revolving Credit Lender shall pay by wire transfer of immediately available funds to the Administrative Agent not later than 2:00 p.m., New York City time, on such date (or, if such Revolving Credit Lender shall have received such notice later than 11:00 a.m., New York City time, on any day, not later than 10:00 a.m., New York City time, on the immediately following Business Day), an amount equal to such Lender's Pro Rata Percentage of such L/C Disbursement (it being understood that such amount shall be deemed to constitute an ABR Revolving Loan of such Lender and such payment shall be

EXHIBIT A

deemed to have reduced the L/C Exposure), and the Administrative Agent will promptly pay to the Issuing Bank amounts so received by it from the Revolving Credit Lenders. The Administrative Agent will promptly pay to the Issuing Bank any amounts received by it from the Borrower pursuant to Section 2.23(e) prior to the time that any Revolving Credit Lender makes any payment pursuant to this paragraph; any such amounts received by the Administrative Agent thereafter will be promptly remitted by the Administrative Agent to the Revolving Credit Lenders that shall have made such payments and to the Issuing Bank, as their interests may appear. If any Revolving Credit Lender shall not have made its Pro Rata Percentage of such L/C Disbursement available to the Administrative Agent as provided above, such Lender and the Borrower severally agree to pay interest on such amount, for each day from and including the date such amount is required to be paid in accordance with this paragraph to but excluding the date such amount is paid, to the Administrative Agent for the account of the Issuing Bank at (i) in the case of the Borrower, a rate per annum equal to the interest rate applicable to Revolving Loans pursuant to Section 2.06(a) or (if applicable) Section 2.07, and (ii) in the case of such Lender, for the first such day, the Federal Funds Effective Rate, and for each day thereafter, the Alternate Base Rate.

Section 2.03. *Borrowing Procedure.* In order to request a Borrowing (other than a Swingline Loan or a deemed Borrowing pursuant to Section 2.02(f), as to which this Section 2.03 shall not apply), the Borrower shall give telephonic notice confirmed promptly by hand delivery or fax to the Administrative Agent of a duly completed Borrowing Request (a) in the case of a Eurodollar Borrowing, not later than 1:00 p.m., New York City time, three Business Days before a proposed Borrowing and (b) in the case of an ABR Borrowing, not later than 1:00 p.m., New York City time, one Business Day before a proposed Borrowing. Each Borrowing Request shall be irrevocable, shall be signed by or on behalf of the Borrower and shall specify the following information: (i) whether the Borrowing then being requested is to be a Tranche B Term Borrowing or a Revolving Credit Borrowing, and whether such Borrowing is to be a Eurodollar Borrowing or an ABR Borrowing; (ii) the date of such Borrowing (which shall be a Business Day); (iii) the number and location of the account to which funds are to be disbursed; (iv) the amount of such Borrowing; and (v) if such Borrowing is to be a Eurodollar Borrowing, the initial Interest Period with respect thereto; *provided, however*, that, notwithstanding any contrary specification in any Borrowing Request, each requested Borrowing shall comply with the requirements set forth in Section 2.02. If no election as to the Type of Borrowing is specified in any such notice, then the requested Borrowing shall be an ABR Borrowing. If no Interest Period with respect to any Eurodollar Borrowing is specified in any such notice, then the Borrower shall be deemed to have selected an Interest Period of one month's duration. The Administrative Agent shall promptly advise the applicable Lenders of any notice given in accordance with this Section 2.03 (and the contents thereof), and of each Lender's portion of the requested Borrowing.

Section 2.04. *Repayment of Loans; Evidence of Debt.* (a) The Borrower hereby unconditionally promises to pay to the Administrative Agent for the

EXHIBIT A

account of each Lender (i) the principal amount of each Tranche B Term Loan of such Lender made to the Borrower as provided in Section 2.11 and (ii) the then unpaid principal amount of each Revolving Loan of such Lender made to the Borrower on the Revolving Credit Maturity Date.  The Borrower hereby unconditionally promises to pay to the Swingline Lender the then unpaid principal amount of each Swingline Loan made to the Borrower on the Revolving Credit Maturity Date.

**(b)**    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender to the Borrower from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

**(c)**    The Administrative Agent shall maintain accounts in which it will record (i) the amount of each Loan made hereunder, the Type thereof and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of the sum received by the Administrative Agent hereunder from the Borrower or any Guarantor and each Lender's share thereof.

**(d)**    The entries made in the accounts maintained pursuant to paragraphs (b) and (c) of this Section 2.04 shall be prima facie evidence of the existence and amounts of the obligations therein recorded; *provided, however*, that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligations of the Borrower to repay the Loans made to the Borrower in accordance with the terms of this Agreement.

**(e)**    Any Lender may request that Loans made by it hereunder be evidenced by a promissory note.  In such event, the Borrower shall execute and deliver to such Lender a promissory note payable to such Lender and its permitted registered assigns and in a form and substance reasonably acceptable to the Administrative Agent. Notwithstanding any other provision of this Agreement, in the event any Lender shall request and receive such a promissory note, the interests represented by such note shall at all times (including after any assignment of all or part of such interests pursuant to Section 9.04) be represented by one or more promissory notes payable to the payee named therein or its registered assigns.

**Section 2.05**. *Fees.*  (a) The Borrower agrees to pay to each Lender, through the Administrative Agent, on the last Business Day of March, June, September and December in each year, commencing with March 31, 2006, and on each date on which any Revolving Credit Commitment of such Lender shall expire or be terminated as provided herein, a commitment fee (a "**Commitment Fee**") equal to the Applicable Rate on the average daily unused amount of the Revolving Credit Commitment of such Lender during the preceding quarter (or other period commencing with the date hereof or ending with the date on which

EXHIBIT A

the Revolving Credit Commitment of such Lender shall expire or be terminated). All Commitment Fees shall be computed on the basis of the actual number of days elapsed in a year of 360 days. The Commitment Fee due to each Lender shall commence to accrue on the date hereof and shall cease to accrue on the date on which the Revolving Credit Commitment of such Lender shall expire or be terminated as provided herein. For purposes of calculating Commitment Fees, no portion of the Revolving Credit Commitments shall be deemed utilized under Section 2.22 as a result of outstanding Swingline Loans.

(b)     The Borrower agrees to pay to the Administrative Agent, for its own account, the fees in the amounts and at the times from time to time agreed to in writing by the Borrower and the Administrative Agent, including pursuant to the Fee Letter (the "**Administrative Agent Fees**").

(c)     The Borrower agrees to pay (i) to each Revolving Credit Lender, through the Administrative Agent, on the last Business Day of March, June, September and December of each year, commencing with March 31, 2006, and on the date on which the Revolving Credit Commitment of such Lender shall be terminated as provided herein (each, an "**L/C Fee Payment Date**") a fee (an "**L/C Participation Fee**") calculated on such Lender's Pro Rata Percentage of the average daily aggregate L/C Exposure (excluding the portion thereof attributable to unreimbursed L/C Disbursements which are earning interim interest pursuant to Section 2.23(h) or interest pursuant to Section 2.02(f)) for each day during the preceding quarter (or shorter period commencing with the date hereof or ending with the Revolving Credit Maturity Date or the date on which all Letters of Credit have been canceled or have expired and the Revolving Credit Commitments of all Lenders shall have been terminated) at a rate per annum equal to the Applicable Rate for such day used to determine the interest rate on Revolving Credit Borrowings comprised of Eurodollar Loans pursuant to Section 2.06, and (ii) to the Issuing Bank with respect to each outstanding Letter of Credit issued for the account of (or at the request of) the Borrower a fronting fee, which shall accrue at the rate of 0.125% per annum or such other rate as shall be separately agreed upon between the Borrower and the Issuing Bank, on the drawable amount of such Letter of Credit, payable quarterly in arrears on each L/C Fee Payment Date after the issuance date of such Letter of Credit, as well as the Issuing Bank's standard fees with respect to the issuance, amendment, renewal or extension of any Letter of Credit issued for the account of (or at the request of) the Borrower or processing of drawings thereunder (the fees in this clause (ii), collectively, the "**Issuing Bank Fees**"). All L/C Participation Fees and Issuing Bank Fees shall be computed on the basis of the actual number of days elapsed in a year of 360 days.

(d)     In the event that the Tranche B Term Loans are prepaid in whole or in part pursuant to Section 2.12(a) or in the event of an assignment of Tranche B Term Loans pursuant to Section 2.21(a) or Section 9.08(c), in each case, on or prior to the first anniversary of the Closing Date, the Borrower shall pay to the Lenders a prepayment fee (a "**Prepayment Fee**") on the principal amount so prepaid, assigned or paid equal to 1.00%.

(NY) 06216/188/CA/ca.first.lien.doc

EXHIBIT A

(e)     All Fees shall be paid on the dates due, in immediately available funds, to the Administrative Agent for distribution, if and as appropriate, among the Lenders, except that the Issuing Bank Fees shall be paid directly to the Issuing Bank. Once paid, none of the Fees shall be refundable under any circumstances.

Section 2.06. *Interest on Loans.* (a) Subject to the provisions of Section 2.07, the Loans comprising each ABR Borrowing, including each Swingline Loan, shall bear interest (computed on the basis of the actual number of days elapsed over a year of 365 or 366 days, as the case may be, when the Alternate Base Rate is determined by reference to the Prime Rate and over a year of 360 days at all other times) at a rate per annum equal to the Alternate Base Rate plus the Applicable Rate in effect from time to time.

(b)     Subject to the provisions of Section 2.07, the Loans comprising each Eurodollar Borrowing shall bear interest (computed on the basis of the actual number of days elapsed over a year of 360 days) at a rate per annum equal to the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Rate in effect from time to time.

(c)     Interest on each Loan shall be payable on the Interest Payment Dates applicable to such Loan except as otherwise provided in this Agreement. The applicable Alternate Base Rate or Adjusted LIBO Rate for each Interest Period or day within an Interest Period, as the case may be, shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

Section 2.07. *Default Interest.* If the Borrower shall default in the payment of the principal of or interest on any Loan or any other amount becoming due hereunder or under any other Loan Document, by acceleration or otherwise, the Borrower shall on demand from time to time pay interest, to the extent permitted by law, on such amount at a rate per annum (computed on the basis of the actual number of days elapsed over a year of 365 or 366 days, as the case may be, when the Alternate Base Rate is determined by reference to the Prime Rate, and over a year of 360 days at all other times) equal to the rate that would be applicable to such amount plus 2.00%.

Section 2.08. *Alternate Rate of Interest.* In the event, and on each occasion, that prior to the commencement of any Interest Period for a Eurodollar Borrowing (a) the Administrative Agent shall have determined that adequate and reasonable means do not exist for determining the Adjusted LIBO Rate for such Interest Period or (b) the Administrative Agent is advised by the Majority Facility Lenders in respect of the relevant Facility that the Adjusted LIBO Rate for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period, the Administrative Agent shall, as soon as practicable thereafter, give written or fax notice of such determination to the Borrower and the Lenders. In the event of any such determination, until the Administrative Agent shall have

EXHIBIT A

advised the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, (i) any request by the Borrower for a Eurodollar Borrowing pursuant to Section 2.03 shall be deemed to be a request for an ABR Borrowing, (ii) any request pursuant to Section 2.10 for the conversion of any Borrowing to a Eurodollar Borrowing shall be ineffective and (iii) any request pursuant to Section 2.10 for the continuation of any Borrowing as a Eurodollar Borrowing shall be deemed to be a request for the conversion of such Borrowing to an ABR Loan. Each determination by the Administrative Agent under this Section 2.08 shall be conclusive absent manifest error.

Section 2.09. *Termination and Reduction of Commitments.* (a) Unless previously terminated in accordance with the terms hereof, (i) the Tranche B Term Loan Commitments shall automatically terminate at 5:00 p.m., New York City time, on the Closing Date and (ii) the Revolving Credit Commitments, the Swingline Commitment and the L/C Commitment shall automatically terminate on the Revolving Credit Maturity Date. Notwithstanding the foregoing, all the Commitments shall automatically terminate at 5:00 p.m., New York City time, on January 31, 2006, if the initial Credit Event shall not have occurred by such time.

(b)    Upon at least one Business Days prior irrevocable written or fax notice to the Administrative Agent, the Borrower may at any time in whole permanently terminate, or from time to time in part permanently reduce, the Revolving Credit Commitments or the Swingline Commitment; *provided* that (i) each partial reduction of the Revolving Credit Commitments or the Swingline Commitment shall be in an integral multiple of $100,000 and in a minimum amount of $500,000 and (ii) the Total Revolving Credit Commitment shall not be reduced to an amount that is less than the Aggregate Revolving Credit Exposure then in effect (after giving effect to any repayment or prepayment effected simultaneously therewith); *provided, further,* that any such notice delivered by the Borrower may state that such notice is conditioned upon the effectiveness of other financing arrangements, in which case such notice may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.

(c)    Each reduction in the Revolving Credit Commitments or Swingline Commitment hereunder shall be made ratably among the applicable Lenders in accordance with their Pro Rata Percentages. The Borrower shall pay to the Administrative Agent for the account of the applicable Lenders, on the date of each termination or reduction, the Commitment Fees on the amount of the Commitments so terminated or reduced accrued to but excluding the date of such termination or reduction.

Section 2.10. *Conversion and Continuation of Borrowings.* The Borrower shall have the right at any time upon prior irrevocable telephonic notice to the Administrative Agent promptly confirmed by hand delivery of a written notice or by fax (a) not later than 1:00 p.m., New York City time, one Business Day prior to conversion, to convert any Eurodollar Borrowing of the Borrower

EXHIBIT A

into an ABR Borrowing, (b) not later than 1:00 p.m., New York City time, three Business Days prior to conversion or continuation, to convert any ABR Borrowing of the Borrower into a Eurodollar Borrowing or to continue any Eurodollar Borrowing of the Borrower as a Eurodollar Borrowing for an additional Interest Period and (c) not later than 1:00 p.m., New York City time, three Business Days prior to conversion, to convert the Interest Period with respect to any Eurodollar Borrowing of the Borrower to another permissible Interest Period, subject in each case to the following:

      (i)     each conversion or continuation shall be made pro rata among the Lenders in accordance with the respective principal amounts of the Loans comprising the converted or continued Borrowing;

      (ii)     if less than all the outstanding principal amount of any Borrowing shall be converted or continued, then each resulting Borrowing shall satisfy the limitations specified in Sections 2.02(a) and 2.02(b) regarding the principal amount and maximum number of Borrowings of the relevant Type;

      (iii)     each conversion shall be effected by each Lender and the Administrative Agent by recording for the account of such Lender the new Loan of such Lender resulting from such conversion and reducing the Loan (or portion thereof) of such Lender being converted by an equivalent principal amount; accrued interest on any Eurodollar Loan (or portion thereof) being converted shall be paid by the Borrower at the time of conversion;

      (iv)     if any Eurodollar Borrowing is converted at a time other than the end of the Interest Period applicable thereto, the Borrower shall pay, upon demand, any amounts due to the Lenders pursuant to Section 2.16;

      (v)     any portion of a Borrowing maturing or required to be repaid in less than one month may not be converted into or continued as a Eurodollar Borrowing;

      (vi)     any portion of a Eurodollar Borrowing that cannot be converted into or continued as a Eurodollar Borrowing by reason of the immediately preceding clause shall be automatically converted at the end of the Interest Period in effect for such Borrowing into an ABR Borrowing;

      (vii)     no Interest Period may be selected for any Eurodollar Tranche B Term Borrowing that would end later than a Repayment Date occurring on or after the first day of such Interest Period if, after giving effect to such selection, the aggregate outstanding amount of (A) the Eurodollar Tranche B Term Borrowings with Interest Periods ending on or prior to such Repayment Date and (B) the ABR Tranche B Term

40

EXHIBIT A

Borrowings would not be at least equal to the principal amount of Tranche B Term Borrowings to be paid on such Repayment Date; and

(viii)    after the occurrence and during the continuance of an Event of Default, no outstanding Loan may be converted into, or continued as, a Eurodollar Loan.

Each notice pursuant to this Section 2.10 shall be irrevocable and shall refer to this Agreement and specify (i) the identity and amount of the Borrowing that the Borrower requests be converted or continued, (ii) whether such Borrowing is to be converted to or continued as a Eurodollar Borrowing or an ABR Borrowing, (iii) if such notice requests a conversion, the date of such conversion (which shall be a Business Day) and (iv) if such Borrowing is to be converted to or continued as a Eurodollar Borrowing, the Interest Period with respect thereto. If no Interest Period is specified in any such notice with respect to any conversion to or continuation as a Eurodollar Borrowing, the Borrower shall be deemed to have selected an Interest Period of one month's duration. The Administrative Agent shall advise the Lenders of any notice given pursuant to this Section 2.10 and of each Lender's portion of any converted or continued Borrowing. If the Borrower shall not have given notice in accordance with this Section 2.10 to continue any Borrowing into a subsequent Interest Period (and shall not otherwise have given notice in accordance with this Section 2.10 to convert such Borrowing), such Borrowing shall, at the end of the Interest Period applicable thereto (unless repaid pursuant to the terms hereof), automatically be converted or continued into an ABR Borrowing.

**Section 2.11**. *Repayment of Tranche B Term Borrowings.* (a) On the dates set forth below, or if any such date is not a Business Day, on the next preceding Business Day (each such date being called a "**Repayment Date**"), the Borrower shall pay to the Administrative Agent, for the account of the Tranche B Lenders, a principal amount of the Tranche B Term Loans (as adjusted from time to time pursuant to Sections 2.11(b), 2.12 and Section 2.13) equal to the amount set forth below for such date, together in each case with accrued and unpaid interest and Fees on the amount to be paid to but excluding the date of such payment:

| Repayment Date | Tranche B Term Loan Amount |
|---|---|
| March 31, 2007 | $750,000 |
| June 30, 2007 | $750,000 |
| September 30, 2007 | $750,000 |
| December 31, 2007 | $750,000 |
| March 31, 2008 | $1,500,000 |
| June 30, 2008 | $1,500,000 |
| September 30, 2008 | $1,500,000 |
| December 31, 2008 | $1,500,000 |

(NY) 06216/188/CA/ca.first.lien.doc

EXHIBIT A

| | |
|---|---|
| March 31, 2009 | $2,250,000 |
| June 30, 2009 | $2,250,000 |
| September 30, 2009 | $2,250,000 |
| December 31, 2009 | $2,250,000 |
| March 31, 2010 | $3,000,000 |
| June 30, 2010 | $3,000,000 |
| September 30, 2010 | $3,000,000 |
| December 31, 2010 | $3,000,000 |
| March 31, 2011 | $3,750,000 |
| June 30, 2011 | $3,750,000 |
| September 30, 2011 | $3,750,000 |
| Tranche B Term Loan Maturity Date | Remainder |

(b)     In the event and on each occasion that any Tranche B Term Loan Commitments shall be reduced or shall expire or terminate other than as a result of the making of a Tranche B Term Loan, the installments payable on each Repayment Date shall be reduced pro rata by an aggregate amount equal to the amount of such reduction, expiration or termination.

(c)     To the extent not previously paid, all Tranche B Term Loans shall be due and payable on the Tranche B Term Loan Maturity Date, together with accrued and unpaid interest on the principal amount to be paid to but excluding the date of payment.

(d)     All repayments pursuant to this Section 2.11 shall be subject to Section 2.16, but shall otherwise be without premium or penalty.

Section 2.12.  *Prepayment.*  (a) The Borrower shall have the right at any time and from time to time to prepay any Borrowing (other than a Swingline Loan as to which Section 2.22(c) shall apply), in whole or in part, upon at least three Business Days' prior written or fax notice (or telephone notice promptly confirmed by written or fax notice) in the case of Eurodollar Loans, or written or fax notice (or telephone notice promptly confirmed by written or fax notice) at least one Business Day prior to the date of prepayment in the case of ABR Loans, to the Administrative Agent before 1:00 p.m., New York City time; *provided, however,* that each partial prepayment shall be in an amount that is an integral multiple of $100,000 and not less than $500,000.

(b)     Optional prepayments of Tranche B Term Loans shall be applied against the remaining scheduled installments of principal due in respect of the Tranche B Term Loans under Section 2.11 in such order as the Borrower may direct.

(c)     Each notice of prepayment shall specify the prepayment date and the principal amount of each Borrowing (or portion thereof) to be prepaid, shall be irrevocable and shall commit the Borrower to prepay such Borrowing by the

EXHIBIT A

amount stated therein on the date stated therein; *provided* that any such notice delivered by the Borrower may state that such notice is conditioned upon the effectiveness of other financing arrangements, in which case such notice may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied. All prepayments under this Section 2.12 shall be subject to Section 2.16, but shall otherwise be without premium or penalty. All Eurodollar prepayments under this Section 2.12 shall be accompanied by accrued and unpaid interest on the principal amount prepaid to but excluding the date of payment.

> **Section 2.13**. *Mandatory Prepayments.* (a) In the event of any termination of all of the Revolving Credit Commitments, the Borrower shall, on the date of such termination, repay or prepay all outstanding Revolving Credit Borrowings and all outstanding Swingline Loans and replace all outstanding Letters of Credit and/or deposit an amount equal to the L/C Exposure in cash in a cash collateral account established with the Collateral Agent for the benefit of the Secured Parties. If as a result of any partial reduction of the Revolving Credit Commitments the Aggregate Revolving Credit Exposure would exceed the Total Revolving Credit Commitment after giving effect thereto, then the Borrower shall, on the date of such reduction, repay or prepay Revolving Credit Borrowings or Swingline Loans (or a combination thereof) and/or cash collateralize Letters of Credit in an amount sufficient to eliminate such excess.

> **(b)** Not later than the fifth Business Day following receipt of the Net Cash Proceeds in respect of any Asset Sale or the occurrence of any Recovery Event, the Borrower shall apply the Required Prepayment Percentage of the Net Cash Proceeds received with respect thereto to prepay outstanding Loans and/or cash collateralize Letters of Credit in accordance with Section 2.13(g).

> **(c)** In the event and on each occasion that an Equity Issuance occurs, the Borrower shall, substantially simultaneously with (and in any event not later than the fifth Business Day next following) the occurrence of such Equity Issuance, apply the Required Prepayment Percentage of the Net Cash Proceeds therefrom to prepay outstanding Loans and/or cash collateralize Letters of Credit in accordance with Section 2.13(g).

> **(d)** In the event that Holdings or any subsidiary of Holdings shall receive Net Cash Proceeds from the issuance or other incurrence of Indebtedness (other than Indebtedness permitted pursuant to Section 6.01), the Borrower shall, substantially simultaneously with (and in any event not later than the fifth Business Day next following) the receipt of such Net Cash Proceeds by such Loan Party or such subsidiary, apply an amount equal to the Required Prepayment Percentage of such Net Cash Proceeds to prepay outstanding Loans and/or cash collateralize Letters of Credit in accordance with Section 2.13(g).

> **(e)** No later than the earlier of (i) 90 days after the end of each fiscal year of the Borrower, commencing with the fiscal year ending on the Friday

EXHIBIT A

closest to April 30, 2007, and (ii) the date on which the financial statements with respect to such period are delivered pursuant to Section 5.04(a), the Borrower shall prepay outstanding Loans and/or cash collateralize Letters of Credit in accordance with Section 2.13(g), in an aggregate principal amount equal to the Required Prepayment Percentage of Excess Cash Flow for the fiscal year then ended; *provided* that the amount payable under this Section 2.13(e) with respect to any fiscal year shall be reduced on a dollar-for-dollar basis by the amount of any optional prepayments of the Tranche B Term Loans pursuant to Section 2.12 and voluntary reductions of the Revolving Credit Commitments pursuant to Section 2.09(b) made during such fiscal year.

**(f)**     The Borrower shall deliver to the Administrative Agent, at the time of each prepayment required under this Section 2.13, (i) a certificate signed by a Financial Officer of the Borrower setting forth in reasonable detail the calculation of the amount of such prepayment and specifying the prepayment date and (ii) to the extent practicable, at least five Business Days prior written notice of such prepayment. All prepayments of Borrowings pursuant to this Section 2.13 shall be subject to Section 2.16, but shall otherwise be without premium or penalty.

**(g)**     Mandatory prepayments under paragraphs (b), (c), (d) and (e) of this Section shall be applied:

**(i)**     *first*, to prepay in chronological order the remaining scheduled installments of principal due in respect of the Tranche B Term Loans under Section 2.11 (and the corresponding accrued and unpaid interest and Fees on the principal amount of Tranche B Term Loans so prepaid), subject to the proviso to this paragraph below;

**(ii)**     *second*, if no Tranche B Term Loans are outstanding, to prepay outstanding Revolving Loans to the full extent thereof (and the corresponding accrued and unpaid interest and Fees on the principal amount of Revolving Loans so prepaid);

**(iii)**     *third*, if no Tranche B Term Loans and no Revolving Loans are outstanding, to cash collateralize any outstanding Letters of Credit (up to an aggregate amount equal to the aggregate undrawn face amount of all such Letters of Credit);

**(iv)**     *fourth*, to prepay outstanding loans under the Second Lien Credit Agreement (and the corresponding accrued and unpaid interest and fees on the principal amount of such loans so prepaid) if and to the extent required thereby; and

**(v)**     *fifth*, any remaining amounts to be retained by the Borrower;

*provided* that, notwithstanding anything herein to the contrary, any Tranche B Lender may elect, by notice to the Administrative Agent by facsimile at least 5 Business Days prior to the applicable prepayment date, to decline (in whole but

EXHIBIT A

not in part) any prepayment of its Tranche B Term Loans pursuant to clauses (b), (c), (d) or (e) of this Section 2.13, in which case the aggregate amount of the prepayment that would have been applied to prepay the Tranche B Term Loans of such declining Tranche B Lender shall be re-offered to those Tranche B Lenders under this Agreement (if any) who have initially accepted such prepayment (such re-offer to be made to each such Tranche B Lender based on the percentage which such Tranche B Lender's Tranche B Term Loans represents of the aggregate Tranche B Term Loans of all Tranche B Lenders who initially accepted such prepayment). In the event of such a re-offer, the relevant Lenders may elect, by notice to the Administrative Agent by facsimile within one Business Day of receiving notification of such re-offer, to decline (in whole but not in part) the amount of such prepayment that is re-offered to them. So long as any Tranche B Term Loans are outstanding, the aggregate amount of the prepayment that would have been applied to prepay accepting Tranche B Lenders but was so declined shall be applied as set forth in clauses (iv) and (v) above. Mandatory prepayments in respect of the Tranche B Term Loans shall be applied on a pro rata basis to the then outstanding Tranche B Term Loans being prepaid irrespective of whether such outstanding Tranche B Term Loans are ABR Loans or Eurodollar Loans; *provided* that if no Lenders exercise the right to waive a given mandatory prepayment of the Term Loans pursuant to this Section 2.13(g), then, with respect to such mandatory prepayment, the amount of such mandatory prepayment shall be applied first to Tranche B Term Loans that are ABR Loans to the full extent thereof before application to Tranche B Term Loans that are Eurodollar Loans in a manner that minimizes the amount of any payments required to be made by the Borrower pursuant to Section 2.16.

**Section 2.14**. *Reserve Requirements; Change in Circumstances.* (a) Notwithstanding any other provision of this Agreement, if any Change in Law shall:

(i)     impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender, the Administrative Agent or the Issuing Bank (except any such reserve requirement which is reflected in the Adjusted LIBO Rate) or

(ii)     impose on any Lender, the Administrative Agent or the Issuing Bank or the London interbank market any other condition affecting this Agreement or Eurodollar Loans made by such Lender or any Letter of Credit or participation therein,

and the result of any of the foregoing shall be to increase the cost to such Lender or the Issuing Bank of making or maintaining any Eurodollar Loan (or of maintaining its obligation to make any such Loan) or to increase the cost to any Lender, the Administrative Agent or the Issuing Bank of issuing or maintaining any Letter of Credit or purchasing or maintaining a participation therein or to reduce the amount of any sum received or receivable by such Lender or the

EXHIBIT A

Issuing Bank hereunder (whether of principal, interest or otherwise) by an amount deemed by such Lender, the Administrative Agent or the Issuing Bank to be material, then the Borrower will pay to such Lender, the Administrative Agent or the Issuing Bank, as the case may be, upon demand such additional amount or amounts as will compensate such Lender or the Issuing Bank, as the case may be, for such additional costs incurred or reduction suffered.

(b)    If any Lender, the Administrative Agent or the Issuing Bank shall have determined that any Change in Law regarding capital adequacy has or would have the effect of reducing the rate of return on such Lender's, the Administrative Agent's or the Issuing Bank's capital or on the capital of such Lender's, the Administrative Agent's or the Issuing Bank's holding company, if any, as a consequence of this Agreement or the Loans made by, or participations in Letters of Credit purchased by, such Lender or the Letters of Credit issued by the Issuing Bank to a level below that which such Lender, the Administrative Agent or the Issuing Bank or such Lender's, the Administrative Agent's or the Issuing Bank's holding company could have achieved but for such Change in Law (taking into consideration such Lender's, the Administrative Agent's or the Issuing Bank's policies and the policies of such Lender's, the Administrative Agent's or the Issuing Bank's holding company with respect to capital adequacy) by an amount deemed by such Lender, the Administrative Agent or the Issuing Bank to be material, then from time to time the Borrower shall pay to such Lender, the Administrative Agent or the Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender, the Administrative Agent or the Issuing Bank or such Lender's, the Administrative Agent's or the Issuing Bank's holding company for any such reduction suffered.

(c)    A certificate of a Lender, the Administrative Agent or the Issuing Bank setting forth the amount or amounts necessary to compensate such Lender, the Administrative Agent or the Issuing Bank or its holding company, as applicable, as specified in paragraph (a) or (b) of this Section shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender, the Administrative Agent or the Issuing Bank, as the case may be, the amount or amounts shown as due on any such certificate delivered by it within 30 days after its receipt of the same.

(d)    Failure or delay on the part of any Lender, the Administrative Agent or the Issuing Bank to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's, the Administrative Agent's or the Issuing Bank's right to demand such compensation; *provided* that the Borrower shall not be under any obligation to compensate any Lender, the Administrative Agent or the Issuing Bank under paragraph (a) or (b) above for increased costs or reductions with respect to any period prior to the date that is 270 days prior to such request if such Lender, the Administrative Agent or the Issuing Bank knew or could reasonably have been expected to know of the circumstances giving rise to such increased costs or reductions and of the fact that such circumstances would result in a claim for increased compensation by reason of such increased

EXHIBIT A

costs or reductions; *provided further* that the foregoing limitation shall not apply to any increased costs or reductions arising out of the retroactive application of any Change in Law within such 270-day period. The protection of this Section shall be available to each Lender, the Administrative Agent and the Issuing Bank regardless of any possible contention of the invalidity or inapplicability of the Change in Law that shall have occurred or been imposed.

(e)    Notwithstanding anything in this Section 2.14 to the contrary, this Section 2.14 shall not apply to any Change in Law with respect to Excluded Taxes, which shall be governed exclusively by Section 2.20.

**Section 2.15**. *Change in Legality.* (a) Notwithstanding any other provision of this Agreement, if any Change in Law shall make it unlawful for any Lender to make or maintain any Eurodollar Loan or to give effect to its obligations as contemplated hereby with respect to any Eurodollar Loan, then, by written notice to the Borrower and to the Administrative Agent:

(i)    such Lender may declare that Eurodollar Loans will not thereafter (for the duration of such unlawfulness) be made by such Lender hereunder (or be continued for additional Interest Periods and ABR Loans will not thereafter (for such duration) be converted into Eurodollar Loans), whereupon any request for a Eurodollar Borrowing (or to convert an ABR Borrowing to a Eurodollar Borrowing or to continue a Eurodollar Borrowing for an additional Interest Period) shall, as to such Lender only, be deemed a request for an ABR Loan (or a request to continue an ABR Loan as such for an additional Interest Period or to convert a Eurodollar Loan into an ABR Loan, as the case may be), unless such declaration shall be subsequently withdrawn; and

(ii)    such Lender may require that all outstanding Eurodollar Loans made by it be converted to ABR Loans, in which event all such Eurodollar Loans shall be automatically converted to ABR Loans as of the effective date of such notice as provided in paragraph (b) below.

In the event any Lender shall exercise its rights under (i) or (ii) above, all payments and prepayments of principal that would otherwise have been applied to repay the Eurodollar Loans that would have been made by such Lender or the converted Eurodollar Loans of such Lender shall instead be applied to repay the ABR Loans made by such Lender in lieu of, or resulting from the conversion of, such Eurodollar Loans. Any such conversion of a Eurodollar Loan under (i) or (ii) above shall be subject to Section 2.16.

(b)    For purposes of this Section 2.15, a notice to the Borrower by any Lender shall be effective as to each Eurodollar Loan made by such Lender, if lawful, on the last day of the Interest Period then applicable to such Eurodollar Loan; in all other cases such notice shall be effective on the date of receipt by the Borrower.

EXHIBIT A

**Section 2.16**. *Indemnity*. The Borrower shall indemnify each Lender against any loss or expense that such Lender may sustain or incur as a consequence of (a) any event, other than a default by such Lender in the performance of its obligations hereunder, which results in (i) such Lender receiving or being deemed to receive any amount on account of the principal of any Eurodollar Loan prior to the end of the Interest Period in effect therefor, (ii) the conversion of any Eurodollar Loan to an ABR Loan, or the conversion of the Interest Period with respect to any Eurodollar Loan, in each case other than on the last day of the Interest Period in effect therefor or (iii) any Eurodollar Loan to be made by such Lender (including any Eurodollar Loan to be made pursuant to a conversion or continuation under Section 2.10) not being made after notice of such Loan shall have been given by the Borrower hereunder (any of the events referred to in this clause (a) being called a "**Breakage Event**") or (b) any default in the making of any payment or prepayment required to be made hereunder.  In the case of any Breakage Event, such loss shall include an amount equal to the excess, as reasonably determined by such Lender, of (i) its cost of obtaining funds for the Eurodollar Loan that is the subject of such Breakage Event for the period from the date of such Breakage Event to the last day of the Interest Period in effect (or that would have been in effect) for such Loan over (ii) the amount of interest likely to be realized by such Lender in redeploying the funds released or not utilized by reason of such Breakage Event for such period.  A certificate of any Lender setting forth any amount or amounts which such Lender is entitled to receive pursuant to this Section 2.16 shall be delivered to the Borrower and shall be conclusive absent manifest error.

**Section 2.17**. *Pro Rata Treatment*. Except as provided below in this Section 2.17 with respect to Swingline Loans and as required under Section 2.13(g) and Section 2.15, each Borrowing of any Class, each payment or prepayment of principal of any Borrowing of any Class, each payment of interest on the Loans of any Class, each payment of the Commitment Fees, each reduction of the Tranche B Term Loan Commitments or the Revolving Credit Commitments and each conversion of any Borrowing of any Class to or continuation of any Borrowing of any Class as a Borrowing of such Class of any Type shall be allocated pro rata among the Lenders in accordance with their respective applicable Commitments of such Class (or, if such Commitments of such Class shall have expired or been terminated, in accordance with the respective principal amounts of their outstanding Loans of such Class).  For purposes of determining the available Revolving Credit Commitments of the Lenders at any time, each outstanding Swingline Loan shall be deemed to have utilized the Revolving Credit Commitments of the Lenders (including those Lenders which shall not have made Swingline Loans) pro rata in accordance with such respective Revolving Credit Commitments.  Each Lender agrees that in computing such Lender's portion of any Borrowing to be made hereunder, the Administrative Agent may, in its discretion, round each Lender's percentage of such Borrowing to the next higher or lower whole dollar amount.

