FILED C4

AUG 06 2008 rw
AUG 0 6 2008

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| RPG INVESTMENT HOLDINGS, LLC, a Delaware Limited Liability Company, | ) ) ) |  |
|  | ) |  |
| Plaintiff, | ) ) | Case No. 08 CV 4422 Judge Wayne R. Andersen |
| v. | ) ) | Magistrate Judge Maria Valdez |
|  | ) |  |
| AMERICAN GREETINGS CORP., an Ohio Corporation, | ) ) | JURY DEMAND |
|  | ) |  |
| Defendant. | ) |  |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
## EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER

The Plaintiff, RPG Investment Holdings, LLC ("RPGI"), seeks a temporary restraining order barring the Defendant, American Greetings Corp. ("AG"), a competitor, from: (1) using loan obligations, which AG acquired in violation of a written confidentiality agreement in any manner that would be detrimental to RPGI and its affiliates, RPG Holdings, Inc. ("RPG Holdings") and Recycled Paper Greetings, Inc. ("RPG")(collectively RPG Holdings and RPG are referred to as the "affiliates"); (2) exploiting its position as a holder of that debt to exercise control over RPGI and its affiliates; (3) using the wrongfully acquired debt to obtain RPGI's and its affiliates' confidential information; (4) purchasing any additional debt in violation of the confidentiality agreement; and (5) interfering with the RPGI's and its affiliates' efforts to restructure debt obligations.

As demonstrated below, RPGI meets the standard for the entry of a temporary restraining order and for a preliminary injunction.

## FACTUAL BACKGROUND

A statement of the facts is contained in the Complaint and in the Affidavit of Charles Yoon (attached as Exhibit 1). Rather than repeating those facts, RPGI incorporates them into this Memorandum.

## ARGUMENT

In order to obtain an injunction, the moving party must show that: (1) it is likely to succeed on the merits of its claims; (2) it has no adequate remedy at law; and (3) it faces a threat of irreparable harm absent an injunction. Foodcomm Int'l v. Barry, 328 F.3d 300, 303 (7th Cir. 2003); AlliedSignal, Inc. v. B.F. Goodrich Co., 183 F.3d 568, 573 (7th Cir. 1999). Once these requirements are shown, the Court evaluates the balance of harms to the parties and the public interest: if the harm the plaintiff will suffer absent an injunction outweighs the harm to the Defendant and the public interest if the injunction issues, the Court must issue the injunction. AlliedSignal, Inc., 183 F.3d at 573; Storck v. Farley Candy Co., 14 F.3d 311, 314 (7th Cir. 1994). The court weighs all these factors employing a sliding-scale approach: the more likely it is the plaintiff will succeed on the merits, the less the balance of harms need weigh in its favor. Abbott Labs v. Mead Johnson & Co., 971 F.2d 6, 12 (7th Cir. 1992).

## I.    RPGI IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS.

RPGI asserts claims for: Breach of Contract (Count I); Specific Performance of Contractual Obligations (Count II); and Tortious Interference with Contractual and Beneficial Relations (Count III). RPGI is likely to succeed on each of those claims.

2

A.    **RPGI is likely to succeed on their claims for breach of contract and specific performance.**

To prevail on their breach of contract claim, RPGI must show:  (1) the existence of a valid contract; (2) a breach of the contract by AG; and (3) a resulting injury.[1]  See VLIW Tech., LLC v. Hewlett-Packard Co., 840 A.2d 606, 612 (Del. 2003).[2]  A party seeking specific performance must prove the existence and terms of an enforceable contract that does not require a court to supply meaning to the essential elements.  See McKinney Family Ltd. Partnership v. Stubbs, 931 A.2d 1006, 2007 WL 1885121, *2 (Del. July 2, 2007).  Applying these precepts, it is clear that RPGI is likely to succeed on their breach of contract and specific performance claims.

1.    **The Confidentiality Agreement is a valid and enforceable contract.**

There is no doubt that AG is a party to a valid and binding contract that should be enforced.  See West Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC, 2007 WL 3317551, *12 (Del. Ch. Nov. 2, 2007).  AG is a highly sophisticated company.  It voluntarily negotiated and executed a Confidentiality Agreement dated May 16, 2008 (the "Confidentiality Agreement"), in which it exchanged clear and unambiguous mutual promises with RPGI.  A copy of the Confidentiality Agreement is attached as Exhibit A to the Complaint (hereinafter referred to as Ex. A).

