**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| RPG INVESTMENT HOLDINGS, LLC, a Delaware Limited Liability Company, RPG HOLDINGS, INC., a Delaware Corporation and RECYCLED PAPER GREETINGS, INC., an Illinois Corporation, <br><br> Plaintiffs, <br><br> v. <br><br> AMERICAN GREETINGS CORP., <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Case No. 08 CV 4422

Judge Wayne R. Andersen

Magistrate Judge Maria Valdez

JURY DEMAND

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF
EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER**

Plaintiff RPG Investment Holdings, LLC ("RPGI") submits this Reply Memorandum in further support of its Motion for a Temporary Restraining Order[1].

**INTRODUCTION**

American Greeting Corporation's ("AG") Opposition to Plaintiff's Emergency Motion for Temporary Restraining Order ("opposition brief" or "Opp'n Br.") is perhaps more remarkable for what it does not say than for what it does say. Significant amongst the points that AG has failed to address, and thus has conceded, are the following:

- AG does not deny that it entered into the Confidentiality Agreement with RPGI[2].

---

[1] RPG Holdings, Inc ("RPG Holdings") and Recycled Paper Greetings, Inc. ("RPG") are now Plaintiffs in this case and join RPGI's Emergency Motion for Temporary Restraining Order and Memorandum of Law in Support of Emergency Motion for Temporary Restraining order filed on August 6, 2008. An Amended Complaint was filed contemporaneously with the filing of this Reply adding RPG Holdings and RPG as parties and adding one count (e.g. RPG and RPG Holdings as Third-Party Beneficiaries of the Confidentiality Agreement (Count II)).

[2] AG has not furnished an affidavit to counter the affidavit of Charles Yoon filed by RPGI as Exhibit 1 to its Memorandum of Law in Support of Emergency Motion for Temporary Restraining Order ("Memo in Supp."). Where well alleged facts within an affidavit are not contradicted by counteraffidavit, they must be taken as true

- AG does not deny that as part of the Confidentiality Agreement it agreed not to contact Plaintiffs' lenders.

- AG does not deny that when it met with RPGI it proposed to buy up the debt of RPG and RPG Holdings, from their unsuspecting lenders at substantially discounted prices using straw-men.

- AG does not deny that RPGI rejected this proposal out of hand and that AG then said it would not proceed with such a plan on its own.

- AG does not deny that despite its explicit representation to RPGI that it would not acquire the debt within weeks it, using straw-men, had acquired in excess of 50% of the First Lien Loans; doing the exact opposite of what it told RPGI it would do.

- AG does not contend that it had acquired any of the debt before it signed the Confidentiality Agreement with RPGI despite the fact that those debt relationships had been outstanding since December 2005.

- AG does not contend that it is in AG's ordinary course of business to purchase the debt of other companies, particularly the debt of its competitors, without their consent.

- AG does not deny that as a competitor, it is not a true investor/lender and that its interest in restructuring a deal is diametrically opposed to the business interests of Plaintiffs.

- AG does not deny that as a holder of the debt that it is privy to RPG's competitive business information that it would not otherwise have access to.  This information includes detailed pricing, financial and strategic information as well as business plans, financial forecasts and cash information.

- AG does not deny that as the holder of the majority of the First Lien Loans it is in a position to block, either by affirmative acts or simply doing nothing, any debt restructuring effort of Plaintiffs.

- AG does not deny that as the holder of the majority of the First Lien Loans and a chief competitor of RPG it is in a position to deter other investors from providing funding because it has a virtual stranglehold over Plaintiffs' restructuring efforts.

AG's failure to rebut the allegations as to its egregious conduct is damning.   Because the facts cannot help it, AG hopes to distract this Court from focusing on its misconduct by weaving a legal argument that, while superficially attractive, is fundamentally flawed and quickly

---

notwithstanding the existence of contrary averments in the adverse party's pleadings.  Berg-Manufacturing & Sales Corp. v. Ivy/Mar Co., Inc., 1996 WL 59612 (N.D. Ill Oct. 15, 1996).

unraveled.  The two principal contentions by AG are that a TRO is unwarranted because
(i) RPGI is unlikely to succeed on the merits of its breach of contract and tortious interference
claims, and (ii) RPGI cannot show irreparable harm.  Opp'n Br. at 1-2, 6-14.

With respect to AG's contention that RPGI is unlikely to succeed on the merits, AG
boldly contends that RPGI "cannot put the 'breach' in its contract claim" because the
Confidentiality Agreement is "not a standstill agreement."  Id. at 2; see also 11-12.  AG's
argument is too cute by half and ignores the express terms of the Confidentiality Agreement.
AG claims that RPGI's tortious interference claim must fail as well because RPGI's
"confidence" that the debt would be restructured amounts to nothing "more than a mere hope."
Id. at 13.  Again, AG provides no support for this contention and fails to counter the affidavit
provided by RPGI's Yoon.  AG simply ignores the fact that Plaintiffs were engaged in ongoing
discussions with the First and Second Lien Lenders and had a "reasonable expectation" of
restructuring the debt on more favorable terms immediately prior to AG's unlawful acquisition
of a majority of the First Lien Loans.  Indeed, most, if not all, of the First and Second Lien
Lenders expressed to RPGI that it was in everyone's best interests to move forward with a
successful restructuring.  Supplemental Affidavit of Charles Yoon ("Supp. Yoon Aff."), ¶¶6-7
(A copy of the Supplemental Affidavit of Charles Yoon is attached hereto as Exhibit I.).

