# EXHIBIT I

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RPG INVESTMENT HOLDINGS, LLC, a Delaware Limited Liability Company, RPG HOLDINGS, INC., a Delaware Corporation and RECYCLED PAPER GREETINGS, INC., an Illinois Corporation, <br><br> Plaintiffs, <br><br> v. <br><br> AMERICAN GREETINGS CORP., <br><br> Defendant. | Case No. 08 CV 4422 <br> Judge Wayne R. Andersen <br> Magistrate Judge Maria Valdez <br><br> JURY DEMAND |

## SUPPLEMENTAL AFFIDAVIT OF CHARLES YOON

Charles Yoon, being duly sworn, hereby deposes and says as follows:

1. I am a member of the Board of Managers of RPG Investment Holdings, LLC ("RPGI"), and a member of the Board of Directors of RPG Holdings, Inc ("RPG Holdings"), and Recycled Paper Greetings, Inc. ("RPG")(collectively, RPG Holdings and RPG are referred to as the "affiliates").

2. I am over 18 years of age, and have personal knowledge of the facts stated herein.

3. I submit this Supplemental Affidavit in support of the Plaintiffs' Complaint and Emergency Motion for Temporary Restraining Order to address the incorrect "factual" assertions contained in American Greetings Corporation's ("AG") Opposition to Plaintiff's Emergency Motion for a Temporary Restraining Order ("opposition brief" or Opp'n Br.").

4. The suggestion by AG that RPGI's delay in filing this lawsuit somehow reflects the lack of an emergency ignores several important facts. See Opp'n Br. at 9.

    a.) First, on July 14, 2008, as soon as RPGI confirmed that AG had wrongfully acquired the debt of RPG through the use of a straw-man, RPGI and its affiliates, through its counsel, made written demand upon AG to immediately cease any communication with RPG's lenders and attempts to acquire their debt. Attached hereto as Exhibit A is a true and accurate copy of that written demand.

    b.) Second, immediately thereafter and up until the filing of the motion for a temporary restraining order, RPGI and its affiliates, and the First and Second Lien Lenders were engaged in negotiations toward a global resolution.

    c.) Because of AG's presence as the majority First Lien Lender and the Second Lien Lenders belief that AG is a potential alternative bidder, the negotiations toward a global resolution were dragged out to the point where RPG is entering into a critical liquidity phase and its independence was and is threatened.

    d.) As soon as it became clear that the negotiations toward a global resolution with the Second Lien lenders had broken down because of AG's presence, RPGI filed suit.

5. With respect to the Confidentiality Agreement, there were negotiations *specifically* over who should be party to the Confidentiality Agreement. It was subsequently agreed by AG, as well as by representatives of RPG and Monitor Clipper

Partners (a member of RPGI), that the Confidentiality Agreement should be executed by AG and RPGI.

6. AG claims that RPGI's tortious interference claim must fail as well because RPGI's "confidence" that the debt would be restructured amounts to nothing "more than a mere hope." Opp'n Br. at 13. At the time that AG acquired debt from the First Lien Lenders, RPGI and its affiliates were engaged in ongoing discussions with the First and Second Lien Lenders and had expected to be able to restructure the debt on more favorable terms. Most, if not all, of the First and Second Lien Lenders expressed to RPGI that it was in everyone's best interests to move forward with a successful restructuring.

7. This expectation of a successful restructuring was based on several factors:

> a.) RPGI and its affiliates had good relationships with the First Lien Lenders and Second Lien Lenders throughout the life of their relationship, which goes back to December 2005.
>
> b.) Up until the time that AG improperly acquired a majority of the debt from the First Lien Lenders, the restructuring efforts were progressing positively and, based on my years of prior business experience and a prior successful restructuring of the debt with the lenders in 2007, in a manner consistent with reaching a mutually agreeable outcome with both the First and Second Lien Lenders.
>
> c.) It was in both the First and Second Lien Lenders' best interests to restructure the debt with RPGI and its affiliates as a means of maximizing

the return on the loans. The failure to restructure the loans could have resulted in a bankruptcy in which the Second Lien Lenders (and possibly the First Lien Lenders) would likely have fared worse than under the restructuring that was being negotiated. It was clearly in the best interest of all parties, prior to AG's acquisition of a majority of the debt from the First Lien Lenders, to ensure that RPG continue to operate and to see that it had the working capital to expand its operation.

