**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| RPG Investment Holdings, LLC, *et al.*, | Civil Action No. 08CV4422 |
| Plaintiffs, | Judge Wayne R. Andersen |
| v. | Magistrate Judge Maria Valdez |
| American Greetings Corporation, | |
| Defendant. | |

**DEFENDANT'S RESPONSE TO PLAINTIFFS' NEW MATERIAL
AND RELATED ARGUMENTS SUBMITTED ON "REPLY"
IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING ORDER**

Of Counsel:
David F. Adler
Pearson N. Bownas
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114-1190
(216) 586-3939

Lee Ann Russo
larusso@jonesday.com
Mark P. Rotatori
mprotatori@jonesday.com
JONES DAY
77 W. Wacker Drive
Chicago, Illinois 60601-1692
(312) 782-3939

John M. Newman, Jr.
jmnewman@jonesday.com
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114-1190
(216) 586-3939

Counsel for Defendant
AMERICAN GREETINGS CORPORATION

**Table of Contents**

Table of Authorities ........................................................................................................-ii-

I.  INTRODUCTION ..............................................................................................................1

II. PLAINTIFFS STILL DO NOT SHOW THEY WILL SUFFER IRREPARABLE
    HARM WITHOUT A TRO ................................................................................................2

    A. The Yoon Affidavits Lack Evidence of Irreparable Harm ...................................3

        1. The Original Yoon Affidavit ....................................................................3

        2. The Supplemental Yoon Affidavit............................................................4

        3. Yoon's "Mere Presence" Assertion ..........................................................6

    B. The Rake Affidavit Lacks Evidence Of Irreparable Harm ...................................7

    C. The Confidentiality Agreement's "Acknowledgment" Does Not Fill
       Plaintiffs' Irreparable Harm Void..........................................................................8

III. PLAINTIFFS STILL DO NOT SHOW THEY ARE LIKELY TO SUCCEED ON
     THE MERITS OF THEIR CLAIMS ................................................................................10

    A. Plaintiffs Do Not Show That AG Likely Breached The Confidentiality
       Agreement By Acquiring RPG's Debt ................................................................10

    B. Plaintiffs Do Not Show That RPGH And RPG Likely Are Third-Party
       Beneficiaries Of The Confidentiality Agreement ...............................................12

    C. Plaintiffs Do Not Show A Likelihood Of Success On Their Claim Of
       Tortious Interference With Business Expectancy ...............................................13

IV. THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST DO NOT
    FAVOR THE TRO ...........................................................................................................13

V.  CONCLUSION.................................................................................................................15

CLI-1647054v1

**Table of Authorities**

***Cases***     ***Page***

*American Passage Media Corp. v. Cass Communications, Inc.*,
750 F.2d 1470 (9th Cir. 1985) ................................................................................................4

*Berg-Manufacturing & Sales Corp. v. Ivy/Mar Co., Inc.*,
No. 96 C 0988, 1996 WL 596512 (N.D. Ill. Oct. 15, 1996) ........................................................4

*Bobson v. Gulfstream Marketing, Ltd.*,
No. 86C-NO11, 1988 WL 109324 (Del. Super. Oct. 4, 1988) ......................................................12

*Brown v. Kerr-McGee Chemical Corp.*,
767 F.2d 1234 (7th Cir. 1985) ................................................................................................7

*Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications Corp.*,
No. 12150, 1991 WL 277613 (Del. Ch. Dec. 30, 1991) ...............................................................14

*Delmarva Health Plan, Inc. v. Aceto*,
750 A.2d 1213 (Del. Ch. 1999) ................................................................................................11

*Geyer v. Ingersoll Publishing Co.*,
621 A.2d 784 (Del. Ch. 1992) ................................................................................................14

*Search Force, Inc. v. Dataforce Int'l, Inc.*,
112 F. Supp. 2d 771 (S.D. Ind. 2000) ...........................................................................................4

*Triebwasser & Katz v. American Telephone and Telegraph Co.*,
535 F.2d 1356 (2d Cir. 1976) ................................................................................................7

***Rules***
Fed. R. Civ. P. 65(b) ................................................................................................................3
Fed. R. Civ. P. 65(c) ................................................................................................................9