EXHIBIT A

**Section 2.18**. *Sharing of Setoffs.* Each Lender agrees that if it shall, through the exercise of a right of banker's lien, setoff or counterclaim against the Borrower or any other Loan Party, or pursuant to a secured claim under Section 506 of Title 11 of the United States Bankruptcy Code or other security or interest arising from, or in lieu of, such secured claim, received by such Lender under any applicable bankruptcy, insolvency or other similar law or otherwise, or by any other means, obtain payment (voluntary or involuntary) in respect of any Loan or L/C Disbursement as a result of which the unpaid principal portion of its Loans and participations in L/C Disbursements shall be proportionately less than the unpaid principal portion of the Loans and participations in L/C Disbursements of any other Lender, it shall be deemed simultaneously to have purchased from such other Lender at face value, and shall promptly pay to such other Lender the purchase price for, a participation in the Loans and L/C Exposure of such other Lender, so that the aggregate unpaid principal amount of the Loans and L/C Exposure and participations in Loans and L/C Exposure held by each Lender shall be in the same proportion to the aggregate unpaid principal amount of all Loans and L/C Exposure then outstanding as the principal amount of its Loans and L/C Exposure prior to such exercise of banker's lien, setoff or counterclaim or other event was to the principal amount of all Loans and L/C Exposure outstanding prior to such exercise of banker's lien, setoff or counterclaim or other event; *provided, however,* that if any such purchase or purchases or adjustments shall be made pursuant to this Section 2.18 and the payment giving rise thereto shall thereafter be recovered, such purchase or purchases or adjustments shall be rescinded to the extent of such recovery and the purchase price or prices or adjustment restored without interest. The Borrower expressly consents to the foregoing arrangements and agrees that any Lender holding a participation in a Loan or L/C Disbursement deemed to have been so purchased may exercise any and all rights of banker's lien, setoff or counterclaim with respect to any and all moneys owing by the Borrower to such Lender by reason thereof as fully as if such Lender had made a Loan directly to the Borrower in the amount of such participation.

**Section 2.19**. *Payments.* (a) The Borrower shall make each payment (including principal of or interest on any Borrowing or any L/C Disbursement or any Fees or other amounts) hereunder and under any other Loan Document not later than 1:00 p.m., New York City time, on the date when due in immediately available dollars, without setoff, defense or counterclaim. Each such payment (other than (i) Issuing Bank Fees, which shall be paid directly to the Issuing Bank, and (ii) principal of and interest on Swingline Loans, which shall be paid directly to the Swingline Lender except as otherwise provided in Section 2.22) shall be made to the Administrative Agent at its offices at Eleven Madison Avenue, New York, NY 10010. All payments hereunder and under each other Loan Document shall be made in dollars.

**(b)** Except as otherwise expressly provided herein, whenever any payment (including principal of or interest on any Borrowing or any Fees or other amounts) or performance hereunder or under any other Loan Document shall

EXHIBIT A

become due, or otherwise would occur, on a day that is not a Business Day, such payment or performance may be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of interest or Fees, if applicable.

Section 2.20. *Taxes.* (a) Any and all payments by or on account of any obligation of the Borrower or any other Loan Party hereunder or under any other Loan Document shall be made free and clear of and without deduction for any Indemnified Taxes or Other Taxes; *provided* that if any Indemnified Taxes or Other Taxes are required to be withheld or deducted from such payments, then (i) the sum payable by the Borrower shall be increased as necessary so that after all required deductions or withholding (including deductions or withholdings applicable to additional sums payable under this Section) the Administrative Agent or such Lender (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower or such other Loan Party shall make (or cause to be made) such deductions and (iii) the Borrower or such other Loan Party shall pay (or cause to be paid) the full amount deducted to the relevant Governmental Authority in accordance with applicable law.  In addition, the Borrower or any other Loan Party hereunder shall pay (or cause to be paid) any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(b)    The Borrower shall indemnify the Administrative Agent and each Lender, within 10 days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by the Administrative Agent or such Lender, as the case may be, or any of their respective Affiliates, on or with respect to any payment by or on account of any obligation of the Borrower or any Loan Party hereunder or under any other Loan Document (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) and any penalties, interest and expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender, or by the Administrative Agent on its behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(c)    As soon as practicable after any payment of Indemnified Taxes or Other Taxes pursuant to Section 2.20(a), and in any event within 30 days of any such payment being due, the Borrower shall deliver (or cause to be delivered) to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(d)    Any Foreign Lender that is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which the Borrower is located, or any treaty to which such jurisdiction is a party, with

EXHIBIT A

respect to payments under this Agreement shall deliver to the Borrower (with a copy to the Administrative Agent) on or prior to the date a payment is to be made to such Lender under this Agreement or promptly upon learning that any such documentation expired or became obsolete, at the reasonable written request of the Borrower, such properly completed and executed documentation necessary to establish under applicable law that such payments may be made without withholding or at a reduced rate; *provided* that such Lender is legally entitled to complete, execute and deliver such documentation and in such Lender's reasonable judgment such completion, execution or delivery would not materially prejudice the legal position of such Lender. In addition, each Foreign Lender shall (i) furnish to the Borrower and the Administrative Agent on or before it becomes a party to the Agreement (or with respect to a Form W-8IMY, the date such Lender does not act or ceases to act for its own account with respect to any portion of any sums paid or payable to such Lender under this Agreement) either (a) two accurate and complete duly executed U.S. Internal Revenue Service Form W-8BEN (or successor form), (b) an accurate and complete duly executed U.S. Internal Revenue Service Form W-8ECI (or successor form) or (c) an accurate and complete duly executed U.S. Internal Revenue Service Form W-8IMY (or any successor thereto) with appropriate Forms W-9 or W-8 (each such form, properly completed and duly executed) attached thereto, certifying, in each case, to such Foreign Lender's legal entitlement (or, with respect to a Form W-8IMY and any associated Forms W-8 or W-9, the legal entitlement of the person(s) for whom such Foreign Lender is acting) to an exemption or reduction from U.S. federal withholding tax with respect to all interest payments hereunder, and (ii) provide a new Form W-8BEN (or successor form) or Form W-8ECI (or successor form) upon the expiration or obsolescence of any previously delivered form to reconfirm any complete exemption from, or any entitlement to a reduction in, U.S. federal withholding tax with respect to any interest payment hereunder; *provided* that any Foreign Lender that is not a "bank" within the meaning of Section 881(c)(3)(A) of the Tax Code and is relying on the so-called "portfolio interest exemption" shall also furnish a "Non-Bank Certificate" in the form of Exhibit G together with a Form W-8BEN. Notwithstanding any other provision of this paragraph, a Foreign Lender shall not be required to deliver any form pursuant to this paragraph that such Foreign Lender is not legally able to deliver.

(e)     Any Lender that is a United States person, as defined in Section 7701(a)(30) of the Tax Code, and is not an exempt recipient within the meaning of Treasury Regulations Section 1.6049-4(c) shall deliver to the Borrower at the times described in Section 2.20(d) (with a copy to the Administrative Agent) two accurate and complete duly signed copies of Internal Revenue Service Form W-9, or any successor form that such person is entitled to provide at such time in order to comply with United States back-up withholding requirements.

(f)     Without prejudice to the survival of any other agreement of the Borrower hereunder, the agreements and obligations of the Borrower contained in this Section 2.20 shall survive the payment in full of all amounts due hereunder.

EXHIBIT A

(g)     If the Administrative Agent, a Lender or an Issuing Bank determines, in its sole discretion, that it has received a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 2.20, it shall pay to the Borrower an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 2.20 with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent, such Lender or such Issuing Bank, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); *provided* that the Borrower, upon the request of the Administrative Agent, such Lender or such Issuing Bank, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent, such Lender or such Issuing Bank in the event the Administrative Agent, such Lender or such Issuing Bank is required to repay such refund to such Governmental Authority. This paragraph shall not be construed to require the Administrative Agent, any Lender or any Issuing Bank to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Borrower or any other person.

**Section 2.21**. *Assignment of Commitments under Certain Circumstances; Duty to Mitigate.* (a) In the event (i) any Lender or the Issuing Bank delivers a certificate requesting compensation pursuant to Section 2.14, (ii) any Lender or the Issuing Bank delivers a notice described in Section 2.15 or (iii) the Borrower is required to pay any additional amount to any Lender or the Issuing Bank or any Governmental Authority on account of any Lender or the Issuing Bank pursuant to Section 2.20, the Borrower may, at its sole expense and effort (including with respect to the processing and recordation fee referred to in Section 9.04(b)), upon notice to such Lender or the Issuing Bank and the Administrative Agent, require such Lender or the Issuing Bank to transfer and assign, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all of its interests, rights and obligations under this Agreement to an assignee that shall assume such assigned obligations (which assignee may be another Lender, if a Lender accepts such assignment); *provided* that (x) such assignment shall not conflict with any law, rule or regulation or order of any court or other Governmental Authority having jurisdiction, (y) the Borrower shall have received the prior written consent of the Administrative Agent (and, if a Revolving Credit Commitment is being assigned, of the Issuing Bank and the Swingline Lender), which consent shall not unreasonably be withheld, and (z) the Borrower or such assignee shall have paid to the affected Lender or the Issuing Bank in immediately available funds an amount equal to the sum of the principal of and interest accrued to the date of such payment on the outstanding Loans or L/C Disbursements of such Lender or the Issuing Bank, respectively, plus all Fees and other amounts accrued for the account of such Lender or the Issuing Bank hereunder (including any amounts under Section 2.14 and Section 2.16); *provided further* that, if prior to any such transfer and assignment the circumstances or

EXHIBIT A

event that resulted in such Lender's or the Issuing Bank's claim for compensation under Section 2.14 or notice under Section 2.15 or the amounts paid pursuant to Section 2.20, as the case may be, cease to cause such Lender or the Issuing Bank to suffer increased costs or reductions in amounts received or receivable or reduction in return on capital, or cease to have the consequences specified in Section 2.15, or cease to result in amounts being payable under Section 2.20, as the case may be (including as a result of any action taken by such Lender or the Issuing Bank pursuant to paragraph (b) below), or if such Lender or the Issuing Bank shall waive its right to claim further compensation under Section 2.14 in respect of such circumstances or event or shall withdraw its notice under Section 2.15 or shall waive its right to further payments under Section 2.20 in respect of such circumstances or event, as the case may be, then such Lender or the Issuing Bank shall not thereafter be required to make any such transfer and assignment hereunder.

**(b)** If (i) any Lender or the Issuing Bank shall request compensation under Section 2.14, (ii) any Lender or the Issuing Bank delivers a notice described in Section 2.15 or (iii) the Borrower is required to pay any additional amount to any Lender or the Issuing Bank or any Governmental Authority on account of any Lender or the Issuing Bank, pursuant to Section 2.20, then such Lender or the Issuing Bank shall use reasonable efforts (which shall not require such Lender or the Issuing Bank to incur an unreimbursed loss or unreimbursed cost or expense or otherwise take any action inconsistent with its internal policies or legal or regulatory restrictions or suffer any disadvantage or burden deemed by it to be significant) (x) to file any certificate or document reasonably requested in writing by the Borrower or (y) to assign its rights and delegate and transfer its obligations hereunder to another of its offices, branches or affiliates, if such filing, assignment, delegation or transfer would reduce its claims for compensation under Section 2.14 or enable it to withdraw its notice pursuant to Section 2.15 or would reduce amounts payable pursuant to Section 2.20, as the case may be, in the future. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender or the Issuing Bank in connection with any such filing or assignment, delegation and transfer.

**Section 2.22**. *Swingline Loans.* (a) <u>Swingline Commitment</u>. Subject to the terms and conditions hereof and relying upon the representations and warranties set forth herein, the Swingline Lender agrees to make loans to the Borrower, at any time and from time to time after the Closing Date, and until the earlier of the Revolving Credit Maturity Date and the termination of the Revolving Credit Commitments in accordance with the terms hereof, in an aggregate principal amount at any time outstanding that will not result in (i) the aggregate principal amount of all Swingline Loans exceeding $5,000,000 in the aggregate or (ii) the Aggregate Revolving Credit Exposure, after giving effect to any Swingline Loan, exceeding the Total Revolving Credit Commitment. Each Swingline Loan shall be in a principal amount that is an integral multiple of $50,000 and not less than $100,000. The Swingline Commitment may be terminated or reduced from time to time as provided herein. Within the foregoing

(NY) 06216/188/CA/ca.first.lien.doc

EXHIBIT A

limits, the Borrower may borrow, pay or prepay and reborrow Swingline Loans hereunder, subject to the terms, conditions and limitations set forth herein.

    **(b)**    <u>Swingline Loans</u>. The Borrower shall notify the Administrative Agent by fax, or by telephone (confirmed by fax), not later than 12:00 Noon, New York City time, on the day of a proposed Swingline Loan to be made to it. Such notice shall be delivered on a Business Day, shall be irrevocable and shall refer to this Agreement and shall specify the requested date (which shall be a Business Day) and amount of such Swingline Loan. The Administrative Agent will promptly advise the Swingline Lender of any notice received from the Borrower pursuant to this paragraph (b). The Swingline Lender shall make each Swingline Loan available to the Borrower by wire transfer of immediately available funds to an account designated by the Borrower in the applicable Borrowing Request by 3:00 p.m. on the date such Swingline Loan is so requested.

    **(c)**    <u>Prepayment</u>. The Borrower shall have the right at any time and from time to time to prepay any Swingline Loan, in whole or in part, upon giving written or fax notice (or telephone notice promptly confirmed by written or fax notice) to the Swingline Lender and to the Administrative Agent before 1:00 p.m., New York City time, on the date of prepayment at the Swingline Lender's address for notices specified in Section 9.01; *provided* that any such notice delivered by the Borrower may state that such notice is conditioned upon the effectiveness of other financing arrangements, in which case such notice may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.

    **(d)**    <u>Interest</u>. Each Swingline Loan shall be an ABR Loan and, subject to the provisions of Section 2.07, shall bear interest as provided in Section 2.06(a).

    **(e)**    <u>Participations</u>. The Swingline Lender may by written notice given to the Administrative Agent not later than 10:00 a.m., New York City time, on any Business Day require the Revolving Credit Lenders to acquire participations on such Business Day in all or a portion of the Swingline Loans outstanding. Such notice shall specify the aggregate amount of Swingline Loans in which Revolving Credit Lenders will participate. The Administrative Agent will, promptly upon receipt of such notice, give notice to each Revolving Credit Lender, specifying in such notice such Lender's Pro Rata Percentage of such Swingline Loan or Loans. In furtherance of the foregoing, each Revolving Credit Lender hereby absolutely and unconditionally agrees, upon receipt of notice as provided above, to pay to the Administrative Agent, for the account of the Swingline Lender, such Revolving Credit Lender's Pro Rata Percentage of such Swingline Loan or Swingline Loans. Each Revolving Credit Lender acknowledges and agrees that its obligation to acquire participations in Swingline Loans pursuant to this paragraph is absolute and unconditional and shall not be affected by any circumstance whatsoever, including the occurrence and continuance of a Default or an Event of Default, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever.

(NY) 06216/188/CA/ca.first.lien.doc

EXHIBIT A

Each Revolving Credit Lender shall comply with its obligation under this paragraph by wire transfer of immediately available funds, in the same manner as provided in Section 2.02(c) with respect to Loans made by such Lender (and Section 2.02(c) shall apply, *mutatis mutandis*, to the payment obligations of the Lenders under this Section) and the Administrative Agent shall promptly pay to the Swingline Lender the amounts so received by it from the Lenders. The Administrative Agent shall notify the Borrower of any participations in any Swingline Loan acquired pursuant to this paragraph and thereafter payments in respect of such Swingline Loan shall be made to the Administrative Agent and not to the Swingline Lender. Any amounts received by the Swingline Lender from the Borrower (or other party on behalf of the Borrower) in respect of a Swingline Loan after receipt by the Swingline Lender of the proceeds of a sale of participations therein shall be promptly remitted to the Administrative Agent; any such amounts received by the Administrative Agent shall be promptly remitted by the Administrative Agent to the Lenders that shall have made their payments pursuant to this paragraph and to the Swingline Lender, as their interests may appear. The purchase of participations in a Swingline Loan pursuant to this paragraph shall not relieve the Borrower (or other party liable for obligations of the Borrower) of any default in the payment thereof.

    **Section 2.23**. *Letters of Credit.* (a) General. Subject to the terms and conditions hereof, the Borrower may request the issuance of a Letter of Credit at any time and from time to time on or after the Closing Date and until the earlier of (i) the date that is 30 days prior to Revolving Credit Maturity Date and (ii) the termination of the Revolving Credit Commitments for its own account or for the account of any Subsidiary (in which case the Borrower and such Subsidiary shall be co-applicants with respect to such Letter of Credit), in a form reasonably acceptable to the Administrative Agent and the Issuing Bank. This Section shall not be construed to impose an obligation upon the Issuing Bank to issue any Letter of Credit that is inconsistent with the terms and conditions of this Agreement.

    **(b)**    Notice of Issuance, Amendment, Renewal, Extension; Certain Conditions. In order to request the issuance of a Letter of Credit (or to amend, renew or extend an existing Letter of Credit), the Borrower shall hand deliver or fax to the Issuing Bank and the Administrative Agent (no less than three Business Days (or such shorter period of time acceptable to the Issuing Bank) in advance of the requested date of issuance, amendment, renewal or extension) a notice requesting the issuance of a Letter of Credit, or identifying the Letter of Credit to be amended, renewed or extended, the date of issuance, amendment, renewal or extension, the date on which such Letter of Credit is to expire (which shall comply with paragraph (c) below), the amount of such Letter of Credit, the name and address of the beneficiary thereof and such other information as shall be necessary to prepare such Letter of Credit. A Letter of Credit shall be issued, amended, renewed or extended only if, and upon issuance, amendment, renewal or extension of each Letter of Credit the Borrower shall be deemed to represent and warrant that, after giving effect to such issuance, amendment, renewal or

(NY) 06216/188/CA/ca.first.lien.doc

EXHIBIT A

extension (i) the L/C Exposure shall not exceed $10,000,000 and (ii) the Aggregate Revolving Credit Exposure shall not exceed the Total Revolving Credit Commitment.

(c)    Expiration Date. Each Letter of Credit shall expire at the close of business on the earlier of (i) the date that is one year after the date of the issuance of such Letter of Credit and (ii) the date that is five Business Days prior to the Revolving Credit Maturity Date, unless such Letter of Credit expires by its terms on an earlier date; *provided, however,* that a Letter of Credit may, upon the request of the Borrower, include a provision whereby such Letter of Credit shall be renewed automatically for additional consecutive periods of 12 months or less (but not beyond the date that is five Business Days prior to the Revolving Credit Maturity Date) unless the Issuing Bank notifies the beneficiary thereof at least 30 days prior to the then-applicable expiration date that such Letter of Credit will not be renewed.

(d)    Participations. By the issuance of a Letter of Credit and without any further action on the part of the Issuing Bank or the Lenders, the Issuing Bank hereby grants to each Revolving Credit Lender, and each such Lender hereby acquires from the Issuing Bank, a participation in such Letter of Credit equal to such Lender's Pro Rata Percentage of the aggregate amount available to be drawn under such Letter of Credit, effective upon the issuance of such Letter of Credit. In consideration and in furtherance of the foregoing, each Revolving Credit Lender hereby absolutely and unconditionally agrees to pay to the Administrative Agent, for the account of the Issuing Bank, such Lender's Pro Rata Percentage of each L/C Disbursement made by the Issuing Bank and not reimbursed by the Borrower (or, if applicable, another party pursuant to its obligations under any other Loan Document) forthwith on the date due as provided in Section 2.02(f). Each Revolving Credit Lender acknowledges and agrees that its obligation to acquire participations pursuant to this paragraph in respect of Letters of Credit is absolute and unconditional and shall not be affected by any circumstance whatsoever, including the occurrence and continuance of a Default or an Event of Default, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever.

(e)    Reimbursement. If the Issuing Bank shall make any L/C Disbursement in respect of a Letter of Credit, the Borrower shall pay to the Administrative Agent an amount equal to such L/C Disbursement not later than two hours after the Borrower shall have received notice from the Issuing Bank that payment of such draft will be made, or, if the Borrower shall have received such notice later than 10:00 a.m., New York City time, on any Business Day, not later than 10:00 a.m., New York City time, on the immediately following Business Day.

(f)    Obligations Absolute. The Borrower's obligations to reimburse L/C Disbursements as provided in paragraph (e) above shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with

EXHIBIT A

the terms of this Agreement, under any and all circumstances whatsoever, and irrespective of:

      **(i)**    any lack of validity or enforceability of any Letter of Credit or any Loan Document, or any term or provision therein;

      **(ii)**    any amendment or waiver of, or any consent to departure from, all or any of the provisions of any Letter of Credit or any Loan Document;

      **(iii)**    the existence of any claim, setoff, defense or other right that the Borrower, any other party guaranteeing, or otherwise obligated with, the Borrower, any subsidiary or other Affiliate thereof or any other person may at any time have against the beneficiary under any Letter of Credit, the Issuing Bank, the Administrative Agent or any Lender or any other person, whether in connection with this Agreement, any other Loan Document or any other related or unrelated agreement or transaction;

      **(iv)**    any draft or other document presented under a Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect;

      **(v)**    payment by the Issuing Bank under a Letter of Credit against presentation of a draft or other document that does not comply with the terms of such Letter of Credit; and

      **(vi)**    any other act or omission to act or delay of any kind of the Issuing Bank, any Lender, the Administrative Agent or any other person or any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section, constitute a legal or equitable discharge of the Borrower's obligations hereunder.

Without limiting the generality of the foregoing, it is expressly understood and agreed that the absolute and unconditional obligation of the Borrower hereunder to reimburse L/C Disbursements will not be excused by the gross negligence or willful misconduct of the Issuing Bank. However, the foregoing shall not be construed to excuse the Issuing Bank from liability to the Borrower to the extent of any direct damages (as opposed to consequential damages, claims in respect of which are hereby waived by the Borrower to the extent permitted by applicable law) suffered by the Borrower that are caused by the Issuing Bank's gross negligence or willful misconduct in determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof; it is understood that the Issuing Bank may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary and, in making any payment under any Letter of Credit (i) the Issuing Bank's exclusive reliance on the documents

EXHIBIT A

presented to it under such Letter of Credit as to any and all matters set forth therein, including reliance on the amount of any draft presented under such Letter of Credit, whether or not the amount due to the beneficiary thereunder equals the amount of such draft and whether or not any document presented pursuant to such Letter of Credit proves to be insufficient in any respect, if such document on its face appears to be in order, and whether or not any other statement or any other document presented pursuant to such Letter of Credit proves to be forged or invalid or any statement therein proves to be inaccurate or untrue in any respect whatsoever and (ii) any noncompliance in any immaterial respect of the documents presented under such Letter of Credit with the terms thereof shall, in each case, be deemed not to constitute willful misconduct or gross negligence of the Issuing Bank.

(g)    Disbursement Procedures.  The Issuing Bank shall, promptly following its receipt thereof, examine all documents purporting to represent a demand for payment under a Letter of Credit.  The Issuing Bank shall as promptly as possible give telephonic notification, confirmed by fax, to the Administrative Agent and the Borrower of such demand for payment and whether the Issuing Bank has made or will make an L/C Disbursement thereunder; *provided* that any failure to give or delay in giving such notice shall not relieve the Borrower of its obligation to reimburse the Issuing Bank and the applicable Lenders with respect to any such L/C Disbursement.  The Administrative Agent shall promptly give each Revolving Credit Lender notice thereof.

(h)    Interim Interest.  If the Issuing Bank shall make any L/C Disbursement in respect of a Letter of Credit, then, unless the Borrower shall reimburse such L/C Disbursement in full on such date, the unpaid amount thereof shall bear interest for the account of the Issuing Bank, for each day from and including the date of such L/C Disbursement to but excluding the earlier of the date of payment by the Borrower or the date on which interest shall commence to accrue thereon as provided in Section 2.02(f), at the rate per annum that would apply to such amount if such amount were an ABR Revolving Loan.

(i)    Resignation or Removal of the Issuing Bank.  The Issuing Bank may resign at any time by giving 30 days' prior written notice to the Administrative Agent, the Lenders and the Borrower.  Subject to the following sentences in this paragraph, upon the acceptance of any appointment as the Issuing Bank hereunder by a Lender that shall agree to serve as successor Issuing Bank, such successor shall succeed to and become vested with all the interests, rights and obligations of the retiring Issuing Bank and the retiring Issuing Bank shall be discharged from its obligations to issue additional Letters of Credit hereunder.  At the time such removal or resignation shall become effective, the Borrower shall pay all accrued and unpaid fees pursuant to Section 2.05(c)(ii).  The acceptance of any appointment as the Issuing Bank hereunder by a successor Lender shall be evidenced by an agreement entered into by such successor, in a form satisfactory to the Borrower and the Administrative Agent, and, from and after the effective date of such agreement, (i) such successor Lender shall have all the rights and

EXHIBIT A

obligations of the previous Issuing Bank under this Agreement and the other Loan Documents and (ii) references herein and in the other Loan Documents to the term "Issuing Bank" shall be deemed to refer to such successor or to any previous Issuing Bank, or to such successor and all previous Issuing Banks, as the context shall require. After the resignation or removal of the Issuing Bank hereunder, the retiring Issuing Bank shall remain a party hereto and shall continue to have all the rights and obligations of an Issuing Bank under this Agreement and the other Loan Documents with respect to Letters of Credit issued by it prior to such resignation or removal, but shall not be required to issue additional Letters of Credit.

(j)    Cash Collateralization. If any Event of Default shall occur and be continuing, the Borrower shall, on the Business Day it receives notice from the Administrative Agent or the Required Lenders (or, if the maturity of the Loans has been accelerated, Revolving Credit Lenders representing greater than 50% of the total L/C Exposure) thereof and of the amount to be deposited, deposit in an account with the Collateral Agent, for the ratable benefit of the Revolving Credit Lenders, an amount in cash equal to 105% of the L/C Exposure as of such date. Such deposit shall be held by the Collateral Agent as collateral for the payment and performance of the obligations of the Borrower under this Agreement. The Collateral Agent shall have exclusive dominion and control, including the exclusive right of withdrawal, over such account. Other than any interest earned on the investment of such deposits in Permitted Investments, which investments shall be made at the option and sole discretion of the Collateral Agent, such deposits shall not bear interest. Interest or profits, if any, on such investments shall accumulate in such account. Moneys in such account shall (i) automatically be applied by the Administrative Agent to reimburse the Issuing Bank for L/C Disbursements for which it has not been reimbursed, (ii) be held for the satisfaction of the reimbursement obligations of the Borrower for the L/C Exposure at such time and (iii) if the maturity of the Loans has been accelerated (but subject to the consent of Revolving Credit Lenders representing greater than 50% of the total L/C Exposure), be applied to satisfy the Obligations. If the Borrower is required to provide an amount of cash collateral hereunder as a result of the occurrence of an Event of Default, such amount (to the extent not applied as aforesaid) shall be returned to the Borrower within three Business Days after all Events of Default have been cured or waived.

(k)    Additional Issuing Banks. The Borrower may, at any time and from time to time with the consent of the Administrative Agent (which consent shall not be unreasonably withheld) and such Lender, designate one or more additional Lenders to act as an issuing bank under the terms of the Agreement. Any Lender designated as an issuing bank pursuant to this paragraph shall be deemed to be an "**Issuing Bank**" (in addition to being a Lender) in respect of Letters of Credit issued or to be issued by such Lender, and, with respect to such Letters of Credit, such term shall thereafter apply to the other Issuing Bank and such Lender.

(NY) 06216/188/CA/ca.first.lien.doc

EXHIBIT A

## ARTICLE 3
### REPRESENTATIONS AND WARRANTIES

Each of Holdings and the Borrower jointly and severally represents and warrants to the Arranger, the Administrative Agent, the Collateral Agent, the Issuing Bank and each of the Lenders that:

**Section 3.01**. *Organization; Powers.* Holdings, the Borrower and each of the Subsidiaries (a) is duly organized or formed, validly existing and (in the case of Holdings, the Borrower and each Subsidiary that is a Loan Party) in good standing under the laws of the jurisdiction of its organization or formation, (b) has all requisite power and authority, and the legal right, to own and operate its property and assets, to lease the property it operates as lessee and to carry on its business as now conducted and as proposed to be conducted, (c) is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required except to the extent that any such failure to qualify or be in good standing could not reasonably be expected to have a Material Adverse Effect, (d) has the power and authority, and the legal right, to execute, deliver and perform its obligations under this Agreement and each of the other Loan Documents, including, in the case of the Borrower, to borrow hereunder, in the case of each Loan Party, to grant the Liens contemplated to be granted by it under the Security Documents and, in the case of each Subsidiary Guarantor, to Guarantee the Obligations as contemplated by the Guarantee and Collateral Agreement and (e) as of the Closing Date, has the power and authority, and the legal right, to execute, deliver and perform its obligations under the Acquisition Documentation, the Second Lien Credit Agreement and each other agreement or instrument contemplated hereby or thereby to which it is a party.

**Section 3.02**. *Authorization; No Conflicts.* The Transactions (a) have been duly authorized by all requisite corporate, partnership or limited liability company and, if required, stockholder, partner or member action and (b) will not (i) violate (A) any provision of law, statute, rule or regulation in a manner that could reasonably be expected to have a Material Adverse Effect, or of the certificate or articles of incorporation or other constitutive documents or by-laws of Holdings, the Borrower or any Subsidiary, (B) any order of any Governmental Authority or arbitrator in a manner that could reasonably be expected to have a Material Adverse Effect or (C) any provision of any indenture, agreement or other instrument to which Holdings, the Borrower or any Subsidiary is a party or by which any of them or any of their property is or may be bound in a manner that could reasonably be expected to have a Material Adverse Effect, (ii) be in conflict with, result in a breach of or constitute (alone or with notice or lapse of time or both) a default under, or give rise to any right to accelerate or to require the prepayment, repurchase or redemption of any obligation under any such indenture, agreement or other instrument in a manner that could reasonably be expected to have a Material Adverse Effect or (iii) result in the creation or imposition of any Lien upon or with respect to any property or assets now owned or hereafter acquired by Holdings, the Borrower or any Subsidiary (other than Liens created

EXHIBIT A

under the Security Documents and the Liens securing obligations under the Second Lien Credit Agreement on a second priority basis).

**Section 3.03**. *Enforceability.* This Agreement has been duly executed and delivered by each of Holdings and the Borrower and constitutes, and each other Loan Document when executed and delivered by each Loan Party party thereto will constitute, a legal, valid and binding obligation of such Loan Party enforceable against such Loan Party in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, receivership, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

**Section 3.04**. *Governmental Approvals.* No action, consent or approval of, registration or filing with, Permit from, notice to, or any other action by, any Governmental Authority is or will be required in connection with the Transactions, except for (a) filings, actions, consents and approvals necessary to perfect the Liens on the Collateral granted to the Collateral Agent in favor of the Lenders created by the Security Documents, (b) such as have been made or obtained and are in full force and effect and (c) such actions, consents or approvals of, registrations or filings with, Permits from, notices to, or any other actions the failure to obtain or make could not reasonably be expected to have a Material Adverse Effect.

**Section 3.05**. *Financial Statements.* (a) The Borrower has heretofore furnished to the Lenders its consolidated balance sheets and statements of income and cash flows as of and for the fiscal years ended April 29, 2005, April 29, 2004 and April 29, 2003, in each case audited by and accompanied by the opinion of an independent public accountant and its unaudited consolidated balance sheets and statements of income as of and for the fiscal months ended May 31, 2005, June 30, 2005, July 31, 2005, August 30, 2005 and September 30, 2005. Such financial statements present fairly in all material respects the financial condition and results of operations and, in the case of the audited financial statements, cash flows of the Borrower and its consolidated Subsidiaries as of such dates and for such periods. Such balance sheets and the notes thereto disclose all material liabilities, direct or contingent, of the Borrower and its consolidated Subsidiaries as of the dates thereof. Such financial statements were prepared in accordance with GAAP applied on a consistent basis, except as expressly noted therein.

**(b)** The Borrower has heretofore delivered to the Lenders its pro forma consolidated balance sheet and statements of income as of July 31, 2005, prepared giving effect to the Transactions as if they had occurred, with respect to such balance sheet, on such date and, with respect to such other financial statements, on the first day of the 12-month period ending on such date. Such pro forma financial statements (i) have been prepared in good faith by the Borrower, based on the assumptions used to prepare the pro forma financial information contained in the Confidential Information Memorandum (which assumptions are believed by the Borrower on the Closing Date to be reasonable), (ii) are based on the

EXHIBIT A

information available to the Borrower after due inquiry as of the date of delivery thereof and (iii) present fairly in all material respects on a pro forma basis the estimated consolidated financial position of the Borrower and its consolidated Subsidiaries as of such date and for such period, assuming that the Transactions had actually occurred at such date or at the beginning of such period, as the case may be; it being understood that such pro forma financial statements, as to future events, are not to be viewed as facts, that actual results may vary and that such variances may be material.

**Section 3.06**. *No Material Adverse Change.*  No event, change or condition has occurred since April 29, 2005 that has caused, or could reasonably be expected to cause, a Material Adverse Effect.

**Section 3.07**. *Title to Properties; Possession Under Leases.*  (a) Each of Holdings, the Borrower and the Subsidiaries has good and indefeasible title to, or valid leasehold interests in, all material properties and assets (including all Real Property) necessary to the conduct of its business, except for minor defects in title that do not interfere with its ability to conduct its business as currently conducted or to utilize such properties and assets for their intended purposes and Liens permitted by Section 6.02.

**(b)**    Each of Holdings, the Borrower and the Subsidiaries, and, to the knowledge of the Borrower, each other party thereto, has complied with all material obligations under all material leases to which it is a party and all such leases are legal, valid, binding and in full force and effect and are enforceable in accordance with their terms, subject to applicable bankruptcy, insolvency, reorganization, receivership, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.  Each of Holdings, the Borrower and the Subsidiaries enjoys peaceful and undisturbed possession under all such material leases.

**Section 3.08**. *Subsidiaries.*  Schedule 3.08 sets forth as of the Closing Date a list of all Subsidiaries, after giving effect to the Acquisition, including each Subsidiary's exact legal name (as reflected in such Subsidiary's certificate or articles of incorporation or other constitutive documents) and jurisdiction of incorporation or formation and the percentage ownership interest of the Borrower or any other Subsidiary therein, and identifies each Subsidiary that is a Loan Party. The shares of capital stock or other Equity Interests so indicated on Schedule 3.08 are fully paid and non-assessable and are owned by Holdings, the Borrower or its Subsidiaries free and clear of all Liens (other than Liens created under the Security Documents and under the security documents relating to the Second Lien Credit Agreement).

**Section 3.09**. *Litigation; Compliance with Laws.*  (a) There are no actions, suits or proceedings at law or in equity or by or before any arbitrator or Governmental Authority now pending or, to the knowledge of Holdings or the

EXHIBIT A

Borrower, threatened against or affecting Holdings, the Borrower or any Subsidiary or any business, property or rights of any such person (i) that involve any Loan Document or, as of the Closing Date, the Transactions or (ii) except as set forth on Schedule 3.09, that could reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

(b)     Since the date of this Agreement, there has been no change in the status of the matters disclosed on Schedule 3.09 that, individually or in the aggregate, has resulted in, or materially increased the likelihood of, a Material Adverse Effect.

(c)     None of Holdings, the Borrower or any of the Subsidiaries or any of their respective material properties or assets is in violation of, nor will the continued operation of their material properties and assets as currently conducted violate, any law, rule or regulation (including any zoning, building, Environmental Law, ordinance, code or approval or any building permits) or any restrictions of record or agreements affecting a Mortgaged Property, or is in default with respect to any judgment, writ, injunction, decree or order of any Governmental Authority, where such violation or default, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

**Section 3.10**. *Agreements*.  None of Holdings, the Borrower or any of the Subsidiaries is in default in any manner under any provision of any indenture or other agreement or instrument evidencing Indebtedness, or any other material agreement or instrument to which it is a party or by which it or any of its properties or assets are bound, where such default, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

**Section 3.11**. *Federal Reserve Regulations*.  (a) None of Holdings, the Borrower or any of the Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock.

(b)     No part of the proceeds of any Loan or any Letter of Credit will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for purchasing or carrying Margin Stock or for the purpose of purchasing, carrying or trading in any securities under such circumstances as to involve the Borrower in a violation of Regulation X or to involve any broker or dealer in a violation of Regulation T.  Following the application of the proceeds of the Loans and the Letters of Credit, Margin Stock will not constitute more than 25% of the value of the assets of Holdings, the Borrower and the Subsidiaries.  If reasonably requested by any Lender or the Administrative Agent, the Borrower will furnish to the Administrative Agent and each Lender a statement to the foregoing effect in conformity with the requirements of FR Form G-3 or FR Form U-1 referred to in Regulation U.

EXHIBIT A

**Section 3.12**. *Investment Company Act; Public Utility Holding Company Act.* None of Holdings, the Borrower or any of the Subsidiaries is (a) an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended, or (b) a "holding company" as defined in, or subject to regulation under, the Public Utility Holding Company Act of 1935, as amended.