The Confidentiality Agreement, which was drafted with the assistance of counsel, provides in relevant part that:  "Without each Party's prior written consent, neither Party nor its Representatives shall . . . *make any contact of any nature* (including inquiries or requests

---

[1] Each of the substantive claims requires a plaintiff to demonstrate injury.  The harm suffered by RPGI will be addressed below in the section of the Memorandum concerning the irreparable harm to which RPGI is and will be subjected.

[2] The contract between RPGI and AG provides that it "shall be governed and construed in accordance with the laws of the State of Delaware, without regard for conflicts-of-law principles."  Nevertheless, there does not appear to be a significant difference between Delaware and Illinois law.  Under Illinois law, "[t]o state a cause of action for breach of contract a plaintiff must show: (1) the existence of a valid and enforceable contract; (2) the performance of the contract by plaintiff; (3) the breach of the contract by defendant; and (4) a resulting injury to plaintiff."  Hickox v. Bell, 195 Ill. App. 3d 976, 992, 552 N.E.2d 1133, 1143 (5th Dist. 1990)(citations omitted).

concerning Confidential Information) with any ... bank or other lender to the other Party or any of its affiliates other than in the ordinary course of such Party's business and not related in any way to such Party's consideration of a Transaction." Id. ¶8(emphasis supplied). Thus, AG voluntarily agreed, without qualification, that it would not make *any* contact with lenders to RPG unless it first obtained RPGI's or its affiliates' prior written consent. Moreover, AG expressly acknowledged that in the event of a breach of the Confidentiality Agreement RPGI and its affiliates "may be irreparably damaged" and RPGI would be entitled to seek injunctive relief. Id. ¶3. It is equally certain that the Confidentiality Agreement is supported by consideration. First Mortg. Co. of Pennsylvania v. Federal Leasing Corp., 456 A.2d 794, 795-796 (Del. 1982)("It is well settled that consideration for a contract can consist of either a benefit to the promiser or a detriment to the promisee"). As such, the Confidentiality Agreement is a valid and enforceable contract under both Delaware and Illinois law.

> **2.    AG breached the clear and definite terms of the Confidentiality Agreement.**

Likewise, there is no doubt that AG breached the clear and definite terms of the Confidentiality Agreement when, without the prior written consent of RPGI or its affiliates, it contacted RPG's lenders and purchased RPG's debt. Despite the unambiguous promise in the Confidentiality Agreement, AG -- either in its own name or using straws to act on its behalf -- contacted RPG's lenders and acquired over 50% of the senior or first tier of RPG's debt. Ex. 1, ¶¶26-28. Such conduct constitutes a clear breach of AG's obligations under the Confidentiality Agreement.

4

3.    **RPGI is entitled to Specific Performance of the Confidentiality Agreement.**

"The remedy of specific performance 'may be defined as the actual accomplishment of a contract by the party bound to fulfill it. . . . It is an equitable remedy available in appropriate circumstances to protect rights under contract.'" <u>Bali v. Christiana Care Health Services, Inc.</u>, 1999 WL 413303, *2 (Del. Ch. June 16, 1999), <u>quoting</u> <u>Potter v. Potter</u>, 251 A.2d 578, 580 (Del. Ch. 1968). AG made an unambiguous promise to refrain from having any contact with the lenders of RPGI and its affiliate, RPG. <u>See</u> Ex. A, ¶8. Moreover, AG expressly acknowledged that in the event of a breach of the Confidentiality Agreement RPGI and its affiliates "may be irreparably damaged" and RPGI or its affiliates would be entitled to seek specific performance. <u>Id.</u> ¶3. As described above, there is no doubt that the Confidentiality Agreement was a valid and binding contract. The essential terms of the Confidentiality Agreement are "clear and definite" and do not require the Court to supply any meaning to permit enforcement of AG's obligation to cease all contact with RPG's lenders. <u>See McKinney v. Stubbs</u>, 931 A.2d 1006, 2007 WL 1885121, *2. As a result, RPGI is likely to prevail on its claim for specific performance of the Confidentiality Agreement.

B.    <u>AG Tortiously Interfered with RPGI's Beneficial Relations.</u>

"Illinois recognizes actions for tortious interference with prospective economic advantage provided a plaintiff can establish (1) [a] reasonable expectancy of entering into a valid business relationship; (2) Defendant's knowledge of [that] expectancy; (3) Defendant's intentional interference which prevents [the] expectancy from ripening into a valid business relationship; and (4) damages to plaintiff as a result of such interference." <u>Malatesta v. Leichter</u>, 186 Ill. App. 3d 602, 613, 542 N.E.2d 768, 777 (1st Dist. 1989).