AG's contention that there is no irreparable harm fares no better.  AG struggles mightily
to deflect the Court's attention away from its own wrongdoing and the irreparable harm it is
causing.  For example, peppered throughout its Introduction alone, AG contends on several
occasions that RPGI does not and cannot allege that AG has done or will do anything that would
constitute wrongdoing and result in irreparable harm.  Opp'n Br. at 1-2.  But the Complaint and

the Yoon Affidavit, which this Court must accept as true, contain numerous unrebutted examples of AG's wrongdoing and the irreparable harm that is being caused by AG's unlawful actions.

Moreover, to the extent there could be any question about whether RPGI _itself_ will suffer irreparable harm, that issue is laid to rest by the Amended Complaint adding RPG and RPG Holdings as plaintiffs.  AG cannot seriously contend that none of RPGI, RPG and RPG Holdings will suffer irreparable harm if AG is permitted to continue to ignore its obligations under the Confidentiality Agreement.

Finally, AG has essentially conceded that the balance of equities and public interest favor the granting of the temporary restraining order.  With respect to the balance of the equities, AG simply stands on its claim that RPGI faces no irreparable harm.  _Id._ at 14.  Since AG offers no other reason, if the Court finds that there is irreparable harm – and there is – the balance of equities must tip in favor RPGI.  Likewise, AG offers no substantive discussion or rebuttal of the arguments made by RPGI in its memorandum in support of why the public interest favors the granting of an injunction.  _Id._

Since RPGI is likely to succeed on the merits, has suffered irreparable harm, and AG has conceded that the balance of equities and the public interest are tipped in favor of RPGI, RPGI's Emergency Motion for a Temporary Restraining Order should be granted.

## **ARGUMENT**

## **I.     RPGI IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS**

While RPGI believes that it has shown a likelihood of prevailing on both its breach of contract and tortious interference claim, a likelihood of success on _either_ claim will support RPGI's application for injunctive relief.

A.    **RPGI is likely to succeed on its claim for breach of contract.**

Brazenly, AG argues that its "alleged conduct in the course of buying RPG's publicly available debt is unrelated to the purpose and plain terms of the [Confidentiality Agreement]." Opp'n Br. at 11.  More precisely, "AG's purchase of RPG's bank debt . . . lacked the necessary connection to the possible 'Transaction' with [RPGI] that was the subject of the Confidentiality Agreement or to any confidential information."  Id. 11-12.  AG's interpretation of the Confidentiality Agreement is completely divorced from the Agreement's express terms; the Agreement simply is not susceptible to the twisted interpretation that AG seeks to impose upon it.

In the Confidentiality Agreement, AG promised that it would not, without Plaintiffs' prior written consent, "make any contact of any nature (including inquiries or requests concerning Confidential Information) with any … bank or other lender to the other Party or any of its affiliates other than in the ordinary course of such Party's business and not related in any way to such Party's consideration of a Transaction."  Confidentiality Agreement, ¶8(A copy of the Confidentiality Agreement is Ex. A to the Amended Complaint ("Am. Cmplt.").)  This language is plain, clear and straightforward.  To the extent that there is any possible ambiguity (which there is not), Yoon's uncontradicted affidavit explicitly states that the reason for including this language was to prevent AG from doing what it did almost immediately after its talks with RPGI ended -- buying up the debt under discussion between the parties[3].  Yoon Aff.,

---

[3] AG's self-serving contention that RPGI really needed a "Standstill Agreement" and not just a "Confidentiality Agreement" misses the mark.  Opp'n Br. at 12, n.9; see also 4, n.1.  The Confidentiality Agreement gave RPGI precisely what it wanted, but for AG's total disregard for its contractual obligations.  RPGI wanted no contact with the lenders and, if AG had honored that contractual obligation, AG would not have been able to acquire the loans at issue or be in the position to stymie RPGI's efforts to restructure the debt.

¶¶13-14(A copy of the Affidavit of Charles Yoon is attached to the Memorandum in Support of Emergency Motion for Temporary Injunction as Exhibit 1).; see also Am. Cmplt. ¶¶24-25.

AG suggests that an agreement not to talk to a party's lenders does not really mean that it could not talk to the lenders.  Instead, AG claims that the Confidentiality Agreement permits them to acquire the debt in the ordinary course of business and freely talk to the lenders about acquiring the debt of RPG and RPG Holdings because such discussions were not related to the proposed "Transaction" between AG and RPGI.  Opp'n Br. at 11.  AG's argument suffers from two fatal flaws.