8. These interests changed due to AG's improper acquisition of the majority of the debt from the First Lien Lenders and its interference with the restructuring efforts that occurred simply by it becoming the majority holder of the debt. Due to AG's wrongful presence as a holder of a majority of this debt, the Second Lien Lenders believed that there was another entity to which they could turn in order to obtain a better return on their loans. This alternative would not have been available to the Second Lien Lenders but for AG's violation of the Confidentiality Agreement that led to its improper acquisition of the majority of the debt from the First Lien Lenders. In addition, representatives of both the First and Second Lien Lenders expressed concern about AG's ability to veto a restructuring that was otherwise acceptable to all parties.

9. AG's presence as the holder of a majority of the First Lien Loans also interferes with the debt restructuring efforts of RPGI and its affiliates in another very important way. RPGI's ability to attract new sources of equity have been destroyed as investors are not willing to invest in an entity where the majority of that entity's loans are held by one of its largest competitors who will have access to RPG's strategically sensitive and highly confidential competitive information.

I, Charles Yoon, am over the age of eighteen, make this affidavit on personal knowledge and under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, and certify that the foregoing is true and correct.

_____
CHARLES YOON

Dated: August 25, 2008

# EXHIBIT A



# MANCHEL BRENNAN
COUNSELLORS AT LAW

*Subject to the terms of the Confidentiality Agreement dated May 16, 2008*

July 14, 2008

*Via Electronic and Overnight Mail*

Catherine M. Kilbane, Esq.
Senior Vice President and General Counsel
American Greetings Corporation
One American Road
Cleveland, OH 44144

RE:   **Recycled Paper Greetings Confidentiality Agreement**

Dear Attorney Kilbane:

This firm represents RPG Investment Holdings, LLC and its affiliates (collectively, "RPG"), and it is on behalf of RPG that demand is made, pursuant to the terms of the Confidentiality Agreement dated May 16, 2008 (the "Agreement"), upon American Greetings Corp., including its representatives and affiliates (collectively, "AG"), for AG to immediately:

(1)   cease and desist from contacting, let alone communicating, with any of RPG's lenders regarding or concerning RPG and/or any debt obligation of RPG in violation of the Agreement;

(2)   cease and desist from using any confidential information of RPG in violation of the Agreement;

(3)   comply fully with the terms of the Agreement;

(4)   terminate, rescind and/or revoke any and all transactions, understandings, efforts and/or agreements pursuant to which AG purchased or assumed or acquired in whole or in part any debt obligation of RPG, or has agreed or is attempting to agree do so (an "AG Debt Transaction"); and

(5)   confirm, by July 16, 2008, in a writing signed under oath that:
    (a)   AG has terminated, rescinded and/or revoked each and every AG Debt Transaction;
    (b)   AG has ceased contacting and, until and including May 15, 2010, will not contact, among others, any RPG lender regarding a debt obligation of RPG, without obtaining RPG's prior written consent; and
    (c)   AG will not enter into or attempt to enter into any AG Debt Transaction without obtaining RPG's prior written consent.

Catherine M. Kilbane
July 14, 2008
Page 2

This demand is made upon the following information:

AG, on its own initiative, contacted RPG to discuss the possibility of a transaction between RPG and AG. In connection therewith, on May 16, 2008, RPG and AG executed the Agreement. As AG knows, Section 8 of the Agreement provides that:

> Without each Party's prior written consent, neither Party nor its Representatives shall . . . make any contact of any nature... (including inquiries or requests concerning Confidential Information) with any ...bank or other lender to the other Party or any of its affiliates other than in the ordinary course of such Party's business and not related in any way to such Party's consideration of a Transaction.