***Other***
13 James Wm. Moore *et al.*, Moore's Federal Practice § 65.23[2] (3d ed. 2008) ..........................4

CLI-1647054v1

I.      INTRODUCTION

Plaintiffs throw up a moving target.  Their "reply" brief attacks defendant American Greetings ("AG") primarily for succumbing to what was essentially a head fake.  In response to the many serious flaws in the TRO motion of original plaintiff RPG Investment Holdings ("I-Holdings"), AG focused on the most glaring deficiency:  the irreparable harm alleged by I-Holdings was actually purported harm to a non-party, its indirect subsidiary Recycled Paper Greetings, Inc. ("RPG").[1]  Under settled Seventh Circuit law, that supposed harm to another, whether actual or not, afforded no proper ground for a TRO in favor of I-Holdings, and so the motion's other flaws were effectively rendered moot.

Apparently conceding, or at least mightily fearing, that AG was right, I-Holdings has now shifted the target.  It amended the complaint to add RPG and another subsidiary, RPG Holdings, Inc. ("RPGH") as parties.  Then, they joined together to criticize AG for shooting wide of the mark.  They say in their reply that AG conceded many items by not having addressed them, and rely on their new material as support.  In this further brief, authorized by Judge Castillo, we address the new circumstances created by the amended complaint and new affidavits.

As the saying goes, the more things change, the more they stay the same – and so with the story here.  Despite the new complaint with two new parties and a new third-party beneficiary theory, as well as new affidavits and even more time to conjure, the protagonists still do not identify anything AG is doing, or has threatened to do, that could cause irreparable harm to any plaintiff, old or new.  This fundamental failure alone means plaintiffs still have not established a basis for extraordinary relief.

Other flaws from the original I-Holdings' motion likewise remain unfixed.  I-Holdings

---

[1] We refer here to AG's opposition memorandum, filed on August 13, 2008 (Dkt. No. 13).  For useful factual background, including a diagram of the I-Holdings corporate structure, we point the Court in particular to pages 1 through 5 of that filing.

still is not likely to succeed on its breach of contract claim; the contract restricted the disclosure of confidential information exchanged between I-Holdings and AG, while plaintiffs' claims here try to seat themselves on something else altogether (AG's acquisition of RPG's debt). And plaintiffs also remain unlikely to prevail on a tortious interference claim. The same failure that dooms their irreparable harm showing also defeats their likelihood of success on tortious interference: the pleadings and other filings identify nothing AG is doing or is about to do to interfere with any restructuring transaction – of which there is none identified in the first place.

Finally, in the several weeks since AG filed its opposition, the weight of the equities and the public interest against the requested TRO have only become more clear. At bottom, I-Holdings seeks a TRO to exclude AG from the process of restructuring RPG's apparently crushing debt – debt for which I-Holdings itself originally arranged. As plaintiffs themselves admit, AG's involvement may well lead to improved terms for the other debt holders, whose interests are inherently senior to that of I-Holdings, and who support AG's involvement, but whose participation in this proceeding I-Holdings has been working to block. A self-serving TRO that would advance only the exclusionary interests of I-Holdings and its equity stake in RPG, at the expense of the many other constituents in the RPG situation, is not favored by equity, and does not serve the public interest

Plaintiffs' changes to their case are substantial enough to require this additional response, but not to change the result. They still do not make the showing required to obtain the extraordinary relief of a TRO. The Court should deny their motion.

**II.    PLAINTIFFS STILL DO NOT SHOW THEY WILL SUFFER IRREPARABLE HARM WITHOUT A TRO**

Despite the passage of roughly ten weeks since AG's acquisition of certain RPG first lien debt, and despite having filed two complaints, two briefs, and three affidavits, plaintiffs still

CLI-1647054v1

cannot identify a single act by AG that has interfered (or threatened to interfere) with any particular transaction to restructure RPG's debt. That failure means plaintiffs have not met their heavy burden to show, clearly and convincingly, they will be irreparably harmed in the absence of extraordinary temporary relief.[2]

### A. The Yoon Affidavits Lack Evidence Of Irreparable Harm.

#### 1. The Original Yoon Affidavit

The complaints are not verified, and so plaintiffs rely on affidavits for evidence to support their TRO motion. Fed. R. Civ. P. 65(b). Their "evidence" regarding AG's alleged conduct and RPG's alleged restructuring efforts is contained in two affidavits of Charles Yoon, an I-Holdings official responsible for creating RPG's debt-laden capital structure. Their reply brief contends that, because AG did not refute the original Yoon affidavit with a counter-affidavit, the Court must accept that affidavit as Gospel. (Reply, Dkt. No. 39, at 1-2 n.1.) This contention is wrong, for two reasons.