**Section 3.13**. *Use of Proceeds.* The Borrower will use the proceeds of the Tranche B Term Loans, together with the proceeds of the borrowings under the Second Lien Credit Agreement and the Equity Contribution, solely to pay the Acquisition Consideration, to consummate the Refinancing and to pay fees and expenses related to the Transactions, including a fee payable to the Sponsor. The Borrower will use the proceeds of the Revolving Loans and the Swingline Loans solely for working capital and general corporate purposes, including Permitted Acquisitions. The Borrower will request the issuance of Letters of Credit solely to support payment obligations incurred in the ordinary course of business by the Borrower and its Subsidiaries.

**Section 3.14**. *Tax Returns.* Each of Holdings, the Borrower and each of the Subsidiaries has timely filed or timely caused to be filed all Federal and state income tax returns and other material tax returns or materials required to have been filed by it and all such tax returns are correct and complete in all material respects. Each of Holdings, the Borrower and each of the Subsidiaries has timely paid or timely caused to be paid all Federal income taxes and all other material Taxes due and payable by it and all assessments received by it, except Taxes that are being contested in good faith by appropriate proceedings and for which Holdings, the Borrower or such Subsidiary, as applicable, shall have set aside on its books adequate reserves in accordance with GAAP. Each of Holdings, the Borrower and each of the Subsidiaries has made adequate provision in accordance with GAAP for all Taxes not yet due and payable. None of Holdings, the Borrower or any of the Subsidiaries (a) intends to treat the Loans or any of the transactions contemplated by any Loan Document or the Acquisition as being a "reportable transaction" (within the meaning of Treasury Regulation Section 1.6011-4) or (b) is aware of any facts or events that would result in such treatment.

**Section 3.15**. *No Material Misstatements.* None of (i) the Confidential Information Memorandum or (ii) any other written information, report, financial statement, exhibit or schedule furnished by or on behalf of Holdings, the Borrower or any Subsidiary to the Arranger, the Administrative Agent or any Lender for use in connection with the transactions contemplated by the Loan Documents or in connection with the negotiation of any Loan Document or included therein or delivered pursuant thereto, taken as a whole, contained or contains any material misstatement of fact or omitted or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were, are or will be made, not misleading; *provided* that to the extent any such written information, report, financial statement, exhibit or schedule was based upon or constitutes a forecast or

EXHIBIT A

projection, each of Holdings and the Borrower represents only that it acted in good faith and utilized reasonable assumptions in light of the conditions existing at the time of preparation; *provided, further*, that no representation is made with respect to information of a general economic or industry specific nature.

Section **3.16**. *Employee Benefit Plans.* Each of the Borrower and each of its ERISA Affiliates is in compliance with the applicable provisions of ERISA and the Tax Code and the regulations and published interpretations thereunder except to the extent the failure to so comply could not reasonably be expected to have a Material Adverse Effect. No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events, could reasonably be expected to have a Material Adverse Effect on the Borrower or any of its ERISA Affiliates. The present value of all benefit liabilities under each Benefit Plan (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the last annual valuation date applicable thereto, exceed by more than $1,000,000 the fair market value of the assets of such Benefit Plan, and the present value of all benefit liabilities of all underfunded Benefit Plans (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the last annual valuation dates applicable thereto, exceed by more than $1,000,000 the fair market value of the assets of all such underfunded Benefit Plans.

Section **3.17**. *Environmental Matters.* (a) Except as set forth in Schedule 3.17 and except with respect to any other matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, none of Holdings, the Borrower or any of the Subsidiaries:

(i)     has failed to comply with any Environmental Law or to take, in a timely manner, all actions necessary to obtain, maintain, renew and comply with any Environmental Permit, and all such Environmental Permits are in full force and effect and not subject to any administrative or judicial appeal;

(ii)     has become a party to any governmental, administrative or judicial proceeding or possesses knowledge of any such proceeding that has been threatened under Environmental Law;

(iii)     has received notice of, become subject to, or is aware of any facts or circumstances that could form the basis for, any Environmental Liability other than those which have been fully and finally resolved and for which no obligations remain outstanding;

(iv)     possesses knowledge that any Mortgaged Property (A) is subject to any Lien, restriction on ownership, occupancy, use or transferability imposed pursuant to Environmental Law or (B) contains or previously contained Hazardous Materials of a form or type or in a

EXHIBIT A

quantity or location that could reasonably be expected to result in any Environmental Liability;

    **(v)**    possess knowledge that there has been a Release or threat of Release of Hazardous Materials at or from the Mortgaged Properties (or from any facilities or other properties formerly owned, leased or operated by Holdings, the Borrower or any of the Subsidiaries) in violation of, or in amounts or in a manner that could give rise to liability under, any Environmental Law;

    **(vi)**    has generated, treated, stored, transported, or Released Hazardous Materials from the Mortgaged Properties (or from any facilities or other properties formerly owned, leased or operated by Holdings, the Borrower or any of the Subsidiaries) in violation of, or in a manner or to a location that could give rise to liability under, any Environmental Law;

    **(vii)**    is aware of any facts, circumstances, conditions or occurrences in respect of any of the facilities and properties owned, leased or operated that could (A) form the basis of any action, suit, claim or other judicial or administrative proceeding relating to liability under or noncompliance with Environmental Law on the part of Holdings, the Borrower or any of the Subsidiaries or (B) interfere with or prevent continued compliance with Environmental Laws by Holdings, the Borrower or the Subsidiaries; or

    **(viii)**    has pursuant to any order, decree, judgment or agreement by which it is bound or has assumed the Environmental Liability for any Person.

    **(b)**    Since the date of this Agreement, there has been no change in the status of the matters disclosed on Schedule 3.17 that, individually or in the aggregate, has resulted in, or materially increased the likelihood of, a Material Adverse Effect.

    **Section 3.18**. *Insurance.*  Schedule 3.18 sets forth a true, complete and correct description of all insurance maintained by or on behalf of Holdings, the Borrower and the Subsidiaries as of the Closing Date.  As of the Closing Date, such insurance is in full force and effect and all premiums have been duly paid. Holdings, the Borrower and the Subsidiaries are insured by financially sound and reputable insurers and such insurance is in such amounts and covering such risks and liabilities (and with such deductibles, retentions and exclusions) as is reasonable and customary for companies in the same or similar businesses operating in the same or similar locations.  None of Holdings, the Borrower or any of the Subsidiaries has received notice from any insurer (or any agent thereof) that substantial capital improvements or other substantial expenditures will have to be made in order to continue such insurance.

EXHIBIT A

**Section 3.19**. *Security Documents.* (a) The Guarantee and Collateral Agreement is effective to create in favor of the Collateral Agent, for the ratable benefit of the Secured Parties, a legal, valid, binding and enforceable security interest in the Collateral described therein and proceeds thereof and (i) in the case of the Pledged Collateral, upon the earlier of the date on which (A) such Pledged Collateral is delivered to the Collateral Agent or (B) financing statements in appropriate form are filed in the offices specified on Schedule 3.19(a) or, after the Closing Date, in such other offices as are prescribed by the UCC and (ii) in the case of all other Collateral described therein with respect to which security interests may be perfected by filing a financing statement, when financing statements in appropriate form are filed in the offices specified on Schedule 3.19(a) or, after the Closing Date, in such other offices as are prescribed by the UCC, the Guarantee and Collateral Agreement shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Secured Parties in such Collateral and proceeds thereof, as security for the Obligations, in each case prior and superior to the rights of any other person (except, in the case of all Collateral other than Pledged Collateral, with respect to Liens expressly permitted by Section 6.02).

**(b)** When the Intellectual Property Security Agreement is filed in the United States Copyright Office, together with financing statements in appropriate form filed in the offices specified in Schedule 3.19(a) or, after the Closing Date, in such other offices as are prescribed by the UCC, such Intellectual Property Security Agreement shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the grantors thereunder in the Intellectual Property Collateral and proceeds thereof, as security for the Obligations, in each case prior and superior in right to any other person (except with respect to Liens expressly permitted by Section 6.02) (it being understood that subsequent recordings in the United States Copyright Office may be necessary to perfect a lien on registered copyrights acquired by the grantors after the date hereof).

**Section 3.20**. *Location of Real Property.* Schedule 3.20 lists completely and correctly as of the Closing Date all Real Property and the addresses thereof, indicating for each parcel whether it is owned or leased, including in the case of leased Real Property, the landlord name, lease date and lease expiration date.

**Section 3.21**. *Labor Matters.* As of the Closing Date, there are no strikes, lockouts or slowdowns against Holdings, the Borrower or any Subsidiary pending or, to the knowledge of Holdings or the Borrower, threatened. The hours worked by and payments made to employees of Holdings, the Borrower and the Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Federal, state, local or foreign law dealing with such matters. All payments due from Holdings, the Borrower or any Subsidiary, or for which any claim may be made against Holdings, the Borrower or any Subsidiary, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of Holdings, the Borrower or such Subsidiary. The consummation of the Transactions will not give rise to any right

EXHIBIT A

of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which Holdings, the Borrower or any Subsidiary is bound.

Section 3.22. *Reserved.*

Section 3.23. *Intellectual Property.* Each of Holdings, the Borrower and each of the Subsidiaries owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual property material to its business, and the use thereof by Holdings, the Borrower and, to the knowledge of Holdings and the Borrower, the Subsidiaries does not infringe upon the rights of any other person, except for any such infringements that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

Section 3.24. *Solvency.* On the Closing Date, after giving effect to the consummation of the Transactions, (a) the fair value of the assets of the Loan Parties, taken as a whole, at a fair valuation, will exceed their consolidated debts and liabilities, subordinated, contingent or otherwise; (b) the present fair saleable value of the property of the Loan Parties, taken as a whole, will be greater than the amount that will be required to pay the probable liability of their consolidated debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured; (c) the Loan Parties, taken as a whole, will be able to pay their consolidated debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured; and (d) the Loan Parties, taken as a whole, will not have unreasonably small capital with which to conduct the business in which they are engaged as such business is now conducted and is proposed to be conducted following the Closing Date.

Section 3.25. *Acquisition Documentation.* As of the Closing Date, (a) Schedule 3.25 lists all of the Acquisition Documentation and (b) the Acquisition Documentation is in full force and effect.

Section 3.26. *Permits.* Except for Permits the failure of which to obtain, hold or maintain in full force and effect, and such events, restrictions, renewals and government actions, as could not reasonably be expected to have a Material Adverse Effect, (a) each Loan Party has obtained and holds all Permits required in respect of all Real Property and for any other property necessary for the operation of each of its businesses as presently conducted, (b) all such Permits are in full force and effect, and each Loan Party has performed and observed all requirements of such Permits, (c) no event has occurred that allows or results in, or after notice or lapse of time would allow or result in, revocation or termination by the issuer thereof or in any other impairment of the rights of the holder of any such Permit, (d) no such Permits contain any restrictions, either individually or in the aggregate, that are materially burdensome to any Loan Party, or to the operation of any of its businesses or any property owned, leased or otherwise operated by such person, (e) each Loan Party reasonably believes that each of its

(NY) 06216/188/CA/ca.first.lien.doc

EXHIBIT A

Permits will be timely renewed and complied with and that any additional Permits that may be required of such Person will be timely obtained and complied with and (f) the Borrower has no knowledge or reason to believe that any Governmental Authority is considering limiting, suspending, revoking or renewing on materially burdensome terms any such Permit.

## ARTICLE 4
### CONDITIONS OF LENDING

The obligations of the Lenders to make Loans and the obligations of the Issuing Bank to issue Letters of Credit are subject to the satisfaction of the following conditions:

**Section 4.01**.  *All Credit Events.*  On the date of each Borrowing, including each Borrowing of a Swingline Loan, and on the date of each issuance, amendment, extension or renewal of a Letter of Credit (each such event being called a "**Credit Event**"):

**(a)**    The Administrative Agent shall have received a notice of such Borrowing as required by Section 2.03 (or such notice shall have been deemed given in accordance with Section 2.03) or, in the case of the issuance, amendment, extension or renewal of a Letter of Credit, the Issuing Bank and the Administrative Agent shall have received a notice requesting the issuance, amendment, extension or renewal of such Letter of Credit as required by Section 2.23(b) or, in the case of the Borrowing of a Swingline Loan, the Swingline Lender and the Administrative Agent shall have received a notice requesting such Swingline Loan as required by Section 2.22(b).

**(b)**    The representations and warranties set forth in each Loan Document shall be true and correct in all material respects on and as of the date of such Credit Event with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects on and as of such earlier date.

**(c)**    At the time of and after giving effect to such Credit Event, no Event of Default or Default shall have occurred and be continuing.

Each Credit Event shall be deemed to constitute a joint and several representation and warranty by each of Holdings and the Borrower on the date of such Credit Event as to the matters specified in paragraphs (b) and (c) of this Section 4.01.

**Section 4.02**.  *First Credit Event.*  On or prior to the Closing Date:

EXHIBIT A

(a) The Administrative Agent shall have received, on behalf of itself, the Lenders and the Issuing Bank, a written opinion of (i) Weil, Gotshal & Manges LLP, counsel for the Loan Parties, substantially to the effect set forth in Exhibit H, and (ii) Sidley Austin Brown & Wood LLP, special Illinois counsel to the Loan Parties, in each case (A) dated the Closing Date, (B) addressed to the Administrative Agent, the Issuing Bank, the Arranger and the Lenders and (C) covering such matters relating to the Loan Documents and the Transactions as the Administrative Agent shall reasonably request and which are customary for transactions of the type contemplated herein, and the Loan Parties hereby request such counsel to deliver such opinions.

(b) The Administrative Agent shall have received (i) a copy of the certificate or articles of incorporation or other formation documents, including all amendments thereto, of each Loan Party, certified as of a recent date by the Secretary of State of the state of its organization, and a certificate as to the good standing of each Loan Party as of a recent date, from such Secretary of State; (ii) a certificate of the Secretary or Assistant Secretary of each Loan Party dated the Closing Date and certifying (A) that attached thereto is a true and complete copy of the by-laws (or other governing documents) of such Loan Party as in effect on the Closing Date and at the time of the resolutions described in clause (B) below, (B) that attached thereto is a true and complete copy of resolutions duly adopted by the Board of Directors (or other governing body) of such Loan Party authorizing the execution, delivery and performance of the Loan Documents to which such person is a party, in the case of the Borrower, the borrowings hereunder, in the case of each Loan Party, the granting of the Liens contemplated to be granted by it under the Security Documents and, in the case of each Subsidiary Guarantor, the Guaranteeing of the Obligations as contemplated by the Guarantee and Collateral Agreement, and that such resolutions have not been modified, rescinded or amended and are in full force and effect, (C) that the certificate or articles of incorporation or other formation documents of such Loan Party have not been amended since the date of the last amendment thereto shown on the certificate furnished pursuant to clause (i) above and (D) as to the incumbency and signature of each officer executing any Loan Document or any other document delivered in connection herewith on behalf of such Loan Party; (iii) certification by another officer as to the incumbency and signature of the Secretary or Assistant Secretary executing the certificate pursuant to (ii) above; and (iv) such other documents as the Administrative Agent, the Arranger, the Issuing Bank or the Lenders may reasonably request.

(c) The Administrative Agent shall have received a certificate, dated the Closing Date and signed by a Responsible Officer of the Borrower, confirming compliance with the conditions precedent set forth in paragraphs (b) and (c) of Section 4.01.

(d) The Administrative Agent shall have received (i) this Agreement, executed and delivered by a duly authorized officer of each of Holdings and the Borrower and by each Lender, (ii) the Guarantee and Collateral Agreement,

(NY) 06216/188/CA/ca.first.lien.doc

EXHIBIT A

executed and delivered by a duly authorized officer of each of Holdings and the Borrower and each Subsidiary Guarantor, (iii) the Intellectual Property Security Agreements, executed and delivered by a duly authorized officer of each Loan Party thereto and (iv) if requested by any Lender pursuant to Section 2.04(e), a promissory note or notes conforming to the requirements of such Section and executed and delivered by a duly authorized officer of the Borrower.

(e)     The Collateral Agent, for the ratable benefit of the Secured Parties, shall have been granted on the Closing Date first priority perfected Liens on the Collateral (subject, in the case of all Collateral other than Pledged Collateral, only to Liens expressly permitted by Section 6.02) and Guarantees from the Subsidiary Guarantors. The Pledged Collateral shall have been duly and validly pledged under the Guarantee and Collateral Agreement to the Collateral Agent, for the ratable benefit of the Secured Parties, and certificates or instruments representing such Pledged Collateral, accompanied by instruments of transfer and stock powers endorsed in blank, shall be in the actual possession of the Collateral Agent.

(f)     The Collateral Agent shall have received a duly executed Perfection Certificate dated on or prior to the Closing Date. The Collateral Agent shall have received the results of recent Lien and judgment searches in each relevant jurisdiction with respect to the Loan Parties, and such search shall reveal no Liens on any of the assets of such Loan Parties except, in the case of Collateral other than Pledged Collateral, for Liens expressly permitted by Section 6.02 and except for Liens to be discharged on or prior to the Closing Date pursuant to documentation reasonably satisfactory to the Collateral Agent.

(g)     The Acquisition and the other Transactions shall be consummated simultaneously with the initial funding of the Loans hereunder in accordance with applicable law and on the terms described in the Stock Purchase Agreement in the form delivered to the Administrative Agent prior to the execution of the Commitment Letter (or otherwise on terms that are reasonably satisfactory to the Administrative Agent); the Stock Purchase Agreement and all other related documentation shall be reasonably satisfactory to the Administrative Agent (it being acknowledged that the execution copy of the Stock Purchase Agreement in the form delivered to the Administrative Agent prior to the execution of the Commitment Letter is satisfactory to the Administrative Agent); the Equity Contribution shall have been made simultaneously with the Acquisition.

(h)     The Borrower shall have received not less than $77,000,000 in gross cash proceeds from the initial borrowing under the Second Lien Credit Agreement. The terms of the Second Lien Credit Agreement (including but not limited to terms relating to the interest rate, fees, amortization, maturity, lien subordination, covenants, events of default and remedies) shall be reasonably satisfactory in all respects to the Administrative Agent.

(i)     After giving effect to the Transactions and the other transactions contemplated hereby, Holdings and its subsidiaries shall have outstanding no

EXHIBIT A

Indebtedness or preferred stock other than (i) the Loans and other extensions of credit hereunder, (ii) loans under the Second Lien Credit Agreement, (iii) other material Indebtedness set forth on Schedule 6.01, if any, and (iv) any preferred stock issued pursuant to the Equity Contribution or otherwise in connection with the Transactions; *provided* that preferred stock issued other than in connection with the Equity Contribution is issued on terms set forth in the Stock Purchase Agreement (as in effect on November 2, 2005) or otherwise on terms reasonably satisfactory to the Administrative Agent. All amounts outstanding under the Existing Note shall have been repaid. The Administrative Agent shall have received satisfactory evidence that (i) the Existing Note shall have been terminated, all amounts then due and payable or to become due and payable (other than indemnification obligations not yet having been requested) thereunder shall have been paid in full, all commitments and reimbursement obligations thereunder shall have been terminated and all guarantees shall have been released and (ii) satisfactory arrangements shall have been made for the termination of all Liens granted in connection therewith, in each case on terms and conditions reasonably satisfactory to the Administrative Agent.

    **(j)**    *Reserved.*

    **(k)**    *Reserved.*

    **(l)**    The Administrative Agent shall have received a certificate from a Financial Officer of the Borrower certifying that Holdings and its subsidiaries, on a consolidated basis and after giving effect to the Transactions and the other transactions contemplated hereby, are solvent.

    **(m)**    (i) All requisite governmental authorities and third parties required to approve or consent to the Transactions under the Stock Purchase Agreement shall have done so and all applicable appeal periods shall have expired except to the extent not required under the terms of the Stock Purchase Agreement and (ii) there shall be no litigation, governmental, administrative or judicial action, actual or threatened, that could reasonably be expected to restrain, prevent or impose burdensome conditions on the Transactions or the other transactions contemplated hereby.

    **(n)**    The Administrative Agent shall have received, at least five Business Days prior to the Closing Date, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act.

    **(o)**    *Reserved.*

    **(p)**    *Reserved.*

    **(q)**    *Reserved.*

EXHIBIT A

(r)    All costs, fees, expenses (including reasonable legal fees and expenses) and other compensation contemplated by the Commitment Letter and the Fee Letter payable to the Administrative Agent, the Arranger, or the Lenders shall have been paid to the extent due, so long as the same shall have been invoiced prior to the Closing Date.

(s)    The Administrative Agent shall have received (and shall provide to each of the Arrangers and the Collateral Agent where appropriate) (i) evidence that insurance required by Section 5.02 is in effect including the receipt of the insurance certificates required by the Guarantee and Collateral Agreement; such certificates shall name the Collateral Agent as the loss payee for the benefit of the Secured Parties, their successors and assigns and (ii) such other evidence of insurance upon the reasonable request of the Administrative Agent.

## ARTICLE 5
### AFFIRMATIVE COVENANTS

Each of Holdings and the Borrower covenants and agrees with each Lender that so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan, all Fees and all other expenses or amounts payable under any Loan Document shall have been paid in full and all Letters of Credit have been canceled or have expired or have otherwise been provided for in a manner satisfactory to the Administrative Agent and the Issuing Bank and all amounts drawn thereunder have been reimbursed in full, each of Holdings and the Borrower will, and will cause each of the Subsidiaries to:

**Section 5.01**. *Existence; Businesses and Properties.*  (a) Do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence, except as otherwise expressly permitted under Section 6.05.

(b)    Except to the extent failure to do so could not reasonably be expected to have a Material Adverse Effect, (i) do or cause to be done all things necessary to obtain, preserve, renew, extend and keep in full force and effect the rights, licenses, permits, franchises, authorizations, patents, copyrights, trademarks and trade names material to the conduct of its business; (ii) comply with all applicable laws, rules, regulations and decrees and orders of any Governmental Authority, whether now in effect or hereafter enacted; (iii) comply with the terms of, and enforce its rights under, each lease of real property and each other agreement so as to not permit any uncured default on its part to exist thereunder; and (iv) at all times maintain and preserve all of its property and keep such property in good repair, working order and condition (ordinary wear and tear, and casualty and condemnation, excepted) and from time to time make, or cause to be made, all needful and proper repairs, renewals, additions, improvements and replacements thereto necessary in order that the business carried on in connection therewith may be properly conducted at all times.

EXHIBIT A

Section 5.02. *Insurance.*  Keep its insurable properties adequately insured at all times by financially sound and reputable insurers to such extent and against such risks (and with such deductibles, retentions and exclusions), including fire and other risks insured against by extended coverage, as is reasonable and customary for companies in the same or similar businesses operating in the same or similar locations; maintain such other insurance as may be required by law; and maintain such other insurance as otherwise required by the Security Documents (and comply with all covenants in the Security Documents with respect thereto).

Section 5.03. *Obligations and Taxes.*  Pay its material Indebtedness and other material obligations promptly and in accordance with their terms and pay and discharge promptly when due all material taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or in respect of its property, before the same shall become delinquent or in default, as well as all lawful claims for labor, materials and supplies or otherwise that, if unpaid, might give rise to a Lien (other than a Lien permitted under Section 6.02) upon such properties or any part thereof; *provided, however,* that such payment and discharge shall not be required with respect to any such material tax, assessment, charge, levy or claim so long as the validity or amount thereof shall be contested in good faith by appropriate proceedings and the Borrower or the applicable Subsidiary shall have set aside on its books adequate reserves with respect thereto in accordance with GAAP.

Section 5.04. *Financial Statements, Reports, Etc.*  In the case of the Borrower, furnish to the Administrative Agent for distribution to each Lender:

(a)    within 90 days after the end of each fiscal year (or within 120 days in the case of the fiscal year ending on the Friday closest to April 30, 2006), its consolidated balance sheet and related statements of income, stockholders' equity and cash flows showing the financial condition of the Borrower and its consolidated Subsidiaries as of the close of such fiscal year and the results of its operations and the operations of such Subsidiaries during such year, together with comparative figures for the immediately preceding fiscal year, all audited by independent public accountants of recognized national standing and accompanied by an opinion of such accountants (which shall not be subject to a "going concern" or similar qualification or a qualification as to the scope of examination of matters relevant to such financial statements) to the effect that such consolidated financial statements fairly present in all material respects the financial condition and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied except as expressly noted therein;

(b)    within 45 days after the end of each of the first three fiscal quarters of each fiscal year, its consolidated balance sheet and related statements of income, stockholders' equity and cash flows showing the financial condition of the Borrower and its consolidated Subsidiaries as of the close of such fiscal quarter and the results of its operations and the operations of such Subsidiaries

EXHIBIT A

during such fiscal quarter and the then elapsed portion of the fiscal year, and comparative figures for the same periods in the immediately preceding fiscal year, all certified by one of its Financial Officers as fairly presenting in all material respects the financial condition and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes;

(c)    *Reserved*;

(d)    concurrently with any delivery of financial statements under paragraph (a) or (b) above, a certificate of a Financial Officer (i) certifying that no Event of Default or Default has occurred or, if such an Event of Default or Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto and (ii) setting forth computations in reasonable detail satisfactory to the Administrative Agent demonstrating compliance with the covenants contained in Section 6.11, Section 6.12, Section 6.13 and Section 6.15 and, in the case of a certificate delivered with the financial statements required by paragraph (a) above, setting forth the Borrower's calculation of Excess Cash Flow;

(e)    concurrently with any delivery of financial statements under paragraph (a) above, a certificate of the accounting firm opining on such statements (which certificate may be limited to accounting matters and disclaim responsibility for legal interpretations) certifying that in the course of performing their audit in order to express an opinion on such financial statements, such accounting firm did not become aware of any Default or Event of Default in respect of Section 6.11, 6.12, 6.13 or 6.15 having occurred or, if such a Default or Event of Default in respect of Section 6.11, 6.12, 6.13 or 6.15 has occurred, specifying the nature and extent thereof;

(f)    at least 90 days after the end of each fiscal year of the Borrower, a detailed consolidated budget for the following fiscal year (including a projected consolidated balance sheet and related statements of projected operations and cash flows as of the end of and for such following fiscal year;

(g)    promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by Holdings, the Borrower or any Subsidiary with the Securities and Exchange Commission, or any Governmental Authority succeeding to any or all of the functions of said Commission, or with any national securities exchange;

(h)    promptly after the receipt thereof by Holdings, the Borrower or any of the Subsidiaries, a copy of any "final management letter" received by any such person from its certified public accountants; and

EXHIBIT A

(i)    promptly, from time to time, such other information regarding the operations, business affairs and financial condition of Holdings, the Borrower or any Subsidiary, or compliance with the terms of any Loan Document, as the Administrative Agent or any Lender (requesting through the Administrative Agent) may reasonably request.

Section 5.05. *Litigation and Other Notices.*  Furnish to the Administrative Agent, the Issuing Bank and each Lender prompt written notice of the following:

(a)    any Event of Default or Default, specifying the nature and extent thereof and the corrective action (if any) taken or proposed to be taken with respect thereto;

(b)    the filing or commencement of, or any threat or notice of intention of any person to file or commence, any action, suit or proceeding, whether at law or in equity or by or before any arbitrator or Governmental Authority, against Holdings, the Borrower or any Subsidiary that could reasonably be expected to result in a Material Adverse Effect; and

(c)    the occurrence of any ERISA Event described in clause (b) of the definition thereof or any other ERISA Event that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to result in liability of Holdings, the Borrower and the Subsidiaries in an aggregate amount exceeding $5,000,000;  and

(d)    any development that has (individually or in the aggregate with other developments) resulted in, or could (individually or in the aggregate with other developments) reasonably be expected to result in, a Material Adverse Effect.

Section 5.06. *Information Regarding Collateral.*  Furnish to each of the Administrative Agent and the Collateral Agent prompt written notice of any change in any Loan Party's (a) corporate name, (b) jurisdiction of organization, any office in which it maintains books or records relating to Collateral owned by it or any office or facility at which Collateral owned by it the fair market value of which is in excess of $750,000 is located (including the establishment of any such new office or facility), (c) identity or corporate structure or (d) Organizational Identification Number.  Each of Holdings and the Borrower agrees promptly to notify each of the Administrative Agent and the Collateral Agent if any material portion of the Collateral is damaged or destroyed.

Section 5.07. *Maintaining Records; Access to Properties and Inspections; Environmental Assessments.*  (a) Keep proper books of record and account in which materially full, true and correct entries in conformity with GAAP are made of all material dealings and transactions in relation to its business and activities. Each of Holdings and the Borrower will, and will cause each of its subsidiaries to, permit any representatives designated by the Administrative Agent or any Lender

(NY) 06216/188/CA/ca.first.lien.doc

EXHIBIT A

to visit and inspect the financial records and the properties of Holdings or the Borrower, as the case may be, or any of its subsidiaries at reasonable times during normal business hours and as often as reasonably requested and to make extracts from and copies of such financial records, and permit any representatives designated by the Administrative Agent or any Lender to discuss the affairs, finances and condition of Holdings or the Borrower, as the case may be, or any of its subsidiaries with the officers thereof and independent accountants therefor; *provided* that (i) any such visit or inspection shall be coordinated through the Administrative Agent, (ii) unless an Event of Default shall have occurred and be continuing, such visits and inspections shall be limited to twice in each calendar year and (iii) in respect of any such discussions with any independent accountants, the Borrower or such subsidiary, as the case may be, shall have received reasonable advance notice thereof and a reasonable opportunity to participate therein.

     **(b)**    At its election, the Administrative Agent or any Lender may, at its own cost and expense, retain an independent engineer or environmental consultant to conduct an environmental assessment of any Mortgaged Property or facility of any Loan Party. Each of Holdings and the Borrower shall, and shall cause each of the Subsidiaries to, cooperate in the performance of any such environmental assessment and permit any such engineer or consultant designated by the Administrative Agent or such Lender to have reasonable access to each property or facility at reasonable times and after reasonable notice to the Borrower of the plans to conduct such an environmental assessment. Environmental assessments conducted under this paragraph shall be limited to visual inspections of the Mortgaged Property or facility, interviews with representatives of the Loan Parties or facility personnel, and review of applicable records and documents pertaining to the property or facility and shall be undertaken no more than once each calendar year in the absence of the occurrence and continuance of an Event of Default.

     **(c)**    In the event that the Administrative Agent or any Lender shall have reason to believe that Hazardous Materials have been Released or are threatened to be Released on or from any Mortgaged Property or other facility of Holdings, the Borrower or the Subsidiaries or that any such property or facility is not being operated in compliance with applicable Environmental Law, the Administrative Agent may, at its election and after reasonable notice to the Borrower, retain an independent engineer or other qualified environmental consultant to evaluate whether Hazardous Materials are present in the soil, groundwater, or surface water at such Mortgaged Property or facility or whether the facilities or properties are being operated and maintained in compliance with applicable Environmental Laws; *provided* that neither the Administrative Agent nor any Lender shall have any rights hereunder unless such Hazardous Materials or violations of Environmental Laws could reasonably be expected to result in a material liability to any Loan Party. Such environmental assessments may include detailed visual inspections of the Mortgaged Property or facility, including any and all storage areas, storage tanks, drains, dry wells and leaching areas, and the taking of soil

(NY) 06216/188/CA/ca.first.lien.doc

EXHIBIT A

samples, surface water samples and groundwater samples as well as such other reasonable investigations or analyses as are necessary; *provided* such is not prohibited by applicable law. The scope of any such environmental assessments under this paragraph shall be reasonable in scope to address the perceived presence of Hazardous Materials or violations of Environmental Laws as determined in the reasonable discretion of the Administrative Agent. Each of Holdings and the Borrower shall, and shall cause each of the Subsidiaries to, cooperate in the performance of any such environmental assessment and permit any such engineer or consultant designated by the Administrative Agent to have reasonable access to each property or facility at reasonable times and after reasonable notice to the Borrower of the plans to conduct such an environmental assessment. All environmental assessments conducted pursuant to this paragraph shall be at the Borrower's sole cost and expense and shall be conducted by a qualified environmental professional possessing reasonable levels of insurance.

Section **5.08**. *Use of Proceeds.* Use the proceeds of the Loans and request the issuance of Letters of Credit only for the purposes set forth in Section 3.13.

Section **5.09**. *Additional Collateral, Etc.* (a) With respect to any Collateral acquired after the Closing Date or, in the case of inventory or equipment (other than inventory or equipment in transit), any material Collateral moved after the Closing Date by the Borrower or any other Loan Party (other than any Collateral described in paragraphs (b), (c) or (d) of this Section) as to which the Collateral Agent, for the benefit of the Secured Parties, does not have a first priority perfected security interest, promptly (and, in any event, within 10 days following the date of such acquisition or move or such longer period as agreed by the Administrative Agent) (i) execute and deliver to the Administrative Agent and the Collateral Agent such amendments to the Guarantee and Collateral Agreement or such other Security Documents as the Collateral Agent deems necessary or that the Collateral Agent may reasonably deem advisable in its reasonable discretion to grant to the Collateral Agent, for the benefit of the Secured Parties, a security interest in such Collateral and (ii) take all actions necessary or that the Collateral Agent may reasonably deem advisable to grant to, or continue on behalf of, the Collateral Agent, for the benefit of the Secured Parties, a perfected first priority security interest in such Collateral, including the filing of UCC financing statements in such jurisdictions as may be required by the Guarantee and Collateral Agreement or by law or as may be requested by the Administrative Agent or the Collateral Agent.

(b) With respect to any fee interest in any Collateral consisting of Real Property acquired after the Closing Date by the Borrower or any other Loan Party, promptly (and, in any event, within 30 days following the date of such acquisition or such longer period as agreed by the Administrative Agent) (i) execute and deliver a first priority Mortgage in favor of the Collateral Agent, for the benefit of the Secured Parties, covering such real property and complying with the provisions herein and in the Security Documents, (ii) provide the Secured Parties

EXHIBIT A

with title and extended coverage insurance in an amount at least equal to the purchase price of such Real Property (or such other amount as the Administrative Agent shall reasonably specify), copies of existing as-built surveys, and if applicable, flood insurance, (iii) if requested by the Administrative Agent, deliver to the Administrative Agent and the Collateral Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent and the Collateral Agent and (iv) deliver to the Administrative Agent a notice identifying, and upon the Administrative Agent's request, provide a copy of, the consultant's reports, environmental site assessments or other documents, if any, relied upon by the Borrower or any other Loan Party to determine that any such real property included in such Collateral does not contain Hazardous Materials of a form or type or in a quantity or location that could reasonably be expected to result in a material Environmental Liability.

(c)     With respect to any Subsidiary (other than an Excluded Foreign Subsidiary) created or acquired after the Closing Date (which, for the purposes of this paragraph, shall include any existing Subsidiary that ceases to be an Excluded Foreign Subsidiary at any time after the Closing Date) by the Borrower or any other Loan Party, promptly (and, in any event, within 10 days following such creation or the date of such acquisition or such longer period as agreed by the Administrative Agent) (i) execute and deliver to the Administrative Agent and the Collateral Agent such amendments to the Guarantee and Collateral Agreement as the Administrative Agent or the Collateral Agent deems necessary or advisable in its reasonable discretion to grant to the Collateral Agent, for the benefit of the Secured Parties, a valid, perfected first priority security interest in the Equity Interests in such new Subsidiary that are owned by the Borrower or any other Loan Party, (ii) deliver to the Collateral Agent the certificates, if any, representing such Equity Interests, together with undated stock powers, in blank, executed and delivered by a duly authorized officer of the Borrower or such other Loan Party, as the case may be, (iii) cause such new Subsidiary (A) to become a party to the Guarantee and Collateral Agreement (and provide Guarantees of the Obligations) and the Intellectual Property Security Agreements, if applicable, and (B) to take such actions necessary or that the Collateral Agent may reasonably deem advisable to grant to the Collateral Agent, for the benefit of the Secured Parties, a perfected first priority security interest in the Collateral described in the Guarantee and Collateral Agreement and the Intellectual Property Security Agreement with respect to such new Subsidiary, including the recording of instruments in the United States Patent and Trademark Office and the United States Copyright Office and the filing of UCC financing statements in such jurisdictions as may be required by law or as may be reasonably requested by the Administrative Agent or the Collateral Agent and (iv) if requested by the Administrative Agent, deliver to the Administrative Agent and the Collateral Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent and the Collateral Agent.