5

1. **RPGI had a reasonable expectancy of advantageous relations with RPG's lenders.**

A reasonable expectation of advantageous relations "is not dependent upon an enforceable contract but, rather, upon an existing relationship." Dowd and Dowd, Ltd. v. Gleason, 284 Ill. App. 3d 915, 930, 672 N.E.2d 854, 865 (1st Dist. 1996), aff'd in relevant part, 181 Ill.2d 460, 485, 693 N.E.2d 358, 371 (1998). As such, Courts generally conclude that plaintiffs have a reasonable expectation that their existing business relationships will continue to provide economic advantage in the future. See Id., 284 Ill. App. 3d at 930, 672 N.E.2d at 865 (law firm had a reasonable expectation of prospective economic advantage with a client based on the firm's past relationship).

A court may also find that a plaintiff's expectation of prospective economic advantage was reasonable based on the defendant's decision to usurp the plaintiff's business plan. In River Park, Inc. v. City of Highland Park, 281 Ill. App. 3d 154, 166-67, 667 N.E.2d 499, 507 (2d Dist. 1996), overruled on other grounds by Village of Bloomingdale v. CDG Enterprises, Inc., 196 Ill.2d 484, 752 N.E.2d 1090, (2001), the plaintiff alleged that, after obtaining initial approval to develop its land into a golf community, the city used dilatory tactics to cause the plaintiff's development permit to lapse and force the plaintiff into bankruptcy. Thereafter, the city purchased the plaintiff's land at a price below the market value and developed the property according to the plaintiff's plans. Based on the plaintiff's existing relationships and on the defendant's decision to use the plaintiff's plan to gain an economic advantage, the Court concluded that the plaintiff had a reasonable expectation of prospective economic advantage. See Id., 281 Ill. App. 3d at 166-167, 667 N.E.2d at 507.

Applying these precepts, it is clear that RPGI and its affiliates had a reasonable expectation that they would continue their existing advantageous relationships with RPG's

lenders and obtain an economic advantage through restructuring RPG's debt. Before AG's wrongful interference, RPGI, its affiliates, and RPG's lenders were in the process of restructuring the terms of their credit agreements. Ex.1, ¶¶14, 29. Before AG's breach, RPGI and its affiliates had the reasonable expectation that they would be able to achieve mutually agreeable restructuring deals with RPG's lenders and that, once achieved, the restructured lending relationships would allow RPG to continue going forward successfully as an independently-operated and owned greeting card company. Id. ¶¶23, 29. RPG's lenders, not being competitors of RPG, had a strong interest in developing a restructuring plan that would permit RPG to continue to operate as a successful business and thereby to repay RPG's obligations. Indeed, the viability of a restructuring plan that would reduce RPG's overall debt is perhaps best evidenced by AG's ability to purchase RPG's debt at reduced, albeit above-market, rates.

Unquestionably, RPGI and its affiliates had a reasonable expectancy of continuing their existing advantageous business relations with RPG's lenders and AG interfered, in violation of both the Confidentiality Agreement with those relationships. See Gleason, 284 Ill. App. 3d at 930, 672 N.E.2d at 865; Fishman v. Estate of Wirtz, 807 F.2d 520, 547 (7th Cir.1986).

> ### 2.    AG had actual knowledge of RPGI's and its affiliates' expectation of entering into advantageous restructuring agreements with RPG's lenders.

AG was aware of RPGI's and its affiliates' advantageous relations with RPG's lenders. Ex. 1, ¶¶15, 21. Before agreeing to meet with AG, RPGI insisted on an agreement that would prohibit AG from even *contacting* RPG's lenders. Id. ¶¶10, 12-14. Put bluntly, the Plaintiffs were unwilling to take the risk that, if discussions with AG failed, AG would use its vast resources to interfere with RPGI's and its affiliates' lending relationships. Id. ¶16. Protecting

RPGI and its affiliates from that unpalatable result was a critical purpose of the Confidentiality Agreement. It was the primary reason RPGI entered into the Confidentiality Agreement and AG was so advised. Id. ¶¶13-14.