First, the Confidentiality Agreement permits contact with Plaintiffs' lenders only when done in the context of the ordinary course of AG's business and "not related in any way to such Party's consideration of a Transaction."  Confidentiality Agreement, ¶8.  AG concedes this point. Opp'n Br. at 11.  Nowhere in the 15 pages that comprise its opposition brief does AG contend, nor can it, that it is in the business of purchasing debt of other companies, particularly the debt of its competitors.  As it acknowledges, "AG is a greeting card company" (Id. at 3) and debt acquisition is not something AG does in the ordinary course of its business.[4]  Any suggestion by AG otherwise is simply speculation of its attorneys and is not supported by affidavit or other evidence.  This, alone, precludes AG's claim that its contact with the lenders passes muster under the Confidentiality Agreement.

Second, AG does not -- and cannot -- deny that at least part of the Transaction it discussed with RPGI in connection with the Confidentiality Agreement was buying up the debt at substantially discounted prices through straw-men purchasers of the debt -- the very thing that AG went out and did when RPGI rejected its proposed Transaction.  See Yoon Aff., ¶¶22-23, 26-

---

[4] AG's ruminations on the market for purchasing debt are of no import.  See Opp'n Br. at 12.  The Agreement addresses AG's ordinary course of business and not what may be in the ordinary course of business of other entities such as the ones referred to in the Huber & Young article noted by AG.  Id.

27.  Essentially, AG is asking this Court to believe that just a few short weeks after its only meeting with RPGI about a proposed "Transaction" to acquire RPG, AG -- in the "ordinary course of its business" and unrelated to its discussions with RPGI -- somehow managed to acquire a majority of the First Lien Loans of RPG.  AG's position strains credulity.  If this is not enough, since wrongfully acquiring the debt, AG has used the First Lien Loans as leverage for a "Transaction" between AG and Plaintiffs.

Next, contrary to AG's contention (Opp'n Br. at 10-11), RPGI is also likely to show that it has been injured.  As a party to the contract, RPGI has a direct, personal interest in vindicating all of its rights under the Confidentiality Agreement and in seeing that the obligations AG undertook pursuant to the Confidentiality Agreement are honored and fulfilled.  See American Dairy Queen Corp. v. Brown-Port Co., 621 F. 2d 255, 258 (7th Cir. 1980)(noting that lessee/sublessor is the "holder of the [contractual] right and may sue for its infringement").  Significantly, AG agreed that RPGI should be a party to the contract and cannot now be heard to complain that RPGI is not the "right" party to enforce the Agreement.  See Supp. Yoon Aff., ¶5.  RPGI's interest in the Confidentiality Agreement is not secondary to some other entity's interest or an interest that RPGI holds simply because of its equity stake in RPG.

In any event, the Amended Complaint adds RPG and RPG Holdings as plaintiffs, asserting, inter alia, their rights as third-party beneficiaries of the Confidentiality Agreement.  With RPG and RPG Holdings in the case as plaintiffs along with RPGI, AG's argument that RPGI will not suffer irreparable injury falls flat.

The violation of Plaintiffs' rights under the Confidentiality Agreement entitles them to obtain the contractual remedies--injunction and specific performance--that AG agreed RPGI would be entitled to.  AG expressly acknowledged that in the event of a breach of the

Confidentiality Agreement "the other Party may be irreparably damaged" and that the other party "shall be entitled" to an injunction "in the event of <u>any</u> breach of the provisions" of the Confidentiality Agreement (emphasis added). Confidentiality Agreement, ¶3. Having agreed to this provision, AG should not be permitted to now stand before this Court and claim otherwise.

Finally, Plaintiffs (including RPGI) have suffered irreparable harm and actual damages as a result of AG's blatant breach of the Confidentiality Agreement. Delaware law follows the Restatement (Second) of Contracts § 347 and provides that where a contract is breached the injured party is entitled to "any other loss, including incidental or consequential loss, caused by the breach". <u>Donald M. Durkin Contracting, Inc. v. City of Newark</u>, 2008 WL 952984, 2 (D. Del. Apr. 9, 2008). The Comments to §347 to the Restatement (Second) of Contracts state that among the incidental losses recoverable for a breach of contract are "costs incurred in a reasonable effort, whether successful or not, to avoid loss." Restatement (Second) of Contracts § 347 cmt. C (1981). Here, RPGI in a reasonable effort to avoid loss as a result of AG's breach of contract retained counsel to demand AG's compliance with the Confidentiality Agreement and to have AG cease and desist from its apparent wrongdoing[5]. Moreover, Delaware law recognizes an award of nominal damages for a breach of contract. See <u>Palmer v. Moffat</u>, 2004 WL 397051, *4 (Del. Super. Ct. Feb. 27, 2004); <u>Standard Distributing Co. v. NKS Distributors, Inc.</u>, 1996 WL 944898, *11 (Del. Super. Ct. Jan. 3, 1996).