Despite this clear contractual obligation, RPG has discovered that AG and/or Representatives of AG appears to have surreptitiously contacted lenders of RPG and acquired, and/or is in the process of attempting to acquire debt obligations RPG owes to lenders. If that is indeed the case, such conduct would violate, among other things, the Agreement and AG's common law duty of good faith and fair dealing. Equally egregious, any such conduct would directly contradict express representations made to RPG by Zev Weiss, the Chief Executive Officer of AG; representations on which RPG relied in deciding whether to continue discussions with AG about a possible transaction between AG and RPG. Moreover, based on what RPG has been able to discern to date, the covert nature of AG's wrongful efforts indicates that, while engaging in the actions described above, AG knew that it was acting unlawfully.

By virtue of the forgoing, RPG demands that AG respond to this letter in the manner set forth above. AG's obligations under the Agreement are clear and unambiguous. Consequently, if RPG's demand is not met on or before 5:00 p.m. EST on Wednesday, July 16, 2008, RPG will take all legal steps necessary to address AG's illegal conduct. In making this demand, RPG expressly reserves and preserves all of its rights and remedies.

RPG looks forward to AG's anticipated cooperation.

Yours very truly,

Steven L. Manchel

Enclosure

CONFIDENTIALITY AGREEMENT

May 16, 2008

In connection with a possible transaction (the "Transaction") between RPG Investment Holdings, LLC ("RPGIH") or its affiliates and American Greetings Corp. ("AM") (individually, a "Party", and collectively, the "Parties"), each Party may disclose and/or deliver to the other Party certain information about its properties, employees, ownership, assets, finances, businesses, operations, plans and other confidential information (such Party when disclosing such information being the "Disclosing Party" and such Party when receiving such information being the "Receiving Party"). All such information furnished by the Disclosing Party or any of its Representatives (as defined below), whether furnished before or after the date hereof, whether oral or written, and regardless of the manner in which it is furnished, is referred to in this confidentiality agreement as "Confidential Information".

1.  The term "Confidential Information" also includes all notes, analyses, compilations, studies, interpretations or other documents prepared by the Receiving Party or any of its Representatives (as hereinafter defined) which contain, reflect or are based upon, in whole or in part, the information furnished to the Receiving Party or any of its Representatives by the Disclosing Party or any of its Representatives pursuant hereto. Confidential Information does not include, however, any information which (i) at the time of disclosure or thereafter is generally available to or known by the public (other than as a result of its disclosure by the Receiving Party or any of its Representatives in breach of this confidentiality agreement), or (ii) was or becomes available to the Receiving Party on a non-confidential basis from a Person, other than the Disclosing Party or any of its Representatives, who is not known by the Receiving Party to be otherwise bound by a confidentiality agreement, or is not otherwise prohibited from transmitting the information. The Confidential Information shall remain the property of the Disclosing Party. No rights to use, license or otherwise exploit the Confidential Information are granted to the Receiving Party, by implication or otherwise. The Receiving Party will not by virtue of our disclosure of the Confidential Information and/or your use of the Confidential Information acquire any rights with respect thereto, all of which rights shall remain exclusively with the Disclosing Party.

2.  Unless otherwise agreed to in writing by the Disclosing Party, the Receiving Party hereby agrees: (a) that the Confidential Information will be used solely for the purpose of evaluating and implementing the Transaction and for no other purpose, including without limitation obtaining a competitive advantage over the other party or enforcement or legal action of any type other than to enforce this Confidentiality Agreement; and (b) that such information will be kept confidential by the Receiving Party; provided that any such information may be disclosed to the Receiving Party's officers, directors, employees, accountants, attorneys, financial advisors, consultants, other agents or representatives and financing