First, Mr. Yoon's original affidavit (apart from verifying certain unarguable formalities, such as the existence of the May 16 confidentiality agreement) discussed only harm that would supposedly occur to RPG, which at the time was not a party to the case. By later scrambling to insert RPG as a party, plaintiffs effectively acknowledged that RPG's alleged non-party injuries could not have supplied the irreparable harm I-Holdings needed to obtain a TRO. Even plaintiffs would therefore seem to agree that, when AG filed its response, Mr. Yoon's original affidavit merited no response because it had no legal significance for the matters on which the requested

---

[2] AG's opposition noted that I-Holdings' delay in seeking "emergency" TRO relief was consistent with the absence of irreparable harm. (Opp., Dkt. No. 13, at 9 n.6.) In reply, plaintiffs lob up many excuses for why they sat on their hands while the harm they now say is irreparable continued, in their view, to occur. (Supp. Aff. of Charles Yoon, Dkt. No. 45 ("Supp. Yoon Aff."), ¶ 4.) None of those excuses, however, changes the reality that plaintiffs have always controlled the decisions about when to file and how aggressively to pursue TRO relief. The supposedly grave harm they describe in their papers is simply not consistent with their deliberate decisions not to seek relief sooner and more aggressively.

- 3 -

relief might hinge.

Second, the affidavit needed no counter-factual response because it had no factual significance itself. Courts accept affidavits only for "well alleged *facts*." *Berg-Mfg. & Sales Corp. v. Ivy/Mar Co., Inc.*, No. 96 C 0988, 1996 WL 596512, at *5 (N.D. Ill. Oct. 15, 1996) (emphasis added). Affidavits that "are conclusory and without sufficient support in facts" are insufficient to support a TRO. *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985) (reversing preliminary injunction because supporting affidavit was conclusory and not factually specific).[3] In his original affidavit, Mr. Yoon asserted that AG was "working on a 'strategy' concerning how it will use" its status as an RPG debt-holder. (Aff. of Charles Yoon, Dkt. No. 35 ("Yoon Aff."), ¶ 27.) He did not identify anything AG had supposedly done or was about to do, beyond mere thinking.

Not only that, but the Yoon affidavit even failed to show the existence of any particular restructuring transaction, or impending transaction, to which any (non-existent) AG "interference" might have been directed. He vaguely asserted that RPG was "negotiating" with its lenders and conclusorily declared that the parties were "working towards a successful" restructuring. (*Id.* ¶¶ 14, 29, 31.) But he did not provide any supporting *facts* – the status of the negotiations, what terms had been agreed to, what terms remained open, *etc*. – and thus raised no need for refutation.

### 2. The Supplemental Yoon Affidavit

Had plaintiffs really believed the original Yoon affidavit was good enough, they would

---

[3] *See also, e.g., Search Force, Inc. v. Dataforce Int'l, Inc.*, 112 F. Supp. 2d 771, 774 n.7 (S.D. Ind. 2000) (court would "consider as 'evidence' only those statements [in affidavit] that are factual assertions and not merely vague generalizations or unsupported allegations"); 13 James Wm. Moore *et al.*, Moore's Fed. Practice §65.23[2] (3d ed. 2008) ("Affidavits . . . must clearly set forth the basis for [the injunction's] need; vague or conclusory affidavits will likely result in the denial of a motion for a preliminary injunction.").

have rested on it.  Not so, however, for they supplemented it when filing their reply.  But the supplement fares no better.

Even with the deficiency highlighted and several days to mull it over, Mr. Yoon *still* cannot identify a single act by AG following acquisition of RPG's debt that has interfered with (or threatens to interfere with) RPG's restructuring efforts.  He does not contend that AG has obstructed, vetoed, suppressed, undermined, or done (or threatened) anything to interfere with any restructuring proposal.  Indeed, in the amended complaint filed at the same time, plaintiffs still do not allege that AG has done **anything** beyond merely considering its options.  (Am. Compl., Dkt. No. 38, ¶ 2 (alleging that AG is still "strategizing").)