EXHIBIT A

(d)     With respect to any Excluded Foreign Subsidiary created or acquired after the Closing Date by the Borrower or any other Loan Party, promptly (and, in any event, within 20 days following such creation or the date of such acquisition or such longer period as agreed by the Administrative Agent) (i) execute and deliver to the Administrative Agent and the Collateral Agent such amendments to the Guarantee and Collateral Agreement as the Administrative Agent or the Collateral Agent deems necessary or advisable in its reasonable discretion in order to grant to the Collateral Agent, for the benefit of the Secured Parties, a perfected first priority security interest in the Equity Interests in such new Excluded Foreign Subsidiary that is directly owned by the Borrower or any other Loan Party (*provided* that in no event shall more than 65% of the total outstanding voting Equity Interests in any such new Excluded Foreign Subsidiary be required to be so pledged if such pledge would result in adverse tax consequences to the Borrower or such other Loan Party), (ii) deliver to the Collateral Agent the certificates representing such Equity Interests, together with undated stock powers, in blank, executed and delivered by a duly authorized officer of the Borrower or such other Loan Party, as the case may be, and take such other action as may be necessary or, in the reasonable opinion of the Administrative Agent or the Collateral Agent, desirable to perfect the security interest of the Collateral Agent thereon and (iii) if requested by the Administrative Agent, deliver to the Administrative Agent and the Collateral Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent and the Collateral Agent.

(e)     Notwithstanding anything to the contrary contained in this Section 5.09, Section 5.10 or the Guarantee and Collateral Agreement, the Collateral shall exclude, and the Loan Parties shall not be required to take any action in respect of, those assets as to which the Administrative Agent shall reasonably determine that the costs of obtaining a security interest in such assets are unreasonably excessive in relation to the benefit to the Lenders of the security interest afforded thereby.

**Section 5.10**. *Further Assurances.*  From time to time duly authorize, execute and deliver, or cause to be duly authorized, executed and delivered, such additional instruments, certificates, financing statements, agreements or documents, and take all such actions (including filing UCC and other financing statements), as the Administrative Agent or the Collateral Agent may reasonably request, for the purposes of implementing or effectuating the provisions of this Agreement and the other Loan Documents, or of perfecting or renewing the rights of the Administrative Agent, the Collateral Agent and the Secured Parties with respect to the Collateral (or with respect to any additions thereto or replacements or proceeds or products thereof or with respect to any other property or assets hereafter acquired by Holdings, the Borrower or any Subsidiary which may be deemed to be part of the Collateral) pursuant hereto or thereto.  Upon the exercise by the Administrative Agent, the Collateral Agent or any Lender of any power, right, privilege or remedy pursuant to this Agreement or the other Loan Documents which requires any consent, approval, recording, qualification or

EXHIBIT A

authorization of any Governmental Authority, each of Holdings and the Borrower will execute and deliver, or will cause the execution and delivery of, all applications, certifications, instruments and other documents and papers that the Administrative Agent, the Collateral Agent or such Lender may be required to obtain from Holdings, the Borrower or any of the Subsidiaries for such governmental consent, approval, recording, qualification or authorization.

**Section 5.11**. *Interest Rate Protection.* The Borrower shall ensure that for at least two years following the Closing Date no less than 50% of the sum of (a) the total outstanding principal amount of the Tranche B Term Loans plus (b) the total outstanding principal amount of the Terms Loans outstanding under (and as defined in) the Second Lien Credit Agreement effectively bears interest at a fixed rate, either by its terms or through the Borrower entering into, as promptly as practicable (and in any event no later than the 180th day after the Closing Date), Hedging Agreements reasonably acceptable to the Administrative Agent.

**Section 5.12**. *Credit Rating.* The Borrower shall at all times use its commercially reasonable efforts to obtain and to cause a credit rating by S&P and by Moody's to be maintained with respect to the Facilities hereunder.

**Section 5.13**. *Post-closing Items.* Holdings and the Borrower shall, and the Borrower shall cause each Subsidiary to, take all necessary actions to satisfy the following requirement within 30 days after the Closing Date (or such longer period as may be consented to by the Administrative Agent): for each of the accounts listed on Schedule 4.06(c) to the Guarantee and Collateral Agreement, the Borrower (a) shall deliver a fully executed control agreement pursuant to which the financial institution at which such account is maintained shall have agreed to comply with instructions issued or originated by the Collateral Agent without further consent of the relevant Loan Party, each such control agreement to be in form and substance reasonably acceptable to the Collateral Agent or (b) shall close such account.

## ARTICLE 6
### NEGATIVE COVENANTS

Each of Holdings and the Borrower covenants and agrees with each Lender that, so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan, all Fees and all other expenses or amounts payable under any Loan Document have been paid in full and all Letters of Credit have been cancelled or have expired or have otherwise been provided for in a manner satisfactory to the Administrative Agent and the Issuing Bank and all amounts drawn thereunder have been reimbursed in full, neither Holdings nor the Borrower will, nor will it cause or permit any of the Subsidiaries to:

EXHIBIT A

**Section 6.01**. *Indebtedness.*  Incur, create, assume or permit to exist any Indebtedness, except:

(a)     Indebtedness existing on the date hereof and set forth in Schedule 6.01 and any Permitted Refinancing Indebtedness in respect of any such Indebtedness;

(b)     Indebtedness created hereunder and under the other Loan Documents;

(c)     unsecured intercompany Indebtedness of the Borrower and the Subsidiaries to the extent permitted by Section 6.04(a);

(d)     Capital Lease Obligations and Synthetic Lease Obligations in an aggregate principal amount, when combined with the aggregate principal amount of all Indebtedness incurred pursuant to this Section 6.01(d), not exceeding $2,500,000 at any time outstanding;

(e)     Indebtedness in respect of the Second Lien Credit Agreement in an aggregate principal amount of up to $77,000,000 at any time outstanding, less the amount of any principal payments made thereon after the Closing Date, and any Permitted Refinancing Indebtedness in respect of such Indebtedness (which shall be limited to the then outstanding principal amount thereof and shall be subject to the terms of the Intercreditor Agreement);

(f)     Indebtedness under performance, stay, customs, appeal and surety bonds or with respect to workers' compensation or other like employee benefit claims, in each case incurred in the ordinary course of business, and obligations in respect of letters of credit related thereto;

(g)     Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently drawn against insufficient funds in the ordinary course of business; *provided* that such Indebtedness is promptly covered by the Borrower or any Subsidiary;

(h)     Indebtedness in respect of Hedging Agreements permitted under this Agreement;

(i)     Indebtedness in respect of bankers' acceptances supporting trade payables, warehouse receipts or similar facilities entered into in the ordinary course of business;

(j)     unsecured Indebtedness of Holdings ("**Permitted Holdco Debt**") that (i) is not subject to any guarantee by the Borrower any of its Subsidiaries, (ii) will not mature prior to the date that is 91 days after the scheduled maturity date of the Tranche B Term Loan, (iii) has no scheduled amortization or payments of principal prior to the date that is 91 days after the scheduled maturity date of the Tranche B Term Loan; *provided* that the proceeds of such Indebtedness are

EXHIBIT A

contributed to the Borrower and used solely for purposes of (x) making permitted repayments of Indebtedness of the Borrower and its Subsidiaries and/or (y) to finance Permitted Acquisitions;

(k)    Indebtedness assumed in connection with any Permitted Acquisition and not incurred in contemplation thereof in an aggregate principal amount not exceeding $25,000,000 at any time outstanding, and Permitted Refinancing Indebtedness in respect thereof;

(l)    purchase money obligations to finance the purchase of real property, improvements thereof or other fixed or capital assets within the limitations set forth in Section 6.02(i) in an aggregate amount not exceeding $1,500,000 at any time outstanding, and Permitted Refinancing Indebtedness in respect thereof;

(m)    Indebtedness consisting of promissory notes issued to future, present or former Qualified Employees (or their respective estates, heirs, family members, spouses or former spouses) to finance the purchase or redemption of Equity Interests permitted by Section 6.06 (and subject to the annual aggregate limit on such repurchases or redemptions of Equity Interests as set forth therein);

(n)    Indebtedness owed to the seller of any property acquired in a Permitted Acquisition on an unsecured subordinated basis, which subordination shall be on terms reasonably satisfactory to the Administrative Agent;

(o)    guarantees of Indebtedness permitted under this Section 6.01;

(p)    Indebtedness of the type described in clause (f) thereof secured by Liens permitted under Section 6.02;

(q)    Indebtedness incurred in a Permitted Acquisition or a disposition of assets otherwise permitted under this Agreement pursuant to agreements providing for indemnification, the adjustment of the purchase price or similar adjustments; and

(r)    other unsecured Indebtedness of the Borrower or the Subsidiaries in an aggregate principal amount not exceeding $5,000,000 at any time outstanding.

Section 6.02. *Liens.*  Create, incur, assume or permit to exist any Lien on any property or assets (including Equity Interests or other securities of any person, including any Subsidiary) now owned or hereafter acquired by it or on any income or revenues or rights in respect of any thereof, except:

(a)    Liens on property or assets of the Borrower and the Subsidiaries existing on the date hereof and set forth in Schedule 6.02; *provided* that such Liens shall secure only those obligations which they secure on the date hereof and refinancings, extensions, renewals and replacements thereof permitted hereunder;

(b)    any Lien created under the Loan Documents;

EXHIBIT A

(c)     any Lien existing on any property or asset prior to the acquisition thereof by the Borrower or any Subsidiary; *provided* that (i) such Lien is not created in contemplation of or in connection with such acquisition, (ii) such Lien does not apply to any other property or assets of the Borrower or any Subsidiary and (iii) such Lien does not materially interfere with the use, occupancy and operation of any Mortgaged Property;

(d)     Liens for taxes not yet due or, if overdue, ( i) which are being contested in compliance with Section 5.03 or (ii) which, in the aggregate, are not material in amount, so long as the failure to make payment of such taxes, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect;

(e)     landlord's, carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business and securing obligations that are not overdue by more than 30 days or, if overdue by more than 30 days, (i) which are being contested in compliance with Section 5.03 or (ii) which, in the aggregate, are not material in amount, so long as the failure to make payment of such obligations, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect;

(f)     (i) pledges and deposits made in the ordinary course of business in compliance with workmen's compensation, unemployment insurance and other social security laws or regulations, (ii) pledges and deposits made in the ordinary course of business in an aggregate amount not exceeding $1,000,000 securing insurance premiums and reimbursement obligations under insurance policies and (iii) obligations in respect of letters of credit or bank guaranties that have been posted by Holdings, the Borrower or any of the Subsidiaries in support of payment of the items described in clauses (i) and (ii) of this Section 6.02(f) ;

(g)     deposits to secure the performance of bids, trade contracts (other than for Indebtedness), leases (other than Capital Lease Obligations), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(h)     zoning restrictions, easements, rights-of-way, restrictions on use of real property and other similar encumbrances incurred in the ordinary course of business which, in the aggregate, do not materially detract from the value of any fee-owned real property subject thereto or interfere with the ordinary conduct of the business of the Borrower or any of the Subsidiaries or the ability of the Borrower or any of the Subsidiaries to utilize such property (whether fee-owned or leased) for its intended purpose;

(i)     purchase money security interests in real property, improvements thereto or other fixed or capital assets hereafter acquired (or, in the case of improvements, constructed) by the Borrower or any Subsidiary; *provided* that (i) such security interests secure Indebtedness permitted by Section 6.01, (ii) such

EXHIBIT A

security interests are incurred, and the Indebtedness secured thereby is created, within 90 days after such acquisition (or construction) and (iii) such security interests do not apply to any other property or assets of the Borrower or any Subsidiary (other than the proceeds and products thereof and accessions thereto);

(j)      judgment Liens securing judgments not constituting an Event of Default under Article 7;

(k)      any interest or title of a lessor, sublessor licensor or sublicensor under any lease or license entered into by the Borrower or any of its Subsidiaries in the ordinary course of business and covering only the assets so leased or licensed;

(l)      Liens on cash deposits and other funds maintained with a depositary institution, in each case arising in the ordinary course of business by virtue of any statutory or common law provision relating to banker's liens; *provided* that (i) the applicable deposit account is not a dedicated cash collateral account and is not subject to restrictions against access by the Borrower or the Subsidiaries in excess of those set forth in regulations promulgated by the Board and (ii) the applicable deposit account is not intended by the Borrower or any of the Subsidiaries to provide collateral or security to the applicable depositary institution or any other person;

(m)      Liens on the Collateral securing obligations under the Second Lien Credit Agreement or any refinancing thereof permitted hereunder and having the same priority of Liens afforded thereto; *provided* that all such Liens are subordinated to the Liens securing the Obligations in accordance with, and otherwise subject to, the terms of the Intercreditor Agreement;

(n)      Liens securing Capitalized Lease Obligations and Synthetic Lease Obligations; *provided* that (i) such security interests secure Indebtedness permitted under Section 6.01(d), and (ii) such security interests do not apply to any property or assets of the Borrower or any Subsidiary other than the property and assets subject to the applicable capital or synthetic lease;

(o)      Liens arising from precautionary UCC financing statement filings (or similar filings under applicable law) regarding leases entered into in the ordinary course of business;

(p)      Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into in the ordinary course of business;

(q)      Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connect with the importation of goods in the ordinary course of business;

EXHIBIT A

(r)     Liens (i) (A) on advances of cash or Permitted Investments in favor of the seller of any property to be acquired in connection with a Permitted Acquisition, which advances shall be applied against the purchase price for such Permitted Acquisition and shall not exceed an aggregate amount of $5,000,000 at any time and (B) consisting of an agreement to dispose of any property in an Asset Sale permitted by Section 6.05 solely to the extent such Asset Sale would have been permitted on the date of the creation of such Lien, and (ii) on cash earnest money deposits in an aggregate amount not exceeding $5,000,000 made in connection with any letter of intent or purchase agreement permitted hereunder; and

(s)     other Liens securing Indebtedness or other obligations outstanding in an aggregate principal amount not in excess of $1,000,000.

**Section 6.03**. *Sale and Lease-Back Transactions.*  Enter into any arrangement, directly or indirectly, with any person whereby it shall sell or transfer any property, real or personal or mixed, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property which it intends to use for substantially the same purpose or purposes as the property being sold or transferred unless (a) the sale of such property is permitted by Section 6.05 and (b) any Capital Lease Obligations or Liens arising in connection therewith are permitted by Section 6.01 and Section 6.02, respectively.

**Section 6.04**. *Investments, Loans and Advances.*  Purchase, hold or acquire any Equity Interests, evidences of indebtedness or other securities of, make or permit to exist any loans or advances or capital contributions to, or make or permit to exist any investment or any other interest in, any other person (all of the foregoing, "**Investments**"), except:

(a)     (i) Investments by Holdings, the Borrower and the Subsidiaries existing on the date hereof in the Equity Interests of the Borrower and the Subsidiaries and (ii) additional Investments by Holdings, the Borrower and the Subsidiaries in the Equity Interests of the Borrower and the Subsidiaries; *provided* that (A) any such Equity Interests held by a Loan Party shall be pledged pursuant to the Guarantee and Collateral Agreement (subject to the limitation referred to in Section 5.09(d) in the case of any Excluded Foreign Subsidiary), (B) the aggregate amount of Investments by Loan Parties in Subsidiaries that are not Subsidiary Guarantors shall not exceed $2,000,000 at any time outstanding; (C) if such Investment shall be in the form of a loan or advance, such loan or advance shall be (x) unsecured, (y) in the case of a loan or advance owed by a Loan Party to a Subsidiary that is not a Loan Party, subordinated to the Obligations pursuant to the Affiliate Subordination Terms and (z) in the case of a loan or advance made by a Loan Party to a Subsidiary that is not a Loan Party, evidenced by a promissory note pledged to the Collateral Agent for the ratable benefit of the Secured Parties pursuant to the Guarantee and Collateral Agreement;

EXHIBIT A

**(b)**     Permitted Investments;

**(c)**     Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business;

**(d)**     the Borrower and the Subsidiaries may make loans and advances (including advances of payroll payments) in the ordinary course of business to their respective employees so long as the aggregate principal amount thereof at any time outstanding (determined without regard to any write-downs or write-offs of such loans and advances) shall not exceed $1,000,000;

**(e)**     the Acquisition and Permitted Acquisitions;

**(f)**     Investments existing on the date hereof and set forth on Schedule 6.04;

**(g)**     extensions of trade credit in the ordinary course of business;

**(h)**     Investments made as a result of the receipt of non-cash consideration from a sale, transfer or other disposition of any asset in compliance with Section 6.05;

**(i)**     intercompany loans and advances to Holdings to the extent that the Borrower is permitted to pay dividends to Holdings pursuant to Section 6.06 (and in lieu of paying such dividends); *provided* that such intercompany loans and advances (i) shall be made for the purposes set forth in Section 6.06 and (ii) shall be unsecured and subordinated to the Obligations;

**(j)**     Investments in the ordinary course consisting of endorsements for collection or deposit;

**(k)**     Investments in respect of Hedging Agreements permitted under this Agreement;

**(l)**     Investments consisting of Liens permitted under Sections 6.02(f) and (g) and Restricted Payments permitted under Sections 6.06; and

**(m)**     in addition to Investments permitted by paragraphs (a) through (k) above, additional Investments by the Borrower and the Subsidiaries so long as the aggregate amount invested, loaned or advanced pursuant to this paragraph (m) (determined without regard to any write-downs or write-offs of such investments, loans and advances) does not exceed $2,000,000 in the aggregate.

**Section 6.05**. *Mergers, Consolidations, Sales of Assets and Acquisitions.* (a) Merge into or consolidate with any other person, or permit any other person to merge into or consolidate with it, or liquidate or dissolve, or sell, transfer, lease, issue or otherwise dispose of (in one transaction or in a series of transactions) all

EXHIBIT A

or substantially all the assets (whether now owned or hereafter acquired) of the Borrower or less than all the Equity Interests of any Subsidiary, or purchase, lease or otherwise acquire (in one transaction or a series of transactions) all or any substantial part of the assets of any other person, except for (i) the purchase by the Borrower or any Subsidiary of inventory in the ordinary course of business, (ii) the liquidation or dissolution of any Subsidiary that is not a Loan Party if the Borrower determines in good faith that such liquidation or dissolution is in the best interests of the Borrower and is not materially disadvantageous to the Lenders, (iii) if at the time thereof and immediately after giving effect thereto neither an Event of Default or an event described in Section 7.01(c) that would, with the passage of time, constitute an Event of Default, shall have occurred and be continuing, (x) the merger or consolidation of any wholly owned Subsidiary into or with the Borrower in a transaction in which the Borrower is the surviving corporation, (y) the merger or consolidation of any wholly owned Subsidiary into or with any other wholly owned Subsidiary in a transaction in which the surviving entity is a wholly owned Subsidiary and no person other than the Borrower or a wholly owned Subsidiary receives any consideration (*provided* that if any party to any such transaction is (1) a Loan Party, the surviving entity of such transaction shall be a Loan Party and (2) a Domestic Subsidiary, the surviving entity of such transaction shall be a Domestic Subsidiary), and (z) sales, assignments, transfers or other dispositions of Investments in joint ventures to the extent required by, or made pursuant to buy/sell arrangements between the joint venture parties set forth in, joint venture arrangements and similar binding arrangements, (iv) Permitted Acquisitions by the Borrower or any Subsidiary and (v) sales, assignments, transfers or other dispositions to the extent constituting a Lien permitted by Section 6.02, a sale and lease-back transaction permitted by Section 6.03, an Investment permitted by Section 6.04, a fundamental change permitted by Section 6.05 or a Restricted Payment permitted by Section 6.06.

    **(b)**    Engage in any Asset Sale unless (i) such Asset Sale is for consideration at least 75% of which is cash (and no portion of the remaining consideration shall be in the form of Indebtedness of the Borrower or any Subsidiary), (ii) such consideration is at least equal to the fair market value of the assets being sold, transferred, leased or disposed of and (iii) the fair market value of all assets sold, transferred, leased or disposed of pursuant to this paragraph (b) shall not exceed (A) $1,000,000 in any fiscal year or (B) $5,000,000 in the aggregate.

    **Section 6.06**. *Restricted Payments; Restrictive Agreements.* (a) Declare or make, or agree to declare or make, directly or indirectly, any Restricted Payment (including pursuant to any Synthetic Purchase Agreement), or incur any obligation (contingent or otherwise) to do so; *provided, however,* that (i) any Subsidiary may declare and pay dividends or make other distributions ratably to its equity holders, (ii) so long as no Event of Default shall have occurred and be continuing or would result therefrom, the Borrower may, or may make distributions to Holdings so that Holdings may, repurchase its Equity Interests held by future, present or former Qualified Employees (or their respective estates,

(NY) 06216/188/CA/ca.first.lien.doc

EXHIBIT A

heirs, family members, spouses or former spouses) or make payments to Qualified Employees upon termination of employment in connection with the exercise of stock options, stock appreciation rights or similar equity incentives or equity based incentives pursuant to management incentive plans or in connection with the death or disability of such Qualified Employees in an aggregate amount not to exceed $3,000,000 in any fiscal year, (iii) the Borrower and its Subsidiaries may declare and make dividend payments or other distributions payable solely in Equity Interests of such person; (iv) to the extent constituting Restricted Payments, the Borrower and its Subsidiaries may enter into transactions expressly permitted by Section 6.07; (v) repurchase of Equity Interests deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price of such options or warrant; and (vi) the Borrower may make Restricted Payments to Holdings (x) to the extent necessary to pay general corporate and overhead expenses incurred by Holdings in the ordinary course of business and (y) in an amount necessary to pay the Tax liabilities (including income, franchise and similar taxes) of Holdings directly attributable to (or arising as a result of) the operations of the Borrower and the Subsidiaries and (z) the proceeds of which shall be used by Holdings to pay customary salary, bonus or other benefits payable to officers, directors and employees of Holdings (including customary directors fees and indemnification obligations) to the extent such salaries, bonuses and other benefits are directly attributable and reasonably allocated to the operations of the Borrower and its Subsidiaries; *provided* that (A) the amount of such dividends pursuant to clause (vi)(y) shall not exceed the amount that the Borrower and the Subsidiaries would be required to pay in respect of Federal, state and local Taxes were the Borrower and the Subsidiaries to pay such Taxes as stand-alone taxpayers and (B) all Restricted Payments made to Holdings pursuant to clause (iii) shall be used by Holdings for the purpose specified herein within 30 days of the receipt thereof.

(b)    Enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (i) the ability of Holdings, the Borrower or any Subsidiary to create, incur or permit to exist any Lien upon any of its property or assets, or (ii) the ability of any Subsidiary to pay dividends or other distributions with respect to any of its Equity Interests or to make or repay loans or advances to the Borrower or any other Subsidiary or to Guarantee Indebtedness of the Borrower or any other Subsidiary; *provided* that (A) the foregoing shall not apply to restrictions and conditions imposed by law or by any Loan Document or the Second Lien Credit Agreement as in effect on the date hereof or related documents (or any agreement relating to any refinancing of the Second Lien Credit Agreement that is permitted hereunder), (B) the foregoing shall not apply to customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary pending such sale; *provided* such restrictions and conditions apply only to the Subsidiary that is to be sold and such sale is permitted hereunder, (C) the foregoing shall not apply to restrictions and conditions imposed on any Subsidiary that is not a Loan Party by the terms of any Indebtedness of such Subsidiary permitted to be incurred hereunder, (D) clause (i) of the foregoing shall not apply to restrictions or conditions imposed by any

EXHIBIT A

agreement relating to secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness and (E) clause (i) of the foregoing shall not apply to customary provisions in leases and other contracts restricting the assignment thereof.

**Section 6.07**. *Transactions with Affiliates.* Except for transactions by or among Loan Parties, sell or transfer any property or assets to, or purchase or acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except that (a) the Borrower or any Subsidiary may engage in any of the foregoing transactions in the ordinary course of business at prices and on terms and conditions not less favorable to the Borrower or such Subsidiary than could be obtained on an arm's-length basis from unrelated third parties, (b) Restricted Payments may be made to the extent provided in Section 6.06, (c) fees and expenses (in an aggregate amount not to exceed $12,950,000) may be paid in connection with the consummation of the Transactions, (d) payments may be made in respect of employment and severance arrangements between any Loan Party and their officers and employees in the ordinary course of business, (e) payments may be made in respect of customary fees, reimbursable out-of-pocket expenses and indemnities payable to directors, officers and employees of Holdings, the Borrower and its Subsidiaries in the ordinary course of business, (f) the Borrower or any Subsidiary may engage in transactions pursuant to agreements in existence on the Closing Date and set forth on Schedule 6.07, and (g) so long as no Event of Default shall have occurred and be continuing or would result therefrom, fees may be paid to the Sponsor or any of its Affiliates in an aggregate amount not to exceed the amount set forth in the Corporate Services Agreement (as in effect on the date hereof) in any fiscal year plus all out-of-pocket costs and expenses incurred by the Sponsor or any such Affiliate, in each case in connection with their performance of underwriting, placement, management, consulting, monitoring, financial advisory or other services with respect to the Borrower and the Subsidiaries.

**Section 6.08**. *Business of Holdings, the Borrower and Subsidiaries; Limitation on Hedging Agreements.* (a) With respect to Holdings, engage in any business activities or have any assets or liabilities other than (i) its ownership of the Equity Interests in the Borrower and activities and liabilities incidental thereto, including its liabilities pursuant to the Loan Documents and the "Loan Documents" (as defined in the Second Lien Credit Agreement), (ii) owning cash and Permitted Investments for the sole purpose of paying general operating expenses of Holdings, (iii) owning assets pursuant to a purchase or acquisition of all or substantially all of the property and assets or business or a division of a person, or all of the Equity Interest in a person; *provided* that concurrently with consummation of such purchase or acquisition the same is contributed to the Borrower and (iv) the incurrence of Permitted Holdco Debt.

**(b)** With respect to the Borrower and the Subsidiaries, engage at any time in any business or business activity other than the business conducted by it as of the date hereof and business activities reasonably incidental or related thereto.

(NY) 06216/188/CA/ca.first.lien.doc

EXHIBIT A

(c)    Enter into any Hedging Agreement other than (a) any such agreement or arrangement entered into in the ordinary course of business and consistent with prudent business practice to hedge or mitigate risks to which the Borrower or any Subsidiary is exposed in the conduct of its business or the management of its liabilities or (b) any such agreement entered into to hedge against fluctuations in interest rates or currency incurred in the ordinary course of business and consistent with prudent business practice; *provided* that in each case such agreements or arrangements shall not have been entered into for speculative purposes.

Section 6.09.  *Other Indebtedness and Agreements; Amendments to Acquisition Documentation.*  (a) Except in each case for changes to the Second Lien Credit Agreement that are permitted by the terms of the Intercreditor Agreement, permit any waiver, supplement, modification, amendment, termination or release of the Second Lien Credit Agreement, any indenture, instrument or agreement pursuant to which any Material Indebtedness of Holdings, the Borrower or any of the Subsidiaries is outstanding if the effect of such waiver, supplement, modification, amendment, termination or release, together with all other changes, would materially increase the obligations of the obligor or confer additional material rights on the holder of such Indebtedness in a manner adverse to Holdings, the Borrower, any of the Subsidiaries or the Lenders.

(b)    Make any distribution, whether in cash, property, securities or a combination thereof, other than regular scheduled payments of principal and interest as and when due (to the extent not prohibited by applicable subordination provisions), in respect of, or pay, or offer or commit to pay, or directly or indirectly (including pursuant to any Synthetic Purchase Agreement) redeem, repurchase, retire or otherwise acquire for consideration, or set apart any sum for the aforesaid purposes, any Permitted Holdco Debt or Indebtedness in respect of the Second Lien Credit Agreement except (A) refinancings of such Indebtedness as permitted by Section 6.01 and (B) in the case of Indebtedness in respect of the Second Lien Credit Agreement, as contemplated by Section 2.13(g).

(c)    Permit any waiver, supplement, modification, amendment, termination or release of, or fail to enforce strictly the terms and conditions of, any of the Acquisition Documentation except to the extent that such waiver, supplement, modification, amendment, termination or release or failure to enforce could not reasonably be expected to have a Material Adverse Effect.

(d)    Permit any waiver, supplement, modification, amendment or termination of any organizational document or any material agreement of Holdings, the Borrower or any Subsidiary in a manner materially adverse to the Administrative Agent or the Lenders.

Section 6.10.  *Capital Expenditures.*  Permit the aggregate amount of Capital Expenditures made by the Borrower and the Subsidiaries in any fiscal year to exceed $5,000,000; *provided* that the amount of permitted Capital

EXHIBIT A

Expenditures in respect of any fiscal year commencing with the fiscal year ending on the Friday closest to April 30, 2007, shall be increased (but not decreased) by (a) the amount of unused permitted Capital Expenditures for the immediately preceding fiscal year less (b) an amount equal to unused Capital Expenditures carried forward to such preceding fiscal year.

**Section 6.11**. *Interest Coverage Ratio.* Permit the Interest Coverage Ratio for any period of four consecutive fiscal quarters of the Borrower ending on the last day of each fiscal quarter set forth below (beginning with the fiscal quarter ending January 30, 2006) to be less than the ratio set forth for such period below:

| Fiscal Year | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| --- | --- | --- | --- | --- |
| 2006 | N/A | N/A | 1.40:1 | 1.45:1 |
| 2007 | 1.50:1 | 1.50:1 | 1.55:1 | 1.55:1 |
| 2008 | 1.65:1 | 1.70:1 | 1.75:1 | 1.80:1 |
| 2009 | 1.95:1 | 1.95:1 | 1.95:1 | 1.95:1 |
| 2010 | 2.20:1 | 2.20:1 | 2.20:1 | 2.20:1 |
| 2011 | 2.45:1 | 2.45:1 | 2.45:1 | 2.45:1 |
| 2012 | 3.00:1 | 3.00:1 | 3.00:1 | N/A |

**Section 6.12**. *Leverage Ratio.* Permit the Leverage Ratio for any period of four consecutive fiscal quarters of the Borrower ending on the last day of each fiscal quarter set forth below (beginning with the fiscal quarter ending January 30, 2006) to be greater than the ratio set forth for such period below:

| Fiscal Year | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| --- | --- | --- | --- | --- |
| 2006 | N/A | N/A | 6.75:1 | 6.75:1 |
| 2007 | 6.50:1 | 6.50:1 | 6.25:1 | 6.00:1 |
| 2008 | 6.00:1 | 5.75:1 | 5.50:1 | 5.25:1 |
| 2009 | 4.75:1 | 4.75:1 | 4.75:1 | 4.75:1 |
| 2010 | 4.00:1 | 4.00:1 | 4.00:1 | 4.00:1 |
| 2011 | 3.50:1 | 3.50:1 | 3.50:1 | 3.50:1 |
| 2012 | 3.50:1 | 3.50:1 | 3.50:1 | N/A |

**Section 6.13**. *First Lien Leverage Ratio.* Permit the First Lien Leverage Ratio for any period of four consecutive fiscal quarters of the Borrower ending on the last day of each fiscal quarter set forth below (beginning with the fiscal quarter ending January 30, 2006) to be greater than the ratio set forth for such period below:

EXHIBIT A

| Fiscal Year | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
|---|---|---|---|---|
| 2006 | N/A | N/A | 4.10:1 | 4.00:1 |
| 2007 | 3.80:1 | 3.80:1 | 3.60:1 | 3.30:1 |
| 2008 | 3.30:1 | 3.15:1 | 3.00:1 | 2.85:1 |
| 2009 | 2.25:1 | 2.25:1 | 2.25:1 | 2.25:1 |
| 2010 | 2.00:1 | 2.00:1 | 2.00:1 | 2.00:1 |
| 2011 | 2.00:1 | 2.00:1 | 2.00:1 | 2.00:1 |
| 2012 | 2.00:1 | 2.00:1 | 2.00:1 | N/A |

**Section 6.14**. *Fiscal Year.*  With respect to Holdings or the Borrower, change its fiscal year-end to a date other than the last day of the 52 or 53 week period, as the case may be, beginning on the last date of the similar preceding period and ending on the Friday closest to April 30.

**Section 6.15**. *Fixed Charge Coverage Ratio.*  Permit the Fixed Charge Coverage Ratio for any period of four consecutive fiscal quarters of the Borrower ending on the last day of each fiscal quarter set forth below (beginning with the fiscal quarter ending January 30, 2006) to be greater than the ratio set forth for such period below:

| Fiscal Year | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
|---|---|---|---|---|
| 2006 | N/A | N/A | 0.85:1 | 0.85:1 |
| 2007 | 0.90:1 | 0.90:1 | 0.95:1 | 1.20:1 |
| 2008 | 1.20:1 | 1.20:1 | 1.20:1 | 1.20:1 |
| 2009 | 1.20:1 | 1.20:1 | 1.20:1 | 1.20:1 |
| 2010 | 1.20:1 | 1.20:1 | 1.20:1 | 1.20:1 |
| 2011 | 1.20:1 | 1.20:1 | 1.20:1 | 1.20:1 |
| 2012 | 1.20:1 | 1.20:1 | 1.20:1 | N/A |

## ARTICLE 7
### Events of Default

**Section 7.01**. *Events Of Default.*  In case of the happening of any of the following events ("**Events of Default**"):

(a)    any representation or warranty made or deemed made in or in connection with any Loan Document or the Borrowings or issuances of Letters of Credit hereunder, or any representation, warranty or statement of fact contained in any report, certificate, financial statement or other instrument required to be

EXHIBIT A

furnished in connection with or pursuant to any Loan Document, shall prove to have been false or misleading in any material respect when so made, deemed made or furnished;

　　　**(b)**　default shall be made in the payment of any principal of any Loan or the reimbursement with respect to any L/C Disbursement when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or by acceleration thereof or otherwise;

　　　**(c)**　default shall be made in the payment of any interest on any Loan or L/C Disbursement or any Fee or any other amount (other than an amount referred to in (b) above) due under any Loan Document, when and as the same shall become due and payable, and such default shall continue unremedied for a period of three Business Days;

　　　**(d)**　default shall be made in the due observance or performance by Holdings, the Borrower or any Subsidiary of any covenant, condition or agreement contained in Section 5.01(a) (with respect to the Borrower only), Section 5.05(a) or Section 5.08 or in Article 6;

　　　**(e)**　default shall be made in the due observance or performance by Holdings, the Borrower or any Subsidiary of any covenant, condition or agreement contained in any Loan Document (other than those specified in clauses (b), (c) or (d) above) and such default shall continue unremedied for a period of 30 days after notice thereof has been given to the Borrower by the Administrative Agent;

　　　**(f)**　(i) Holdings, the Borrower or any Subsidiary shall fail to pay any principal or interest (subject, in the case of interest, to any applicable grace period), regardless of amount, due in respect of any Material Indebtedness, when and as the same shall become due and payable, or (ii) any other event or condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; *provided* that this clause (ii) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness;

　　　**(g)**　an involuntary proceeding shall be commenced or an involuntary petition shall be filed in a court of competent jurisdiction seeking (i) relief in respect of Holdings, the Borrower or any Subsidiary, or of a substantial part of the property or assets of Holdings, the Borrower or a Subsidiary, under Title 11 of the United States Bankruptcy Code, as now constituted or hereafter amended, or any other Federal, state or foreign bankruptcy, insolvency, receivership or similar law, (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or

EXHIBIT A

similar official for Holdings, the Borrower or any Subsidiary or for a substantial part of the property or assets of Holdings, the Borrower or a Subsidiary or (iii) the winding-up or liquidation of Holdings, the Borrower or any Subsidiary; and such proceeding or petition shall continue undismissed or unstayed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(h)    Holdings, the Borrower or any Subsidiary shall (i) voluntarily commence any proceeding or file any petition seeking relief under Title 11 of the United States Bankruptcy Code, as now constituted or hereafter amended, or any other Federal, state or foreign bankruptcy, insolvency, receivership or similar law, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or the filing of any petition described in (g) above, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for Holdings, the Borrower or any Subsidiary or for a substantial part of the property or assets of Holdings, the Borrower or any Subsidiary, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors, (vi) become unable, admit in writing its inability or fail generally to pay its debts as they become due or (vii) take any action for the purpose of effecting any of the foregoing;

(i)    one or more judgments for the payment of money in an aggregate amount in excess of $5,000,000 (to the extent not covered by independent third-party insurance as to which the insurer has not denied or disputed its obligation to cover such judgment) or non-monetary judgments that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect shall be rendered against Holdings, the Borrower, any Subsidiary or any combination thereof and the same shall remain undischarged for a period of 30 consecutive days during which execution shall not be effectively stayed by reason of appeal or otherwise, or any action shall be legally taken by a judgment creditor to levy upon assets or properties of Holdings, the Borrower or any Subsidiary to enforce any such judgment;

(j)    an ERISA Event described in clause (b) of the definition thereof shall have occurred or any other ERISA Event shall have occurred that, when taken together with all other such ERISA Events, could reasonably be expected to result in liability of the Borrower and its ERISA Affiliates in an aggregate amount exceeding $5,000,000;

(k)    any Guarantee under the Guarantee and Collateral Agreement for any reason shall cease to be in full force and effect (other than in accordance with its terms), or any Guarantor shall deny that it has any further liability under its Guarantee (other than as a result of the discharge of such Guarantor in accordance with the terms of the Loan Documents);

(l)    any Lien purported to be created under any Security Document shall cease to be, or shall be asserted by the Borrower or any other Loan Party not to be,

EXHIBIT A

a valid, perfected and, with respect to the Secured Parties, first priority (except as otherwise expressly provided in this Agreement or such Security Document) Lien on any material Collateral covered thereby, except to the extent that any such loss of perfection or priority results from the failure of the Collateral Agent to maintain possession of certificates representing Equity Interests pledged under the Guarantee and Collateral Agreement; or

    **(m)**    there shall have occurred a Change in Control;

then, and in every such Event of Default (other than an Event of Default with respect to Holdings or the Borrower described in paragraph (g) or (h) above), and at any time thereafter during the continuance of such Event of Default either or both of the following actions may be taken: (i) the Administrative Agent may with the consent of, and shall at the request of, the Majority Facility Lenders with respect to the Revolving Credit Facility, by notice to the Borrower, terminate forthwith the Revolving Credit Commitments and the Swingline Commitment and (ii) the Administrative Agent may with the consent of, and shall at the request of, the Required Lenders, declare the Loans then outstanding to be forthwith due and payable in whole or in part, whereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and any unpaid accrued Fees and all other liabilities of the Borrower accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower, anything contained herein or in any other Loan Document to the contrary notwithstanding, and the Administrative Agent and the Collateral Agent shall have the right to take all or any actions and exercise any remedies available to a secured party under the Security Documents or applicable law or in equity; and in any event with respect to Holdings or the Borrower described in paragraph (g) or (h) above, the Revolving Credit Commitments and the Swingline Commitment shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon and any unpaid accrued Fees and all other liabilities of the Borrower accrued hereunder and under any other Loan Document, shall automatically become due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower, anything contained herein or in any other Loan Document to the contrary notwithstanding, and the Administrative Agent and the Collateral Agent shall have the right to take all or any actions and exercise any remedies available to a secured party under the Security Documents or applicable law or in equity.