During the meeting with AG, RPGI advised AG that they expected to restructure the debt with RPG's lenders in a manner that would be beneficial to both RPGI and its affiliates, and the lenders. Id. ¶¶21, 23. AG was advised also that RPGI's and its affiliates' beneficial relationships with the lenders, and the ability to effectively manage RPG's debt, were critical to their continued success. Id. ¶15. In response, and in addition to the plain language of the Confidentiality Agreement, RPGI received express assurances from AG that it would not interfere with their relationships with RPG's lenders or the efforts to restructure RPG's debt. Id. ¶24. Thus, there is no question that AG was aware of RPGI's and its affiliates' advantageous relations with RPG's lenders and of their reasonable expectation of continuing those advantageous relations.

### 3. AG, in violation of the Confidentiality Agreement, interfered with RPGI's and its affiliates' beneficial relations with RPG's lenders.

Intentional interference with the advantageous relations of a competitor is improper and unlawful when it is accomplished through "wrongful means" or creates "an unlawful restraint of trade." See Fishman, 807 F.2d at 546-547; Karlberg European Transp., Inc. v. Vertriebsgesellschaft, 1991 WL 352524, *8-9 (N.D.Ill. Sept. 30, 1991). AG's intentional interference with RPGI's and its affiliates' reasonable expectation of continued advantageous relations with RPG's lenders is unlawful and tortious under both standards.

AG's intentional interference with RPGI's and its affiliates' relations with RPG's lenders was in direct violation of the Confidentiality Agreement. See Ex. A, ¶¶8, 16("Confidential Information" may not be used to "obtain a competitive advantage over the other party."). AG's

breach is preventing RPGI and its affiliates from negotiating necessary restructuring plans and is severely limiting RPGI's and its affiliates' ability and options to restructure RPG's remaining debt. AG's breach also artificially inflated the value of RPG's debt, and thereby prevented RPGI and its affiliates from restructuring that debt on the far more advantageous terms that were most likely available before AG's interference. On these facts, RPGI is not only likely but virtually certain to succeed on the merits of its tortious interference claim.

## II.   RPGI HAS NO ADEQUATE REMEDY AT LAW AND WILL SUFFER IRREPARABLE HARM IF THE INJUNCTION IS NOT GRANTED.

The parties, sophisticated business entities, specifically agreed in the Confidentiality Agreement that unauthorized disclosure of the confidential information might cause irreparable damage to the other party. See Ex. A, ¶3. Preliminary injunctive relief is also appropriate here because RPGI has "no adequate remedy at law and, as a result . . . will suffer irreparable harm if the injunction is not issued." Foodcomm Int'l v. Barry, 328 F.3d 300, 304 (7th Cir. 2003); see also Illinois Sporting Goods Ass'n v. County of Cook, 845 F.Supp. 582, 585 (N.D.Ill. 1994). "Inadequate remedy at law does not mean wholly ineffectual; rather, the remedy must be seriously deficient as compared to the harm suffered."[3] Barry, 328 F.3d at 304 (citation omitted).

A damage award is inadequate when a plaintiff may lose its ability to operate independently while awaiting final judgment. See e.g., Doran v. Salem Inn, Inc., 422 U.S. 922, 932 (1975); Illinois Sporting Goods Ass'n, 845 F.Supp. at 585. Where, as here, the wrongful conduct has damaged or threatened to damage existing or prospective business relations, the

---

[3] Under Delaware law, contractual stipulations as to irreparable harm alone suffice to establish that element for the purpose of issuing preliminary injunctive relief. See True North Communications Inc. v. Publicis S.A., 711 A.2d 34, 44 (Del. Ch. 1997). Here, AG acknowledged in the Confidentiality Agreement that RPGI and its affiliates would be irreparably damaged by the unauthorized disclosure of confidential information and that injunctive relief and specific performance were appropriate remedies for breach of the Confidentiality Agreement. See Ex. A, ¶3.

resulting harm is also considered to be incalculable, and thus irreparable. See Barry, 328 F.3d at 304("not practicable to calculate damages to remedy" the threatened loss of an important business relationship and "no remedy at law can adequately compensate" that kind of harm). See also Falcon, Ltd. v. Corr's Natural Beverages, Inc., 165 Ill. App. 3d 815, 820-821, 520 N.E.2d 831, 835 (1st Dist. 1987)(irreparable injury established where breach of contract threatened to interfere with prospective business relations and cause damage that would extend immeasurably into the future).