**B.     RPGI is likely to prevail on its claim for tortious interference.**

AG claims that RPGI has not shown that it had more than a "mere hope" of maintaining its business expectancy with the Lenders. Opp'n Br. at 13. AG is wrong. As noted above, AG

---

[5] RPGI recognizes that under the "American Rule" it is not entitled to recover its legal fees for this litigation unless such fees are provided by contract or statute. RPGI is not claiming its legal fees for this litigation, but is only claiming as damages those fees incurred in a reasonable effort to head-off litigation by having AG comply with its contractual obligations.

has not presented an affidavit to counter the factual assertions made in the Yoon Affidavit. Accordingly, the facts contained in Yoon's affidavit (and supplemental affidavit) stand unrebutted. Those facts include a statement that Plaintiffs had enjoyed a continuing relationship with the Lenders since December 2005 and that, based on that continuing relationship and existing discussions, RPGI expected those positive relationships to continue. Yoon. Aff. ¶¶6, 15, 21, 23, 29. It is generally accepted that a party has a reasonable expectation that their existing business relationships will continue to provide economic advantage into the future. Dowd & Dowd, Ltd. v. Gleason, 284 Ill. App.3d 915, 930, 672 N.E.2d 854, 865 (1st Dist. 1996), aff'd in relevant part, 181 Ill.2d 460, 485, 693 N.E.2d 358, 371 (1998). Accordingly, especially in the absence of any rebuttal to Yoon's Affidavit, RPGI has made an adequate showing of its anticipated continuing relationship with the Lenders. RPGI need not prove its case at this point; it need only making a showing of a likelihood of success.

AG provides absolutely no authority for its position that RPGI could not have a reasonable expectation in continuing the relationship because the relationship is with lenders as opposed to clients. Opp'n Br. at 13. Indeed the opposite is true here; it is of critical importance to Plaintiffs and its lenders that their relationships continue because otherwise both parties stand to lose their entire interest. Similarly, AG's assertion, lacking any case law authority, that the fact that restructuring of the loans was taking place undercuts the expectation of continuing relationships falls flat. Id. at 13. To the contrary, the case law recognizes that past relationships create a reasonable expectation that the relationship will continue.

AG next claims that even if there is an expectation of a continuing relationship it has done nothing to interfere with that expectation. Id. at 14. Unfortunately, the interference is both real and immediate. AG was aware of the ongoing efforts to restructure the debt when it met

with RPGI in mid-May 2008 and that RPGI was confident that those efforts would lead to a restructuring that was beneficial to all involved.  Yoon Aff., ¶¶15, 21, 23, 29.  AG cannot point to anything suggesting that the relationship with the lenders, which had been in place since December 2005 (Yoon Aff., ¶6), would not continue forward successfully, but for AG's interference.

AG's new and completely improper presence in the debt restructuring picture constituted a marked interference with those efforts.  The unwelcomed presence of AG in these efforts threw a monkey wrench in the renegotiations by: 1) scaring away potential new investors who were not interested in providing equity in a situation in which the holder of the majority of the First Lien Debt that was needed to accomplish a successful renegotiation was also the major competitor whose interests were clearly not aligned with Plaintiffs', and 2) causing the current Second Lien Lenders to balk at completing a restructuring of their debt without the participation of AG who the Second Lien Lenders apparently hoped might offer a better deal.  Supp. Yoon Aff., ¶¶8-9.

Again, AG's participation is not as a lender/investor interested in keeping RPG operating, but rather as a competitor hoping to sweep in and buy RPG from RPGI on the cheap or force it into bankruptcy by cutting off its ability to renegotiate its debt.  This conduct is sufficient to show a reasonable likelihood of prevailing on a claim of tortious interference.

## II.     RPGI HAS NO ADEQUATE REMEDY AT LAW AND WILL SUFFER IRREPARABLE HARM IF THE INJUNCTION IS NOT GRANTED.

### A.     RPGI will be irreparably harmed.

AG's claim that RPGI will not be irreparably harmed is predicated in large part on its claim that its breach of contract did not "harm" RPGI.  As noted above, not only has RPGI been harmed by AG's flagrant violations of its contractual undertakings, but AG specifically recognized that such damages would likely cause irreparable harm and that injunctive relief, as

well as specific performance, was appropriate remedies for such misconduct.  Confidentiality

Agreement, ¶3.  Again, AG cannot and should not be permitted to come before this Court and

disavow that which it contractually agreed to in the Confidentiality Agreement.

Additionally, RPGI is harmed by AG's interference with the efforts to restructure the

debt with the First and Second Lien Lenders.  The injury to RPGI's interest in a successful

restructuring of the debt is a harm that cannot be compensated by money damages alone.

**B.     RPG and RPG Holdings have been and will be irreparably harmed[6].**

Next, AG contends that any supposed irreparable harm to plaintiffs RPG and RPG

Holdings is "too speculative" and speculation about what AG might and might not do in the

future "does not establish a risk of irreparable harm."  Opp'n Br. at 8-10.  In an effort to wiggle

off the hook, AG's counsel repeatedly asserts that AG has done nothing wrong (yet—presumably

not counting its breach of the Confidentiality Agreement).  See Id. at 8(RPGI "does not contend

that AG has actually blocked, or said it will block, any refinancing efforts."), 9-10(RPGI "cannot

allege that AG has done anything more than think about what it might do . . . .[or that] AG made,

or will make, competitive use of any alleged confidential information[.]"); and 1-2.