BOI\179541\02\3%J902!.DOC\69303.0001

sources (such Persons hereinafter collectively being referred to as "Representatives"). The Receiving Party agrees that Confidential Information shall only be provided to its Representatives who need such Confidential Information for the purpose of evaluating and implementing the Transaction, who have been informed of the confidential nature of the Confidential Information and the terms of this Confidentiality Agreement, and agree to be bound by the terms of this Confidentiality Agreement prior to disclosure to them of any Confidential Information. The Receiving Party shall be liable for any breach of this Confidentiality Agreement by its Representatives. Without the prior written consent of AM, RPGIH will not disclose any Confidential Information of AM to any employees of Recycled Paper Greetings, Inc. Notwithstanding the foregoing, AM recognizes and agrees that employees of Recycled Paper Greetings may be aware of discussions between RPGIH and AM and may be utilized to assist RPGIH in providing Confidential Information to AM.

3. Given the nature of the Confidential Information and the Parties' current discussions, each Party acknowledges that the other Party may be irreparably damaged by any unauthorized disclosure of any Confidential Information. Without prejudice to the rights and remedies otherwise available to each Party, each Party shall be entitled, without the requirement of a posting of a bond or other security to seek equitable relief, including an injunction or specific performance, in the event of any breach of the provisions of this confidentiality agreement.

4. In the event that the Receiving Party or any of its Representatives becomes legally compelled (by deposition, interrogatory, request for documents, subpoena, civil investigation, demand, order or similar process) to disclose any of the contents of the Confidential Information, or the fact that discussions or negotiations are taking place concerning a possible Transaction between RPGIH and AM, or any of the terms, conditions or other facts with respect to any such possible Transaction, including the status thereof, the Disclosing Party agrees that the Receiving Party and its Representatives may do so without liability, but the Receiving Party agrees to (i) promptly notify the Disclosing Party prior to any such disclosure to the extent practicable and (ii) cooperate with the Disclosing Party, at such party's expense, in any attempt it may make to obtain a protective order or other appropriate assurance that confidential treatment will be afforded the Confidential Information.

5. Each Party may elect at any time to terminate further access to its Confidential Information. Following any such written request the Receiving Party and its Representatives agree (i) to promptly, in its discretion, redeliver or destroy all written Confidential Information and any other written material containing or reflecting any of the Confidential Information in its possession or its Representatives' possession, (ii) not to retain any copies, extracts or other reproductions in whole or in part, mechanical or electronic, of such written material, and (iii) to destroy all computer records, documents, memoranda, notes

and other writings prepared by the Receiving Party or its Representatives based on the Confidential Information.

6. Each Party agrees that it is not entitled to rely on the accuracy or completeness of the Confidential Information and that each Party shall be entitled to rely solely on such representations and warranties as may be made in any definitive agreement relating to the Transaction, subject to the terms and conditions of such agreement. Accordingly, each Party acknowledges that, except as may be provided in such agreement, neither the other Party nor any of its Representatives makes any express or implied representation or warranty as to the accuracy or completeness of any of the Confidential Information.

7. The Parties agree that, unless and until a binding agreement is entered into between RPGIH and AM with respect to the Transaction, neither RPGIH nor AM will be under any legal obligation of any kind whatsoever with respect to the Transaction by virtue of this or any other written or oral expression, except with respect to the matters specifically agreed to herein. Nothing contained in any discussions between RPGIH and AM or in any Confidential Information shall be deemed to constitute a representation or warranty. Except for the matters set forth in this Agreement or in any such binding agreement, neither party shall be entitled to rely on any statement, promise, agreement or understanding, whether oral or written, any custom, usage of trade, course of dealing or conduct.