What's more, Mr. Yoon *still* cannot identify any particular restructuring proposal that could even be subject to interference.  Presumably seeking to address AG's explanation that the mere hope of reaching some unspecified restructuring deal is not legally protectable, Mr. Yoon tries to make it seem more than just a yearning.  (Supp. Yoon Aff. ¶ 6.)  But in the end he merely piles on adverbs and adjectives, not evidence.  He says: (1) RPG and its lenders had "good relationships"; (2) before AG acquired RPG's debt, "the restructuring efforts were progressing positively" and "in a manner consistent with reaching a mutually agreeable outcome"; and (3) it was in the lenders' "best interests" to restructure RPG's debt.  (*Id.* ¶ 7 a) – c).)  He continues being unable to identify so much as a single specific proposal that was on the table, much less to demonstrate its viability or to describe what progress had been made toward a definitive agreement on it.  And even as to his woefully vague assertion that before AG's involvement negotiations had been "progressing positively," other vitally interested parties to those negotiations flatly contradict him:  the second lien debt holders say that "little progress had been made in restructuring efforts prior to the referenced June-July time-frame of AG's alleged

activities." (2d Lien Group's Opp. To Emergency Mot. for TRO, Dkt. No. 20, at 3.) And AG understands that the second lien debt holders will be submitting an affidavit with their supplemental memorandum, also authorized by Judge Castillo, stating, among other things, that plaintiffs and the debt holders we not even close to reaching an agreement on restructuring, and that the failures in the negotiations have nothing to do with AG's presence. Small wonder that Mr. Yoon and I-Holdings are seeking to muzzle the lenders before this Court by opposing intervention.

### 3. Yoon's "Mere Presence" Assertion

Sensing the terminal weakness of their original position, even as supplemented, Mr. Yoon and plaintiffs lob up yet another proposition: that AG's "mere presence" as a debt-holder is interference enough. (Supp. Yoon Aff. ¶¶ 8-9.) This last minute toss, made off the back foot while in full retreat, drops far short, for two reasons.

First, there is still nothing identified as to which AG's "mere presence" as a debt-holder could interfere. As explained above, the second lien debt holders say that, before AG's presence, restructuring talks were going nowhere; plaintiffs' affidavits offer no factual details to belie that description. So too for Mr. Yoon's bald speculation that AG's presence has discouraged new equity investors in RPG (*id.* ¶ 8): what equity investors supposedly were (or would have been) interested in investing in RPG, and what did they tell Mr. Yoon to permit him to conclude that AG's presence scared them away? Without supplying supporting details like these, Mr. Yoon exposes his submission as a wandering rumination, or at best a guess, about potential equity investors, which hardly suffices as clear and convincing proof.

Second, the relief plaintiffs seek would not – and could not – eliminate AG's "mere presence." The proposed TRO would merely prevent AG from exercising certain rights it holds

- 6 -

by virtue of its debt ownership. (Proposed Order Granting Injunctive Relief ¶ 1.) Plaintiffs do not (and cannot) seek a TRO that would eliminate AG's "mere presence" by, *e.g.*, requiring AG to disgorge its debt holdings, because that would constitute permanent (not temporary) and irrevocable (not provisional) relief, the type of relief allowed only after a full and final adjudication of the parties' rights on the merits. *E.g., Brown v. Kerr-McGee Chem. Corp.*, 767 F.2d 1234, 1240 (7th Cir. 1985) (provisional injunctive relief should not "give the moving party affirmative relief equivalent to the ultimate relief sought") (citing *Triebwasser & Katz v. Am. Tel. & Tel. Co.*, 535 F.2d 1356, 1360 (2d Cir. 1976)).[4]

Both Yoon affidavits are long on speculation and conclusory assertions and short on facts. Plaintiffs have an exacting burden to provide facts that clearly and convincingly entitle them to the extraordinary relief of a TRO. The Yoon affidavits do not supply those facts and therefore do not support granting preliminary restraint of any kind.