    **Section 7.02**. *Borrower's Right To Cure.* (a) In the event of any Event of Default under any covenant set forth in Section 6.11, Section 6.12, Section 6.13 or Section 6.15 with respect to any fiscal period and until the expiration of the fifteenth Business Day after the date on which the Borrower provides the Administrative Agent notice that it intends to exercise its rights under this Section 7.02 (but only if such notice is provided on or before the financial statements are required to be delivered under Section 5.04 (without regard to any cure periods set

EXHIBIT A

forth in Section 7.01) with respect to such fiscal period), Holdings or the Borrower may engage in an Equity Cure Issuance and apply the amount of the Equity Cure Proceeds thereof to increase Consolidated EBITDA with respect to such fiscal period; *provided* that such Equity Cure Proceeds (i) are actually received by the Borrower no later than the fifteenth Business Day following the date on which the financial statements are required to be delivered under Section 5.04 (without regard to any cure periods set forth in Section 7.01) with respect to such fiscal period, (ii) were not previously applied in determining the permissibility of a transaction under the Loan Documents where such permissibility was (or may have been) contingent on receipt of such amount or utilization of such amount for a specified purpose and (iii) do not exceed the aggregate amount necessary to cure such Event of Default under Section 6.11, Section 6.12, Section 6.13 or Section 6.15 for such fiscal period. The parties hereby acknowledge that this Section 7.02(a) shall not be relied on for purposes of (x) determining Excess Cash Flow or (y) calculating any financial ratios other than as applicable to Section 6.11, Section 6.12, Section 6.13 or Section 6.15 and shall not result in any adjustment to Consolidated EBITDA or any other amounts, other than the amount of Consolidated EBITDA referred to in the immediately preceding sentence.

(b)     In each period of four fiscal quarters of the Borrower, there shall be at least one fiscal quarter of the Borrower in which the right to cure set forth in Section 7.02(a) is not exercised and in each period of eight fiscal quarters of the Borrower, there shall be at least four consecutive fiscal quarters of the Borrower in which the right to cure set forth in Section 7.02(a) is not exercised.

(c)     The Administrative Agent and the Lenders agree that from the date of delivery of the notice referred to in (and delivered in accordance with) Section 7.02(a) until the date that is fifteen Business Days thereafter, neither the Administrative Agent nor the Lenders shall exercise any rights or remedies with respect to any Event of Default addressed in such notice.

## ARTICLE 8
### THE AGENTS AND THE ARRANGER

Each of the Lenders and the Issuing Bank hereby irrevocably appoints each of the Agents its agent and authorizes the Agents to take such actions on its behalf and to exercise such powers as are delegated to such Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental thereto. Without limiting the generality of the foregoing, the Agents are hereby expressly authorized by the Lenders to execute any and all documents (including releases and the Security Documents) with respect to the Collateral and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Security Documents.

EXHIBIT A

Each bank serving as an Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent, and such bank and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with Holdings, the Borrower or any Subsidiary or any of their respective Affiliates as if it were not an Agent hereunder.

No Agent shall have any duties or obligations except those expressly set forth in the Loan Documents.  Without limiting the generality of the foregoing, (a) no Agent shall be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) no Agent shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that the Administrative Agent or the Collateral Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.08), and (c) except as expressly set forth in the Loan Documents, no Agent shall have any duty to disclose, nor shall it be liable for the failure to disclose, any information relating to Holdings, the Borrower or any of the Subsidiaries that is communicated to or obtained by the bank serving as any Agent or any of its Affiliates in any capacity.  The Administrative Agent and the Collateral Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.08 ) or in the absence of its own gross negligence or willful misconduct.  No Agent shall be deemed to have knowledge of any Default unless and until written notice thereof is given to such Agent by Holdings, the Borrower or a Lender, and no Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article 4 or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to such Agent.

Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper person.  Each Agent may also rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper person, and shall not incur any liability for relying thereon.  Each Agent may consult with legal counsel (who may be counsel for Holdings or the Borrower), independent accountants and other experts selected by it, and shall not be liable

EXHIBIT A

for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Each Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by it. Each Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of each Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Agent.

Each Agent may at any time give notice of its resignation to the Lenders, the Issuing Banks and the Borrower. Upon receipt of any such notice of resignation of the Administrative Agent or the Collateral Agent, the Required Lenders shall have the right, in consultation with the Borrower, to appoint a successor. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may on behalf of the Lenders and the Issuing Banks, appoint a successor Agent meeting the qualifications set forth above provided that if the Agent shall notify the Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Agent on behalf of the Lenders or the Issuing Banks under any of the Loan Documents, the retiring Agent shall continue to hold such collateral security until such time as a successor Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through the Agent shall instead be made by or to each Lender and each Issuing Bank directly, until such time as the Required Lenders appoint a successor Agent as provided for above in this paragraph. Upon the acceptance of a successor's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this paragraph). The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and Section 9.05 shall continue in effect for the benefit of such retiring Agent, its sub agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as Agent.

(NY) 06216/188/CA/ca.first.lien.doc

EXHIBIT A

The Arranger, in its capacity as such, shall have no duties or responsibilities, and shall incur no liability, under this Agreement or any other Loan Document.

Each Lender acknowledges that it has, independently and without reliance upon the Agents, the Arranger or any Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Agents, the Arranger or any Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement or any other Loan Document, any related agreement or any document furnished hereunder or thereunder.

To the extent required by any applicable law, the Administrative Agent may withhold from any interest payment to any Lender an amount equivalent to any applicable withholding tax. If the Internal Revenue Service or any other Governmental Authority asserts a claim that the Administrative Agent did not properly withhold tax from amounts paid to or for the account of any Lender because the appropriate form was not delivered or was not properly executed or because such Lender failed to notify the Administrative Agent of a change in circumstance which rendered the exemption from, or reduction of, withholding tax ineffective or for any other reason, such Lender shall indemnify the Administrative Agent fully for all amounts paid, directly or indirectly, by the Administrative Agent as tax or otherwise, including any penalties or interest and together with all expenses (including legal expenses, allocated internal costs and out-of-pocket expenses) incurred.

## ARTICLE 9
### MISCELLANEOUS

**Section 9.01**. *Notices.* Notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax, as follows:

**(a)** if to Holdings or the Borrower, to it at 3636 North Broadway, Chicago, IL, 60613, Attention of Leonard Levine (Telecopier No. 773-929-7123; Telephone No. 773-868-8527) with a copy to Weil, Gotshal & Manges LLP at 100 Federal Street, 34th Floor, Boston, Massachusetts 02110, Attention of James Westra (Telecopier No. 617-772-8333; Telephone No. 617-772-8377) and a copy to Monitor Clipper Partners at Two Canal Park, 4th Floor, Cambridge, Massachusetts 02141, Attention of Chief Financial Officer (Telecopier No. 617-252-2211; Telephone No. 617-252-2200);

**(b)** if to the Administrative Agent, the Issuing Bank or the Swingline Lender, to Credit Suisse, Cayman Islands Branch, at Eleven Madison Avenue,

(NY) 06216/188/CA/ca.first.lien.doc

EXHIBIT A

New York, New York 10010, Attention of Thomas Lynch, Agency Group Manager (Telecopier No. 212-325-8304; Telephone No. 212-325-9205) with a copy to Davis Polk & Wardwell at 450 Lexington Ave., New York, New York 10017, Attention of Marlane Melican (Telecopier No. 212-450-3533; Telephone No. 212-450-4533); and

(c)     if to a Lender, to it at its address (or fax number) set forth in its Administrative Questionnaire or the Assignment and Acceptance pursuant to which such Lender shall have become a party hereto.

All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt if delivered by hand or overnight courier service, when sent and confirmation of receipt has been obtained if sent by fax (except that, if not received during normal business hours for the recipient, such faxed notices and communications shall be deemed to have been given on the next business day for the recipient) or on the date three Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this Section 9.01 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 9.01.

Section 9.02. *Survival of Agreement.*  All covenants, agreements, representations and warranties made by Holdings or the Borrower herein and in the certificates or other instruments prepared or delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the Lenders and the Issuing Bank and shall survive the making by the Lenders of the Loans and the issuance of Letters of Credit by the Issuing Bank, regardless of any investigation made by the Lenders or the Issuing Bank or on their behalf, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any Fee or any other amount payable under this Agreement or any other Loan Document is outstanding and unpaid or any Letter of Credit is outstanding and so long as the Commitments have not been terminated.  The provisions of Section 2.14, Section 2.16, Section 2.20 and Section 9.05 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Loans, the expiration of the Commitments, the expiration of any Letter of Credit, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document or any investigation made by or on behalf of the Administrative Agent, the Collateral Agent, the Arranger, any Lender or the Issuing Bank.

Section 9.03. *Binding Effect.*  This Agreement shall become effective when it shall have been executed by each of the parties hereto and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto.

(NY) 06216/188/CA/ca.first.lien.doc

EXHIBIT A

Section 9.04. *Successors and Assigns.* (a) Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the permitted successors and permitted assigns of such party; and all covenants, promises and agreements by or on behalf of Holdings, the Borrower, the Administrative Agent, the Collateral Agent, the Issuing Bank or the Lenders that are contained in this Agreement shall bind and inure to the benefit of their respective successors and permitted assigns.

(b)    Each Lender may assign to one or more assignees all or a portion of its interests, rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); *provided, however*, that (i) the Administrative Agent must give its prior written consent to such assignment (which consent shall not be unreasonably withheld or delayed), (ii) in the case of any assignment of a Revolving Credit Commitment, each of the Issuing Bank and the Swingline Lender must give its prior written consent to such assignment (which consent shall not be unreasonably withheld or delayed), (iii) the Borrower must give its prior written consent to such assignment (which consent shall not be unreasonably withheld or delayed); *provided* that the consent of the Borrower shall not be required to any such assignment (A) made to a Lender or an Affiliate or Related Fund of a Lender, (B) during the continuance of any Event of Default or (C) in connection with the initial syndication of the Facilities: *provided, however,* that in connection with the initial syndication of the Facilities, each assignee shall be identified in consultation with and reasonably acceptable to the Borrower, (iv) the amount of the Commitment of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000 (or, if less, the entire remaining amount of such Lender's Commitment) and shall be in an amount that is an integral multiple of $1,000,000 (or the entire remaining amount of such Lender's Commitment); *provided* that simultaneous assignments to two or more Related Funds shall be combined for purposes of determining whether the minimum assignment requirement is met, (v) the parties to each such assignment shall execute and deliver to the Administrative Agent an Assignment and Acceptance (such Assignment and Acceptance to be electronically executed and delivered to the Administrative Agent via an electronic settlement system then acceptable to the Administrative Agent (or, if previously agreed with the Administrative Agent, manually)) and shall pay to the Administrative Agent a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent) and (vi) the assignee, if it shall not be a Lender immediately prior to the assignment, shall deliver to the Administrative Agent an Administrative Questionnaire and applicable tax forms required under Section 2.20.  Upon acceptance and recording pursuant to paragraph (e) of this Section 9.04, from and after the effective date specified in each Assignment and Acceptance, (A) the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement and (B) the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and

EXHIBIT A

Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Section 2.14, Section 2.16, Section 2.20 and Section 9.05, as well as to any Fees accrued for its account and not yet paid).

(c)　By executing and delivering an Assignment and Acceptance, the assigning Lender thereunder and the assignee thereunder shall be deemed to confirm to and agree with each other and the other parties hereto as follows:  (i) such assigning Lender warrants that it is the legal and beneficial owner of the interest being assigned thereby free and clear of any adverse claim and that its Tranche B Term Loan Commitment and Revolving Credit Commitment, and the outstanding balances of its Tranche B Term Loans and Revolving Loans, in each case without giving effect to assignments thereof which have not become effective, are as set forth in such Assignment and Acceptance, (ii) except as set forth in (i) above, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement, or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto, or the financial condition of Holdings, the Borrower or any Subsidiary or the performance or observance by Holdings, the Borrower or any Subsidiary of any of its obligations under this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto; (iii) such assignee represents and warrants that it is legally authorized to enter into such Assignment and Acceptance; (iv) such assignee confirms that it has received a copy of this Agreement, together with copies of the most recent financial statements referred to in Section 3.05(a) or delivered pursuant to Section 5.04 and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (v) such assignee will independently and without reliance upon the Administrative Agent, the Collateral Agent, the Arranger, such assigning Lender or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (vi) such assignee appoints and authorizes the Administrative Agent and the Collateral Agent to take such action as agent on its behalf and to exercise such powers under this Agreement as are delegated to the Administrative Agent and the Collateral Agent, respectively, by the terms hereof, together with such powers as are reasonably incidental thereto; and (vii) such assignee agrees that it will perform in accordance with their terms all the obligations which by the terms of this Agreement are required to be performed by it as a Lender.

(d)　The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices in The City of New York a copy of each Assignment and Acceptance delivered to it and a register for the recordation

EXHIBIT A

of the names and addresses of the Lenders, and the Commitment of, and principal amount of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**"). The entries in the Register shall be conclusive and the Borrower, the Administrative Agent, the Issuing Bank, the Collateral Agent and the Lenders may treat each person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower, the Issuing Bank, the Collateral Agent and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(e)     Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Lender and an assignee, an Administrative Questionnaire completed in respect of the assignee (unless the assignee shall already be a Lender hereunder) and the written consent of the Borrower, the Swingline Lender, the Issuing Bank and the Administrative Agent to such assignment, in each case to the extent required pursuant to Section 9.04(b), the Administrative Agent shall (i) accept such Assignment and Acceptance, (ii) record the information contained therein in the Register and (iii) give prompt notice thereof to the Lenders, the Issuing Bank, the Swingline Lender and the Borrower. No assignment shall be effective unless it has been recorded in the Register as provided in this paragraph (e).

(f)     Each Lender may without the consent of the Borrower, the Swingline Lender, the Issuing Bank or the Administrative Agent sell participations to one or more banks or other entities in all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans); *provided, however,* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) the participating banks or other entities shall, to the fullest extent permitted by law, be entitled to the benefit of the cost protection provisions contained in Section 2.14, Section 2.16 and Section 2.20 to the same extent as if they were Lenders (but, with respect to any particular participant, to no greater extent than the Lender that sold the participation to such participant and, in the case of Section 2.20, only if such participant shall have provided any form or updating information that it would have been required to provide under such Section if it were a Lender) and (iv) the Borrower, the Administrative Agent, the Issuing Bank and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement, and such Lender shall retain the sole right to enforce the obligations of the Borrower relating to the Loans or L/C Disbursements and to approve any amendment, modification or waiver of any provision of this Agreement (other than amendments, modifications or waivers decreasing any fees payable hereunder or the amount of principal of or the rate at which interest is payable on the Loans, extending the Tranche B Maturity Date, the Revolving Credit Maturity Date, any scheduled principal payment date or date fixed for the payment of

EXHIBIT A

interest on the Loans, increasing or extending the Commitments or releasing any material Guarantor (except in respect of a transaction permitted under this Agreement) or all or substantially all of the Collateral).

(g)     Any Lender or participant may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 9.04, disclose to the assignee or participant or proposed assignee or participant any information relating to the Borrower furnished to such Lender by or on behalf of the Borrower; *provided* that, prior to any such disclosure of information designated by the Borrower as confidential, each such assignee or participant or proposed assignee or participant shall execute an agreement whereby such assignee or participant shall agree (subject to customary exceptions) to preserve the confidentiality of such confidential information on terms no less restrictive than those applicable to the Lenders pursuant to Section 9.16.

(h)     Any Lender may at any time assign all or any portion of its rights under this Agreement to secure extensions of credit to such Lender or in support of obligations owed by such Lender; *provided* that no such assignment shall release a Lender from any of its obligations hereunder or substitute any such assignee for such Lender as a party hereto.

(i)     Notwithstanding anything to the contrary contained herein, any Lender (a "**Granting Lender**") may grant to a special purpose funding vehicle (an "**SPC**"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower, the option to provide to the Borrower all or any part of any Loan that such Granting Lender would otherwise be obligated to make to the Borrower pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPC to make any Loan and (ii) if an SPC elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof. The making of a Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Each party hereto hereby agrees that no SPC shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender). In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPC, it will not institute against, or join any other person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any state thereof. In addition, notwithstanding anything to the contrary contained in this Section 9.04, any SPC may (i) with notice to, but without the prior written consent of, the Borrower and the Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loans to the Granting Lender or to any financial institutions (consented to by the Borrower and Administrative Agent) providing liquidity and/or credit support to

EXHIBIT A

or for the account of such SPC to support the funding or maintenance of Loans and (ii) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPC.

(j)     Neither Holdings nor the Borrower shall assign or delegate any of its rights or duties hereunder without the prior written consent of the Administrative Agent, the Issuing Bank and each Lender, and any attempted assignment without such consent shall be null and void.

**Section 9.05**. *Expenses; Indemnity.* (a) Holdings and the Borrower agree, jointly and severally, to pay (i) all reasonable out-of-pocket costs and expenses incurred by the Administrative Agent, the Collateral Agent, the Arranger, the Issuing Bank and the Swingline Lender (including the reasonable fees, disbursements and other charges of Davis Polk & Wardwell, counsel for the Administrative Agent and the Collateral Agent) in connection with the syndication of the credit facilities provided for herein and the preparation and administration of the Commitment Letter, the Fee Letter, this Agreement and the other Loan Documents or in connection with any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions hereby or thereby contemplated shall be consummated) and (ii) all out-of-pocket costs and expenses incurred by the Administrative Agent, the Collateral Agent, the Arranger, the Issuing Bank or any Lender in connection with the enforcement or protection of its rights in connection with this Agreement and the other Loan Documents or in connection with the Loans made or Letters of Credit issued hereunder, including the fees, disbursements and other charges of Davis Polk & Wardwell, counsel for the Administrative Agent and the Collateral Agent, and, in connection with any such enforcement or protection, the reasonable fees, disbursements and other charges of any counsel for the Administrative Agent, the Collateral Agent, the Arranger, the Issuing Bank or any Lender (it being understood that, subject to customary exceptions for actual and potential conflicts, local counsel and special counsel, such persons shall be represented by a single firm as counsel).

(b)     Holdings and the Borrower agree, jointly and severally, to indemnify the Administrative Agent, the Collateral Agent, the Arranger, each Lender, the Issuing Bank and each Related Party of any of the foregoing persons (each such person being called an "**Indemnitee**") against, and to hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related reasonable out-of-pocket costs and expenses, including reasonable counsel fees, disbursements and other charges (it being understood that, subject to customary exceptions for actual and potential conflicts, local counsel and special counsel, such Indemnitees shall be represented by a single firm as counsel), incurred by or asserted against any Indemnitee arising out of, in any way connected with, or as a result of (i) the execution or delivery of this Agreement or any other Loan Document or the Commitment Letter or the Fee Letter or any agreement or instrument contemplated thereby, the performance by the parties

EXHIBIT A

thereto of their respective obligations thereunder or the consummation of the Transactions and the other transactions contemplated thereby, (ii) the use of the proceeds of the Loans or issuance of Letters of Credit, (iii) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto, or (iv) any actual or alleged presence or Release of Hazardous Materials on any property owned or operated by Holdings, the Borrower or any of the Subsidiaries, or any Environmental Liability related in any way to Holdings, the Borrower or any of the Subsidiaries; *provided* that such indemnity (x) shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related costs and expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted primarily from the gross negligence or willful misconduct of such Indemnitee or such Indemnitee's intentional and material breach of this Agreement or any other Loan Document (and, upon any such determination, any indemnification payments with respect to such losses, claims, damages, liabilities or related costs and expenses previously received by such Indemnitee shall be subject to reimbursement by such Indemnitee) and (y) shall not, as to any Indemnitee (other than the Agents or the Arranger) apply to losses, claims, damages, liabilities or related costs and expenses arising from claims brought by one Indemnitee solely against one or more other Indemnitees that do not involve any actual or alleged act or omission, or any default or breach of this Agreement or any other Loan Document, by the Borrower, Holdings or any of their respective officers, directors, stockholders, partners, members, employees, agents, representatives or advisors.

      **(c)**    To the extent that Holdings and the Borrower fail to pay any amount required to be paid by them to the Administrative Agent, the Collateral Agent, the Arranger, the Issuing Bank or the Swingline Lender under paragraph (a) or (b) of this Section, each Lender severally agrees to pay to the Administrative Agent, the Collateral Agent, the Arranger, the Issuing Bank or the Swingline Lender, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; *provided* that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent, the Collateral Agent, the Arranger, the Issuing Bank or the Swingline Lender in its capacity as such. For purposes hereof, a Lender's "pro rata share" shall be determined based upon its share of the sum of the Aggregate Revolving Credit Exposure, outstanding Tranche B Term Loans and unused Commitments at the time.

      **(d)**    To the extent permitted by applicable law, each of the parties hereto agrees not to assert, and each hereby waives, any claim against any Indemnitee or any other party hereto, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the Transactions, any Loan or Letter of Credit or the use of the proceeds thereof.

(NY) 06216/188/CA/ca.first.lien.doc

EXHIBIT A

(e)     The provisions of this Section 9.05 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the Transactions or the other transactions contemplated hereby, the repayment of any of the Loans, the expiration of the Commitments, the expiration of any Letter of Credit, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Administrative Agent, the Collateral Agent, the Arranger, any Lender or the Issuing Bank.  All amounts due under this Section 9.05 shall be payable on written demand therefor.

Section 9.06.  *Right of Setoff.*  If an Event of Default shall have occurred and be continuing, each Lender is hereby authorized at any time and from time to time, except to the extent prohibited by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Lender to or for the credit or the account of Holdings or the Borrower against any of and all the obligations of Holdings or the Borrower now or hereafter existing under this Agreement and other Loan Documents held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or such other Loan Document and although such obligations may be unmatured.  The rights of each Lender under this Section 9.06 are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.  Promptly upon the exercise of any such rights of setoff, such Lender shall give the Borrower and the Administrative Agent notice thereof.

Section 9.07.  *Applicable Law.*  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (OTHER THAN LETTERS OF CREDIT AND AS EXPRESSLY SET FORTH IN OTHER LOAN DOCUMENTS) SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.  EACH LETTER OF CREDIT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED IN ACCORDANCE WITH, THE LAWS OR RULES DESIGNATED IN SUCH LETTER OF CREDIT, OR IF NO SUCH LAWS OR RULES ARE DESIGNATED, THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS MOST RECENTLY PUBLISHED AND IN EFFECT, ON THE DATE SUCH LETTER OF CREDIT WAS ISSUED, BY THE INTERNATIONAL CHAMBER OF COMMERCE (THE "**UNIFORM CUSTOMS**") AND, AS TO MATTERS NOT GOVERNED BY THE UNIFORM CUSTOMS, THE LAWS OF THE STATE OF NEW YORK.

Section 9.08.  *Waivers; Amendment.*  (a) No failure or delay of the Administrative Agent, the Collateral Agent, any Lender or the Issuing Bank in exercising any power or right hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Administrative Agent,

(NY) 06216/188/CA/ca.first.lien.doc

EXHIBIT A

the Collateral Agent, the Issuing Bank and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by the Borrower or any other Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice or demand on Holdings or the Borrower in any case shall entitle Holdings or the Borrower to any other or further notice or demand in similar or other circumstances.

(b)    Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by Holdings, the Borrower and the Required Lenders; *provided, however*, that no such agreement shall (i) decrease the principal amount of, or extend the maturity of or any scheduled principal payment date or date for the payment of any interest on any Loan or any date for reimbursement of an L/C Disbursement, or waive or excuse any such payment or any part thereof, or decrease the rate of interest on any Loan or L/C Disbursement, without the prior written consent of each Lender affected thereby (it being understood that a waiver of any mandatory prepayment or of the obligation to pay default interest shall only require the consent of the Required Lenders), (ii) increase or extend the Commitment or decrease or extend the date for payment of any Fees of any Lender without the prior written consent of each Lender affected thereby, (iii) amend or modify the pro rata requirements of Section 2.17, the provisions of Section 9.04(j), the provisions of this Section or the definition of the term "Required Lenders," or release any material Guarantor (other than pursuant to a transaction permitted by Section 6.05), without the prior written consent of each Lender, (iv) amend or modify the definition of the term "Majority Facility Lenders" without the prior written consent of each Lender affected thereby, (v) release all or substantially all of the Collateral without the prior written consent of each Lender or (vi) modify the protections afforded to an SPC pursuant to the provisions of Section 9.04(i) without the written consent of such SPC; *provided further* that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent, the Collateral Agent, the Issuing Bank or the Swingline Lender hereunder or under any other Loan Document without the prior written consent of the Administrative Agent, the Collateral Agent, the Issuing Bank or the Swingline Lender, as applicable.

(c)    Notwithstanding the foregoing, each Lender grants (x) to the Administrative Agent the right to purchase all (but not less than all) of such Lender's Commitments and Loans owing to it and the Notes held by it and all of its rights and obligations hereunder and under the other Loan Documents, and (y) to the Borrower the right to cause an assignment of all (but not less than all) of such Lender's Commitments and Loans owing to it, its participations in the Notes held by it and all of its rights and obligations hereunder and under the other Loan Documents to an assignee or assignees pursuant to Section 9.04, which right may

EXHIBIT A

be exercised by the Administrative Agent or the Borrower, as the case may be, if (i) such Lender refuses to execute any amendment, waiver or consent which requires the written consent of Lenders other than Required Lenders and to which Required Lenders, the Administrative Agent and the Borrower have otherwise agreed (such refusing Lender, a "**Non-Consenting Lender**") or (ii) such Lender shall have failed to fund any Loan or any participation in a Letter of Credit or Swingline Loan hereunder that it was required to have funded hereunder within one Business Day of the date on which such funding was required, or shall have been deemed insolvent or become the subject of a bankruptcy or insolvency proceeding (any such Lender described in this clause (ii), a "**Non-Funding Lender**"); *provided* that such Non-Consenting Lender or Non-Funding Lender, as applicable, shall receive, in connection with such assignments, payment equal to the aggregate amount of outstanding Loans owed to such Lender (together with all accrued and unpaid interest, fees and other amounts (other than indemnities) owed to such Lender). Each Lender agrees that if the Administrative Agent or the Borrower, as the case may be, exercises its option hereunder, it shall promptly execute and deliver all agreements and documentation necessary to effectuate such assignment as set forth in Section 9.04. The Borrower or the Administrative Agent shall be entitled (but not obligated) to execute and deliver such agreement and documentation on behalf of such Non-Consenting Lender or Non-Funding Lender, as applicable, and any such agreement and/or documentation so executed by the Borrower or the Administrative Agent shall be effective for purposes of documenting an assignment pursuant to Section 9.04.

Section 9.09. *Interest Rate Limitation.* Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan or participation in any L/C Disbursement, together with all fees, charges and other amounts which are treated as interest on such Loan or participation in such L/C Disbursement under applicable law (collectively the "**Charges**"), shall exceed the maximum lawful rate (the "**Maximum Rate**") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan or participation in accordance with applicable law, the rate of interest payable in respect of such Loan or participation hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan or participation but were not payable as a result of the operation of this Section 9.09 shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or participations or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

Section 9.10. *Entire Agreement.* This Agreement, the Fee Letter and the other Loan Documents constitute the entire contract between the parties relative to the subject matter hereof. Any other previous agreement among the parties with respect to the subject matter hereof is superseded by this Agreement and the other Loan Documents. Nothing in this Agreement or in the other Loan

EXHIBIT A

Documents, expressed or implied, is intended to confer upon any person (other than the parties hereto and thereto, their respective successors and assigns permitted hereunder (including any Affiliate of the Issuing Bank that issues any Letter of Credit) and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent, the Collateral Agent, the Arranger, the Issuing Bank and the Lenders ) any rights, remedies, obligations or liabilities under or by reason of this Agreement or the other Loan Documents.

**Section 9.11**. *WAIVER OF JURY TRIAL*. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.11.

**Section 9.12**. *Severability.* In the event any one or more of the provisions contained in this Agreement or in any other Loan Document should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction). The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

**Section 9.13**. *Counterparts.* This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original but all of which when taken together shall constitute a single contract, and shall become effective as provided in Section 9.03. Delivery of an executed signature page to this Agreement by facsimile transmission shall be as effective as delivery of a manually signed counterpart of this Agreement.

**Section 9.14**. *Headings.* Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

(NY) 06216/188/CA/ca.first.lien.doc

EXHIBIT A

**Section 9.15**. *Jurisdiction; Consent to Service of Process.* (a) Each of Holdings and the Borrower hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in New York City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or the other Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

**(b)** Each of Holdings and the Borrower hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Loan Documents in any New York State or Federal court. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

**(c)** Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

**Section 9.16**. *Confidentiality.* Each of the Administrative Agent, the Collateral Agent, the Issuing Bank and the Lenders agrees to maintain the confidentiality of the Information, except that Information may be disclosed (a) to its and its Affiliates' officers, directors, employees and agents, including accountants, legal counsel and other advisors (it being understood that the persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority or quasi-regulatory authority (such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process; *provided* that the Borrower will be given prompt notice of such disclosure, (d) in connection with the exercise of any remedies hereunder or under the other Loan Documents or any suit, action or proceeding relating to the enforcement of its rights hereunder or thereunder, (e) subject to an agreement containing provisions substantially the same as those of this Section 9.16, to (i) any actual or prospective assignee of or participant in any of its rights or obligations under this Agreement and the other Loan Documents or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to Holdings, the Borrower or any Subsidiary or any of their respective obligations,

EXHIBIT A

(f) with the consent of Holdings or the Borrower or (g) to the extent such Information becomes publicly available other than as a result of a breach of this Section 9.16. For the purposes of this Section, "**Information**" shall mean all information received from Holdings or the Borrower and related to the Borrower or its business, other than any such information that was available to the Administrative Agent, the Collateral Agent, the Issuing Bank or any Lender on a nonconfidential basis prior to its disclosure by Holdings or the Borrower. Any person required to maintain the confidentiality of Information as provided in this Section 9.16 shall be considered to have complied with its obligation to do so if such person has exercised the same degree of care to maintain the confidentiality of such Information as such person would accord its own confidential information. Notwithstanding any other express or implied agreement, arrangement or understanding to the contrary, each of the parties hereto agrees that each other party hereto (and each of its employees, representatives or agents) are permitted to disclose to any persons the tax treatment and tax structure of the Loans and the other transactions contemplated by the Loan Documents and all materials of any kind (including opinions and tax analyses) that are provided to the Loan Parties, the Lenders, the Arranger or any Agent related to such tax treatment and tax aspects. To the extent not inconsistent with the immediately preceding sentence, this authorization does not extend to disclosure of any other information or any other term or detail not related to the tax treatment or tax aspects of the Loans or the transactions contemplated by the Loan Documents.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

EXHIBIT A

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

RPG HOLDINGS, INC.

By: _____
Name:    Charles Yoon
Title:    Secretary & Treasurer

RPG ACQUISITION CORP.

By: _____
Name:    Charles Yoon
Title:    Chief Financial Officer,
         Secretary & Treasurer

(NY) 06216/188/CA/ca.first.lien.doc

EXHIBIT A

CREDIT SUISSE, CAYMAN ISLANDS
BRANCH, as Administrative Agent,
Collateral Agent, Issuing Bank,
Swingline Lender, Arranger and a
Lender

By: _____
    Name:    ROBERT HETU
    Title:     DIRECTOR

By: _____
    Name:    CASSANDRA DROOGAN
    Title:     ASSOCIATE

EXHIBIT A

EXHIBIT A
to the First Lien Credit Agreement

## ADMINISTRATIVE QUESTIONNAIRE

## RECYCLED PAPER GREETINGS

Agent Information
Credit Suisse
Eleven Madison Avenue
New York, NY  10010

Agent Wire Instructions
Bank of New York
ABA 021000018
Account Name:  CS Agency Cayman Account
Account Number:  8900492627

Agent Closing Contact
Patricia Estevez
Tel:  212-325-9932
Fax:  212-325-8304
E-Mail:  patricia.estevez@csfb.com

---

It is very important that **all** of the requested information be completed accurately and that this questionnaire be returned promptly.  If your institution is sub-allocating its allocation, please fill out an administrative questionnaire for each legal entity.

---

Legal Name of Lender to appear in Documentation:

_____

Signature Block Information:    _____

- Signing Credit Agreement   ☐ Yes   ☐ No
- Coming in via Assignment   ☐ Yes   ☐ No

Type of Lender:   _____

(Bank, Asset Manager, Broker/Dealer, CLO/CDO; Finance Company, Hedge Fund, Insurance, Mutual Fund, Pension Fund, Other Regulated Investment Fund, Special Purpose Vehicle, Other-please specify)

Lender Parent:   _____

Lender Domestic Address              Lender Eurodollar Address

_____          _____

_____          _____

_____          _____

EXHIBIT A

| Contacts/Notification Methods:  Borrowings, Paydowns, Interest, Fees, etc. |
|---|

<table>
<tr><td></td><td>Primary Credit Contact</td><td>Secondary Credit Contact</td></tr>
<tr><td>Name:</td><td></td><td></td></tr>
<tr><td>Company:</td><td></td><td></td></tr>
<tr><td>Title:</td><td></td><td></td></tr>
<tr><td>Address:</td><td></td><td></td></tr>
<tr><td>Telephone:</td><td></td><td></td></tr>
<tr><td>Facsimile:</td><td></td><td></td></tr>
<tr><td>E-Mail Address:</td><td></td><td></td></tr>
<tr><td></td><td>Primary Operations Contact</td><td>Secondary Operations Contact</td></tr>
<tr><td>Name:</td><td></td><td></td></tr>
<tr><td>Company:</td><td></td><td></td></tr>
<tr><td>Title:</td><td></td><td></td></tr>
<tr><td>Address:</td><td></td><td></td></tr>
<tr><td>Telephone:</td><td></td><td></td></tr>
<tr><td>Facsimile:</td><td></td><td></td></tr>
<tr><td>E-Mail Address:</td><td></td><td></td></tr>
</table>

| Lender's Domestic Wire Instructions |
|---|

Bank Name: _____

ABA/Routing No.: _____

Account Name: _____

Account No.: _____

FFC Account Name: _____

FFC Account No.: _____

Attention: _____

Reference: _____

A-2

EXHIBIT A

Tax Documents

## NON-U.S. LENDER INSTITUTIONS:

### *I. Corporations:*

If your institution is incorporated outside of the United States for U.S. federal income tax purposes, <u>and</u> is the beneficial owner of the interest and other income it receives, you must complete one of the following three tax forms, as applicable to your institution: ***a.) Form W-8BEN** (Certificate of Foreign Status of Beneficial Owner),* ***b.) Form W-8ECI** (Income Effectively Connected to a U.S. Trade or Business), or* ***c.) Form W-8EXP** (Certificate of Foreign Government or Governmental Agency).*

A U.S. taxpayer identification number is required for any institution submitting Form W-8ECI. It is also required on Form W-8BEN for certain institutions claiming the benefits of a tax treaty with the U.S.  Please refer to the instructions when completing the form applicable to your institution.  In addition, please be advised that U.S. tax regulations do not permit the acceptance of faxed forms.  **An original tax form must be submitted**.