Despite its express agreement to the contrary, AG has used confidential information received from RPGI and its affiliates in order to "obtain[] a competitive advantage" over them. If AG is allowed to continue interfering with RPGI's and its affiliates' advantageous relations with its lenders, or to use the wrongfully acquired debt to harm RPGI and its affiliates, RPGI and its affiliates face the near certain loss of their independence. In breaching the Confidentiality Agreement, AG wrongfully removed the majority of RPGs' first tier debt from lenders who had been willing to negotiate the necessary restructuring deals with RPGI and its affiliates. Thus, AG's wrongful interference in breach of its contractual obligations, as a threshold matter, is preventing RPGI and its affiliates from finalizing restructuring plans, and severely limiting their restructuring options. AG's unlawful conduct is also artificially inflating the value of RPG's debt, and thereby preventing RPGI and its affiliates from restructuring that debt on the far more advantageous terms that were certainly available before AG's improper conduct.

As a result of AG's wrongful conduct, over 50% of RPG's First Lien Loans is now controlled by a direct competitor who has an interest in eliminating RPG as a competitor and simultaneously exposing RPG and its valuable assets to being purchased on the distressed market at steeply discounted prices. AG, unlike RPGI, its affiliates, and RPG's lenders, does not care

whether RPG is forced out of the marketplace.  Indeed, RPGI and its affiliates are certain that AG's ultimate "strategy" is to destroy them by putting RPGI and its affiliates out of business altogether or forcing RPGI and its affiliates into an unwelcome sale, in either case losing their independence and removing a competitive force from the market.  Thus, if AG is not enjoined from continuing its unlawful conduct and using its ill-gotten gains to exercise power over RPG, hundreds of jobs will be at risk, competition between AG and RPG will be erased, and the public will be deprived of access to the wonderful greeting card products of one of the last, free-standing, nationally-operating greeting card companies.

The harm to RPGI, its affiliates, and the public, if AG is permitted to continue its unlawful conduct is therefore presently incalculable.  Only an injunction will adequately protect RPGI and its affiliates from the immediate and irreparable harm they will suffer if AG is not stopped, and only a preliminary injunction can preserve the *status quo* until the Court can fully address the merits of RPGI's claims.   Under these circumstances, RPGI is entitled to an injunction.  See Falcon, Ltd., 165 Ill. App. 3d at 835, 520 N.E.2d at 484.

## III.    THE BALANCE OF EQUITIES FAVORS RPGI.

The requested relief protects RPGI and its affiliates' ability to continue operating their business as a competitor of AG.  As discussed above, the consequences to RPGI and its affiliates if this Court does not grant an injunction are significant and devastating.

The burden that will be imposed on AG if an injunction enters is, by contrast, minimal.  RPGI simply asks this Court to enjoin AG from contacting RPG's lenders in violation of the Confidentiality Agreement, and from using its position as an owner of RPG's debt -- a status to which AG came unlawfully -- to harm or control RPGI and its affiliates.  Put bluntly, any imposition on AG results *solely* from AG's wrongful conduct.

The proposed injunction does not interfere with the public interest. On the contrary, public interests are served by enforcing contractual obligations. See Farr Financial, Inc. v. Sentinel Mgmt. Group, Inc., 2007 WL 2410379, *2 (N.D.Ill. Aug. 17, 2007). By preventing defendants from ignoring their contracts, courts are able to "ensure that the public has confidence in our willingness to enforce contractual obligations." Cook Inc. v. Boston Scientific Corp., 2002 WL 31236289, *6 (N.D.Ill. Oct. 1, 2002). Entering an injunction temporarily preserves the *status quo* and existing competition in the market, leaving AG in the same position it was in before the challenged transactions. The public interest factor, therefore, weighs heavily in favor of granting the injunction.

## CONCLUSION

For the foregoing reasons, RPGI respectfully requests that the Court enter a Temporary Restraining Order in the form of the proposed Order submitted herewith.

Respectfully submitted,

RPG INVESTMENT HOLDINGS, LLC

By: /s/ Michael F. Braun
One of the Attorneys for Plaintiff

Michael F. Braun(Atty No.: 6180471)
James L. Komie(Atty No.: 6198089)
Robert D. Snow, Jr.(Atty No.: 6275952)
Schuyler Roche, P.C.
One Prudential Plaza, Suite 3800
130 East Randolph Street
Chicago, Illinois 60601
(312)565-2400
(312)565-8300(facsimile)

527871

# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| RPG INVESTMENT HOLDINGS, LLC, a Delaware Limited Liability Company, | ) ) ) |  |
|  | ) |  |
| Plaintiff, | ) ) | Case No. 08 CV 4422 |
|  | ) | Judge Wayne R. Andersen |
| v. | ) | Magistrate Judge Maria Valdez |
|  | ) |  |
| AMERICAN GREETINGS CORP., an Ohio Corporation, | ) ) | JURY DEMAND |
|  | ) |  |
| Defendant. | ) |  |

### AFFIDAVIT OF CHARLES YOON

I, Charles Yoon, hereby declare under penalty of perjury as follows:

1.    I am a member of the Board of Directors of RPG Investment Holdings, LLC ("RPGI") and RPG Holdings, Inc. ("RPG Holdings").