AG's argument – in addition to being unsupported by affidavit – is unpersuasive because

it defies reality.  First, by improperly contacting the lenders and acquiring the First Lien Loans,

AG has already caused irreparable harm to the critical debt restructuring efforts.  For example, as

a direct result of AG's interference, the Second Lien Lenders are in a position to demand and

have demanded more favorable credit terms than would have been the case had AG not breached

the contract.  Supp. Yoon Aff. ¶¶6, 8.  Additionally, the efforts to restructure the debt have been

---

[6] In support of RPG's claim that it has been irreparably harmed, RPG submits the Affidavit of Jude Rake, its Chief
Executive Officer, a copy of which is attached as Exhibit II hereto.

delayed[7].  This delay has placed RPG in imminent danger of losing its independence.  See SMC
Corp., Ltd. v. Lockjaw, LLC, 481 F.Supp. 2d 918, 928 (N.D. Ill. 2007).  Yoon Aff., ¶¶37-38, 44.
Second, AG's argument that it has done nothing is a red-herring.  The fact of the matter is that
AG can do absolutely nothing beyond what it has already done and still cause irreparable harm to
RPG's restructuring efforts.  For example, just by holding RPG's debt for a little while longer
(i.e. a matter of weeks), it may force RPG to lose its independence and force RPG into a fire sale.
Id.  Clearly, the harm to RPG and RPG Holdings is presently incalculable and irreparable.

These harms are real and immediate.  Unlike each of the plaintiffs in the cases cited by
AG, RPG and RPG Holdings have "sustained or [are] immediately in danger of sustaining a
direct injury as a result of the allegedly unlawful conduct."  Warner Cable Communications, Inc
v. City of Niceville, 911 F.2d 634, 640 (11th Cir. 1990)(Plaintiff failed to allege an actual or
immediately threatened injury); Singer Co. v. P.R. Mallory & Co., Inc., 671 F.2d 232, 235 (7th
Cir. 1982)(Plaintiff not entitled to injunction because his "injury rest[s] on the assumption that a
[future] decision of the Patent Office" will be adverse to Plaintiff's interests.).

**C.     There was no delay in bringing this action.**

AG seeks to give the Court the impression that RPGI's delay in filing the TRO belies the
"need for extraordinary relief to prevent imminent harm.[8]"  See Opp'n Br. at 9, n.6.  AG is dead
wrong on this point.  RPGI tried everything possible to avoid having to file this suit and the fact

---

[7] Without waiving its objections to the efforts of the Second Lien Lenders and CSFB to intervene in this matter, the pleadings of both proposed intervenor groups adds substantial weight to RPGI's argument that irreparable harm has been caused by AG's acquisition of the debt.  As noted by CSFB, as agent for the First Lien Lenders, as the majority holder of the first lien loans, AG is in a position to block access to the revolving credit facility that RPG may need to meet payroll and other day-to-day operating expenses.  CSFB Opp'n Br. at 2.  Moreover, as CSFB notes, no restructuring of the First Lien Loans is possible without AG's concurrence.  Id. at 2-3.  AG would not be in a position to exercise such a veto power or to have such say in the ongoing debt restructuring negotiations except for its breach of the Confidentiality Agreement.  In much the same way, the Second Lien Lenders' demand that AG be permitted to talk to them, no matter what agreement AG might have made not to do so, forcefully demonstrates the immediate and irreparable harm that AG's breach of the Confidentiality Agreement has caused.  The Second Lien Lenders would not be clamoring for AG's participation in the debt restructuring efforts, but for the AG's utter disregard of its contractual undertaking to RPGI.

that RPGI ultimately found itself backed into the corner of litigating speaks volumes to the imminent harm it is facing.  It was not until RPGI concluded that it had no recourse outside of the courts to undo the harm caused by AG's violation of the Confidentiality Agreement that RPGI was forced to file this action.

RPGI did not want to make public its efforts to restructure the debt.  RPGI's efforts to renegotiate the debt were intended to be private and confidential (Yoon Aff., ¶30); unfortunately, that is no longer the case.  These discussions are extremely sensitive; it was RPGI's fervent hope that they not get played out in a public forum.  Moreover, at the same time that the debt restructuring efforts were ongoing, RPGI and RPG were far along with discussions with new customers to expand RPG's presence in the marketplace.  Yoon Aff., ¶ 29.  The last thing RPGI needed at this critical time was to have its restructuring efforts and dispute with its chief competitor played out in a public forum.  Such publicity is simply not helpful and RPGI would not have gone to the extraordinary steps of filing this case if it had any viable options left.

Ultimately, only when it became clear that the debt could not be restructured because of AG's looming, and unlawful, presence in the picture was RPGI forced to file this action.  RPGI waited until AG's interference with the efforts to restructure the debt demonstrated that no successful restructuring could take place before it concluded that litigation was its only remaining option.  In short, any delay in the restructuring of the debt and the irreparable harm it has suffered or will suffer is because of AG's unlawful conduct.