8. Each Party agrees that all (i) communications regarding the Transaction, (ii) requests for additional information, (iii) requests for facility tours or management meetings, and (iv) discussions or questions regarding procedures, will be submitted or directed to the Persons designated by each Party. Without each Party's prior written consent, neither Party nor its Representatives shall (i) disclose to any Person the fact that the Disclosing Party has made the Confidential Information available to the Receiving Party, that either Party is considering a proposed Transaction or that discussions, negotiations or meetings are taking place or have taken place concerning a proposed Transaction, or any of the terms, conditions or other facts with respect to any such Transaction, including the status and/or timing thereof, or (ii) make any contact of any nature (including inquiries or requests concerning Confidential Information) with any employee, supplier, customer, labor union, landlord, lessor, bank or other lender to the other Party or any of its affiliates other than in the ordinary course of such Party's business and not related in any way to such Party's consideration of a Transaction. Each party represents and warrants to the other that it has the right to disclose to the other party any Confidential Information disclosed pursuant to this Confidentiality Agreement.

9. This Agreement shall be governed and construed in accordance with the laws of the State of Delaware, without regard to conflicts-of-law principles. You hereby irrevocably and unconditionally consent to submit to the jurisdiction of the courts of the State of Delaware and of the United States of America located in the State

of Delaware for any action, suit or proceeding arising out of or relating to this agreement.

10. The provisions of this Agreement shall be binding solely upon and inure to the benefit of the Parties hereto and their respective successors and assigns. Neither Party may assign any or all rights, power, privileges and obligations under this Agreement without the other Party's prior written consent.

11. This confidentiality agreement represents the entire understanding and agreement of the Parties hereto and may be modified only by a separate written agreement executed by RPGIH and AM expressly modifying this confidentiality agreement. This Agreement supersedes and cancels any and all prior agreements between the parties hereto, express or implied, relating to the Transaction.

12. No past, present or future director, officer, employee, member, shareholder, incorporator, partner, and/or affiliate of either Party hereto or any affiliate thereof shall have any liability for any obligations of such Party under this Agreement or for any claim based on, in respect of or by reason of such obligations or their creation

13. In the event that any provision or portion of this Agreement is determined to be invalid or unenforceable for any reason, in whole or in part, the remaining provisions of this Agreement shall be unaffected thereby and shall remain in full force and effect to the fullest extent permitted by law, and such invalid or unenforceable term or provision shall be deemed replaced by a term or provision that is valid and enforceable and that comes closest to expressing the Parties' intention with respect to such invalid or unenforceable term or provision.

14. The failure or refusal by either Party to insist upon strict performance of any provision of this Agreement or to exercise any right in any one or more instances or circumstances shall not be construed as a waiver or relinquishment of such provision or right, nor shall such failures or refusals be deemed a custom or practice contrary to such provision or right.

15. For purposes of this confidentiality agreement: (a) "affiliate" shall mean, as to any Person, any other Person which, directly or indirectly, controls, or is controlled by, or is under common control with, such Person (for this purpose, "control" (including, with its correlative meanings, "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management or policies of a Person, whether through the ownership of securities or partnership or other ownership interests, by contract or otherwise); and (b) "Person" shall be broadly interpreted to include any individual, corporation, company, partnership, limited liability company, trust or other group or entity (including any court, government or agency, commission, board or authority thereof, federal, state or local, domestic, foreign or multinational).

16. This confidentiality agreement shall terminate upon the earlier to occur of (i) the closing of the Transaction contemplated by this confidentiality agreement, and (ii) two (2) years after the date hereof, provided that the Parties' obligations hereunder with respect to trade secrets will continue indefinitely.

17. This confidentiality agreement may be executed in any number of counterparts, each of which when so executed shall be deemed an original, but such counterparts shall together constitute one and the same agreement.

*Remainder of page intentionally left blank*

IN WITNESS WHEREOF, the Parties have executed this confidentiality agreement as of the date first written above.

| RPG INVESTMENT HOLDINGS, LLC | American Greetings Corp. |
|---|---|
| By: *[signature]* | By: _____ |
| | Name: _____ |
| | Title: _____ |
| By: _____ | |
| Name: _Bill Young_ | |
| Title: _Director, RPG Investment Holdings, LLC_ | |

BOI::170541'02-3%J9021.DOC\69303.0001