### B. The Rake Affidavit Lacks Evidence Of Irreparable Harm.

Again retreating from their original, unprovable argument that AG is somehow interfering with some specific restructuring proposal, plaintiffs in their reply and a new affidavit also raise the possibility of an entirely different harm to RPG if AG puts to a competitive use certain information about RPG that is provided to RPG's debt-holders. (Reply at 11 n. 6; Affidavit of Jude Rake, Dkt. No. 39-2 ("Rake Aff."), ¶ 5.) But, here again, well over two months after AG acquired RPG debt, this argument remains entirely hypothetical: plaintiffs do not identify a single instance of AG using any information it has received as a debt-holder to obtain a

---

[4] In a footnote to their reply, plaintiffs suggest that the Court order AG to exercise its interest in RPG's debt consistent with how the other first lien holders exercise their interests, but at the same time forbid AG from communicating with those other first lien holders. (Reply at 14 n.9.) That suggested relief would effectively disenfranchise AG for the period it was in effect and, if some transaction were to occur while that "interim" order was in place – which is plainly plaintiffs' hope – the disenfranchisement would be functionally permanent. This suggestion, then, also violates the rule against awarding permanent and irrevocable final relief under the guise of a "temporary" injunction.

CLI-1647054v1


competitive advantage over RPG. Not one example of AG shifting resources to an area of RPG's competitive focus; not one example of AG being a step ahead of RPG on any confidential initiative; nothing.

### C. The Confidentiality Agreement's "Acknowledgment" Does Not Fill Plaintiffs' Irreparable Harm Void.

Perhaps realizing their irreparable harm shortcomings, plaintiffs – in addition to trying futilely to establish irreparable harm – contend that they do not have to prove irreparable harm anyway. Instead, they say, AG stipulated to irreparable harm in the Confidentiality Agreement. In their reply, however, plaintiffs are unable to quote a section, or even a complete sentence, of the agreement to support this argument. What they do quote is a surgically excised snippet of Paragraph 3 of the Confidentiality Agreement that mischaracterizes the paragraph's plain language. (Reply at 7-8.) Plaintiffs contend that "AG expressly acknowledged that in the event of a breach of the Confidentiality Agreement 'the other party may be irreparably damaged.'" (Reply at 7-8 (citing Confidentiality Agreement ¶ 3).) But that is not what Paragraph 3 says.

Plaintiffs ignore Paragraph 3's express limitation. The first sentence of that paragraph states, in full: "Given the nature of the Confidential Information and the Parties' current discussions, each Party acknowledges that the other Party may be irreparably damaged *by any unauthorized disclosure of any Confidential Information*." (Am. Compl., Ex. A ¶ 3 (emphasis added).) Plaintiffs do not, and cannot, allege that AG disclosed "Confidential Information" without authorization; they allege only that AG bought RPG's debt, in the process making supposedly forbidden contact with RPG's lenders. That mere contact, assuming it occurred, is not covered by the narrow acknowledgement of potential irreparable harm in Paragraph 3.

To be sure, plaintiffs' new filings also now emphasize AG's access to certain information about RPG by virtue of its status as a lien-holder. (Rake Aff. ¶ 5; Am. Compl. ¶ 51.) But access

to that information is not covered by Paragraph 3's acknowledgement of possible irreparable harm, either.  "Confidential Information," specifically defined for purposes of Paragraph 3, is limited to information disclosed between the parties "[i]n connection with a possible transaction . . . between [I-Holdings] and" AG.  (Am. Compl., Ex. A, first unnumbered paragraph.) Plaintiffs do not even allege, much less offer facts, that they provided any Confidential Information to AG in connection with the potential transaction.  To the contrary, they allege that the discussions about the potential transaction ended almost as soon as they began.  (Am. Compl. ¶ 35.)  Thus, the "confidential information" newly raised in plaintiffs' amended complaint and new Rake affidavit is different from the "Confidential Information" that is the subject of Paragraph 3 and, therefore, is beyond the supposed acknowledgement of potential irreparable harm.[5]  But even if it were the same information, plaintiffs still never allege any such disclosure by AG.