### *II. Flow-Through Entities:*

If your institution is organized outside the U.S., and is classified for U.S. federal income tax purposes as either a Partnership, Trust, Qualified or Non-Qualified Intermediary, or other non-U.S. flow-through entity, an original ***Form W-8IMY** (Certificate of Foreign Intermediary, Foreign Flow-Through Entity, or Certain U.S. Branches for United States Tax Withholding)* must be completed by the intermediary together with a withholding statement.  Flow-through entities other than Qualified Intermediaries are required to include tax forms for each of the underlying beneficial owners.

Please refer to the instructions when completing this form.  In addition, please be advised that U.S. tax regulations do not permit the acceptance of faxed forms.  **Original tax form(s) must be submitted**.

## U.S. LENDER INSTITUTIONS:

If your institution is incorporated or organized within the United States, you must complete and return ***Form W-9** (Request for Taxpayer Identification Number and Certification).*  **Please be advised that we request that you submit an original Form W-9.**

***Pursuant to the language contained in the tax section of the Credit Agreement, the applicable tax form for your institution must be completed and returned prior to the first payment of income.  Failure to provide the proper tax form when requested may subject your institution to U.S. tax withholding.***

(NY) 06216/188/CA/Exhibits.1st.lien.ca.doc

EXHIBIT A

## FORM OF AFFILIATE SUBORDINATION TERMS

Section 1. *Agreement to Subordinate.* [INSERT NAME OF BORROWER]'s (the "**Company**") obligations to [INSERT NAME OF LENDER] (the "**Subordinated Lender**") under this [INSERT NAME OF DOCUMENT] (the "**Subordinated Obligations**") are subordinated in right of payment, to the extent and in the manner provided in this [Note/Instrument], to the prior payment of all Senior Debt. "**Senior Debt**" means the Obligations (as defined in the First Lien Credit Agreement dated as of December 5 2005 (as in effect from time to time, the "**Credit Agreement**") among RPG Holdings, Inc., RPG Acquisition Corp., the lenders from time to time party thereto and Credit Suisse, Cayman Islands Branch, as sole bookrunner and sole lead arranger, as administrative agent (in such capacity, the "**Administrative Agent**") and as collateral agent), and "**Senior Lenders**" means the holders from time to time of the Senior Debt. The subordination provisions of this [Note/Instrument] are for the benefit of and enforceable by the Senior Lenders or their designated representatives.

Section 2. *Liquidation, Dissolution, Bankruptcy.* Upon any payment or distribution of the assets of the Company to creditors upon a total or partial liquidation or a total or partial dissolution of the Company or in a bankruptcy, reorganization, insolvency, receivership or similar proceeding relating to the Company or its property:

(1)    the Senior Lenders are entitled to receive payment in full in cash of all Senior Debt, including all interest accrued or accruing on the Senior Debt after the commencement of any bankruptcy, insolvency or reorganization or similar case or proceeding at the contract rate (including, without limitation, any contract rate applicable upon default) specified in the Credit Agreement, whether or not the claim for the interest is allowed or allowable as a claim in the case or proceeding with respect to the Senior Debt (only such payment constituting "**payment in full**") before the Subordinated Lender will be entitled to receive any payment of principal of or interest on the Subordinated Obligations; and

(2)    until the Senior Debt is paid in full, any payment or distribution to which the Subordinated Lender would be entitled but for these subordination provisions shall instead be made to the Senior Lenders as their interests may appear.

Section 3. *Default on Senior Debt.* If at any time any Event of Default (as defined in the Credit Agreement) has occurred and is continuing, the Company shall not pay any Subordinated Obligations and the Subordinated Lender shall not take or receive from the Company, directly or indirectly, in cash or other property or by set-off or in any other manner, including, without limitation, from or by way of collateral, payment of all or any of the Subordinated Obligations.

Section 4. *When Distribution Must Be Paid Over.* If a payment or other distribution is made to the Subordinated Lender that because of these subordination provisions should not have been made to it, the Subordinated Lender shall hold it in trust for the Senior Lenders and pay it over to them as their interests may appear.

EXHIBIT A

Section 5. *Subrogation.* A distribution made under these subordination provisions to the Senior Lenders which otherwise would have been made to the Subordinated Lender is not, as between the Company and the Subordinated Lender, a payment by the Company on the Senior Debt. After all Senior Debt is paid in full and until the Subordinated Obligations are paid in full, the Subordinated Lender will be subrogated to the rights of the Senior Lenders to receive payments in respect of the Senior Debt.

Section 6. *Relative Rights; Subordination Not to Prevent Events of Default or Limit Right to Accelerate.* These subordination provisions define the relative rights of the Subordinated Lender and the Senior Lenders and do not impair, as between the Company and the Subordinated Lender, the obligation of the Company, which is absolute and unconditional, to pay principal of and interest on the Subordinated Obligations in accordance with their terms; *provided* that so long as any Default or Event of Default (each as defined in the Credit Agreement) has occurred and is continuing, the Subordinated Lender shall not be entitled to, and waives its right to, accelerate the maturity of the Subordinated Obligations upon an Event of Default under this [Note/Instrument] or exercise any remedies upon an Event of Default under this [Note/Instrument]. The failure to make a payment on the Subordinated Obligations by reason of these subordination provisions does not prevent the occurrence of a Default or an Event of Default under this [Note/Instrument].

Section 7. *Subordinated Lender Entitled to Rely.* For the purpose of ascertaining the outstanding amount of the Senior Debt, the Senior Lenders, and all other information relevant to making any payment or distribution to the Senior Lenders pursuant to [Sections 1-9], the Subordinated Lender is entitled to rely upon an order or decree of a court or competent jurisdiction in which any proceedings of the nature referred to in Section 2 above are pending, a certificate of the liquidating trustee or other person making a payment or distribution to the Subordinated Lender, or information provided by the Senior Lenders or the Administrative Agent.

Section 8. *Subordination May Not Be Impaired By Company.* No right of any Senior Lender to enforce the subordination of the Subordinated Obligations will be impaired by any act or failure to act by the Company or by its failure to comply with [Sections 1–9].

Section 9. *Reliance by Senior Lenders on Subordination Provisions; No Waiver.* (a) The Subordinated Lender acknowledges and agrees that these subordination provisions are, and are intended to be, an inducement and a consideration to each Senior Lender, whether the Senior Debt was created or acquired before or after the incurrence of the Subordinated Obligations, to acquire or to hold the Senior Debt, and each Senior Lender will be deemed conclusively to have relied on these subordination provisions in acquiring and holding such Senior Debt.

(b)     The Senior Lenders may, at any time and from time to time, without the consent of or notice to the Subordinated Lender, without incurring any liability or responsibility to the Subordinated Lender, and without impairing the rights of the Senior Lenders under these subordination provisions, do any of the following:

(NY) 06216/188/CA/Exhibits.1st.lien.ca.doc

EXHIBIT A

(1)    change the manner, place or terms of payment or extend the time of payment of, or renew or alter, the Senior Debt or any instrument evidencing the same or any agreement under which the Senior Debt is outstanding or secured;

(2)    sell, exchange, release or otherwise deal with any property pledged, mortgaged or otherwise securing the Senior Debt;

(3)    release any person liable in any manner for the payment of the Senior Debt; or

(4)    exercise or refrain from exercising any rights against the Company and any other person.

B-3

EXHIBIT A

EXHIBIT C
to the First Lien Credit Agreement

## FORM OF ASSIGNMENT AND ACCEPTANCE

This Assignment and Acceptance (the "**Assignment and Acceptance**") is dated as of the Effective Date (as defined below) and is entered into by and between the Assignor (as defined below) and the Assignee (as defined below). Capitalized terms used but not defined herein shall have the meanings given to them in the First Lien Credit Agreement identified below (as amended, the "**First Lien Credit Agreement**"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Acceptance as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the First Lien Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below (i) all of the Assignor's rights and obligations in its capacity as a Lender under the First Lien Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the respective Facilities identified below (including without limitation any Letters of Credit, Guarantees, and Swingline Loans included in such Facilities) and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the First Lien Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as, the "**Assigned Interest**"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Acceptance, without representation or warranty by the Assignor.

1.    Assignor (the "**Assignor**"):    _____

2.    Assignee (the "**Assignee**"):    _____

3.    Borrower:    [RPG Acquisition Corp. / Recycled Paper Greetings, Inc.]

4.    Administrative Agent:    Credit Suisse, Cayman Islands Branch, as the Administrative Agent under the First Lien Credit Agreement

EXHIBIT A

5.    First Lien Credit Agreement:    The First Lien Credit Agreement dated as of December 5 2005 among RPG Holdings, Inc., RPG Acquisition Corp., the lenders from time to time party thereto and Credit Suisse, Cayman Islands Branch, as sole bookrunner and sole lead arranger, as administrative agent and as collateral agent.

6.    Assigned Interest:

| Facility Assigned | Aggregate Amount of Commitment/ Loans for all Lenders | Amount of Commitment/ Loans Assigned | Percentage Assigned of Commitment/Loans[1] | CUSIP Number |
|---|---|---|---|---|
| Revolving Credit Commitment | $20,000,000 | $ | % | |
| Tranche B Term Loan Commitment | $120,000,000 | $ | % | |
| | $140,000,000 | $ | % | |

7.    Effective Date of Assignment (the "**Effective Date**"):    _____ ___, 20___[2].

The terms set forth in this Assignment and Acceptance are hereby agreed to:

ASSIGNOR
[NAME OF ASSIGNOR]

By:_____
     Title:

ASSIGNEE
[NAME OF ASSIGNEE]

By:_____
     Title:

---

[1] Set forth, to at least 9 decimals, as a percentage of the Commitment/Loans of all Lenders thereunder.

[2] To be inserted by Administrative Agent and which shall be the effective date of recordation of transfer in the Register therefor.

EXHIBIT A

Consented to and Accepted:

CREDIT SUISSE, CAYMAN ISLANDS BRANCH,
as Administrative Agent

By_____
  Title:
By_____
  Title:


[Consented to:

RECYCLED PAPER GREETINGS, INC., as Borrower

By_____
  Title:]


[Consented to:

CREDIT SUISSE, CAYMAN ISLANDS BRANCH,
as Issuing Bank

By_____
  Title:

By_____
  Title:]


[Consented to:

CREDIT SUISSE, CAYMAN ISLANDS BRANCH,
as Swingline Lender

By_____
  Title:

By_____
  Title:]

EXHIBIT A

ANNEX 1

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ACCEPTANCE

1.  <u>Representations and Warranties</u>.

1.1  <u>Assignor</u>.  The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Acceptance and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the First Lien Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any Collateral thereunder, (iii) the financial condition of Holdings, the Borrower, any of their respective Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by Holdings, the Borrower, any of their respective Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2.  <u>Assignee</u>.  The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Acceptance and to consummate the transactions contemplated hereby and to become a Lender under the First Lien Credit Agreement, (ii) it satisfies the requirements, if any, specified in the First Lien Credit Agreement that are required to be satisfied by it in order to acquire the Assigned Interest and become a Lender thereunder (subject to the receipt of such consents as may be required under the Credit Agreement), (iii) from and after the Effective Date, it shall be bound by the provisions of the First Lien Credit Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it has received a copy of the First Lien Credit Agreement, together with copies of the most recent financial statements delivered pursuant to Section 5.04 thereof, as applicable, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Acceptance and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on the Administrative Agent, any other Agent or any other Lender, and (v) if it is a Foreign Lender, attached to the Assignment and Acceptance is any documentation required to be delivered by it pursuant to the terms of the First Lien Credit Agreement, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, any other Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2.  <u>Payments</u>.  From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest,

EXHIBIT A

fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

        3.  <u>General Provisions</u>.  This Assignment and Acceptance shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment and Acceptance may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment and Acceptance by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Acceptance.  This Assignment and Acceptance shall be governed by, and construed in accordance with, the law of the State of New York.

(NY) 06216/188/CA/Exhibits.1st.lien.ca.doc

EXHIBIT A

EXHIBIT D
to the First Lien Credit Agreement

## FORM OF BORROWING REQUEST

Credit Suisse, Cayman Islands Branch, as
    Administrative Agent for the Lenders referred to
    below,
Eleven Madison Avenue
New York, NY 10010

Attention of [    ]

[Date]

Ladies and Gentlemen:

        The undersigned, Recycled Paper Greetings, Inc., an Illinios corporation (the "**Borrower**"), refers to the First Lien Credit Agreement dated as of December 5, 2005 (as amended, restated, supplemented or otherwise modified from time to time, the "**First Lien Credit Agreement**"), among RPG Holdings, Inc., RPG Acquisition Corp., the lenders from time to time party thereto and Credit Suisse, Cayman Islands Branch, as sole bookrunner and sole lead arranger, as administrative agent (in such capacity and together with its successors, the "**Administrative Agent**") and as collateral agent. Terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the First Lien Credit Agreement. The Borrower hereby gives you notice pursuant to Section 2.03 of the First Lien Credit Agreement that it requests a Borrowing under the First Lien Credit Agreement, and in that connection sets forth below the terms on which such Borrowing is requested to be made:

(A)    Date of Borrowing
        (which is a Business Day)        _____

(B)    Principal Amount of Borrowing[3]     _____

(C)    Class of Borrowing[4]        _____

(D)    Type of Borrowing[5]        _____

(E)    Interest Period and the last day
        thereof[6]        _____

(F)    Funds are requested to be disbursed to the Borrower's account with _____
        (Account No. _____ ).

---

[3]    Not less than $500,000 and in an integral multiple of $100,000.

[4]    Specify Tranche B Term Borrowing or Revolving Credit Borrowing.

[5]    Specify Eurodollar Borrowing or ABR Borrowing.

[6]    Which shall be subject to the definition of "Interest Period" and Section 2.02 of the First Lien Credit Agreement and end not later than the Tranche B Maturity Date or the Revolving Credit Maturity Date (applicable for Eurodollar Borrowings only).

EXHIBIT A

The Borrower hereby represents and warrants to the Administrative Agent and the Lenders that, on the date of this Borrowing Request and on the date of the related Borrowing, the conditions to lending specified in Section 4.01 of the First Lien Credit Agreement have been satisfied.

RPG ACQUISITION CORP.

By:_____
　　　Name:
　　　Title:

EXHIBIT A

**GUARANTEE AND COLLATERAL AGREEMENT**
*See Tab No. 2*

EXHIBIT A

EXHIBIT F
to the First Lien Credit Agreement

## FORM OF PERFECTION CERTIFICATE

The undersigned is a duly authorized officer of [NAME OF LIEN GRANTOR] (the "**Lien Grantor**"). With reference to the First Lien Credit Agreement dated as of December 5, 2005 among RPG Holdings, Inc., RPG Acquisition Corp., the lenders party thereto and Credit Suisse, Cayman Islands Branch, as administrative agent, collateral agent, sole bookrunner and sole lead arranger (terms defined therein being used herein as therein defined), the undersigned certifies to the Administrative Agent and each other Secured Party as follows:

A.    Information Required for Filings and Searches for Prior Filings.

1.    *Jurisdiction of Organization*. The Lien Grantor is a corporation[2] organized under the laws of _____.

2.    *Name*. The exact legal name of the Lien Grantor as it appears in its [certificate of incorporation] is as follows:

3.    *Prior Names*. (a) Set forth below is each other legal name that the Lien Grantor has had since its organization, together with the date of the relevant change:

(b)    Except as set forth in Schedule A hereto, the Lien Grantor has not changed its corporate structure[3] in any way within the past five years.

(c)    None of the Lien Grantor's Collateral was acquired from another Person within the past five years, except

(i)    property sold to the Lien Grantor by another Person in the ordinary course of such other Person's business;

(ii)    property with respect to which the Liens granted pursuant to the Guarantee and Collateral Agreement are to be perfected by taking possession or control thereof; and

(iii)    other property having an aggregate fair market value not exceeding $50,000.

B.    Additional Information Required for Searches for Prior Filings Under Old Article 9.

---

[2]  Modify as needed if the Lien Grantor is not a corporation.

[3]  Changes in corporate structure would include mergers and consolidations, as well as any change in the Lien Grantor's form of organization.  If any such change has occurred, include in Schedule A the information required by Part A of this certificate as to each constituent party to a merger or consolidation and any other predecessor organization.

EXHIBIT A

1.    *Current* Locations. (a) The chief executive office of the Lien Grantor is located at the following address:

| Mailing Address | County | State |
|---|---|---|
| | | |

The Lien Grantor [does] [does not] have a place of business in another county of the State listed above.

(b)    The following are all current places of business of the Lien Grantor not identified above:

| Mailing Address | County | State |
|---|---|---|
| | | |

(c)    The following are all locations not identified above where the Lien Grantor currently maintains any Inventory (as defined in the UCC):

| Mailing Address | County | State |
|---|---|---|
| | | |

(d)    The following are the names and addresses of all Persons (other than the Lien Grantor) that have currently possession of any of the Lien Grantor's Inventory (as defined in the UCC):

| Mailing Address | County | State |
|---|---|---|
| | | |

2.    *Prior Locations.*  (a) Set forth below is the information required by paragraphs (a) and (b) of Part B–1 above with respect to each other location or place of business maintained by the Lien Grantor at any time during the past five years:

(b)    Set forth below is the information required by paragraphs (c) and (d) of Part B–1 above with respect to each other location or bailee where or with whom any of the Lien Grantor's Inventory (as defined in the UCC) has been lodged at any time during the past four months:

IN WITNESS WHEREOF, I have hereunto set my hand this __ day of December, 2005.

Name: _____
Title:

EXHIBIT A

EXHIBIT G
to the First Lien Credit Agreement

## FORM OF NON-BANK CERTIFICATE

Reference is made to the First Lien Credit Agreement dated as of December 5, 2005 (as amended, restated, supplemented or otherwise modified from time to time, the "**First Lien Credit Agreement**"), among RPG Holdings, Inc., RPG Acquisition Corp., the lenders from time to time party thereto and Credit Suisse, Cayman Islands Branch, as sole bookrunner and sole lead arranger, as administrative agent and as collateral agent.  Terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the First Lien Credit Agreement.  Pursuant to Section 2.20(d) of the First Lien Credit Agreement, the undersigned certifies that it is not a "bank" or other Person described in Section 881(c)(3) of the Internal Revenue Code of 1986, as amended.

[NAME OF LENDER]

By:_____
      Name:
      Title

G-1

EXHIBIT A

EXHIBIT H
to the First Lien Credit Agreement

[See next page]

H

EXHIBIT A

# WEIL, GOTSHAL & MANGES LLP

200 CRESCENT COURT
SUITE 300
DALLAS, TEXAS 75201
(214) 746-7700
FAX: (214) 746-7777

AUSTIN
BOSTON
BRUSSELS
BUDAPEST
FRANKFURT
HOUSTON
LONDON
MIAMI
NEW YORK
PARIS
PRAGUE
SILICON VALLEY
SINGAPORE
WARSAW
WASHINGTON, D.C.

WRITER'S DIRECT LINE

December 5, 2005

To the Lenders party to the Credit Agreement
referred to below and Credit Suisse, Cayman Islands Branch,
as Administrative Agent, Collateral Agent, Issuing Bank
and Arranger for the Lenders

Ladies and Gentlemen:

We have acted as counsel to RPG Holdings, Inc., a Delaware corporation ("Holdings"), and RPG Acquisition Corp., a Delaware corporation (the "Borrower" and together with Holdings, each, a "Delaware Opinion Party" and, collectively, the "Delaware Opinion Parties"), and special counsel to Recycled Paper Greetings, Inc., an Illinois corporation ("RPG"), Recycled Paper Greetings Canada, Inc., an Illinois corporation ("RPG Canada"), and Barnyard Industries, Inc., an Illinois corporation ("Barnyard" and together with RPG and RPG Canada, each, an "Illinois Opinion Party" and collectively, the "Illinois Opinion Parties") (the Illinois Opinion Parties and the Delaware Opinion Parties, each, an "Opinion Party" and, collectively the "Opinion Parties") in connection with the preparation, authorization, execution and delivery of, and the consummation of the transactions contemplated by, that certain First Lien Credit Agreement dated as of even date herewith (the "Credit Agreement") among Holdings, the Borrower, each lender from time to time party thereto (the "Lenders") and Credit Suisse, Cayman Islands Branch, as administrative agent and collateral agent for the Lenders (in such capacities, the "Agent"). Capitalized terms defined in the Credit Agreement and used (but not otherwise defined) herein are used herein as so defined.

In so acting, we have examined originals or copies (certified or otherwise identified to our satisfaction) of (a)(i) the Credit Agreement, (ii) the Guarantee and Collateral Agreement, (iii) the Intellectual Property Security Agreement, and (iv) the Intercreditor Agreement (the items listed in (a)(i) through (a)(iv), each dated as of the date hereof unless otherwise noted, are, collectively, the "Transaction Documents"), and (b) such corporate records, agreements, documents and other instruments, and such certificates or comparable documents of public officials and of officers and representatives of each Opinion Party, and have made such inquiries of such officers and

EXHIBIT A

WEIL, GOTSHAL & MANGES LLP

December 5, 2005
Page 2

representatives, as we have deemed relevant and necessary as a basis for the opinions hereinafter set forth.

In such examination, we have assumed the genuineness of all signatures (other than for any Opinion Party), the legal capacity of all natural persons, the authenticity of all documents submitted to us as originals, the conformity to original documents of all documents submitted to us as certified, conformed or photostatic copies and the authenticity of the originals of such latter documents. We have also assumed (a) the valid existence and good standing of each Illinois Opinion Party under the laws of the State of Illinois, (b) that each Illinois Opinion Party has all requisite corporate power and authority to (i) own, lease and operate its properties and to carry on its business as now being conducted and (ii) execute and deliver the Transaction Documents to which it is a party and to perform its obligations thereunder, (c) that the execution, delivery and performance by each Illinois Opinion Party of the Transaction Documents to which such Illinois Opinion Party is a party and the consummation by each of the Illinois Opinion Party of the transactions contemplated thereby have been duly authorized by all necessary corporate action on the part of each such Illinois Opinion Party and (d) that the Transaction Documents to which each Illinois Opinion Party is a party have been duly and validly executed and delivered by such Illinois Opinion Party. As to all questions of fact material to these opinions that have not been independently established, we have relied upon certificates or comparable documents of officers and representatives of each Opinion Party and upon the representations and warranties of each Opinion Party contained in the Transaction Documents. As used herein, "to our knowledge" and "of which we are aware" mean the conscious awareness of facts or other information by any lawyer in our firm actively involved in the transactions contemplated by the Credit Agreement or the Stock Purchase Agreement.

Based on the foregoing, and subject to the qualifications stated herein, we are of the opinion that:

1. Holdings is a corporation validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now being conducted.

2. The Borrower is a corporation validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now being conducted.

3. Each Delaware Opinion Party has all requisite corporate power and authority to execute and deliver the Transaction Documents to which it is a party and to perform its respective obligations thereunder. The execution, delivery and performance

EXHIBIT A

WEIL, GOTSHAL & MANGES LLP

December 5, 2005
Page 3

by each Delaware Opinion Party of the Transaction Documents to which such Opinion Party is a party have been duly authorized by all necessary corporate action on the part of such Delaware Opinion Party. The Transaction Documents to which each Delaware Opinion Party is a party have been duly and validly executed and delivered by such Delaware Opinion Party. Assuming the due authorization, execution and delivery thereof by the other parties thereto, the Transaction Documents to which any Opinion Party is a party constitute the legal, valid and binding obligation of such Opinion Party, enforceable against it in accordance with their terms, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity) and except that (a) rights to indemnification and contribution thereunder may be limited by federal or state securities laws or public policy relating thereto, (b) no opinion is expressed with respect to rights of setoff under the Transaction Documents, and (c) certain remedial provisions of the Transaction Documents are or may be unenforceable in whole or in part under the laws of the State of New York, but the inclusion of such provisions does not affect the validity of the Transaction Documents and the Transaction Documents contain adequate provisions for the practical realization of the rights and benefits afforded thereby. No opinion is expressed in this paragraph as to the attachment, perfection or priority of any liens granted pursuant to the Guarantee and Collateral Agreement.

4.    The execution and delivery by each Delaware Opinion Party of the Transaction Documents to which it is a party and the performance by such Delaware Opinion Party of its respective obligations thereunder will not conflict with, constitute a default under or violate (a) any of the terms, conditions or provisions of the Certificate of Incorporation, or by-laws of such Delaware Opinion Party, (b) any of the terms, conditions or provisions of any document, agreement or other instrument listed on Exhibit A hereto to which such Delaware Opinion Party is a party, (c) any New York, Delaware corporate or federal law or regulation (other than federal and state securities or blue sky laws, as to which we express no opinion in this paragraph), or (d) any judgment, writ, injunction, decree, order or ruling of any court or governmental authority binding on any Delaware Opinion Party of which we are aware.

5.    The execution and delivery by each Illinois Opinion Party of the Transaction Documents to which it is a party and the performance by such Illinois Opinion Party of its respective obligations thereunder will not conflict with, constitute a default under or violate (a) any of the terms, conditions or provisions of any document, agreement or other instrument listed on Exhibit A hereto to which such Illinois Opinion Party is a party, (b) any judgment, writ, injunction, decree, order or ruling of any court or governmental authority binding on any Illinois Opinion Party of which we are aware or

EXHIBIT A

WEIL, GOTSHAL & MANGES LLP

December 5, 2005
Page 4

(c) any New York or federal law or regulation (other than federal and state securities or blue sky laws, as to which we express no opinion in this paragraph).

6.  No consent, approval, waiver, license or authorization or other action by or filing with any Delaware corporate, New York or federal governmental authority is required in connection with the execution and delivery by any Opinion Party of the Transaction Documents to which it is a party, the consummation by any Opinion Party of the transactions contemplated thereby or the performance by any Opinion Party of its obligations thereunder, except for (a) those already obtained, (b) filings in connection with perfecting security interests, and (c) federal and state securities or blue sky laws, as to which we express no opinion in this paragraph.

7.  To our knowledge, there is no litigation, proceeding or governmental investigation pending or overtly threatened against any Opinion Party that relates to any of the transactions contemplated by the Transaction Documents or the Acquisition Documentation.

8.  (a) The execution and delivery of the Guarantee and Collateral Agreement by each Opinion Party creates a valid security interest in the Collateral (as defined in the Guarantee and Collateral Agreement), as security for the Obligations. Assuming the filing of the financing statement on Form UCC 1 attached hereto as Exhibit B with the Secretary of State of the State of Delaware, the security interest created by the Guarantee and Collateral Agreement in each of the Delaware Opinion Party's respective rights, title and interest in and to the Collateral will be perfected, to the extent a security interest in such Collateral may be perfected by the filing of a financing statement under the Uniform Commercial Code in effect in the State of Delaware (the "DE UCC").

(b) Assuming (i) delivery in the State of New York to the Agent of all certificates that represent the Pledged Stock (as defined in the Guarantee and Collateral Agreement) listed on Exhibit C attached hereto (the "Opinion Securities"), together with stock powers properly executed in blank with respect thereto, and (ii) that the Agent was without notice of any adverse claim (as such phrase is defined in Section 8-105 of the Uniform Commercial Code in effect in the State of New York (the "NY UCC" and together with the DE UCC, the "UCC") with respect to the Opinion Securities, such security interest in the Opinion Securities is perfected and is free of any adverse claim.

The opinions in subparagraph (a) and, with respect to subclause (i) below, subparagraph (b) are subject to the following exceptions:

EXHIBIT A

WEIL, GOTSHAL & MANGES LLP

December 5, 2005
Page 5

(i)      that with respect to rights in the Collateral of any Grantor (as defined in the Guarantee and Collateral Agreement), we express no opinion, and have assumed that such Grantor has rights in the Collateral;

(ii)      that with respect to any Collateral as to which the perfection of a lien or security interest is governed by the laws of any jurisdiction other than the State of Delaware or New York, we express no opinion;

(iii)      that with respect to any Collateral which is or may become fixtures (as defined in Section 9-102(a)(41) of the DE UCC) or a commercial tort claim (as defined in Section 9-102(a)(13) of the DE UCC), we express no opinion.

The opinion set forth in subparagraph (b) is also subject to the following exceptions:

(iv)      that with respect to (A) federal tax liens accorded priority under law and (B) liens created under Title IV of the Employee Retirement Income Security Act of 1974 which are properly filed after the date hereof, we express no opinion as to the relative priority of such liens and the security interests created by the Guarantee and Collateral Agreement or as to whether such liens may be adverse claims; and

(v)      that with respect to any claim (including for taxes) in favor of any state or any of its respective agencies, authorities, municipalities or political subdivisions which claim is given lien status and/or priority under any law of such state, we express no opinion as to the relative priority of such liens and the security interests created by the Guarantee and Collateral Agreement or as to whether such liens may be adverse claims.

In addition, the opinions in subparagraphs (a) and (b) are subject to (i) the limitations on perfection of security interests in proceeds resulting from the operation of Section 9-315 of the UCC; (ii) the limitations with respect to buyers in the ordinary course of business imposed by Sections 9-318 and 9-320 of the UCC; (iii) the limitations with respect to documents, instruments and securities imposed by Sections 8-302, 9-312 and 9-331 of the UCC; (iv) the provisions of Section 9-203 of the UCC relating to the time of attachment; and (v) Section 552 of Title 11 of the United States Code (the "Bankruptcy Code") with respect to any Collateral acquired by any Grantor subsequent to the commencement of a case against or by any Grantor under the Bankruptcy Code.

We further assume that all filings will be timely made and duly filed as necessary (i) in the event of a change in the name, identity or corporate structure of any Grantor, (ii) in the event of a change in the location of any Grantor and (iii) to continue to maintain the effectiveness of the original filings.

DA1:\424096\03\938G03!.DOC\63960.0004

EXHIBIT A

WEIL, GOTSHAL & MANGES LLP

December 5, 2005
Page 6

9.   No Opinion Party is an "investment company" and none of the Opinion Parties is a company controlled by an investment company within the meaning of the Investment Company Act of 1940, as amended.

10. None of the Opinion Parties is a "holding company" as defined in, or subject to regulation under, the Public Utility Holding Company Act of 1935, as amended.

11. The making of the loans and other extensions of credit under the Credit Agreement does not violate Regulations T, U or X of the Board of Governors of the Federal Reserve System.

The opinions expressed herein are limited to the laws of the State of New York, corporate laws of the State of Delaware, Articles 8 and 9 of the DE UCC and the federal laws of the United States, and we express no opinion as to the effect on the matters covered by this letter of the laws of any other jurisdiction.

The opinions expressed herein are rendered solely for your benefit in connection with the transactions described herein.  Those opinions may not be used or relied upon by any other person, nor may this letter or any copies hereof be furnished to a third party, filed with a governmental agency, quoted, cited or otherwise referred to without our prior written consent, other than to bank regulatory authorities or successors or permitted assigns of the Agent or any Lender.

Very truly yours,

*Weil, Gotshal & Manges LLP*

EXHIBIT A

## Exhibit A

### Material Agreements

Far Side Database Limited License Agreement dated March 8, 2002, between Farworks, Inc. and the Company, as amended June 19, 2003 and June 8, 2005.

Letter Agreement dated March 27, 2003 between the Company and Cost Plus World Market.

License and Profit Sharing Agreements dated March 12, 2001 between the Company and Andrews McMeel Publishing, as amended December 8, 2003.

Agreement dated June 9, 1997 between the Company and DCI, Inc., as amended by a Letter Agreement dated June 2, 1997.

Agreement dated July 28, 2005 between the Company and Walgreen Co.

Agreement dated February 23, 2004 between the Company and Walgreen Co.

Vendor Services Agreement dated January 12, 2004 between the Company and Kinko's Inc.

Artist Agreement dated November 6, 1985, as amended August 9, 2005, with Carl & Steve Bjorkman.

Letter dated November 16, 2000 regarding Kathy Davis and Addendum Letter dated December 1, 2000.

Target Recap of Existing Terms.

Second Lien Credit Agreement dated as of December 5, 2005.

Stock Purchase Agreement dated as of November 2, 2005 between Recycled Paper Greetings, Inc., RPG Investment Holdings, LLC, Michael Keiser and Philip Friedmann.

EXHIBIT A

**<u>Exhibit B</u>**

**Delaware Financing Statement**

See attached.

EXHIBIT A

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME – insert only one debtor name (1a or 1b) – do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| RPG HOLDINGS, INC. | | | | |

OR

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| C/O MONITOR CLIPPER PARTNERS, LLC TWO CANAL PARK, 4TH FLOOR | CAMBRIDGE | MA | 02141 | U.S.A. |

| 1d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | CORPORATION | DE | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME – insert only one debtor name (2a or 2b) – do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|

OR

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|

| 2c. MAILING ADDRESS | CITY | STATE | POSTALCODE | COUNTRY |
|---|---|---|---|---|

| 2d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNORS/P) - insert only __ one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| CREDIT SUISSE, CAYMAN ISLANDS BRANCH, AS COLLATERAL AGENT FOR THE FIRST LIEN CREDIT FACILITY | | | | |

OR

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|

| 3c. MAILING ADDRESS | CITY | STATE | POSTALCODE | COUNTRY |
|---|---|---|---|---|
| ELEVEN MADISON AVENUE | NEW YORK | NY | 10010 | U.S.A. |

4. This FINANCING STATEMENT covers the following collateral:

ALL PERSONAL PROPERTY.

5. ALTERNATIVE DESIGNATION [if applicable]: ☐ LESSEE/LESSOR  ☐ CONSIGNEE/CONSIGNOR  ☐ BAILEE/BAILOR  ☐ SELLER/BUYER  ☐ AG. LIEN  ☐ NON-UCC FILING

| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]  [optional] | ☐ All Debtors ☐ Debtor 1 ☐ Debtor 2 |
|---|---|---|

8. OPTIONAL FILE REFERENCE DATA
FILE WITH THE SECRETARY OF STATE, DE                          1ST LIEN

FILING OFFICE COPY – NATIONAL UCC FINANCING STATEMENT (FORM UCC 1) (REV. 07/29/98)

EXHIBIT A

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME – insert only one debtor name (1a or 1b) – do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| RPG ACQUISITION CORP. | | | | |

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| C/O MONITOR CLIPPER PARTNERS, LLC TWO CANAL PARK, 4TH FLOOR | CAMBRIDGE | MA | 02141 | U.S.A. |

| 1d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | CORPORATION | DE | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME – insert only one debtor name (2a or 2b) – do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTALCODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR'S/P) - insert only __ one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| CREDIT SUISSE, CAYMAN ISLANDS BRANCH, AS COLLATERAL AGENT FOR THE FIRST LIEN CREDIT FACILITY | | | | |

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTALCODE | COUNTRY |
|---|---|---|---|---|
| ELEVEN MADISON AVENUE | NEW YORK | NY | 10010 | U.S.A. |

4. This FINANCING STATEMENT covers the following collateral:

ALL PERSONAL PROPERTY.

5. ALTERNATIVE DESIGNATION [if applicable]: ☐ LESSEE/LESSOR   ☐ CONSIGNEE/CONSIGNOR   ☐ BAILEE/BAILOR   ☐ SELLER/BUYER   ☐ AG. LIEN   ☐ NON-UCC FILING

6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]   [optional]   ☐ All Debtors ☐ Debtor 1 ☐ Debtor 2

8. OPTIONAL FILE REFERENCE DATA
FILE WITH THE SECRETARY OF STATE, DE                1ST LIEN

FILING OFFICE COPY – NATIONAL UCC FINANCING STATEMENT (FORM UCC 1) (REV. 07/29/98)

EXHIBIT A

## Exhibit C

## Opinion Securities

| "Pledged Stock" | Grantor | % of Issued and Outstanding Equity Interests |
|---|---|---|
| Recycled Paper Greetings, Inc. | RPG Holdings, Inc. | 100% |
| Recycled Paper Greetings Canada, Inc. | Recycled Paper Greetings, Inc. | 100% |
| Barnyard Industries, Inc. | Recycled Paper Greetings, Inc. | 100% |

EXHIBIT A

EXHIBIT I
to the First Lien Credit Agreement

INTERCREDITOR AGREEMENT
*See Tab No. 7*

EXHIBIT A

*SCHEDULE 1.01(b)*

## SUBSIDIARY GUARANTORS

Recycled Paper Greetings Canada, Inc.