2.    I submit this affidavit in support of the Plaintiff's Complaint and Motion for Temporary Restraining Order.  I am over 18 years of age, and have personal knowledge of the facts stated herein.

3.    RPGI is the sole shareholder of RPG Holdings, Inc.

4.    RPG Holdings is the sole shareholder of Recycled Paper Greetings, Inc.("RPG")(collectively RPG and RPG Holdings are referred to herein as the "affiliates").

5.    RPGI and RPG Holdings acquired, directly or indirectly, RPG on December 5, 2005.

6.      The acquisition was financed in part with proceeds from: (i) a "First Lien Credit Agreement," dated as of December 5, 2005 (the "First Lien Credit Agreement"), among RPG Holdings, RPG (successor by merger to RPG Acquisition Corp.), the so-called "First Lien Lenders" and Credit Suisse, Cayman Islands Branch, as administrative agent and as collateral agent; and (ii) the "Second Lien Credit Agreement," dated as of December 5, 2005 (the "Second Lien Credit Agreement" and, together with the First Lien Credit Agreement, the "Credit Agreements"), among RPG Holdings, RPG (successor by merger to RPG Acquisition Corp.), the so-called "Second Lien Lenders" (together, with the First Lien Lenders, the "Lenders") and Credit Suisse, Cayman Islands Branch, as administrative agent and as collateral agent.

7.      The First Lien Credit Agreement is secured by a first priority lien on substantially all of the assets of RPG, RPG Holdings, and RPG's subsidiaries, and the Second Lien Credit Agreement is secured by a second priority lien on substantially all of the assets of RPG, RPG Holdings, and RPG's subsidiaries.  RPG Holdings has agreed to certain obligations if RPG does not completely fulfill its obligations with respect to credit extended to RPG under the First and/or Second Lien Credit Agreements.

8.      In early May 2008, Defendant American Greetings Corp. ("AG"), on its own initiative, and without any prompting whatsoever from RPGI or its affiliates, requested a meeting with RPGI, the purpose of which I later learned at the May 19, 2008 meeting was to discuss a possible transaction between RPGI and AG.

9.      AG is a direct competitor of RPG.

10.     Before any meeting could occur, both parties insisted that a confidentiality agreement be executed between AG and RPGI.

2

11.    AG and RPGI then negotiated and executed a Confidentiality Agreement dated May 16, 2008 (the "Agreement"). A copy of the Agreement is attached to the Complaint as Exhibit A.

12.    The Agreement provides in relevant part that:

> Without each Party's prior written consent, neither Party nor its Representatives shall . . . ***make any contact of any nature*** . . . (including inquiries or requests concerning Confidential Information) with any ...bank or other lender to the other Party or any of its affiliates other than in the ordinary course of such Party's business and not related in any way to such Party's consideration of a Transaction.

13.    That particular provision -- especially the language regarding AG not even *contacting* any bank or lender of RPGI or its affiliates -- was central to RPGI's willingness to meet with AG, as AG was advised.

14.    The "no contact" term was critical because, at the time AG asked to meet with RPGI, RPG was, and currently is, negotiating a restructuring of the Credit Agreements with RPG's lenders.

15.    AG was advised that RPGI's and its affiliates' beneficial relationships with RPG's lenders, and the ability to effectively manage their obligations under the Credit Agreements, were critical to RPG's continued success.

16.    As noted, AG is a direct competitor of RPG, and because of its market size, AG has the ability to bring remarkable economic resources to bear against RPG. Put bluntly, RPGI was unwilling to take the risk that, if discussions with AG failed, AG would use its resources to interfere with RPGI's and its affiliates' lending relationships.

17.    The Confidentiality Agreement is to remain in effect for two years from its effective date (until May 16, 2010). That time period was chosen to allow RPGI and its affiliates the ability to restructure the Credit Agreements and to move forward, under a

3

new arrangement, with RPG's lenders. While the Agreement was in effect, AG was prohibited from contacting RPG's lenders.