## III.     THE BALANCE OF EQUITIES FAVORS RPGI.

AG has essentially conceded that the balance of equities and public interest favor the granting of the temporary restraining order.  AG in a single sentence summarily dismisses the

---

[8] AG's position is certainly paradoxical.  On the one hand, it contends that it has done nothing to injure RPGI and that the injury is, at least at present, too speculative, while on the other hand, it asks this Court to conclude that RPGI waited too long to bring this claim.  AG cannot have it both ways.

balance of the equities prong.  In doing so, AG contends that the balance of the equities do not favor the granting of an injunction here because RPGI faces no irreparable harm.  Opp'n Br. at 14.  But as articulated above and in RPGI's initial memorandum, RPGI has been irreparably harmed.  AG does not contest that the consequences to Plaintiffs are devastating and, by contrast, minimal for AG.  See Memo. in Supp. at 11.  As noted in the Dairy Queen decision, the harm that RPG will suffer is certainly a factor that this Court can and should take into consideration in determining the balancing of the public interest.  621 F.2d at 259, n.4.  While AG seeks to discount the harm that RPGI faces if an injunction is not entered, it does not and cannot dismiss the harm to RPG if AG is permitted to proceed unchecked[9].  Accordingly, the balance of equities must tip in favor RPGI.

Likewise, AG offers no substantive discussion or rebuttal of the arguments made by RPGI in its original memorandum in support of why the public interest favors the granting of an injunction.  Opp'n Br. at 14.  Nor does AG cite a single case in support of its conclusion that a TRO would not serve the public interest.  Id.  Left unexplained in AG's opposition brief is what benefit there is for AG, RPG's chief competitor, in assisting Plaintiffs in restructuring their debt so they can survive and prosper as a competing entity.  By failing to refute RPGI's arguments,

---

[9] Again, without waiving its objection to CSFB's Petition to Intervene in this matter, CSFB notes that the relief requested by RPGI creates issues in the administration of the loans of the First Lien Lenders.  CSFB Opp'n Br. at 1-2.  It should be noted that to the extent that these issues exist it is solely because of AG's wrongdoing in acquiring this debt in violation of the Confidentiality Agreement and is not attributable to any action or inaction of RPGI.  Additionally, as pointed out earlier, the issues raised by CSFB demonstrate the extent to which AG's acquisition of this debt, in and of itself, has interfered with the relationship with the First Lien Lenders and the power that AG wields in connection with this debt absent this Court providing RPGI with the relief it requests.  See Section II.B., supra, at 11-12, n.5.

With respect to CSFB's concerns that the temporary remedy RPGI is seeking may have an impact on the First Lien Lenders other than AG, it would seem that that concern could be addressed by requiring AG to exercise its interest in these loans consistent with how the majority of the other First Lien Lenders exercise their interests while precluding AG from engaging in any further discussions the First Lien Lenders (consistent with the obligations AG undertook in the Confidentiality Agreement).  In this way, the other First Lien Lenders can continue to exercise their rights with respect to these loans without RPGI being deprived of the remedy that AG specifically agreed was appropriate for a violation of the Confidentiality Agreement.

AG has conceded that that the proposed TRO does not interfere with the public interest and the public's interests are served by enforcing contractual obligations. <u>See</u> Memo. in Supp. at 12.

Finally, if AG is not enjoined from continuing its unlawful conduct and using its ill-gotten position to exercise power over RPGI, hundreds of jobs will be at risk, competition between AG and RPG will be erased, and the public will be deprived of access to the greeting cards of one of the last free-standing, nationally-operating greeting card companies. Yoon Aff., ¶44. In short, the public will be harmed and those interests further favor the granting of the requested injunction.

<u>**CONCLUSION**</u>

For the reasons set forth in this Reply and in its initial Memorandum of Law in Support of Emergency Motion for Temporary Restraining Order, RPGI respectfully requests that the Court enter a Temporary Restraining Order.

Dated: August 25, 2008                    Respectfully submitted,

                                          RPG INVESTMENT HOLDINGS, LLC,
                                          RPG HOLDINGS, INC. and
                                          RECYCLED PAPER GREETINGS, INC.

                                          By:  /s/ Michael F. Braun
                                          One of the Attorneys for Plaintiff

Michael F. Braun(Atty No.: 6180471)
James L. Komie(Atty No.: 6198089)
Robert D. Snow, Jr.(Atty No.: 6275952)
Schuyler Roche, P.C.
One Prudential Plaza, Suite 3800
130 East Randolph Street
Chicago, Illinois 60601
(312)565-2400
(312)565-8300(facsimile)

528835

**CERTIFICATE OF SERVICE**

I, Michael F. Braun, an attorney, certify that I have caused a true and correct copy of the above and

foregoing **PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF EMERGENCY MOTION FOR**