Plaintiffs also contend that Paragraph 3 entitles them to an automatic injunction for any breach of the Confidentiality Agreement.  (Reply at 7-8.)  The second sentence of Paragraph 3 states:  "Without prejudice to the rights and remedies otherwise available to each Party, each Party shall be entitled, without the requirement of posting a bond or other security to seek equitable relief, including an injunction or specific performance, in the event of any breach of the provisions of this confidentiality agreement."  (Am. Compl., Ex. A ¶ 3.)  This sentence, by its terms, merely permits either party to seek equitable relief without posting a bond, which otherwise would be required by Fed. R. Civ. P. 65(c).  The parties agreed to eliminate that requirement and, accordingly, AG did not raise the requirement in its opposition brief.  But

---

[5] AG's opposition also explained that, even if the supposed before-the-fact irreparable harm acknowledgment operated as plaintiffs misleadingly say it does, the Court would retain an independent duty to confirm that irreparable harm actually exists before it could grant a TRO that passed muster under Fed. R. Civ. P. 65.  (Opp. at 10 n.7.)  Plaintiffs have no answer for that in their reply.

- 9 -

CLI-1647054v1

plaintiffs' attempts to bootstrap that narrow agreement about a bond into a free pass on proving irreparable harm or other elements necessary for obtaining injunctive relief cannot survive any reasonable interpretation of the agreement's plain language.

In sum, after two separate tries, plaintiffs are unable to show that AG is doing, or threatens to do, anything that needs to be restrained. For that matter, plaintiffs have not shown that any meaningful restructuring proposal even exists to be interfered with. Plaintiffs' "mere presence" argument rests on guesswork and speculation. And, even if plaintiffs had offered proof instead of conjecture, the TRO they seek would not – and properly could not – give them the permanent and irrevocable final relief on the merits they would need to rectify the situation (again, assuming they had proven that situation even exists, which they have not). Essentially conceding their failure, plaintiffs' last gasp is to argue that AG stipulated to irreparable harm and injunctive relief in advance. That argument, however, flies in the face of the parties' agreement. The Court should deny plaintiffs' motion for an insufficient showing of irreparable harm.

### III.   PLAINTIFFS STILL DO NOT SHOW THEY ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS.

#### A.   Plaintiffs Do Not Show That AG Likely Breached The Confidentiality Agreement By Acquiring RPG's Debt.

Plaintiffs contend that AG breached the Confidentiality Agreement with I-Holdings by acquiring RPG's debt from RPG's lenders. The Confidentiality Agreement is, as its name confirms, concerned with the disclosure of confidential information (if any) that I-Holdings provided to AG during their talks about a possible transaction. Corporate Transactions 101 teaches that if a potential target company wants to negotiate with a potential acquirer but also to prevent the acquirer from going outside the negotiations to buy the target's securities or debt, the target company will insist on a "standstill" agreement that specifically prohibits such purchases. (Opp. at 4 n.1 and 12 n.9.)

- 10 -

Plaintiffs' new material neither denies that the Confidentiality Agreement lacks a "standstill" provision nor offers an explanation why, if a "standstill" had been what they had really wanted, they did not require inclusion of this basic and common provision. (Reply at 5-6 & n.3.)[6] Instead, they just bang the table and insist that the Confidentiality Agreement accomplishes everything a "standstill" provision would have accomplished. (*Id.*) But the Confidentiality Agreement does not support their table-banging.

That agreement was made in connection with discussions about a possible transaction between I-Holdings and AG. (Am. Compl., Ex. A first unnumbered paragraph.) Its stated purpose was nothing more than to prevent the disclosure of confidential information emerging in that context, including the confidential fact that I-Holdings and AG were even talking to each other. (*Id.*, Ex. A ¶ 8.) Plaintiffs do not assert that AG disclosed confidential information to anyone, including to RPG's lenders in connection with AG's acquisition of RPG's debt. Nor would it have been necessary for AG to do so. (*See* Opp. at 4, 11-12 (discussing the open market that exists for bank debt).) Nothing in the Confidentiality Agreement prohibits AG from merely buying RPG's debt; that would have been the function of a "standstill" provision, if the parties had included one. The assertion that the Confidentiality Agreement was really also a standstill is a litigation-driven figment of plaintiffs' imagination.[7]

---

[6] Plaintiffs' assertions about I-Holdings' subjective intention behind the Confidentiality Agreement (Reply at 5-6) cannot create a standstill provision where none exists in the language to which the parties' agreed. *E.g., Delmarva Health Plan, Inc. v. Aceto*, 750 A.2d 1213, 1218 (Del. Ch. 1999) (one party's "subjective intentions cannot control the interpretation of" a contract).