Barnyard Industries, Inc.

EXHIBIT A

*SCHEDULE 3.08*

<u>SUBSIDIARIES</u>

| Subsidiary - Legal Name | Jurisdiction of Incorporation | Ownership Percentage | Ownership | Loan Party |
|---|---|---|---|---|
| Recycled Paper Greetings Canada, Inc. | Illinois | 100% | Recycled Paper Greetings, Inc. (successor-by-merger to RPG Acquisition Corp.) | Yes |
| Barnyard Industries, Inc. | Illinois | 100% | Recycled Paper Greetings, Inc. (successor-by-merger to RPG Acquisition Corp.) | Yes |

EXHIBIT A

*SCHEDULE 3.09*

## LITIGATION

None.

EXHIBIT A

*SCHEDULE 3.17*

### ENVIRONMENTAL MATTERS

None.

EXHIBIT A

*SCHEDULE 3.18*

### INSURANCE

St. Paul Travelers Insurance
Property Policy No.  630308D558603
EXPIRATION DATE:  03/01/2006
LIMIT:  $36,817.615 Blanket Building and Contents (Chicago & University Park exclusive); $3,000,000
((Valuable Papers – 3636 N. Broadway, Chicago IL ), ($500,000 Any Unnamed Location)); $2,000,000 (EDP:
Hardware); $1,381,000 (Extra Expense); $500,000 (Personal Property - Other Locations); $300,000 (EDP:
Media); $60,000 (Fine Arts); $25,000 (Transit), (Exhibition Floater).

Old Republic
General Liability Policy No.  MWZY56721
EXPIRATION DATE:  02/01/2006
LIMIT:  $2,000,000 General and Products / Completed Operations Aggregates; $1,000,000 (Personal &
Advertising Injury, Each Occurrence), (Employee Benefit Liability – Each Occurrence and Aggregate)
$300,000 (Fire Damage);
$5,000 (Medical Expense).

Old Republic
Workers Compensation Policy No.  MWC11115600
EXPIRATION DATE:  02/01/2006
LIMIT:  $1,000,000

Berkley Risk Administrators Company, LLC
(MN) Workers Compensation Policy No.  WC22-04-138883-02
EXPIRATION DATE:  02/11/2006
LIMIT:  $100,000 (Per Accident For Injury and Per Employee for Disease);
        $500,000 (Per Policy For Disease)

CHUBB
Umbrella Policy No.  7971-56-73
EXPIRATION DATE:  02/01/2006
LIMIT:  $20,000,000

Essex
Professional Liability Policy No.  EO818831
EXPIRATION DATE:  03/04/2006
LIMIT:  $2,000,000

CHUBB
Forefront Runoff Policy (Employment Practices & Fiduciary Liability) Policy No. 8171-1202
EXPIRATION DATE:  12/2/2011
Allows for Insured to report claims that occurred within original policy period up to date of expiration of
extended reporting period.

Old Republic
Business Automobile Policy No.  MWTB19123
EXPIRATION DATE:  02/01/2006
LIMIT:  $1,000,000 (Liability)
        $     5,000 (Medical Payments)

EXHIBIT A

$ Statutory  (Uninsured / Underinsured Motorists)
$ AVC        (Physical Damage)
$    50,000  (Hired Automobile Physical Damage)

Chubb Group of Insurance Companies
Directors & Officers Liability with Employment Practices Policy No.  6803-7789
EXPIRATION DATE:  12/2/06 (may be amended)
LIMIT:  $3,000,000
                    $25,000 Deductible
            - EPL includes Third Party Coverage

Chubb Group of Insurance Companies
Fiduciary Liability and Crime Insurance Policy No.  6803-7789
EFF/EXP DATE:  12/2/2006 (may be amended)
LIMIT:  $3,000,000 Fiduciary Liability
                $0 Deductible

        LIMIT:  $1,000,000 Employee Dishonesty (Crime)
                $1,000,000 Premises (Crime)
                $1,000,000 In Transit (Crime)
                $1,000,000 Forgery (Crime)
                $1,000,000 Computer Fraud (Crime)
                $1,000,000 Funds Transfer Fraud (Crime)
                $1,000,000 Money Orders (Crime)
                $1,000,000 Credit Card (Crime)
                $1,000,000 Client (Crime)
                $   250,000 Expense (Crime)
                $  10,000 Deductible (Crime)

EXHIBIT A

*SCHEDULE 3.19(a)*

## UCC FILING OFFICES

Delaware Secretary of State

Illinois Secretary of State

EXHIBIT A

*SCHEDULE 3.20*

## OWNED AND LEASED REAL PROPERTY

Leased Property:

| Address | Landlord | Lease Date | Lease Expiration |
|---|---|---|---|
| Recycled Paper Products, Inc. 2510 Bond Street University Park, IL (lease) | LaSalle National Bank, as Trustee | 12/05/05 | 12/05/10 |
| Recycled Paper Products, Inc. 222 West Adams Street Chicago, IL (lease) | American National Bank and Trust Company of Chicago, as Trustee | 5/08/92 | 8/31/07 |
| Barnyard Industries, Inc. 233 North Michigan Avenue Chicago, IL (retail building lease) | TST 233 N. Michigan, L.L.C. | 11/02/00 | 2/29/12 |
| Barnyard Industries, Inc. 233 South Wacker Drive Chicago, IL (retail lease) | Tower Leasing, Inc. | 12/12/95 | 2/01/06 |
| Recycled Paper Products, Inc. and Storage Lease #2 231 S. LaSalle Street Chicago, IL (retail lease) | Continental Bank National Association | 10/16/91 | 12/31/06 |
| Recycled Paper Products, Inc. 3636 North Broadway Chicago, IL (industrial building lease) | Amalgamated Trust & Savings Bank, as Trustee | 12/05/05 | 12/05/07 |

Owned Property:
      None

EXHIBIT A

*SCHEDULE 3.25*

## ACQUISITION DOCUMENTATION

Stock Purchase Agreement, dated November 2, 2005, by and among RPG Investment Holdings, LLC, Recycled Paper Greetings, Inc., Philip Friedmann and Michael Keiser.

Disclosure Schedules to the Stock Purchase Agreement.

Contribution Agreement, dated December 5, 2005, by and among RPG Holdings, Inc., Philip Friedmann and Michael Keiser.

Agreement and Plan of Merger, dated December 5, 2005, by and among Recycled Paper Greetings, Inc. and RPG Acquisition Corp.

Stock Purchase Agreement (Barnyard Industries, Inc.), dated December 5, 2005, by and among Recycled Paper Greetings, Inc., Philip Friedmann and Michael Keiser.

Membership Purchase Agreement (Internet Media International, L.L.C.), dated December 5, 2005, by and among Recycled Paper Greetings, Inc., Philip Friedmann and Michael Keiser.

Equity Purchase Agreement, dated December 5, 2005, by and among RPG Investment Holdings, LLC, Monitor Clipper Equity Partners II, LP, Monitor Clipper Equity Partners (NQP) II, LP, Leonard Levine, Philip Friedmann and Michael Keiser.

Demand Note issued by Philip Friedmann to Recycled Paper Greetings, Inc., dated December 5, 2005 (to be repaid in full at closing).

Demand Note issued by Michael Keiser to Recycled Paper Greetings, Inc., dated December 5, 2005 (to be repaid in full at closing).

Mutual Release, dated December 5, 2005, by and among, RPG Investment Holdings, LLC, Recycled Paper Greetings, Inc. and Philip Friedmann.

Mutual Release, dated December 5, 2005, by and among, RPG Investment Holdings, LLC, Recycled Paper Greetings, Inc. and Michael Keiser.

EXHIBIT A

*SCHEDULE 6.01*

## EXISTING INDEBTEDNESS

Indebtedness evidenced by that certain Letter of Credit No. HACH 20549 in an aggregate amount not to exceed $502,175.07.

EXHIBIT A

*SCHEDULE 6.02*

<u>EXISTING LIENS</u>

| Jurisdiction | Debtor | Secured Party | Filing Info | Collateral |
|---|---|---|---|---|
| **RECYCLED PAPER GREETINGS, INC.** | | | | |
| Illinois – SOS | Recycled Paper Greetings Inc. 3636 N. Broadway Chicago, IL 60613 | Minolta Business Solutions, Inc. (fka Minolta Business Systems, Inc.) One International Blvd. Mahwah, NJ 07430 | 4998049 3/29/02 | Minolta DI 750 Copier |
| Illinois – SOS | Recycled Paper Greetings, Inc. 3636 N. Broadway Chicago, IL 60613 | CIT Technology Financing Services, Inc. 4600 Touchton Rd E Bldg. Jacksonville, FL 32246 -and- CIT Technology Financing Services, Inc. 100, Ste 300 Jacksonville, FL 32246 | 6305946 12/27/02 | Equipment lease for various copiers and office equipment and products, computers, security systems. |
| Illinois - SOS | Recycled Paper Greetings, Inc. 3636 N. Broadway Chicago, IL 60613 | Forsythe/McArthur Associates, Inc. 7770 Frontage Road Skokie, IL 60077 | 8249156 2/18/04 | Computer, data processing, telecommunications and other equipment together with all attachments, accessories, replacements, products and proceeds therefrom, from time to time leased by Lessor to Lessee pursuant to master Equipment Lease Agreement No. F57609 dated 10/23/02 and various schedules entered into pursuant thereto. |

EXHIBIT A

| Jurisdiction | Debtor | Secured Party | Filing Info | Collateral |
|---|---|---|---|---|
| Illinois - SOS | Recycled Paper Greetings Inc. 3636 North Broadway Chicago, IL 60613 | Konica Minolta Business Solutions U.S.A., Inc. P.O. Box 728 Park Ridge, NJ 07656 | 8515654 4/12/04 | Lease transaction for L#3085653 (1) DI850. |

A Cash Collateral Account at Harris Bank, N.A. in Account No.: 278-038-5, in respect of that certain Letter of Credit No. HACH 20549 in an aggregate amount not to exceed $502,175.07.

EXHIBIT A

*SCHEDULE 6.04*

**EXISTING INVESTMENTS**

The Company owns one (1) share of voting common stock and one (1) share of non-voting redeemable preferred stock of Summit Insurance Ltd., a Cayman Island Company.

The Company owns 176 shares of The Penn Traffic Company, a Delaware corporation, common stock, par value $0.01 per share.

The Company owns one (1) share of Pharmhouse Corp., a New York corporation, common stock, par value $0.01 per share. This share was converted into the right to receive $2.88 in cash pursuant to Phar-Mor, Inc.'s acquisition of Pharmhouse Corp. on March 15, 1999.

The Company owns 688 shares of Tam's Stationers, Inc., a California corporation, common stock.

The Company owns 168 shares of Elder-Beerman Stores Corp., an Ohio corporation, common stock, without par value. These shares were converted into the right to receive $8.00 in cash per share pursuant to the acquisition of Elder-Beerman Stores Corp. by Bon-Ton Stores, Inc. on October 24, 2003.

The Company owns a fifty percent (50%) Membership Interest in Internet Media International, L.L.C., a Delaware limited liability corporation.

EXHIBIT A

*SCHEDULE 6.07*

## AGREEMENTS WITH AFFILIATES

Office Building Lease, by and between 3636 North Broadway LLC, an Illinois limited liability company, as Landlord, and Recycled Paper Greetings, Inc., an Illinois corporation, as Tenant, dated December 5, 2005, for the building commonly known as 3620-3642 N. Broadway, Chicago, Illinois.

Warehouse Building Lease, by and between LaSalle National Bank, not individually or personally but solely as Trustee under Trust Agreement dated December 5, 2005, known as Trust No. 54331, as Landlord, and Recycled Paper Greetings, Inc., an Illinois corporation, as Tenant, for the building commonly known as 2510 Bond Street, University Park, Illinois.

EXHIBIT A

EXECUTION COPY

## AMENDMENT NO. 1 TO FIRST LIEN CREDIT AGREEMENT

AMENDMENT NO. 1 (this "**Amendment**") dated as of December 19, 2005, to the First Lien Credit Agreement dated as of December 5, 2005 (the "**Credit Agreement**") among RPG HOLDINGS, INC. ("**Holdings**"), RECYCLED PAPER GREETINGS, INC. (successor by merger to RPG Acquisition Corp.) (the "**Borrower**"), the LENDERS party thereto and CREDIT SUISSE, CAYMAN ISLANDS BRANCH, as administrative agent (the "**Administrative Agent**") and collateral agent.

## W I T N E S S E T H:

WHEREAS, the parties hereto desire to amend certain provisions of the Credit Agreement as provided herein;

NOW, THEREFORE, the parties hereto agree as follows:

SECTION 1.  *Defined Terms; References.*  Unless otherwise specifically defined herein, each term used herein which is defined in the Credit Agreement has the meaning assigned to such term in the Credit Agreement.  Each reference to "hereof", "hereunder", "herein" and "hereby" and each other similar reference and each reference to "this Agreement" and each other similar reference contained in the Credit Agreement shall, after the amendments herein become effective, refer to the Credit Agreement as amended hereby.

SECTION 2.  *Fixed Charge Coverage Ratio.*  (a) The definition of "Consolidated Fixed Charges" in Section 1.01 of the Credit Agreement is amended and restated in its entirety to read as follows:

> ""**Consolidated Fixed Charges**" shall mean, for any period, the sum of (a) Consolidated Cash Interest Expense for such period and (b) the aggregate amount of all Taxes paid during such period."

(b)    The definition of "Fixed Charge Coverage Ratio" in Section 1.01 of the Credit Agreement is amended and restated in its entirety to read as follows:

> ""**Fixed Charge Coverage Ratio**" shall mean, on any date, the ratio of (a) Consolidated EBITDA minus (i) the aggregate amount of all investments in new customer accounts and new rooftops (including fixture costs, slotting fees, free fills and buy back credits) in each case, to the extent included in Consolidated EBITDA for the relevant period and (ii) the aggregate amount of all Capital Expenditures to (b) Consolidated Fixed Charges, in each case, for the period of four consecutive fiscal quarters most

EXHIBIT A

recently ended on or prior to such date, taken as one accounting period."

SECTION 3.  *Representations Correct; No Default.*  The Borrower represents and warrants that (i) the representations and warranties contained in the Loan Documents are true and correct in all material respects on and as of the date hereof, except to the extent that such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects on and as of such earlier date and (ii) no Default or Event of Default has occurred and is continuing on the date hereof.

SECTION 4.  *Counterparts.*  This Amendment may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

SECTION 5.  *Effectiveness.*  (a) This Amendment shall become effective as of the date hereof on the date when the Administrative Agent shall have received duly executed counterparts hereof signed by Holdings, the Borrower and the Required Lenders.

(b)    Except as expressly set forth herein, the amendments contained herein shall not constitute a waiver or amendment of any term or condition of the Credit Agreement or any other Loan Document, and all such terms and conditions shall remain in full force and effect and are hereby ratified and confirmed in all respects.

SECTION 6.  *Governing Law.*  THIS AMENDMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

*[Signature pages follow]*

(NY) 06216/188/AMEND/amend.ca.1st.lien.1.doc

EXHIBIT A

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed by their respective authorized officers as of the date and year first above written.

RPG HOLDINGS, INC.

By:

Name: Charles Yoon

Title:   Secretary and Treasurer

RECYCLED PAPER GREETINGS, INC.

By:

Name: Charles Yoon

Title:   Secretary and Treasurer

EXHIBIT A

CREDIT SUISSE, CAYMAN ISLANDS
   BRANCH, as Administrative Agent
   and Lender

By: _____
   Name:   **BILL O'DALY**
   Title:    **DIRECTOR**

By: _____
   Name:
   Title:   CASSANDRA DROOGAN
               ASSOCIATE

EXHIBIT A

## AMENDMENT NO. 2 TO FIRST LIEN CREDIT AGREEMENT

AMENDMENT NO. 2 (this "**Amendment**") dated as of April 27, 2007, to the First Lien Credit Agreement dated as of December 5, 2005 (as heretofore amended, the "**Credit Agreement**") among RPG HOLDINGS, INC. ("**Holdings**"), RECYCLED PAPER GREETINGS, INC. (successor by merger to RPG Acquisition Corp.) (the "**Borrower**"), the LENDERS party thereto, and CREDIT SUISSE, CAYMAN ISLANDS BRANCH, as administrative agent (the "**Administrative Agent**") and collateral agent (the "**Collateral Agent**").

### W I T N E S S E T H:

WHEREAS, Holdings and the Borrower have informed the Administrative Agent and the Lenders that (i) the Sponsor and certain members of management (such members of management, the "**Contributing Members**") propose to contribute not less than $10,000,000 in cash to Holdings as common equity, (ii) Holdings will, simultaneously upon receipt thereof, contribute the amount so received pursuant to clause (i) to the Borrower as cash common equity (the equity contributions described in clauses (i) and (ii) being referred to herein collectively as the "**Prepayment Equity Contribution**"), (iii) the Borrower will, simultaneously upon receipt thereof, apply the amount so contributed to it pursuant to the Prepayment Equity Contribution to prepay outstanding Tranche B Term Loans in an aggregate principal amount equal to the amount so contributed to it, (iv) the Sponsor and the Contributing Members propose to contribute not less than an additional $5,000,000 in cash to Holdings as common equity and (v) Holdings will, simultaneously upon receipt thereof, contribute the amount so received pursuant to clause (iv) to the Borrower as cash common equity (the equity contributions described in clauses (iv) and (v) being referred to herein collectively as the "**SBT Equity Contribution**"); and

WHEREAS, the parties hereto desire to amend certain provisions of the Credit Agreement as provided herein;

NOW, THEREFORE, the parties hereto agree as follows:

**SECTION 1.** *Defined Terms; References.* Unless otherwise specifically defined herein, each term used herein which is defined in the Credit Agreement has the meaning assigned to such term in the Credit Agreement. Each reference to "hereof", "hereunder", "herein" and "hereby" and each other similar reference and each reference to "this Agreement" and each other similar reference contained in the Credit Agreement shall, after the amendments herein become effective, refer to the Credit Agreement as amended hereby.

**SECTION 2.** *The Prepayment.* The Borrower shall apply the proceeds of the Prepayment Equity Contribution to prepay outstanding Tranche B Term Loans in an aggregate principal amount equal to the amount of the Prepayment Equity Contribution (the "**Prepayment**"). The Prepayment shall be applied against the remaining scheduled installments of principal due in respect of the Tranche B Term Loans in order of maturity

1

EXHIBIT A

but shall otherwise be subject to the provisions of Section 2.12 of the Credit Agreement as if the Prepayment were an optional prepayment of Tranche B Term Loans made pursuant to such Section.

SECTION 3. *The SBT Equity Contribution.* The Borrower will use the proceeds of the SBT Equity Contribution solely to pay scan-based trading (SBT) related expenses. Concurrently with any delivery of financial statements under Section 5.04(a) or (b) of the Credit Agreement, the Borrower will furnish to the Administrative Agent a certificate of a Financial Officer setting forth the aggregate amount of the proceeds of the SBT Equity Contribution applied to pay scan-based trading (SBT) related expenses during the fiscal period covered by such financial statements.

SECTION 4. *Consent.* The Administrative Agent and the Required Lenders hereby agree that the Borrower may, at its election, exclude up to an aggregate amount of $15,000,000 of Capital Expenditures made by the Borrower and its Subsidiaries during the term of the Credit Agreement solely for purposes of calculating the Fixed Charge Coverage Ratio for any period during which such Capital Expenditures were made. The Borrower shall notify the Administrative Agent in writing of the exercise of any such election.

SECTION 5. *Waivers.* (a) The Administrative Agent and the Required Lenders hereby waive the provisions of Section 6.07 of the Credit Agreement to the extent (but only to the extent) necessary to permit the Borrower to make loans to the Contributing Members in an aggregate principal amount not exceeding $100,000, the proceeds of which loans will be contributed by the Contributing Members to Holdings as part of the Prepayment Equity Contribution.

*(b)* The Administrative Agent and the Required Lenders hereby waive any Event of Default under Section 7.01(d) of the Credit Agreement to the extent (but only to the extent) that such Event of Default is as a result of a failure by Holdings and the Borrower to comply with any of Sections 6.11, 6.12, 6.13 and 6.15 of the Credit Agreement, in each case solely with respect to the period of four consecutive fiscal quarters ended on or about January 31, 2007.

SECTION 6. *Amendments to Section 1.01 of the Credit Agreement.* (a) The definition of "Applicable Rate" in Section 1.01 of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

"**Applicable Rate**" shall mean, for any day (i) with respect to any ABR Tranche B Term Loan, ABR Revolving Loan or Swingline Loan, 2.50% per annum, (ii) with respect to any Eurodollar Tranche B Term Loan or Eurodollar Revolving Loan, 3.50% per annum, and (iii) with respect to any Commitment Fee, the applicable rate per annum set forth below under the caption "Commitment Fee Rate" based upon the Leverage Ratio as of the relevant date of determination; *provided* that, until the Trigger Date shall occur, the rates per annum set forth in or determined pursuant to foregoing clauses (i), (ii) and (iii) shall be increased by 0.25%:

| Leverage Ratio | Commitment Fee Rate |
|---|---|

(NY) 06216/188/AMEND.2007/amend.ca.1st.lien.2.doc

EXHIBIT A

| | |
|---|---|
| Category 1 Greater than 4.75 to 1.00 | 0.500% |
| Category 2 Greater than 3.75 to 1.00 but less than or equal to 4.75 to 1.00 | 0.375% |
| Category 3 Less than or equal to 3.75 to 1.00 | 0.250% |

Each change in the Applicable Rate resulting from a change in the Leverage Ratio shall be effective with respect to all Loans and Letters of Credit outstanding and Commitment Fees accruing on or after the date of delivery to the Administrative Agent of the financial statements and certificates required by Section 5.04(a) or (b) and Section 5.04(d), respectively, indicating such change until the date immediately preceding the next date of delivery of such financial statements and certificates indicating another such change. Notwithstanding the foregoing, until the Borrower shall have delivered the financial statements and certificates required by Section 5.04(b) and Section 5.04(d), respectively, for the period ended on January 31, 2006, the Leverage Ratio shall be deemed to be in Category 1 for purposes of determining the Applicable Rate with respect to Commitment Fees. In addition, (a) at any time during which the Borrower has failed to deliver the financial statements and certificates required by Section 5.04(a) or (b) and Section 5.04(d), respectively, or (b) at any time after the occurrence and during the continuance of an Event of Default pursuant to clauses (b), (c), (g) or (h) of Article 7 to but excluding the day such financial statements and certificates are delivered or such Event of Default is cured or waived, as applicable, the Leverage Ratio shall be deemed to be in Category 1 for purposes of determining the Applicable Rate. In the event that any financial statement or certificate delivered pursuant to Section 5.04(a), (b) or (d) is inaccurate (regardless of whether this Agreement or the Commitments are in effect when such inaccuracy is discovered), and such inaccuracy, if corrected, would have led to the application of a higher Applicable Rate for any period (an "**Applicable Period**") than the Applicable Rate applied for such Applicable Period, then (i) the Borrower shall promptly deliver to the Administrative Agent a corrected financial statement and a corrected certificate for such Applicable Period, (ii) the Applicable Rate shall be determined based on the corrected certificate for such Applicable Period, and (iii) the Borrower shall promptly pay to the Administrative Agent the accrued additional amounts owing as a result of such increased Applicable Rate for such Applicable Period, which payment shall be promptly applied by the Administrative Agent in accordance with the provisions of this Agreement. The foregoing shall not limit the rights of the Administrative Agent or the Lenders with respect to Sections 2.07 and Article 7.

*(b)* The definition of "Consolidated EBITDA" in Section 1.01 of the Credit Agreement is amended by replacing clause (a)(vii) thereof in its entirety with the following:

3

EXHIBIT A

(vii) restructuring charges or reserves or other charges with respect to ROCS retail store losses, owner-related expenses, extraordinary occupancy expenses and IT consulting, investment in new customer accounts, investment in incremental business with existing customers and new rooftops (including fixture costs, slotting fees, free fills and buy back credits), officer consulting and transaction bonuses, in each case for such period

*(c)*     The definition of "Consolidated EBITDA" in Section 1.01 of the Credit Agreement is amended by replacing clause (a)(x) thereof in its entirety with the following:

(x) (A) a one-time charge with respect to Valentine's Day in an amount not to exceed $700,000 for the four consecutive fiscal quarter period ended on or about January 31, 2007 and $1,800,000 for the four consecutive fiscal quarter period ended on or about April 30, 2007, (B) non-cash, non-recurring charges for such period with respect to employee severance (up to $1,000,000 in any fiscal year), (C) solely with respect to the periods referred to in this clause (C), non-recurring charges with respect to scan-based trading (SBT) related expenses, obsolescence costs and buyback credits so long as such charges described in this clause (C) do not exceed $200,000 in the aggregate for the fiscal year ended on or about April 30, 2007, $4,000,000 in the aggregate for the fiscal year ended on or about April 30, 2008 and $150,000 in the aggregate for the fiscal year ended on or about April 30, 2009; *provided* that the amount of addbacks permitted pursuant to this clause (C) in respect of any fiscal year shall be increased (but not decreased) by (1) the amount of unused permitted addbacks for the immediately preceding fiscal year less (2) an amount equal to unused addbacks carried forward to such preceding fiscal year, (D) other non-cash, non-recurring charges (other than a charge of the type described in the foregoing clauses (A), (B) or (C)) so long as such charges described in this clause (D) do not result in a cash charge in a future period and (E) non-recurring charges other than those referred to in the foregoing clauses (A), (B), (C) and (D) so long as such charges described in this clause (E) do not exceed $3,000,000 in the aggregate during any fiscal year (*provided* that to the extent that all or any portion of the income of any person is excluded from Consolidated Net Income pursuant to the definition thereof for all or any portion of such period any amounts set forth in the preceding clauses (i) through (x) that are attributable to such person shall not be included for purposes of this definition for such period or portion thereof)

*(d)*     The definition of "Fixed Charge Coverage Ratio" in Section 1.01 of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

"**Fixed Charge Coverage Ratio**" shall mean, on any date, the ratio of (a) Consolidated EBITDA minus (i) the aggregate amount of all investments in new customer accounts, investments in incremental business with existing customers and new rooftops (including fixture costs, slotting fees, free fills and buy back credits not related to scan-based trading (SBT)) in each case, to the extent included in Consolidated EBITDA for the relevant period and (ii) the aggregate amount of all Capital Expenditures to (b) Consolidated Fixed Charges, in each

4

EXHIBIT A

case, for the period of four consecutive fiscal quarters most recently ended on or prior to such date, taken as one accounting period.

*(e)*     The following defined term is inserted in appropriate alphabetical order in Section 1.01 of the Credit Agreement:

"**Trigger Date**" shall mean the first date after the date on which Amendment No. 2 to First Lien Credit Agreement shall have become effective on which the financial statements and certificates delivered to the Administrative Agent pursuant to Section 5.04(a) or (b) and Section 5.04(d) shall indicate that the Leverage Ratio for the applicable period of four consecutive fiscal quarters of the Borrower is less than 6.00:1.0.

**SECTION 7**.  *Amendments to Section 5.04 of the Credit Agreement.*  (a) Section 5.04(c) of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

within 30 days after the end of each of the first two fiscal months of each fiscal quarter, its consolidated balance sheet and related statement of income showing the financial condition of the Borrower and its consolidated Subsidiaries as of the close of such fiscal month and the results of its operations and the operations of such Subsidiaries during such fiscal month and the then elapsed portion of the fiscal year;

*(b)*     Section 5.04(d) of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

concurrently with any delivery of financial statements under paragraph (a), (b) or (c) above, a certificate of a Financial Officer (i) certifying that no Event of Default or Default has occurred or, if such an Event of Default or Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto, (ii) in the case of a certificate delivered with the financial statements required by paragraph (a) or (b) above, setting forth computations in reasonable detail satisfactory to the Administrative Agent demonstrating compliance with the covenants contained in Section 6.11, Section 6.12, Section 6.13 and Section 6.15 and, in the case of a certificate delivered with the financial statements required by paragraph (a) above, setting forth the Borrower's calculation of Excess Cash Flow and (iii) setting forth, in reasonable detail and in form satisfactory to the Administrative Agent, a descriptive analysis of the performance of the Borrower and its consolidated Subsidiaries during the relevant period covered thereby in the form of a "management's discussion and analysis";

**SECTION 8**.  *Amendments To Indebtedness Covenant.*  Section 6.01(e) of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

Indebtedness in respect of the Second Lien Credit Agreement in an aggregate principal amount of up to $77,000,000 at any time outstanding plus any pay-in-kind interest added to the principal amount thereof after the Closing Date in

5

EXHIBIT A

accordance with the terms thereof, less the amount of any principal payments made thereon after the Closing Date, and any Permitted Refinancing Indebtedness in respect of such Indebtedness (which shall be limited to the then outstanding principal amount thereof and shall be subject to the terms of the Intercreditor Agreement)

**SECTION 9**. *Amendments To Transactions With Affiliates Covenant.* Section 6.07(g) of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

so long as no Event of Default shall have occurred and be continuing or would result therefrom, fees may be paid to the Sponsor or any of its Affiliates in an aggregate amount not to exceed the amount set forth in the Corporate Services Agreement (as in effect on the date hereof) in any fiscal year (*provided* that, until the Trigger Date shall occur, no more than 50% of such fees shall be paid in cash (and the remainder of such fees shall be accrued and shall be payable in cash only after the Trigger Date shall have occurred)) plus all out-of-pocket costs and expenses incurred by the Sponsor or any such Affiliate, in each case in connection with their performance of underwriting, placement, management, consulting, monitoring, financial advisory or other services with respect to the Borrower and the Subsidiaries

**SECTION 10**. *Amendments to the Financial Covenants.* (a) *Interest Coverage Ratio.* The table appearing in Section 6.11 of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

| Fiscal Year | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| --- | --- | --- | --- | --- |
| 2006 | N/A | N/A | 1.40:1 | 1.45:1 |
| 2007 | 1.50:1 | 1.50:1 | 1.55:1 | 1.10:1 |
| 2008 | 1.10:1 | 1.05:1 | 1.05:1 | 1.10:1 |
| 2009 | 1.15:1 | 1.20:1 | 1.25:1 | 1.35:1 |
| 2010 | 1.40:1 | 1.45:1 | 1.50:1 | 1.55:1 |
| 2011 | 1.55:1 | 1.60:1 | 1.65:1 | 1.70:1 |
| 2012 | 1.70:1 | 1.70:1 | 1.70:1 | N/A |

*(b)* *Leverage Ratio.* The table appearing in Section 6.12 of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

6

EXHIBIT A

| Fiscal Year | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
|---|---|---|---|---|
| 2006 | N/A | N/A | 6.75:1 | 6.75:1 |
| 2007 | 6.50:1 | 6.50:1 | 6.25:1 | 7.75:1 |
| 2008 | 7.75:1 | 7.75:1 | 7.75:1 | 7.85:1 |
| 2009 | 7.50:1 | 7.50:1 | 7.05:1 | 6.45:1 |
| 2010 | 5.95:1 | 5.90:1 | 5.75:1 | 5.50:1 |
| 2011 | 5.25:1 | 5.10:1 | 5.00:1 | 4.75:1 |
| 2012 | 4.25:1 | 4.25:1 | 4.25:1 | N/A |

　　　　(c)　　*First Lien Leverage Ratio.* The table appearing in Section 6.13 of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

| Fiscal Year | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
|---|---|---|---|---|
| 2006 | N/A | N/A | 4.10:1 | 4.00:1 |
| 2007 | 3.80:1 | 3.80:1 | 3.60:1 | 4.50:1 |
| 2008 | 4.50:1 | 4.50:1 | 4.50:1 | 4.50:1 |
| 2009 | 4.40:1 | 4.35:1 | 4.00:1 | 3.65:1 |
| 2010 | 3.35:1 | 3.25:1 | 3.15:1 | 3.05:1 |
| 2011 | 2.80:1 | 2.75:1 | 2.50:1 | 2.40:1 |
| 2012 | 2.10:1 | 2.00:1 | 2.00:1 | N/A |

　　　　(d)　　*Fixed Charge Coverage Ratio.* The table appearing in Section 6.15 of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

| Fiscal Year | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
|---|---|---|---|---|
| 2006 | N/A | N/A | 0.85:1 | 0.85:1 |
| 2007 | 0.90:1 | 0.90:1 | 0.95:1 | 0.80:1 |
| 2008 | 0.80:1 | 0.85:1 | 0.85:1 | 0.75:1 |
| 2009 | 0.70:1 | 0.75:1 | 0.85:1 | 1.05:1 |
| 2010 | 1.20:1 | 1.20:1 | 1.25:1 | 1.25:1 |
| 2011 | 1.40:1 | 1.40:1 | 1.40:1 | 1.40:1 |
| 2012 | 1.40:1 | 1.40:1 | 1.40:1 | N/A |

　　　　**SECTION 11**. *Representations Correct; No Default.* The Borrower represents and warrants that (i) the representations and warranties contained in the Loan Documents are true and correct in all material respects on and as of the date hereof and will be true and correct in all material respects on and as of the Amendment Effective Date (as

7

EXHIBIT A

defined below), except to the extent that such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects on and as of such earlier date and (ii) except for any Default or Event of Default waived herein, no Default or Event of Default has occurred and is continuing on the date hereof or will occur or be continuing on the Amendment Effective Date.

**SECTION 12**. *Counterparts.*  This Amendment may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

**SECTION 13**. *Effectiveness.*  (a) This Amendment shall become effective as of the date hereof on the date when the following conditions are met (the "**Amendment Effective Date**"):

(i)    the Administrative Agent shall have received from each of Holdings, the Borrower and the Required Lenders a counterpart hereof signed by such party or facsimile or other written confirmation (in form satisfactory to the Administrative Agent) that such party has signed a counterpart hereof;

(ii)    the Administrative Agent shall have received evidence satisfactory to it that an amendment substantially similar in substance to this Amendment (to the extent relevant thereto) to the Second Lien Credit Agreement shall have become effective;

(iii)    the Prepayment shall have occurred;

(iv)    the SBT Equity Contribution shall have been made;

(v)    the Administrative Agent shall have received an amendment fee, for the account of each Lender that complies with clause (i) above at or prior to 12:00 pm, New York City time, on April 27, 2007, in an amount equal to 0.20% of the sum of the aggregate principal amount of such Lender's outstanding Tranche B Term Loans (calculated after giving effect to the Prepayment) and Revolving Credit Commitment (whether used or unused) as of such date; and

(vi)    the Administrative Agent and its affiliates shall have received payment of all costs, fees and expenses relating to this Amendment and the Credit Agreement or any other Loan Document (including, without limitation, all costs, fees and expenses payable pursuant to Section 9.05(a) of the Credit Agreement).

*(b)*    Any costs, fees and expenses referred to above shall, once paid, be non-refundable.

*(c)*    Except as expressly set forth herein, the amendments contained herein shall not constitute a waiver or amendment of any term or condition of the Credit Agreement or any other Loan Document, and all such terms and conditions shall remain in full force and effect and are hereby ratified and confirmed in all respects.

8

EXHIBIT A

**SECTION 14**. *Governing Law.* THIS AMENDMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

*[Signature pages follow]*

EXHIBIT A

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed by their respective authorized officers as of the date and year first above written.

RPG HOLDINGS, INC.

By: _____

    Name:  William Young
    Title:    President


RECYCLED PAPER GREETINGS, INC.

By: _____

    Name:
    Title:

EXHIBIT A

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed by their respective authorized officers as of the date and year first above written.

RPG HOLDINGS, INC.

By: _____

  Name:

  Title:

RECYCLED PAPER GREETINGS, INC.