18.    Given the importance of the protections afforded by the Agreement, AG and RPGI agreed also that each of them would "be entitled, without the requirement of a posting of a bond or other security to seek equitable relief, including an injunction or specific performance, in the event of any breach of the provisions of this confidentiality agreement."

19.    On May 19, 2008, following the execution of the Agreement, AG and RPGI met.

20.    Zev Weiss, AG's Chief Executive Officer, was present at the meeting.

21.    During the May 19 meeting, RPGI and AG talked about RPG's lenders, about the Credit Agreements and, especially, about the commitment to staying the course with RPG's lenders and restructuring the Credit Agreements.

22.    Despite RPGI's expressed commitment to the RPG lenders, Zev Weiss suggested at the meeting that, in substance, RPGI allow AG to act as a front for RPGI. In that capacity, Weiss said, AG would go into the marketplace and buy loans from the unsuspecting lenders at, hopefully, substantially discounted prices. (Technically, the targeted loans concerned either the First Lien Credit Agreement (the "First Lien Loans") and/or loans under the Second Lien Credit Agreement (the "Second Lien Loans") (together, with the First Lien Loans, the "Loans."))

23.    RPGI responded by advising Weiss that, under no circumstances, would RPGI participate in any effort to mislead RPG's lenders generally, let alone attempt to trick the Lenders into selling the Loans to an entity acting, ultimately, in concert with

4

RPGI or its affiliates. RPGI again advised AG that RPGI and its affiliates were committed to maintaining a successful and mutually beneficial relationship with RPG's lenders, and that it was confident in the ability to achieve a restructuring of the Credit Agreements that would allow RPG to continue moving forward successfully as a growing, independent company.

24.    In response, Weiss declared, and the following quote is almost verbatim: "I am not the kind of person who would go around you and buy the debt. I just want you to know that, if we cannot do a deal, we will not do a deal at all. That is consistent with the way we do business."

25.    The May 19 meeting ended without even a general consensus that discussions should continue. Shortly after the May 19, 2008 meeting, RPGI notified AG that there was no basis for further discussion.

26.    About five weeks after the May 19 meeting, or in late June/early July, RPGI heard that an entity out of Cleveland Ohio -- the city, coincidentally, where AG has its corporate headquarters -- was suddenly contacting RPG's lenders as part of an effort to acquire a substantial portion of the Loans.

27.    RPGI has since been told that AG -- either in its own name or using straws to act on its behalf -- has now acquired over 50% of the First Lien Loans, and that AG is presently working on a "strategy" concerning how it will use its wrongfully obtained leverage.

28.    Neither AG nor its agents ever obtained RPGI's or its affiliates' "prior written consent" before contacting RPG's lenders, as required by the Agreement.

5

29.    All of this comes at the moment when, as noted, RPGI and its affiliates are working towards a successful and significant restructuring of the Credit Agreements. It also comes at a time when RPG is poised to gain access to testing its cards in a number of major, national retail stores. If AG is allowed to continue interfering, RPG's restructuring efforts will be unsuccessful. This could lead to disastrous consequences, including the loss of artists, customers, jobs and new business prospects. Additionally, and equally devastating, failed restructuring efforts could lead to AG acquiring operating control of RPG and thereby eliminating one of its last remaining competitors.

30.    Moreover, because of AG's wrongful conduct, RPGI has been forced to publicly disclose RPG's restructuring efforts by filing this lawsuit; efforts that, almost certainly, would have been resolved successfully and in private had AG not interfered with RPG's lending relationships.

31.    RPG Holdings and RPG are currently in default of certain obligations under the Credit Agreements. As a result of such defaults, RPG, among other things, is not able to borrow additional loans under the revolving credit facility established by the First Lien Credit Agreement. It is for this reason that RPG is in active negotiations with the Lenders to restructure the Credit Agreements.

32.    In addition, as a result of such defaults: (i) the First Lien Lenders have the right to accelerate the First Lien Loans and to exercise other remedies pursuant to the First Lien Credit Agreement and related collateral documents, including seeking foreclosure on the collateral securing the First Lien Credit Agreement; and (ii) the Second Lien Lenders have the right to accelerate the Second Lien Loans and, subject to the inter-creditor agreement with the First Lien Lenders, to exercise other remedies

6

pursuant to the Second Lien Credit Agreement and related collateral documents, including seeking foreclosure on the collateral securing the Second Lien Credit Agreement.