**TEMPORARY RESTRAINING ORDER** to be served, as indicated, by electronic means through CM/ECF and by

first class mail upon the persons named below on this 25th day of August, 2008:

| | |
|---|---|
| Lee Ann Russo<br>Mark P. Rotatori<br>JONES DAY<br>77 W. Wacker Drive<br>Chicago, IL 60601-1692<br><br>larusso@jonesday.com<br>mprotatori@jonesday.com<br><br>Counsel for Defendant American Greetings Corporation | John M. Newman, Jr.<br>JONES DAY<br>North Point<br>901 Lakeside Ave.<br>Cleveland, OH 44114-1190<br><br>jmnewman@jonesday.com<br><br><br>Counsel for Defendant American Greetings Corporation |
| Steven B. Towbin<br>Janice A. Alwin<br>SHAW GUSSIS FISHMAN GLANTZ<br> WOLFSON & TOWBIN LLC<br>321 N. Clark St., Ste. 800<br>Chicago, IL 60654<br><br>stowbin@shawgussis.com<br>jalwin@shawgussis.com<br><br>Counsel for Group of Second Lien Lenders of RPG Holdings, Inc. and Recycled Paper Greetings, Inc.: The institutions composing the Second Lien Group are funds managed by AEA Investors LLC, Guggenheim Investment Management, LLC, Plainfield Asset Management LLC, and Camulos Capital LP | Abid Qureshi<br>AKIN GUMP STRAUSS HAUER<br> & FELD LLP<br>590 Madison Ave.<br>New York, NY 10022<br><br>aquresh@akingump.com<br><br><br>Counsel for Group of Second Lien Lenders of RPG Holdings, Inc. and Recycled Paper Greetings, Inc. The institutions composing the Second Lien Group are funds managed by AEA Investors LLC, Guggenheim Investment Management, LLC, Plainfield Asset Management LLC, and Camulos Capital LP |
| Derek L. Wright<br>Mark F. Hebbeln<br>FOLEY & LARDNER LLP<br>321 N. Clark, Ste. 2800<br>Chicago, IL 60654<br><br>dlwright@foley.com<br>mfhebbein@foley.com<br><br>Counsel for Credit Suisse, Cayman Islands Branch | Kenneth H. Eckstein<br>P. Bradley O'Neill<br>KRAMER LEVIN NAFTALIS &<br> FRANKEL, LLP<br>1177 Avenue of the Americas<br>New York, NY 10036<br><br>keckstein@kramerlevin.com<br>boneill@kramerlevin.com<br><br>Counsel for Credit Suisse, Cayman Islands Branch |

By: /s/ Michael F. Braun

# EXHIBIT I

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

RPG INVESTMENT HOLDINGS, LLC, a     )
Delaware Limited Liability Company, RPG     )
HOLDINGS, INC., a Delaware Corporation     )
and RECYCLED PAPER GREETINGS, INC.,     )
an Illinois Corporation,     )     Case No. 08 CV 4422
                                              )     Judge Wayne R. Andersen
             Plaintiffs,     )     Magistrate Judge Maria Valdez
                                              )
v.     )     JURY DEMAND
                                              )
AMERICAN GREETINGS CORP.,     )
                                              )
             Defendant.     )

## SUPPLEMENTAL AFFIDAVIT OF CHARLES YOON

Charles Yoon, being duly sworn, hereby deposes and says as follows:

1.      I am a member of the Board of Managers of RPG Investment Holdings,

LLC ("RPGI"), and a member of the Board of Directors of RPG Holdings, Inc ("RPG

Holdings"), and Recycled Paper Greetings, Inc. ("RPG")(collectively, RPG Holdings and

RPG are referred to as the "affiliates").

2.      I am over 18 years of age, and have personal knowledge of the facts stated

herein.

3.      I submit this Supplemental Affidavit in support of the Plaintiffs'

Complaint and Emergency Motion for Temporary Restraining Order to address the

incorrect "factual" assertions contained in American Greetings Corporation's ("AG")

Opposition to Plaintiff's Emergency Motion for a Temporary Restraining Order

("opposition brief" or Opp'n Br.").

4.    The suggestion by AG that RPGI's delay in filing this lawsuit somehow reflects the lack of an emergency ignores several important facts.  See Opp'n Br. at 9.

a.) First, on July 14, 2008, as soon as RPGI confirmed that AG had wrongfully acquired the debt of RPG through the use of a straw-man, RPGI and its affiliates, through its counsel, made written demand upon AG to immediately cease any communication with RPG's lenders and attempts to acquire their debt.  Attached hereto as Exhibit A is a true and accurate copy of that written demand.

b.) Second, immediately thereafter and up until the filing of the motion for a temporary restraining order, RPGI and its affiliates, and the First and Second Lien Lenders were engaged in negotiations toward a global resolution.

c.) Because of AG's presence as the majority First Lien Lender and the Second Lien Lenders belief that AG is a potential alternative bidder, the negotiations toward a global resolution were dragged out to the point where RPG is entering into a critical liquidity phase and its independence was and is threatened.

d.) As soon as it became clear that the negotiations toward a global resolution with the Second Lien lenders had broken down because of AG's presence, RPGI filed suit.

5.    With respect to the Confidentiality Agreement, there were negotiations *specifically* over who should be party to the Confidentiality Agreement.  It was subsequently agreed by AG, as well as by representatives of RPG and Monitor Clipper

Partners (a member of RPGI), that the Confidentiality Agreement should be executed by AG and RPGI.