[7] So too is their version of a conversation about debt that occurred during the mid-May meeting between I-Holdings and AG. (Am. Compl. ¶¶ 32-34; Yoon Aff. ¶¶ 22-24.) There is time enough to set the factual record straight on that subject, in the event the case ever reaches a stage where testimony is required. For now, we note only that the supposed interchange has no legal significance; plaintiffs do not plead that it creates any promissory estoppel or oral contract claim, or that it adds legal heft to the claims they proffer. To the contrary, as presented by plaintiffs themselves, it would be flatly inconsistent with any interpretation of the Confidentiality Agreement as itself containing a standstill.

CLI-1647054v1

### B. Plaintiffs Do Not Show That RPGH And RPG Likely Are Third-Party Beneficiaries Of The Confidentiality Agreement.

In addition to the absence of a breach, new plaintiffs RPGH and RPG have not shown a likelihood of succeeding on their breach of contract claims because they have not shown a likelihood that they are in fact third-party beneficiaries of the Confidentiality Agreement.

There is no contention that RPGH or RPG is a party to the Confidentiality Agreement; neither of those entities signed the agreement as a party. (Am. Compl., Ex. A at 6.) Instead, they claim status as third-party beneficiaries. (Am. Compl. ¶ 71; Reply at 7.) But plaintiffs do not cite any provision of the Confidentiality Agreement that confers third-party beneficiary rights upon RPGH, RPG or anyone else. (Am. Compl. ¶ 71; Reply at 7.) In fact, the Confidentiality Agreement expressly states that it "shall be binding solely upon and inure to the benefit of the Parties hereto and their respective successors and assigns." (Am. Compl., Ex. A ¶ 10.) RPGH and RPG are subsidiaries of I-Holdings, but they are not its successors or assigns. In light of this provision, the rule that third-party beneficiary rights must be express,[8] and plaintiffs' failure to identify any part of the Confidentiality Agreement that expressly confers third-party beneficiary rights, plaintiffs have not shown that RPGH or RPG is likely to succeed on its third-party breach of contract claim.[9]

---

[8] *E.g., Bobson v. Gulfstream Marketing, Ltd.*, No. 86C-NO11, 1988 WL 109324, at *2 (Del. Super. Oct. 4, 1988). The Confidentiality Agreement is governed by Delaware law. (Am. Compl., Ex. A ¶ 9.)

[9] Even if the Court were somehow to find that RPGH and RPG are third-party beneficiaries of the Confidentiality Agreement, that would not solve plaintiffs' problems. To the contrary, it would make their other problems worse. One can understand how (if the parties had expressly agreed to this) RPG could potentially benefit from restrictions on the disclosure of its confidential information. But there is no apparent benefit to RPG from a "standstill" agreement that restricts who can acquire RPG's debt. Thus, accepting plaintiffs' third-party beneficiary argument only solidifies rejection of plaintiffs' theory that the Confidentiality Agreement has "standstill"-like properties that AG breached when it acquired RPG's debt.

### C. Plaintiffs Do Not Show A Likelihood Of Success On Their Claim Of Tortious Interference With Business Expectancy.

For their tortious interference claim, plaintiffs contend that AG is interfering with plaintiffs' efforts to enter into new relationships with RPG's first and second lien debt holders. (Reply at 8-10.) To establish a protectable interest, it is not enough that plaintiffs hoped or expected to enter into new relationships with the debt holders; they must show they were on the verge of entering into such a relationship. (Opp. at 13.) As demonstrated above, however, plaintiffs' "evidence" on this point, even with the new submissions, is nothing more than Mr. Yoon's speculative optimism that a deal would eventually be reached, optimism not shared by the second lien debt holders. (See pages 4 through 6, above.) Indeed, for all the supposed mutual interest among plaintiffs and the lien holders to renegotiate RPG's debt, Mr. Yoon is unable (or unwilling) to give any details whatsoever about the state of those (re)negotiations. Without this type of evidence, plaintiffs fail to show they were on the verge of an agreement with the lien holders.

As also shown above, plaintiffs still have not demonstrated a likelihood of establishing any interference by AG. Plaintiffs do not identify any conduct taken or threatened by AG to scuttle any restructuring proposal.

Plaintiffs fail to show that they are likely to establish critical elements of their claims. The Court should deny plaintiffs' TRO motion based on plaintiffs' lack of likely success on the merits.