By: _____

  Name: _MICHAEL H. MURRAY_

  Title: _PRESIDENT_

EXHIBIT A

CREDIT SUISSE, CAYMAN ISLANDS
BRANCH, as Administrative Agent and
Lender

By: _____

Name:
Title:     ROBERT HETU
           MANAGING DIRECTOR

By: _____

Name:
Title:     DENISE L. ALVAREZ
           ASSOCIATE

EXHIBIT A

NAME OF INSTITUTION:

By: _CREDIT SUISSE, CAYMAN ISLANDS BRANCH_
     Name:
     Title:

BARRY ZAMORE
MANAGING DIRECTOR

Robert Healey
Director

EXHIBIT A

LASALLE BANK NATIONAL
ASSOCIATION

By: _____
    Name:  Jeffery B. Michalczyk
    Title:   First Vice President

EXHIBIT A

[NAME OF LENDER] ACA CLO 2005-1, Limited

ACA Management, LLC as
Investment Advisor

By: _____

Name:
Title:    Vincent Ingato
          Managing Director

EXHIBIT A

[NAME OF LENDER]    **ACA CLO 2006 - 1 Limited**
ACA Management, LLC as
Investment Advisor

By: _____

Name:
Title:    Vincent Ingato
Managing Director

EXHIBIT A

[NAME OF LENDER]    **ACA CLO 2006 - 2, Limited**

ACA Management, LLC as
Investment Advisor

By: _____

Name:    Vincent Ingato
Title:    Managing Director

EXHIBIT A

BEAR STEARNS CREDIT PRODUCTS INC.

By: _____

Name: _____

Title: _____

**JEFFTRY TUC**
**Authorized Signatory**

TOTAL P.01

EXHIBIT A

KC CLO II PLC:

By: _____

Name:

Title:    Melanie Harries
          Assistant Vice President
          Operations

EXHIBIT A

Madison Park Funding IV, Ltd.

By: _____
Name:
Title:

**LINDA R. KARN**
**AUTHORIZED SIGNATORY**

EXHIBIT A

Castle Garden Funding

By: _____

Name: _____

Title: _____

LINDA R. KARN
AUTHORIZED SIGNATORY

EXHIBIT A

Madison Park Funding II, Ltd.

By: _____

Name: _____

Title: _____

LINDA R. KARNRY
AUTHORIZED SIGNATORY

EXHIBIT A

Madison Park Funding III, Ltd.

By: _____

Name:

Title:

**LINDA R. KARN**
**AUTHORIZED SIGNATORY**

EXHIBIT A

Atrium V

By: _____

Name:
Title:

LINDA R. MANN
AUTHORIZED SIGNATORY

EXHIBIT A

NAME OF INSTITUTION: Avery Street CLO, Ltd.

By: _____

Name: A. Ian O'Keeffe
Title: Authorized Signatory

EXHIBIT A

NAME OF INSTITUTION: Emerson Place CLO, Ltd.

By: _____

Name: R. Ian O'Keelfe

Title: Authorized signatory

EXHIBIT A

GLADSTONE INVESTMENT CORP.

By: _____

Name:   Terry Lee Brubaker
Title:    Chief Operating Officer

EXHIBIT A

FOXE BASIN CLO 2003, LTD.
By GSO Capital Partners LP

By:

Name: Melissa Marano
Title: Authorized Signatory

EXHIBIT A

Gale Force 1 CLO, Ltd.
By: GSO Capital Partners LP as Collateral Manager

By:

Name: Melissa Marano
Title: Authorized Signatory

EXHIBIT A

HUDSON STRAITS CLO 2004, LTD.
By: GSO Capital Partners LP as Collateral Manager

By:
Name: Melissa Marano
Title: Authorized Signatory

(NY) 06216/188/AMEND.2007/amend.ca.1st.lien.2.doc

EXHIBIT A

1888 Fund, Ltd.

By: _____

Name:  Kaitlin Trinh
Title:    Director

EXHIBIT A

Copper River CLO Ltd.

By: _____

     Name:  Kaitlin Trinh
     Title:   Director

EXHIBIT A

Green Lane CLO Ltd.

By: _____
Name:  Kaitlin Trinh
Title:   Director

EXHIBIT A

Kennecott Funding Ltd.

By: _____

Name:  Kaitlin Trinh
Title:   Director

EXHIBIT A

LFC2 Loan Funding LLC, for itself or as
agent for Loan Funding Corp. THC, Ltd.

By: _____

Name:
Title:

**Adam Kaiser**
**Attorney-in-fact**

EXHIBIT A

Sands Point Funding Ltd.

By: _____

Name:  Kaitlin Trinh
Title:  Director

EXHIBIT A

WHITNEY PRIVATE DEBT FUND, L.P.

By: _____

Name:  Kevin J. Curley

Title:   Authorized Signatory

EXHIBIT A

CLEAR LAKE CLO LTD.

By: _____

Name:  WADE T. WINTER
Title:  S.V.P.

**EXHIBIT A**

DIAMOND LAKE CLO LTD.

By: _____

Name:  WADE T. WINTER
Title:  S.V.P.

EXHIBIT A

ST. JAMES RIVER CLO LTD.

By:

Name:  WADE T. WINTER
Title:  S.V.P.

EXHIBIT A

SUMMIT LAKE CLO LTD.

By: _____

Name:　WADE T. WINTER

Title:　S.V.P.

EXHIBIT A

VICTORIA FALLS CLO LTD.

By: _____

Name:  WADE T. WINTER
Title:   S.V.P.

EXHIBIT A

NAME OF INSTITUTION:

Confluent 4 Limited

By: _Please See Following Page_____
      Name:
      Title:

EXHIBIT A

LENDER:

CONFLUENT 4 LIMITED,
As Lender
By:  Loomis, Sayles & Company, L.P.,
     As Sub-Manager
By:  Loomis, Sayles & Company, Incorporated,
     Its General Partner

By:

By:    Kevin J. Perry
Title: Vice President

EXHIBIT A

NAME OF INSTITUTION:

IXIS Loomis Sayles Senior Loan Fund

By:  ___Please See Following Page_____ __
     Name:
     Title:

EXHIBIT A

IXIS LOOMIS SAYLES SENIOR LOAN FUND
By Loomis, Sayles and Company, L.P.
    *its manager*
By Loomis, Sayles and Company, Inc.
    *its general partner*

By:
Name: KEVIN J PERRY
Title: Vice President

EXHIBIT A

NAME OF INSTITUTION:

Loomis Sayles CLO I, Ltd.

By:   Please See Following Page
      Name:
      Title:

EXHIBIT A

LOOMIS SAYLES CLO I, LTD.
By Loomis, Sayles and Company, L.P.
*its collateral manager*
By Loomis, Sayles and Company, Inc.
*its general partner*

By: _____

Name: Kevin P. Charleston
Title: Executive Vice President

**EXHIBIT A**

NAME OF INSTITUTION:

The Loomis Sayles Senior Loan Fund, LLC

By:　　Please See Following Page
　　　　Name:
　　　　Title:

EXHIBIT A

THE LOOMIS SAYLES SENIOR LOAN FUND, LLC
By Loomis Sayles and Company, L.P.
_its manager_
By Loomis Sayles and Company, Inc.
_its general partner_

By: _KEVIN J. PERRY_
Title: Vice President

EXHIBIT A

NAME OF INSTITUTION:

The Loomis Sayles Senior Loan Fund II LLC

By:   Please See Following Page             
       Name:
       Title:

EXHIBIT A

THE LOOMIS SAYLES SENIOR LOAN FUND II LLC
By: Loomis, Sayles & Company, L.P., *Its Managing Member*
By: Loomis, Sayles & Company, Inc., *Its General Partner*

By: Kevin J. Perry
Title: Vice President

**EXHIBIT A**

Navigare Funding I CLO, Ltd

By: Navigare Partners LLC, its Collateral
Manager

By: _____

    Name:  Joel Serebransky
    Title: Managing Director

EXHIBIT A

Navigare Funding II CLO, Ltd

By: Navigare Partners LLC, as Collateral Manager

By: _____
     Name:  Joel Serebransky
     Title: Managing Director

EXHIBIT A

ARCHIMEDES FUNDING IV (CAYMAN), LTD.

By:  West Gate Horizons Advisors LLC,
     as Collateral Manager

By:  _____
Name   Cheryl Wasilewski
Title:   Senior Credit Analyst

EXHIBIT A

OCEAN TRAILS CLO II

By: West Gate Horizons Advisors LLC,
   as Manager

By: _____

Name    Cheryl Wasilewski
Title:    Senior Credit Analyst

EXHIBIT A

**ENDURANCE CLO I, LTD.**

c/o:   West Gate Horizons Advisors LLC,
        as Collateral Manager

By:

Name    Cheryl Wasilewski
Title:    Senior Credit Analyst

EXHIBIT A

[NAME OF LENDER] Lime Street CLO, Ltd.

By: _____
Name: D. Ian Dreeff
Title: Authorized Signatory

**EXHIBIT A**

NAME OF INSTITUTION: _____

Feingold O'Keeffe Credit Fund CBNA Loan Funding LLC

By: _____
Name: _____
Title: **Jeff Parkinson**
**Attorney-in-fact**

EXHIBIT A

## WAIVER AND AMENDMENT NO. 3 TO FIRST LIEN CREDIT AGREEMENT

WAIVER AND AMENDMENT NO. 3 (this "**Waiver and Amendment**") dated as of March 31, 2008, to the First Lien Credit Agreement dated as of December 5, 2005 (as heretofore amended, the "**Credit Agreement**") among RPG HOLDINGS, INC. ("**Holdings**"), RECYCLED PAPER GREETINGS, INC. (successor by merger to RPG Acquisition Corp.) (the "**Borrower**"), the other Loan Parties party hereto, the LENDERS party hereto, and CREDIT SUISSE, CAYMAN ISLANDS BRANCH, as administrative agent (the "**Administrative Agent**") and collateral agent (the "**Collateral Agent**").

### W I T N E S S E T H:

WHEREAS, Holdings and the Borrower have informed the Administrative Agent and the Lenders that (a) Holdings and the Borrower breached or will breach Section 6.11 of the Credit Agreement by failing to satisfy the Interest Coverage Ratio test for the period of four consecutive fiscal quarters ending April 25, 2008, (b) Holdings and the Borrower breached or will breach Section 6.12 of the Credit Agreement by failing to satisfy the Leverage Ratio test for the periods of four consecutive fiscal quarters ending January 25, 2008 and April 25, 2008, (c) Holdings and the Borrower breached or will breach Section 6.13 of the Credit Agreement by failing to satisfy the First Lien Leverage Ratio test for the periods of four consecutive fiscal quarters ending January 25, 2008 and April 25, 2008, and (d) Holdings and the Borrower breached or will breach Section 6.15 of the Credit Agreement by failing to satisfy the Fixed Charge Coverage Ratio test for the periods of four consecutive fiscal quarters ending January 25, 2008 and April 25, 2008 (the Events of Default described in clauses (a), (b), (c) and (d) are herein referred to as the "**Specified Events of Default**");

WHEREAS, Holdings and the Borrower have requested that the Administrative Agent and the Required Lenders temporarily waive the Specified Events of Default, effective during the Waiver Period (as defined below); and

WHEREAS, the parties hereto further desire to amend certain provisions of the Credit Agreement as provided herein;

NOW, THEREFORE, the parties hereto agree as follows:

**SECTION 1.** *Defined Terms; References.* Unless otherwise specifically defined herein, including in the Preamble hereof, each term used herein which is defined in the Credit Agreement has the meaning assigned to such term in the Credit Agreement. As used herein, the following terms shall have the respective meanings set forth below:

"**Cash Flow Forecast**" shall mean a 13-week cash flow forecast prepared by the Borrower in a form and with detail reasonably acceptable to the Administrative Agent and reflecting the Borrower's good faith projection of all cash receipts and disbursements in connection with the operation of its business in the 13-week period beginning on the first day of the week of delivery thereof.

"**Releasees**" shall mean all of the Administrative Agent and the Lenders in their capacity as Lenders and their respective affiliates, subsidiaries, shareholders and "controlling

EXHIBIT A

persons" (within the meaning of the federal securities laws), and their respective successors and assigns and each and all of the officers, directors, employees, agents, attorneys and other representatives of each of the foregoing in their capacities as such.

"**Releasors**" shall mean each Loan Party, its agents, representatives, officers, directors, advisors, employees, subsidiaries, affiliates, successors and assigns.

"**Second Lien Waiver and Amendment**" shall mean an amendment substantially similar to this Waiver and Amendment (to the extent relevant thereto) to the Second Lien Credit Agreement, in form and substance satisfactory to the Administrative Agent.

"**Waiver and Amendment Effective Date**" shall mean the date on which the conditions precedent set forth in Section 8 hereof shall have been met (or duly waived).

"**Waiver Default**" shall mean any of the following: (i) the occurrence of an Event of Default other than a Specified Event of Default, (ii) the failure of any Loan Party to timely comply with any term, condition or covenant set forth in this Waiver and Amendment and such failure remains unremedied for 2 Business Days, or (iii) the failure of any representations and warranties made by any Loan Party in this Waiver and Amendment to be true and correct in any material respect when made.

"**Waiver Period**" shall mean the period from the Waiver and Amendment Effective Date through the earlier of (i) April 28, 2008 (or June 13, 2008 if (x) after the Waiver and Amendment Effective Date and on or prior to April 28, 2008, the Borrower shall have received a contribution to capital in cash in an amount sufficient to pay accrued and unpaid interest payable in cash in accordance with the terms of the Second Lien Credit Agreement (but excluding for the avoidance of doubt the additional interest charged pursuant to Section 3 of the Second Lien Waiver and Amendment) in respect of the Second Lien Credit Agreement through April 30, 2008 and (y) no payment of interest shall be due and payable in respect of the Second Lien Credit Agreement after April 30, 2008 and on or prior to June 13, 2008) and (ii) the date when a Waiver Default has occurred.

Each reference to "hereof", "hereunder", "herein" and "hereby" and each other similar reference and each reference to "this Agreement" and each other similar reference contained in the Credit Agreement shall, after the amendments herein become effective, refer to the Credit Agreement as amended hereby.

**SECTION 2.** *Waiver.* **(a)** Effective as of the Waiver and Amendment Effective Date, and for the duration, and only for the duration, of the Waiver Period, the Administrative Agent and the Required Lenders hereby agree to waive the Specified Events of Default.

*(b)* During the Waiver Period, the Revolving Credit Lenders shall continue to make Loans and other extensions of credit to the Borrower and the Issuing Bank shall continue to issue, renew, amend and extend Letters of Credit; *provided* that the aggregate amount of Revolving Loan Borrowings plus the face amount of Letters of Credit issued during the Waiver Period shall not exceed (i) $3,000,000 through April 28, 2008 or (ii) to the extent the Waiver Period is extended beyond April 28, 2008, $4,500,000 through June 13, 2008. Notwithstanding clause (viii) of Section 2.10 of the Credit Agreement, the Borrower shall have the right, during the Waiver Period, to continue Eurodollar Borrowings or convert ABR Borrowings into

2

EXHIBIT A

Eurodollar Borrowings in accordance with the provisions of Section 2.10 of the Credit Agreement.

    *(c)*    Upon the expiration of the Waiver Period, the agreement of the Administrative Agent and the Lenders hereunder to waive the Specified Events of Default shall immediately terminate without the requirement of any demand, presentment, protest, or notice of any kind to any Loan Party (all of which each Loan Party waives). Each of the Loan Parties agrees that any or all of the Administrative Agent and the Lenders may at any time thereafter proceed to exercise any and all of their respective rights and remedies under the Loan Documents or applicable law, including, without limitation, their respective rights and remedies with respect to the Specified Events of Default.

    *(d)*    The parties hereto agree that the running of all statutes of limitation or doctrine of laches applicable to all claims or causes of action that the Administrative Agent or any Lender may be entitled to take or bring in order to enforce its rights and remedies against any Loan Party is, to the fullest extent permitted by law, tolled and suspended during the Waiver Period.

    *(e)*    Each of the Loan Parties acknowledges and agrees that any Loan or other financial accommodation which any Lender makes during the Waiver Period has been made by such party in reliance upon, and is consideration for, among other things, the general releases and indemnities contained in Section 5 hereof and the other covenants, agreements, representations and warranties of the Loan Parties hereunder.

    **SECTION 3.** *Additional Interest; Payment Date.* Notwithstanding anything to the contrary in Section 2.07 of the Credit Agreement, commencing as of February 1, 2008 and until the termination of the Waiver Period, the Borrower shall pay interest, to the extent permitted by law, on the outstanding principal amount of the Loans (and with respect to past accruals, the outstanding principal amount of the Loans shall be deemed to bear interest) at a rate per annum (computed on the basis of the actual number of days elapsed over a year of 365 or 366 days, as the case may be, when the Alternate Base Rate is determined by reference to the Prime Rate, and over a year of 360 days at all other times) equal to the rate that would be applicable to the Loans plus 2.00% on the Interest Payment Dates applicable to such Loans. Notwithstanding anything to the contrary in the Credit Agreement, all accrued and unpaid interest in respect of the Loans shall be due and payable on June 12, 2008, and such date shall be deemed to be an Interest Payment Date and the last day of an Interest Period.

    **SECTION 4.** *Covenants.* During the Waiver Period, the Borrower shall deliver the following documents to the Administrative Agent for distribution to each Lender: (i) no later than Wednesday of each week (or, if such day is not a Business Day, on the immediately succeeding Business Day), a Cash Flow Forecast and a report, in a form and in detail reasonably acceptable to the Administrative Agent, comparing the Borrower's actual cash receipts and disbursements for the immediately preceding week to the projected cash receipts and disbursements for such week as set forth in the Cash Flow Forecast, (ii) on or prior to April 16, 2008, a revised business plan through April 30, 2011 (reviewed and recommended by the Borrower's management) in a form and with detail reasonably acceptable to the Administrative Agent, together with supporting financial projections and other information in support thereof, (iii) on or prior to April 23, 2008, a reasonably detailed written summary of the terms of proposed modifications to the Credit Agreement and the Second Lien Credit Agreement and the

KL2 2550638.9

EXHIBIT A

terms of any capital infusion, and (iv) such other information as the Administrative Agent may reasonably request.

**SECTION 5.** *General Release; Indemnity. (a)* IN CONSIDERATION OF, AMONG OTHER THINGS, THE ADMINISTRATIVE AGENT'S AND THE REQUIRED LENDERS' EXECUTION AND DELIVERY OF THIS WAIVER AND AMENDMENT, EACH OF THE RELEASORS HEREBY FOREVER AGREES AND COVENANTS NOT TO SUE OR PROSECUTE AGAINST ANY RELEASEE AND HEREBY FOREVER WAIVES, RELEASES AND DISCHARGES, TO THE FULLEST EXTENT PERMITTED BY LAW, EACH RELEASEE FROM ANY AND ALL CLAIMS THAT SUCH RELEASOR NOW HAS OR HEREAFTER MAY HAVE, OF WHATSOEVER NATURE AND KIND, WHETHER KNOWN OR UNKNOWN, WHETHER NOW EXISTING OR HEREAFTER ARISING, WHETHER ARISING AT LAW OR IN EQUITY, AGAINST THE RELEASEES, BASED IN WHOLE OR IN PART ON FACTS, WHETHER OR NOT NOW KNOWN, EXISTING ON OR BEFORE THE WAIVER AND AMENDMENT EFFECTIVE DATE, THAT RELATE TO, ARISE OUT OF OR OTHERWISE ARE IN CONNECTION WITH: (I) ANY OR ALL OF THE LOAN DOCUMENTS OR TRANSACTIONS CONTEMPLATED THEREBY OR ANY ACTIONS OR OMISSIONS IN CONNECTION THEREWITH; OR (II) ANY ASPECT OF THE DEALINGS OR RELATIONSHIPS BETWEEN OR AMONG THE LOAN PARTIES, ON THE ONE HAND, AND ANY OR ALL OF THE ADMINISTRATIVE AGENT AND THE LENDERS, ON THE OTHER HAND, RELATING TO ANY OR ALL OF THE DOCUMENTS, TRANSACTIONS, ACTIONS OR OMISSIONS REFERENCED IN CLAUSE (I) HEREOF. THE RECEIPT BY ANY LOAN PARTY OF ANY LOANS OR OTHER FINANCIAL ACCOMMODATIONS MADE BY ANY LENDER AFTER THE DATE HEREOF DURING THE WAIVER PERIOD OR SO LONG AS ANY EVENT OF DEFAULT IS CONTINUING SHALL CONSTITUTE A RATIFICATION, ADOPTION, AND CONFIRMATION BY SUCH PARTY OF THE FOREGOING GENERAL RELEASE OF ALL CLAIMS AGAINST THE RELEASEES WHICH ARE BASED IN WHOLE OR IN PART ON FACTS, WHETHER OR NOT NOW KNOWN OR UNKNOWN, EXISTING ON OR PRIOR TO THE DATE OF RECEIPT OF ANY SUCH LOANS OR OTHER FINANCIAL ACCOMMODATIONS. IN ENTERING INTO THIS WAIVER AND AMENDMENT, EACH LOAN PARTY CONSULTED WITH, AND HAS BEEN REPRESENTED BY, LEGAL COUNSEL AND EXPRESSLY DISCLAIMS ANY RELIANCE ON ANY REPRESENTATIONS, ACTS OR OMISSIONS BY ANY OF THE RELEASEES AND HEREBY AGREES AND ACKNOWLEDGES THAT THE VALIDITY AND EFFECTIVENESS OF THE RELEASES SET FORTH ABOVE DO NOT DEPEND IN ANY WAY ON ANY SUCH REPRESENTATIONS, ACTS OR OMISSIONS OR THE ACCURACY, COMPLETENESS OR VALIDITY HEREOF. THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE TERMINATION OF THIS WAIVER AND AMENDMENT, ANY LOAN DOCUMENT AND PAYMENT IN FULL OF THE OBLIGATIONS UNDER THE LOAN DOCUMENTS.

*(b)* EACH LOAN PARTY HEREBY AGREES THAT IT SHALL BE JOINTLY AND SEVERALLY OBLIGATED TO INDEMNIFY AND HOLD THE RELEASEES HARMLESS WITH RESPECT TO ANY AND ALL LIABILITIES, OBLIGATIONS, LOSSES, PENALTIES, ACTIONS, JUDGMENTS, SUITS, COSTS, EXPENSES OR DISBURSEMENTS OF ANY KIND OR NATURE WHATSOEVER INCURRED BY THE RELEASEES, OR ANY OF THEM, WHETHER DIRECT, INDIRECT OR

4

EXHIBIT A

CONSEQUENTIAL, AS A RESULT OF OR ARISING FROM OR RELATING TO ANY PROCEEDING BY, OR ON BEHALF OF ANY PERSON, INCLUDING, WITHOUT LIMITATION, THE RESPECTIVE OFFICERS, DIRECTORS, AGENTS, TRUSTEES, CREDITORS, PARTNERS OR SHAREHOLDERS OF ANY LOAN PARTY, OR ANY OF THEIR RESPECTIVE SUBSIDIARIES, WHETHER THREATENED OR INITIATED, IN RESPECT OF ANY CLAIM FOR LEGAL OR EQUITABLE REMEDY UNDER ANY STATUTE, REGULATION OR COMMON LAW PRINCIPLE ARISING FROM OR IN CONNECTION WITH THE NEGOTIATION, PREPARATION, EXECUTION, DELIVERY, PERFORMANCE, ADMINISTRATION AND ENFORCEMENT OF THE LOAN DOCUMENTS, THIS WAIVER AND AMENDMENT OR ANY OTHER DOCUMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH; PROVIDED, THAT NO LOAN PARTY SHALL HAVE ANY OBLIGATION TO INDEMNIFY OR HOLD HARMLESS ANY RELEASEE HEREUNDER WITH RESPECT TO LIABILITIES TO THE EXTENT THEY RESULT FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THAT RELEASEE AS FINALLY DETERMINED BY A COURT OF COMPETENT JURISDICTION. IF AND TO THE EXTENT THAT THE FOREGOING UNDERTAKING MAY BE UNENFORCEABLE FOR ANY REASON, EACH LOAN PARTY AGREES TO MAKE THE MAXIMUM CONTRIBUTION TO THE PAYMENT AND SATISFACTION THEREOF WHICH IS PERMISSIBLE UNDER APPLICABLE LAW. THE FOREGOING INDEMNITY SHALL SURVIVE THE TERMINATION OF THIS WAIVER AND AMENDMENT, ANY LOAN DOCUMENT AND THE PAYMENT IN FULL OF THE OBLIGATIONS UNDER THE LOAN DOCUMENTS.

*(c)*     EACH LOAN PARTY, ON BEHALF OF ITSELF AND ITS SUCCESSORS, ASSIGNS, AND OTHER LEGAL REPRESENTATIVES, HEREBY ABSOLUTELY, UNCONDITIONALLY AND IRREVOCABLY, COVENANTS AND AGREES WITH AND IN FAVOR OF EACH RELEASEE THAT IT WILL NOT SUE (AT LAW, IN EQUITY, IN ANY REGULATORY PROCEEDING OR OTHERWISE) ANY RELEASEE ON THE BASIS OF ANY CLAIM RELEASED, REMISED AND DISCHARGED BY ANY LOAN PARTY PURSUANT TO THIS SECTION. IF ANY LOAN PARTY OR ANY OF ITS SUCCESSORS, ASSIGNS OR OTHER LEGAL REPRESENTATIVES VIOLATES THE FOREGOING COVENANT, EACH LOAN PARTY, FOR ITSELF AND ITS SUCCESSORS, ASSIGNS AND LEGAL REPRESENTATIVES, AGREES TO PAY, IN ADDITION TO SUCH OTHER DAMAGES AS ANY RELEASEE MAY SUSTAIN AS A RESULT OF SUCH VIOLATION, ALL ATTORNEYS' FEES AND COSTS INCURRED BY ANY RELEASEE AS A RESULT OF SUCH VIOLATION.

**SECTION 6.** *Representations Correct; No Default.* The Borrower represents and warrants that (i) the representations and warranties contained in the Loan Documents (other than the representations and warranties set forth in Sections 3.06 and 3.24 of the Credit Agreement) are true and correct in all material respects on and as of the date hereof and will be true and correct in all material respects on and as of the Waiver and Amendment Effective Date (as defined below), except to the extent that such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects on and as of such earlier date and (ii) except for the Specified Defaults, no Waiver Default, Default or Event of Default has occurred and is continuing on the date hereof or will occur or be continuing on the Waiver and Amendment Effective Date.

KL2 2550638.9

EXHIBIT A

**SECTION 7.** *Counterparts.* This Amendment may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

**SECTION 8.** *Effectiveness.* **(a)** This Waiver and Amendment shall become effective on the Waiver and Amendment Effective Date when the following conditions are met:

> (i)    the Administrative Agent shall have received from each of Holdings, the Borrower, the other Loan Parties party hereto and the Required Lenders a counterpart hereof signed by such party or facsimile or other written confirmation (in form satisfactory to the Administrative Agent) that such party has signed a counterpart hereof;

> (ii)    the Administrative Agent shall have received evidence satisfactory to it that the Second Lien Waiver and Amendment shall have become effective; and

> (iii)    the Administrative Agent shall have received from the Borrower, concurrently with the occurrence of the Waiver and Amendment Effective Date, payment in cash from proceeds of Revolving Loans borrowed on the Waiver and Amendment Effective Date for all accrued and unpaid interest in respect of the Credit Agreement through the Waiver and Amendment Effective Date.

Notwithstanding anything to the contrary in the Credit Agreement, the payment made pursuant to clause (iii) hereof shall be applied for accrued and unpaid interest in respect of the Credit Agreement and for no other purpose.

**(b)**    Except as expressly set forth herein, the amendments contained herein shall not constitute a waiver or amendment of any term or condition of the Credit Agreement or any other Loan Document, and all such terms and conditions shall remain in full force and effect and are hereby ratified and confirmed in all respects.

**SECTION 9.** *Costs and Expenses.* The Borrower agrees to reimburse the Administrative Agent and the Lenders for all out-of-pocket costs and expenses of the Administrative Agent and the Lenders relating to this Waiver and Amendment and the restructuring of the liabilities of Holdings, the Borrower and its Subsidiaries (it being intended that during the Waiver Period the Administrative Agent and the Lenders shall be represented by a single firm, Kramer Levin Naftalis & Frankel LLP, and a single financial advisor, Conway Del Genio Gries & Co., LLC), and such other costs and expenses to the extent required by the Credit Agreement, including without limitation pursuant to Section 9.05 of the Credit Agreement.

**SECTION 10.** *Governing Law.* THIS WAIVER AND AMENDMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

*[Signature pages follow]*

KL2 2550638.9

EXHIBIT A

IN WITNESS WHEREOF, the parties hereto have caused this Waiver and Amendment to be duly executed by their respective authorized officers as of the date and year first above written.

RPG HOLDINGS, INC.

By: _____

Name: ED STASSEN

Title: CFO

RECYCLED PAPER GREETINGS, INC.

By: _____

Name: ED STASSEN

Title: CFO

RECYCLED PAPER GREETINGS CANADA, INC.

By: _____

Name: ED STASSEN

Title: CFO

~~BARNYARD INDUSTRIES, INC.~~

~~By:~~ _____

~~Name:~~ _____

~~Title:~~ _____

KL2 2550638.9

EXHIBIT A

CREDIT SUISSE, CAYMAN ISLANDS
BRANCH, as Administrative Agent and
Lender

By: _____

Name: ROBERT HETU
Title: MANAGING DIRECTOR

By: _____

Name:
Title: JOHN D. TORONTO
DIRECTOR

KL2 2350638.9

EXHIBIT A

ACA CLO 2005-1, Limited

[NAME OF LENDER]

By: _____

Name:
Title:      Vincent Ingato
            Managing Director

            ACA Management, LLC as
            Investment Advisor

EXHIBIT A

**ACA CLO 2006 - 1 Limited**

[NAME OF LENDER]

By: _____

    Name:
    Title:    **Vincent Ingato**
              **Managing Director**

          **ACA Management, LLC as**
             **Investment Advisor**

**EXHIBIT A**

**ACA CLO 2006 - 2, Limited**

**[NAME OF LENDER]**

By: _____

Name:

Title: **Vincent Ingato**
**Managing Director**

**ACA Management, LLC as**
**Investment Advisor**

**EXHIBIT A**

Madison Park Funding IV, Ltd.

By: _____

      Name:

      Title:        **THOMAS FLANNERY**
                      **AUTHORIZED SIGNATORY**

**EXHIBIT A**

**Castle Garden Funding**

By: _____

Name: _____

Title:            THOMAS FLANNERY
              AUTHORIZED SIGNATORY

**EXHIBIT A**

**Madison Park Funding II, Ltd.**

By: _____

Name:  THOMAS FLANNERY
Title:  AUTHORIZED SIGNATORY

KL2 2590638 9

**Madison Park Funding III, Ltd.**

By: _____

      Name:
      Title:      **THOMAS FLANNERY**
                  **AUTHORIZED SIGNATORY**

**EXHIBIT A**

**Atrium V**

By: _____

Name:      THOMAS FLANNERY
Title:      AUTHORIZED SIGNATORY

KL2 2530638.9

**EXHIBIT A**

GLADSTONE BUSINESS INVESTMENT, LLC, A
    DELEWARE LIMITED LIABILITY
    COMPANY, AS SUCCESSOR-IN-INTEREST
    TO GLADSTONE INVESTMENT
    CORPORATION, A DELEWARE COMPANY,
    as a Lender

By: _____

    Name: John Sateri
    Title: Managing Director

**EXHIBIT A**

FOXE BASIN CLO 2003, LTD.
By: GSO Debt Funds Management LLC as Collateral
Manager

By: _____

Name:     SANJAI BHONSLE

Title:     AUTHORIZED SIGNATORY

EXHIBIT A

Gale Force 1 CLO, Ltd.
By: GSO Debt Funds Management LLC as Collateral
Manager

By: _____

Name:    **SANJAI BHONSLE**

Title:    **AUTHORIZED SIGNATORY**

EXHIBIT A

HUDSON STRAITS CLO 2004, LTD.
By: GSO Debt Funds Management LLC as Collateral
Manager

By: _____
Name:    **SANJAI BHONSLE**
Title:    **AUTHORIZED SIGNATORY**

EXHIBIT A

**1888 FUND, LTD.**

By: _____

Name: KAITLIN TRINN

Title: DIRECTOR

EXHIBIT A

**COPPER RIVER CLO LTD.**

By: _____

Name: KAITLIN TRINH
Title: DIRECTOR

EXHIBIT A

**GREEN LANE CLO LTD.**

By: _____

Name: KAITLIN TRINH
Title:   DIRECTOR

EXHIBIT A

**KENNECOTT FUNDING LTD.**

By: _____

Name: KAITLIN TRINH

Title:  DIRECTOR

EXHIBIT A

LFC2 Loan Funding LLC

By: _____

Name:

Title:

Brian Schott
Attorney-in-fact

**EXHIBIT A**

**SANDS POINT FUNDING LTD.**

By: _____

Name: KAITLIN TRINH

Title:  DIRECTOR

EXHIBIT A

**WHITNEY PRIVATE DEBT FUND, L.P.**

By: _____

Name:  Michael C. Salvator
Title:    Authorized Signatory

EXHIBIT A

**Clear Lake CLO, Ltd.**

By: _____

Name: Bradley K. Bryan

Title: SVP

EXHIBIT A

**Diamond Lake CLO, Ltd.**

By: _____

Name: Bradley K. Bryan
Title: SVP

**EXHIBIT A**

**St. James River CLO, Ltd.**

By: _Bradley K. Bryan_

Name: Bradley K. Bryan
Title: SVP

EXHIBIT A

**Summit Lake CLO, Ltd.**

By: _Bradley K. Bryan_

Name: Bradley K. Bryan
Title: SVP

EXHIBIT A

Victoria Falls CLO, Ltd.

By: _____

Name: Bradley K. Bryan

Title: SVP

EXHIBIT A

Grand Central Asset Trust, CMF Series

By: _____

Name:    **Valerie Opperman**
Title:    **AS ATTORNEY-IN-FACT**

**EXHIBIT A**

APOSTLE LOOMIS SAYLES SENIOR LOAN FUND,
As Lender

By:    Loomis, Sayles & Company, L.P.,
       Its Investment Manager

By:    Loomis, Sayles & Company, Incorporated,
       Its General Partner

By:    _____

       Name:    John R. Bell
       Title:    Vice President

EXHIBIT A

LENDER:

CONFLUENT 4 LIMITED,
As Lender

By: Loomis, Sayles & Company, L.P.,
As Sub-Manager

By: Loomis, Sayles & Company, Incorporated,
Its General Partner

By:

By:    Kevin J. Perry
Title: Vice President

EXHIBIT A

LOOMIS SAYLES CLO I, LTD.
By Loomis, Sayles and Company, L.P.
*its collateral manager*
By Loomis, Sayles and Company, Inc.
*its general partner*

By: _____

Name: Kevin P. Charleston
Title: Executive Vice President

**EXHIBIT A**

THE LOOMIS SAYLES SENIOR LOAN FUND, LLC
By Loomis Sayles and Company, L.P.
      *its manager*
By Loomis Sayles and Company, Inc.
      *its general partner*

By: _Kevin J. Perry_
Title: Vice President

EXHIBIT A

NATIXIS LOOMIS SAYLES SENIOR LOAN FUND,
As Lender

By: Loomis, Sayles and Company, L.P.,
    Its Manager

By: Loomis, Sayles and Company, Inc.,
    Its General Partner

By: _____
    Name:  John R. Bell
    Title:    Vice President

**EXHIBIT A**

THE LOOMIS SAYLES SENIOR LOAN FUND II LLC
By: Loomis, Sayles & Company, L.P., *Its Managing Member*
By: Loomis, Sayles & Company, Inc., *Its General Partner*


By: Kevin J. Perry
Title: Vice President

**EXHIBIT A**

ARCHIMEDES FUNDING IV (CAYMAN), LTD.

By: West Gate Horizons Advisors LLC,
    as Collateral Manager

By: _____

Name:   CHERYL A. WASILEWSKI
Title:    SENIOR CREDIT ANALYST


ENDURANCE CLO I, LTD.

By: West Gate Horizons Advisors LLC,
    as Portfolio Manager

By: _____

Name:   CHERYL A. WASILEWSKI
Title:    SENIOR CREDIT ANALYST


OCEAN TRAILS CLO II

By: West Gate Horizons Advisors LLC,
    as Investment Manager

By: _____

Name:   CHERYL A. WASILEWSKI
Title:    SENIOR CREDIT ANALYST


WG HORIZONS CLO I

By: West Gate Horizons Advisors LLC,
    as Manager

By: _____

Name:   CHERYL A. WASILEWSKI
Title:    SENIOR CREDIT ANALYST

EXHIBIT A