33.    As noted, upon information and belief, AG, despite the terms of the Agreement, now owns and/or controls over 50% of the First Lien Loans. A 50% plus share of the First Lien Loans confers veto power upon AG because, pursuant to the First Lien Credit Agreement, the holders of more than 50% of the First Lien Loans and revolving credit facility commitments in the aggregate must agree to certain major decisions, including amending or waiving the existing defaults under the First Lien Credit Agreement, accelerating the First Lien Loans, and seeking foreclosure on the collateral securing the First Lien Credit Agreement.

34.    Moreover, by virtue of owning and/or controlling the First Lien Loans, AG, under the First Lien Credit Agreement, has rights of access to detailed pricing, financial and strategic information of RPG, including business plans, financial forecasts and the amount of cash that RPG has on hand, provided to the First Lien Lenders and the Second Lien Lenders on a confidential basis. The detail in this information goes far beyond the confidential information provided to AG pursuant to the terms of the Confidentiality Agreement.

35.    The First Lien Credit Agreement also gives AG advance notice, and the ability to block, various RPG business transactions. For example, AG has power to veto or approve:  the disposal of certain assets; corporate restructuring; new loans; and new acquisitions.

7

36.    Failure to block AG's access to RPG's sensitive competitive information would cause irreparable harm to RPG.

37.    AG's ability to block RPGI's and its affiliates' efforts to restructure the existing Credit Agreements will cause irreparable harm to RPG's ability to continue to operate independently in the marketplace.

38.    AG is not a true creditor of RPG. Upon information and belief, its interest is not to invest in RPG. As RPG's competitor, it is in AG's interest to liquidate RPG, as doing so would eliminate a chief competitor and, simultaneously, expose RPG's assets to being purchased on the market at steeply discounted prices.

39.    RPG was founded in 1971, and is in the business of selling greeting cards; the majority of which are so-called "humorous" cards.

40.    RPG's original business concept was to introduce greeting cards on 100% recycled paper and thereby persuade consumers and the card industry generally to accept the environmental wisdom of using recycled paper for greeting cards.

41.    The "industry giants" are RPG's two main competitors, Hallmark and AG, which together dominate the greeting card industry.

42.    Begun in a college dormitory, over the course of thirty-plus years, RPG has grown to become the number three greeting card company, although its market share remains small compared to the industry giants, with approximately 2-3% of the market.

43.    I am incredibly troubled by the fact that AG now controls over 50% of RPG's senior debt. It is my strong belief that AG, unlike RPGI, its affiliates, and RPG's lenders, does not care if RPG survives as an independent greeting card company. Indeed, it almost certainly wants just the opposite result.

8

44.    From all appearances, AG's ultimate "strategy" is to destroy RPG by putting RPG out of business altogether or forcing RPG into a fire sale. Either result will place the jobs of hundreds of RPG employees at risk, and deprive the public of access to the wonderful cards of one of the last, nationally-operating, free-standing, greeting card companies, RPG.

45.    RPGI and its affiliates' fears are well-founded, as they are based on *years* of fending off efforts by AG to drive RPG from the marketplace. What is at issue here is the most recent, and potentially the most egregious act, in a long chain of anticompetitive activities.

46.    AG has fought to keep RPG out of stores, upon information and belief, primarily by using contracts and extraordinary "rebates" to block RPG from even getting into retail locations.

47.    Regarding AG's efforts to keep RPG out of stores, upon information and belief, AG has used, and continues to use, a combination of exclusive contracts, so-called "rebate" programs, and/or contracts that call for the retailer to at all times insure that AG has a defined (very large) percentage of available store space.

48.    The common link to those artificial barriers is that they keep competitors such as RPG out of the stores, and/or keep competitors from achieving efficient scales of production and distribution. In other words, rather than compete on the merits against smaller, more innovative and growing competitors such as RPG -- i.e., letting consumers choose the better product -- AG has increasingly resorted to artificial, inefficient and exclusionary practices to protect its entrenched position.

9

49.    Still, RPG's combination of recycled paper and humorous messages -- featuring over 250 artists, including well recognized brands such as The Far Side and Sandra Boynton -- have made it a popular alternative to the more traditional cards offered by AG. Thus, AG's efforts notwithstanding, the quality of the RPG product has convinced more and more retailers to at least test out the possibility of putting RPG cards into retail stores.


I, Charles Yoon, am over the age of eighteen, make this affidavit on personal knowledge and under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, and certify that the foregoing is true and correct.

CHARLES YOON

Dated:  8 / 6 / 08