6.    AG claims that RPGI's tortious interference claim must fail as well because RPGI's "confidence" that the debt would be restructured amounts to nothing "more than a mere hope." Opp'n Br. at 13.  At the time that AG acquired debt from the First Lien Lenders, RPGI and its affiliates were engaged in ongoing discussions with the First and Second Lien Lenders and had expected to be able to restructure the debt on more favorable terms.  Most, if not all, of the First and Second Lien Lenders expressed to RPGI that it was in everyone's best interests to move forward with a successful restructuring.

7.    This expectation of a successful restructuring was based on several factors:

> a.) RPGI and its affiliates had good relationships with the First Lien Lenders and Second Lien Lenders throughout the life of their relationship, which goes back to December 2005.
>
> b.) Up until the time that AG improperly acquired a majority of the debt from the First Lien Lenders, the restructuring efforts were progressing positively and, based on my years of prior business experience and a prior successful restructuring of the debt with the lenders in 2007, in a manner consistent with reaching a mutually agreeable outcome with both the First and Second Lien Lenders.
>
> c.) It was in both the First and Second Lien Lenders' best interests to restructure the debt with RPGI and its affiliates as a means of maximizing

the return on the loans.  The failure to restructure the loans could have resulted in a bankruptcy in which the Second Lien Lenders (and possibly the First Lien Lenders) would likely have fared worse than under the restructuring that was being negotiated.  It was clearly in the best interest of all parties, prior to AG's acquisition of a majority of the debt from the First Lien Lenders, to ensure that RPG continue to operate and to see that it had the working capital to expand its operation.

8.     These interests changed due to AG's improper acquisition of the majority of the debt from the First Lien Lenders and its interference with the restructuring efforts that occurred simply by it becoming the majority holder of the debt.  Due to AG's wrongful presence as a holder of a majority of this debt, the Second Lien Lenders believed that there was another entity to which they could turn in order to obtain a better return on their loans.  This alternative would not have been available to the Second Lien Lenders but for AG's violation of the Confidentiality Agreement that led to its improper acquisition of the majority of the debt from the First Lien Lenders.  In addition, representatives of both the First and Second Lien Lenders expressed concern about AG's ability to veto a restructuring that was otherwise acceptable to all parties.

9.     AG's presence as the holder of a majority of the First Lien Loans also interferes with the debt restructuring efforts of RPGI and its affiliates in another very important way.  RPGI's ability to attract new sources of equity have been destroyed as investors are not willing to invest in an entity where the majority of that entity's loans are held by one of its largest competitors who will have access to RPG's strategically sensitive and highly confidential competitive information.

4

I, Charles Yoon, am over the age of eighteen, make this affidavit on personal knowledge and under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, and certify that the foregoing is true and correct.

_____
CHARLES YOON

Dated:  August 25, 2008

# EXHIBIT II

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RPG INVESTMENT HOLDINGS, LLC, a Delaware Limited Liability Company, RPG HOLDINGS, INC., a Delaware Corporation and RECYCLED PAPER GREETINGS, INC., an Illinois Corporation, | ) ) ) ) ) | Case No. 08 CV 4422 |
| | ) | Judge Wayne R. Andersen |
| Plaintiffs, | ) ) | Magistrate Judge Maria Valdez |
| | ) | |
| v. | ) | JURY DEMAND |
| | ) | |
| AMERICAN GREETINGS CORP., | ) ) | |
| Defendant. | ) | |

**AFFIDAVIT OF JUDE RAKE**

I, Jude Rake, hereby declare under penalty of perjury as follows:

1.    I am the Chief Executive Officer of plaintiff Recycled Paper Greetings, Inc. ("RPG").

2.    I am over 18 years of age, and have personal knowledge of the facts stated herein.

3.    I submit this affidavit in support of RPGI's Emergency Motion for a Temporary Restraining Order against defendant American Greetings Corp. ("AG"), which RPG joins.

4.    AG is a direct competitor of RPG.

5.    My understanding is that, by virtue of owning and/or controlling the First Lien Loans, AG, under the First Lien Credit Agreement, has rights of access to detailed pricing, financial and strategic information of RPG, including business plans, financial forecasts and the amount of cash that RPG has on hand. This type of information is provided to the First Lien Lenders and the Second Lien Lenders on a confidential basis.

The detail in this information goes far beyond the confidential information provided to AG pursuant to the terms of the Confidentiality Agreement (which, in any event, AG was permitted to use only for the purpose of considering a Transaction.).

6.      RPG keeps this information confidential and, in particular, would not provide it to AG.

7.      Disclosure to AG of RPG's sensitive competitive information would cause irreparable harm to RPG. AG is one of RPG's main competitors. As such, RPG will be at a substantial competitive disadvantage if AG is permitted to have access to this information.

I, Jude Rake, am over the age of eighteen, make this affidavit on personal knowledge and under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, and certify that the foregoing is true and correct.

JUDE RAKE
Chief Executive Officer
Recycled Paper Greetings, Inc.
Dated:  August 25, 2008

2