### IV. THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST DO NOT FAVOR THE TRO

Plaintiffs contend that AG has conceded that the balance of equities and public interest favor the TRO. (Reply at 14-15.) Not so. Because I-Holdings was the only plaintiff when AG filed its opposition, AG limited its balance of equities argument to the fact that, because I-

- 13 -

CLI-1647054v1

Holdings had asserted no irreparable harm of its own, no equities could weigh in I-Holdings' favor. (Opp. at 15.) And AG observed that limiting RPG's restructuring options by freezing out AG, which might be more favorable to I-Holdings but definitely less favorable to the lien holders, is contrary to the interests of those members of the public with the most direct stake in the outcome of RPG's restructuring efforts. (*Id.*)

Since the time AG filed its response, some of the relevant players' roles have clarified, but the basic points remain the same. The debt holders have weighed in to oppose plaintiffs' TRO motion. They agree that plaintiffs' attempts to exclude AG from the restructuring process serves only the equity interests of RPG's parent holding company, and disserves the interests of the lien holders and the public at large. (2d Lien Group's Memo. In Opp. To Plf.'s Emergency Mot. for TRO, at 7.) Indeed, plaintiffs themselves brazenly acknowledge that they want a TRO to exclude AG because AG's involvement *may mean a better deal for the lien holders* (and a correspondingly worse deal for I-Holdings). (Reply at 11 (complaining that "the Second Lien Lenders are in a position to demand . . . more favorable credit terms than would have been the case" without AG's involvement).) Because RPG is likely insolvent (or in the insolvency zone), the law puts the interests of its creditors ahead of the interests of its equity holder, I-Holdings. *See Geyer v. Ingersoll Pub. Co.*, 621 A.2d 784, 787-90 (Del. Ch. 1992) (holding that fiduciary duties to creditors arise when a company is unable to pay its debts as they come due); *Credit Lyonnais Bank Nederland, N.V. v. Pathe Commc'ns Corp.*, No. 12150, 1991 WL 277613, at *34 n.55 (Del. Ch. Dec. 30, 1991) (similar). Plaintiffs fail to identify, much less explain, any equities that justify reversing these legally mandated priorities.

Plaintiffs do not even try to explain how anyone other than I-Holdings would benefit from excluding AG from the restructuring efforts. Their silence on this point is even more

- 14 -

CLI-1647054v1

conspicuous given that other necessary participants to those efforts (the debt holders) not only have no objection to AG's participation, they are intervening in this case to encourage it.

Plaintiffs' TRO would create grave inequities and would selfishly serve only I-Holdings' interest in protecting its equity stake, at the expense of RPG's lien holders. The equities and the public interest favor denying plaintiffs' TRO motion.

## V.   CONCLUSION

For these reasons, the Court should deny plaintiffs' motion for a temporary restraining order.

Dated:  September 4, 2008               Respectfully submitted,


                                         /s/ Mark P. Rotatori
Of Counsel:                             Lee Ann Russo
David F. Adler                          larusso@jonesday.com
Pearson N. Bownas                       Mark P. Rotatori
JONES DAY                               mprotatori@jonesday.com
North Point                             JONES DAY
901 Lakeside Avenue                     77 W. Wacker Drive
Cleveland, Ohio 44114-1190              Chicago, Illinois 60601-1692
(216) 586-3939                          (312) 782-3939

                                        John M. Newman, Jr.
                                        jmnewman@jonesday.com
                                        JONES DAY
                                        North Point
                                        901 Lakeside Avenue
                                        Cleveland, Ohio 44114-1190
                                        (216) 586-3939

                                        Counsel for Defendant
                                        AMERICAN GREETINGS CORPORATION

## CERTIFICATE OF SERVICE

I hereby certify that I have caused a true and correct copy of the above and foregoing Defendant's Response To Plaintiffs' New Material And Related Arguments Submitted On "Reply" In Support of Motion For A Temporary Restraining Order to be served, as indicated, by electronic means through CM/ECF and by first class mail upon the person named below on this 4th day of September, 2008:

> Michael F. Braun, Esq.
> James L. Komie, Esq.
> Robert D. Snow, Jr., Esq.
> Schuyler Roche, P.C.
> One Prudential Plaza
> Suite 3800
> 130 East Randolph Street
> Chicago IL 60601

> _____/s/ Mark P. Rotatori_____
> Mark P. Rotatori