**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RPG INVESTMENT HOLDINGS, LLC, a Delaware Limited Liability Company, RPG HOLDINGS, INC., a Delaware Corporation and RECYCLED PAPER GREETINGS, INC., an Illinois Corporation, <br><br> Plaintiffs, <br><br> v. <br><br> AMERICAN GREETINGS CORP., an Ohio Corporation, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | 08-cv-4422 <br> Judge Wayne R. Andersen <br> Magistrate Judge Maria Valdez |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF LIMITED MOTION
TO INTERVENE BY THE SECOND LIEN GROUP**

  The Second Lien Group,[1] through its undersigned counsel, hereby submits this reply memorandum of law in further support of its limited motion to intervene in this action pursuant to Fed. R. Civ. P. 24(a)(2) and/or (b), for the purpose of responding to the portions of the amended complaint (the "Amended Complaint" or "Am. Compl.") and motion for a temporary restraining order (the "TRO Motion") filed by plaintiffs RPG Holdings, Inc. ("RPG Holdings"), RPGI and RPG (collectively, the "Companies" or "Plaintiffs") seeking to enjoin defendant AG from (i) contacting the Companies' lenders, or (ii) exercising rights under the Second Lien Credit Agreement and the First Lien Credit Agreement.[2]

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to them in the Second Lien Group's Memorandum of Law in Support of its Motion to Intervene.

[2] The Second Lien Group expressly reserves its right to file a motion to intervene in this action at a later date with respect to the portions of Plaintiffs' Amended Complaint not addressed herein.

## PRELIMINARY STATEMENT

The Second Lien Group files this reply in response to Plaintiffs' opposition to the Second Lien Group's limited motion to intervene in this action for the narrow purpose of opposing Plaintiffs' efforts to preclude communication between AG, the holder of a majority of RPG's first lien debt, and RPG's other lenders, including the Second Lien Group.  Plaintiffs' principal argument in support of their opposition is that the Second Lien Group does not have a sufficient interest in this action to warrant intervention, because its only "legally protected interest" is the "right to collect on the debts secured by the Second Lien Agreement and secured by a second priority interest in the assets of RPG."  Opposition to Motion to Intervene of Group of Second Lien Lenders of RPG Holdings and Recycled Paper Greetings ("Opposition Brief" or "Opp. Br.") at 5.  The Second Lien Group's interest in communicating with AG, Plaintiffs argue, "does not amount to one that is protected by law and does not give rise to the right to intervene here." *Id.* at 6.

Plaintiffs are wrong.  The Second Lien Group's interest in collecting on its debt cannot be segregated from its interest in negotiating with AG.  As Plaintiffs appear to agree, the terms of the Second Lien Credit Agreement must be restructured if RPG is to continue as a going concern and the Second Lien Group is to ultimately collect on its debt.  Yet the Second Lien Group's ability to achieve a successful out-of-court restructuring is limited by its contractual obligations to the first lien lenders, including AG.  For example, an intercreditor agreement (the "Intercreditor Agreement")[3] entered into between an RPG entity and the agents for the lenders under the First and Second Lien Credit Agreements purports to prohibit the Second Lien Group from exercising certain of its rights under the Second Lien Credit Agreement – including rights

---

[3] A copy of the Intercreditor Agreement is attached as Exhibit 1.

relating to refinancing its debt – without the consent of the first lien lenders.  Additionally, the First Lien Credit Agreement purports to limit the Companies' ability to issue additional debt or securities to the second lien lenders in exchange for the waiver of defaults under the Second Lien Credit Agreement.  Thus, in order for the Second Lien Group to fully explore the possibility of an out-of-court restructuring of its debt in RPG, it must be permitted to negotiate with AG, whose consent is necessary before the Intercreditor Agreement or First Lien Credit Agreement may be amended.

Plaintiffs' remaining arguments, that (i) the Second Lien Group's alternative request for permissive intervention should be denied because there are no common questions of law or fact and no independent basis for subject matter jurisdiction, and (ii) the Second Lien Group did not comply with Rule 24(c), are similarly without merit.  First, the Second Lien Group's opposition to Plaintiffs' TRO Motion is premised upon the assertion that, while Plaintiffs will suffer no harm if injunctive relief is denied, the Second Lien Group will be irreparably harmed if the relief is granted.  This same balancing of the harms analysis must be undertaken in connection with Plaintiffs' TRO Motion.  Second, the Seventh Circuit instructs that permissive intervention should not be denied on jurisdictional grounds where, as here, the proposed intervenor's claim forms the same case or controversy as the original action, and the intervenor had no control over where the original action was filed.  Third, Plaintiffs' assertion that the Second Lien Group's motion to intervene should be denied because it did not file an answer to RPGI's original complaint, *before* answers were due from existing parties and *before* the complaint was superseded by an amended complaint, conflicts with well-settled law holding that Rule 24(c) is to be "liberally construed."

**ARGUMENT**

I.     **THE SECOND LIEN GROUP SHOULD BE PERMITTED TO
       INTERVENE AS OF RIGHT IN THIS ACTION**

An applicant shall be permitted to intervene under Rule 24(a)(2) when he or she claims a

legally protected, direct and substantial interest relating to the property or transaction which is

the subject of the action, is not adequately represented by existing parties, and is so situated that

the disposition of the action may as a practical matter impair or impede the applicant's ability to

protect that interest.  *See, e.g., Nat'l Cas. Co. v. Davis*, No. 91 C 01318, 1991 U.S. Dist. Lexis

7651, at *1 (N.D. Ill. June 3, 1991);[4] *Aurora Loan Servs. v. Craddieth*, 442 F.3d 1018, 1022 (7th

Cir. 2006).

Plaintiffs argue that the Second Lien Group's interest in this action does not rise to the

level required for intervention under Rule 24(a) based on two unsubstantiated assertions.  First,

Plaintiffs contend that the Second Lien Group's interest is not "legally protected."  *See* Opp. Br.

at 5.  Second, Plaintiffs argue that because the Second Lien Group is neither a party to nor

beneficiary of the Confidentiality Agreement at issue in this lawsuit, the Second Lien Group's

interest is not "direct and substantial."  *Id.*  Each of these arguments fails.

### A.  The Second Lien Group's Interest in this Lawsuit is Legally Protected

Plaintiffs themselves acknowledge that the Second Lien Group possesses a "legally

protected interest . . . to collect on the debts created by the Second Lien [Credit] Agreement."

Opp. Br. at 5.  Yet Plaintiffs attempt to distinguish this interest from the Second Lien Group's

interest in "communicat[ing] directly with AG regarding restructuring of RPG's debt," which

Plaintiffs assert "does not amount to [an interest] that is legally protected by law."  Opp. Br. at 6.

---

[4] For the Court's convenience, a copy of *Nat'l Cas. Co. v. Davis* was attached as Exhibit 1 to the Second
Lien Group's memorandum of law in support of its limited motion to intervene.

The Second Lien Group's interests cannot be so divorced. Rather, given the provisions of the Intercreditor Agreement and the First Lien Credit Agreement, the Second Lien Group's interest in negotiating with AG regarding a restructuring is part and parcel of the Second Lien Group's interest in collecting on its debt under the Second Lien Credit Agreement. As Plaintiffs well know, RPG's chances of continuing as a going concern, and thereby allowing the Second Lien Group to "collect on the debts created by the Second Lien [Credit] Agreement," are virtually foreclosed if RPG is unable to restructure its debt. Opp. Br. at 6. In turn, a restructuring is unlikely to occur unless the Second Lien Group and AG reach an agreement, because the provisions of the Intercreditor Agreement and First Lien Credit Agreement, which cannot be waived or amended without AG's consent, purport to significantly limit the Second Lien Group from amending key provisions in the Second Lien Credit Agreement that may be crucial to such a restructuring.

For example, while the Second Lien Group may be willing to restructure the terms of the debt it has extended to RPG, the restructuring options available to it may be limited by the Intercreditor Agreement, which purports to preclude the second lien lenders from, among other things, changing the redemption provisions or collateral relating to the Second Lien Credit Agreement outside of the bankruptcy context, or, with respect to a refinancing, increasing the outstanding principal amount of its debt or increasing the Companies' obligations in any manner that might be deemed "adverse" to the first lien lenders. Intercreditor Agmt. §5.3(b). In addition, the out-of-court restructuring options available to the Companies are limited by the First Lien Credit Agreement, which purports to prohibit RPG from, among other things, issuing certain types or amounts of additional debt or granting certain other related rights. First Lien Credit Agmt. § 6.01(e). Moreover, it is unlikely that RPG will be able to avoid bankruptcy

without the agreement of both its first and second lien lenders, which, as a practical matter, will necessitate discussions between and among the Companies and all of their lenders.

Accordingly, RPG's efforts to preclude discussions between the Second Lien Group and AG invades the Second Lien Group's legally protected interest in guarding its rights under the Second Lien Credit Agreement. Plaintiffs' assertion that this interest is not "one that is protected by law" turns a blind eye to a variety of legal claims designed to protect just such an interest, including breach of contract, breach of the covenant of good faith and fair dealing, tortious interference with prospective economic advantage, tortious interference with contractual relations, and breach of fiduciary duty.

Plaintiffs' reliance on *Sakaogon Chippewa Community Mole Lake Band v. Babbit*, 214 F.3d 941, 945 (7th Cir. 2000) is misplaced. To begin with, the Seventh Circuit has cautioned that "[w]hether an applicant has an interest sufficient to warrant intervention as a matter of right is a highly fact-specific determination, making comparison to other cases of limited value." *Security Ins. Co. v. Schipporeit, Inc.*, 69 F.3d 1377, 1381 (7th Cir. 1995). This is certainly the case with *Chippewa*, which involved the completely inapposite fact pattern of whether the St. Croix Indian tribe could intervene, more than a year after litigation was commenced and five days before settlement was reached, in an action brought by a partnership of Indian tribes against the Department of the Interior regarding procedures used by the department to review the partnership's land application. *Id.* at 944. Moreover, the court in *Chippewa* never reached the question of whether the St. Croix's interest was legally protected, determining instead that such a question "need not [be] resolve[d]" because the St. Croix's motion for intervention failed on other grounds. *Id.* at 947.

**B.  The Second Lien Group's Interest in this Lawsuit is Direct and Substantial**

Plaintiff's attempts to characterize the issues presented in this case as "entirely apart from and outside" the Second Lien Group's interests are disingenuous.  Opp. Br. at 5.  The Amended Complaint seeks specific performance and a temporary restraining order requiring AG to "refrain from all contact with the Plaintiffs' lenders [including the Second Lien Group] without the Plaintiffs' prior written consent."  Am. Compl. ¶ 87, Request for Relief ¶ 1.  Such relief, if granted, would prevent the Second Lien Group from communicating with an entity whose cooperation is required in order for the Second Lien Group to realize the full benefit of its bargain in respect of the second lien debt.  Clearly, the Second Lien Group has a direct and substantial interest in opposing Plaintiffs' request.

Additionally, Plaintiffs' suggestion that Rule 24(a) requires a proposed intervenor to be a "party to []or a third party beneficiary of" the contract at the center of the lawsuit misstates the dictates of the rule.  Opp. Br. at 5.  Courts in the Seventh Circuit and this district consistently grant motions to intervene where the proposed intervenor cannot make such a showing.  For example, in *Craddieth*, 442 F.3d at 1022, the Seventh Circuit reversed the district court's decision to deny a motion made by the high bidder in a foreclosure sale to intervene in the mortgagee's foreclosure action against the mortgagor.  The proposed intervenor was not a party to or third party beneficiary of the mortgage agreement being sued upon.  *Id.*

Similarly, in *Security Insurance Co. v. Schipporeit, Inc.*, 69 F.3d 1377, 1379 (7th Cir. 1995), a case cited by Plaintiffs, the Seventh Circuit affirmed a lower court decision granting a motion filed by a plaintiff in a state court action to intervene in a federal coverage action filed by an insurer against the defendant in the state court action.  *See also Hartford Acc. & Indem. Co. v. Crider*, 58 F.R.D. 15, (N.D. Ill. 1973) (proposed intervenor had "vital" interest in suit brought to determine whether insurance policy issued by plaintiff to defendant covered intervenor's claim

against defendant); *Davis*, No. 91 C 01318, 1991 U.S. Dist. Lexis 7651, at *1. Again, the proposed intervenor was neither a party to nor third party beneficiary of the insurance policy at issue in the coverage action. *Schipporeit, Inc.*, 69 F.3d at 1379.

In addition, Plaintiffs' attempt to analogize the Second Lien Group's interest in this action to the "indirect economic interest" found in *Cal Data Systems Inc. v. NCS Pearson Inc.*, H-07-1390, 2008 WL 1730539 at *2-3 (S.D. Tex. Apr. 10, 2008), is unavailing.[5] Opp. Br. at 6. In *Cal Data*, the court denied a motion brought by Capital Bank, the creditor of bankrupt Cal Data Systems, Inc. ("Cal Data"), to intervene in a breach of contract action between Cal Data and NCS Pearson, Inc. ("NCS") over contracts regarding Cal Data's development of software for NCS's use and distribution. *Id.* at *2. The court denied Capital Bank's motion to intervene, holding that its "interest . . . in the prospective collectability" of its promissory notes was unrelated to the software contracts at issue in the case. *Id.* at *3. Conversely, here, Plaintiffs' interpretation of the Confidentiality Agreement allegedly giving rise to their claim against AG is specifically aimed at precluding negotiation among AG and the Second Lien Group.

Plaintiffs' citation to *Philadelphia Indemnity Ins. Co. v. Business Computer Training Institute, Inc.*, C05-5706, 2006 WL 2883010 (W.D. Wash. Oct. 10, 2006) is also misguided.[6] There, the plaintiffs in a state court action pending against Business Computer Training Institute ("BCTI") moved to intervene in a federal action brought against BCTI by its insurer seeking a declaration that its insurance policy did not cover an action similar to the action filed by the proposed intervenors. The District Court for the Western District of Washington denied the

---

[5] For the Court's convenience, a copy of *Cal Data Systems Inc. v. NCS Pearson Inc.* is attached as Exhibit 2.

[6] For the Court' convenience, a copy of *Philadelphia Indemnity Insurance Co. v. Business Computer Training Institute, Inc.* is attached as Exhibit 3.

motion to intervene, holding that the proposed intervenors "lack[ed] a significantly protectable interest" because their interest was "not only purely economic, but also theoretical" and "speculative because it hinge[d] upon obtaining a state court judgment against BTCI." *Id.* In sharp contrast, the Second Lien Group's interest in this action is rooted in the present rights afforded to it by the Second Lien Credit Agreement, and is not contingent upon any future occurrence.[7]

### C. The Irreparable Harm the Second Lien Group will Suffer if the Injunction is Granted Weighs in Favor of Denying Plaintiffs' Motion

Finally, contrary to Plaintiffs' assertion, the harm that will be suffered by the Second Lien Group if Plaintiffs' motion for a temporary restraining order is granted constitutes a valid consideration to be taken into account by this Court. It is well-settled law that courts confronted with a motion for injunctive relief must evaluate the harm that will be caused to non-parties if the requested relief is granted. *See Storck USA, L.P. v. Farley Candy Co.*, 14 F.3d 311, 314 (7th Cir. 1994); *Tenneco Auto. Operating Co. v. Hyrad Corp.*, No. 02 C 0728, 2002 WL 1632499, at *1 (N.D. Ill. July 23, 2002).[8] The cases cited by Plaintiffs, *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1092 (D.C. Cir. 1997) and *FTC v. PPG Industries, Inc.*, 798 F.2d 1500 (D.C. Cir. 1986), do not alter this analysis. Opp. Br. at 7. Rather, those cases stand only for the proposition that, based on the specific facts presented therein, harm or prospective harm to shareholders did not warrant denying the request for preliminary relief made by the Federal Trade Commission ("FTC"),

---

[7] Notably, courts in the Seventh Circuit and this district consistently hold that facts identical to those presented in *Philadelphia Indemnity* do warrant intervention. *See, e.g., Security Insurance Co. v. Schipporeit, Inc.*, 69 F.3d 1377, 1379 (7th Cir. 1995); *Hartford Acc. & Indemnity Co. v. Crider*, 58 F.R.D. 15, (N.D. Ill. 1973); *Nat'l Cas. Co. v. Davis*, No. 91 C 01318, 1991 U.S. Dist. Lexis 7651, at *1 (N.D. Ill. June 3, 1991).

[8] For the Court's convenience, a copy of *Tenneco Automotive Operating Co. v. Hyrad Corp.* was attached as Exhibit 1 to the Second Lien Group's memorandum of law in opposition to RPGI's motion for a temporary restraining order.

where the FTC had demonstrated a likelihood of success on the merits and that denying the motion would cause irreparable harm. *See Staples*, 970 F. Supp. at 1092, *PPG Indus.*, 798 F.2d at 1509. These findings have no bearing on the present action.

## II.    ALTERNATIVELY, PERMISSIVE INTERVENTION SHOULD BE GRANTED TO THE SECOND LIEN GROUP

Alternatively, even if the Court denies the Second Lien Group's motion to intervene as of right, the Second Lien Group should be permitted to intervene permissively under Rule 24(b). In order to qualify for intervention under Rule 24(b), an applicant must show that there is (i) a common question of law or fact, and (ii) independent jurisdiction. *Security Ins. Co. of Hartford v. Schipporeit, Inc.*, 69 F.3d 1377, 1379 (7th Cir. 1995). The Second Lien Group meets both these requirements.

### A. Common Questions of Law and Fact Pervade the Second Lien Group's Defenses and the Current Action

Contrary to Plaintiffs' assertion, the instant action and the Second Lien Group's defenses against injunctive relief share common questions of law and fact. The Second Lien Group's defenses center on whether Plaintiffs may interfere with the rights of the members of the Second Lien Group, as creditors of RPG, by dictating with which of RPG's other creditors the Second Lien Group may communicate. In making this determination, the Court will be called upon to determine the harm that will inure to the Second Lien Group if such a restriction is imposed, and the harm that will inure to Plaintiffs if it is denied. This very same analysis must be made by the Court in determining Plaintiffs' motion for a temporary restraining order.

Moreover, the equities weigh in favor of granting the Second Lien Group's motion. *See Security Ins. Co. v. Schipporeit, Inc.*, 69 F.3d at 1381 (holding that a court should balance the impact of intervention against judicial economy in determining a motion for intervention). If

Plaintiffs' motion for a temporary restraining order is granted and the Second Lien Group's motion for intervention is denied, the Second Lien Group will be forced to consider commencing its own separate litigation to enforce its right to communicate directly with AG.  Such additional litigation brings with it the risk of inconsistent results, and the unnecessary cost of additional litigation.  Conversely, the existing parties will not be compromised in any way if the Second Lien Group's motion to intervene is granted, as AG does not oppose the motion, and Plaintiffs "can hardly be said to be prejudiced by having to prove a lawsuit they chose to initiate."  *Id.*

### B. Permissive Intervention Does Not Require Complete Diversity Between the Second Lien Group and Plaintiffs

Plaintiffs argue further that the Second Lien Group's motion for intervention should be denied because the Second Lien Group has not established an independent basis for jurisdiction. Opp. Br. at 9.  "Considerations of judicial economy," however, "allow a federal court to exercise . . . 'supplemental'[] jurisdiction over claims that could not be litigated in federal court were it not for their relation to a claim, party, etc. properly before the court."  *Craddieth*, 442 F.3d at 1022.  Specifically, 28 U.S.C. §1367(a) provides that a court having original jurisdiction of a case "shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy."

Plaintiffs' request for a temporary injunction and the Second Lien Group's opposition thereto are different sides of the "same controversy," and the identity of legal and factual questions between the opposing positions weighs in favor of determining them as part of the same case.  Moreover, while 28 U.S.C. §1367(b) provides that supplemental jurisdiction does not extend to "persons . . . seeking to intervene as plaintiffs under Rule 24," it does not include a similar prohibition where, as here, intervention is sought in order to assert a defense.  As the Seventh Circuit has held, the purpose of preventing proposed intervenors from "circumvent[ing]

the requirement of complete diversity has no application" to a party who "has no say in deciding where the suit is brought and so cannot be gaming the system." *Craddieth*, 442 F.3d at 1025; *see also Wichita R. & Light Co. v. Public Util. Comm'n*, 260 U.S. 48, 54 (1922) (stating that an intervening party "had an interest and was a proper party" notwithstanding that it was a citizen of the same state as its adversary). While the interest of the proposed intervenor in *Craddieth* did not arise until some time after the initial suit was commenced, the Seventh Circuit's language applies equally here, where, notwithstanding that the relief sought by Plaintiffs will have a serious impact on the Second Lien Group, the Second Lien Group had no control over the jurisdiction in which Plaintiffs chose to bring this action.

## III.    THE SECOND LIEN GROUP HAS COMPLIED WITH RULE 24(C)

Finally, Plaintiffs argue that the Second Lien Group has failed to satisfy Rule 24(c) because its limited motion to intervene was accompanied by an opposition to the TRO Motion rather than an answer to RPGI's complaint. Opp. Br. at 9 – 10. Plaintiffs assert that while this factor "may not be grounds to deny the Second Lient [sic] Group's motion to intervene," it "weighs against granting the motion." *Id.* It is well-settled law, however, that Rule 24(c)'s requirement that a motion for intervention "be accompanied by a pleading setting forth the claim or defense for which intervention is sought" should be "liberally construed." *See Davis*, 1991 U.S. Dist. Lexis 7651, at *1; *Patridge v. J.K. Harris Co.*, No. 05-2172, 2006 WL 1582464, at *1 (C.D.Ill. May 31, 2006); *Pittman v. Chicago Bd. of Educ.*, No. 92 C 2219, 1992 WL 233903, at *1 (N.D.Ill. Sept. 15, 1992);[9] *Shevlin v. Schewe*, 809 F.2d 447, 450 (7th Cir. 1987). Thus, courts

---

[9] For the Court's convenience, copies of *Patridge v. J.K. Harris Co.*, No. 05-2172, 2006 WL 1582464, at *1 (C.D. Ill. May 31, 2006) and *Pittman v. Chicago Board of Education*, No. 92 C 2219, 1992 WL 233903, at *1 (N.D. Ill. Sept. 15, 1992) are attached as Exhibit 4.

repeatedly hold that "[w]here the necessary pleading is filed soon after the motion, and there is no prejudice to the other parties, a strictly textual interpretation of the rule is unwarranted." *Davis*, 1991 U.S. Dist. Lexis 7651, at \*2; *Pittman v. Chicago Bd. of Educ.*, 1992 WL 233903, at \*1. Moreover, notwithstanding Plaintiffs' efforts to distinguish the Second Lien Group's opposition to the TRO Motion from other motions found to satisfy Rule 24(c) on the ground that it is not a "dispositive motion," courts do not recognize such a distinction. *Patridge v. J.K. Harris Co.*, No. 05-2172, 2006 WL 1582464, at \*1 (holding that a motion seeking a preliminary ruling that defendant was entitled to absolute immunity with regard to certain testimony was "sufficient to meet the requirement of Rule 24(c)" notwithstanding that it "would not dispose of any counts in the matter.").

In the instant action, it would have made no sense to require the Second Lien Group to file an answer with its limited motion to intervene, given that the motion was filed before answers to the complaint were due from existing parties. To be sure, RPGI's decision to amend its complaint in apparent response to the oppositions filed against the TRO Motion would have rendered such an exercise futile. The Second Lien Group will file its answer to Plaintiffs' Amended Complaint on September 15, 2008, when answers to the Amended Complaint are due from existing parties, or as otherwise ordered by the Court. Plaintiffs cannot (and indeed, do not) allege any prejudice as a result of this timing.

## <u>CONCLUSION</u>

For the foregoing reasons, the Second Lien Group respectfully requests that the Court allow it to intervene in this action, either permissively or as of right.

Dated: New York, New York
        September 4, 2008

                                        Respectfully submitted,

*Of Counsel*

                                        _____/s/ Janice A. Alwin_____

Fred S. Hodara                          Steven B. Towbin (2848546)
Abid Qureshi                            Janice A. Alwin (6277043)
Akin Gump Strauss Hauer& Feld LLP       Shaw Gussis Fishman Glantz Wolfson &
590 Madison Avenue                      Towbin LLC
New York, New York  10022               321 North Clark Street, Suite 800
(212) 872-1000 (Telephone)              Chicago, Illinois 60654
(212) 872-1002 (Telecopier)             (312) 276-1333  direct phone
fhodara@akingump.com                    (312) 275-0569  direct facsimile
                                        stowbin@shawgussis.com

## **CERTIFICATE OF SERVICE**

The undersigned attorney certifies that service of the above and attached pleadings was accomplished (i) by electronic notice to CM/ECF registrants and (ii) by First Class U.S. Mail, postage prepaid on this 4th day of September, 2008.

*/s/ Janice A. Alwin*

### **CM/ECF Service List:**

- **Michael F. Braun**
  mbraun@srzlaw.com
- **James L. Komie**
  jkomie@srzlaw.com
- **John M. Newman , Jr**
  jmnewman@jonesday.com,
  nmadamczyk@jonesday.com
- **Mark P. Rotatori**
  mprotatori@jonesday.com,
  babutkus@jonesday.com

- **Lee Ann Russo**
  larusso@jonesday.com
- **Robert D Snow , Jr**
  rsnow@srzlaw.com
- **Steven Bennett Towbin**
  stowbin@shawgussis.com
- **Derek Leland Wright**
  dlwright@foley.com,khall@foley.com

### **Mail Service List:**

**Michael F. Braun**
Schuyler, Roche & Zwirner
130 East Randolph Street
Suite 3800
Chicago, IL 60601

**Robert D Snow, Jr**
Schuyler Roche and Zwirner
One Prudential Plaza
130 East Randolph Street
Suite 3800
Chicago, IL 60601

**Mark P. Rotatori**
Jones Day
77 West Wacker Drive
Suite 3500
Chicago, IL 60601-1692

**James L. Komie**
Schuyler, Roche & Zwirner
130 East Randolph Street
Suite 3800
Chicago, IL 60601

**Lee Ann Russo**
Jones Day
77 West Wacker Drive
Suite 3500
Chicago, IL 60601-1692

**With a Courtesy Copy to:**

**Hon. Wayne R. Anderson**
**Chambers 1486**
**219 S Dearborn St**
**Chicago, IL 60604**

COMPOSITE COPY INCORPORATING
AMENDMENT NO. 1

# INTERCREDITOR AGREEMENT

This **INTERCREDITOR AGREEMENT**, is dated as of December 5, 2005, and entered into by and among **RPG ACQUISITION CORP.,** an Delaware corporation (the **"Company"**), **CREDIT SUISSE, CAYMAN ISLANDS BRANCH**, in its capacity as administrative agent for the First Lien Lenders (as defined below), including its successors and assigns from time to time (the **"First Lien Administrative Agent"**), and **Credit Suisse, CAYMAN ISLANDS BRANCH**, in its capacity as administrative agent for the Second Lien Lenders (as defined below), including its successors and assigns from time to time (the **"Second Lien Administrative Agent"**). Capitalized terms used herein but not otherwise defined herein have the meanings set forth in Section 1 below.

## RECITALS

**WHEREAS**, the Company, RPG Holdings, Inc. (**"Holdings"**)**,** the lenders party thereto and the First Lien Administrative Agent have entered into that certain First Lien Credit Agreement, dated as of the date hereof, providing for a revolving credit facility and term loan (as amended, restated, supplemented, modified or Refinanced from time to time, the **"First Lien Credit Agreement"**);

**WHEREAS**, the Company, Holdings, the lenders party thereto and the Second Lien Administrative Agent have entered into that certain Second Lien Credit Agreement, dated as of the date hereof, providing for a term loan (as amended, restated, supplemented, modified or Refinanced from time to time, the **"Second Lien Credit Agreement"**);

**WHEREAS**, the obligations of the Company under the First Lien Credit Agreement and any Specified Hedge Agreements are secured by substantially all of the assets of the Company, Holdings and certain Subsidiaries of the Company (such Subsidiaries and any future Subsidiaries of the Company providing a guaranty thereof, the **"Guarantor Subsidiaries"**), pursuant to the terms of the First Lien Collateral Documents;

**WHEREAS**, the obligations of the Company under the Second Lien Credit Agreement are secured by substantially all of the assets of the Company, Holdings and the Guarantor Subsidiaries, pursuant to the terms of the Second Lien Collateral Documents;

**WHEREAS**, the First Lien Credit Documents and the Second Lien Credit Documents provide, among other things, that the parties thereto shall set forth in this Agreement their respective rights and remedies with respect to the Collateral; and

**WHEREAS**, in order to induce the First Lien Administrative Agent and the First Lien Claimholders to consent to the Grantors incurring the Second Lien Obligations and to induce the First Lien Claimholders to extend credit and other financial accommodations and lend monies to or for the benefit of the Company, Holdings or any Subsidiary of the Company, the Second Lien Administrative Agent on behalf of the

Second Lien Claimholders has agreed to the subordination, intercreditor and other provisions set forth in this Agreement.

NOW, **THEREFORE**, in consideration of the foregoing, the mutual covenants and obligations herein set forth and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## SECTION 1.  Definitions.

**1.1**    Defined Terms.  As used in this Agreement, the following terms shall have the following meanings:

**"Agreement"** means this Intercreditor Agreement, as amended, renewed, extended, supplemented or otherwise modified from time to time in accordance with the terms hereof.

**"Bankruptcy Code"** means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

**"Bankruptcy Law"** means the Bankruptcy Code and any similar federal, state or foreign law for the relief of debtors.

**"Business Day"** means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed, provided that, when used in connection with a Eurodollar Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in dollar deposits in the London interbank market.

**"Cap Amount"** means $145,000,000 less the amount of any permanent repayments of principal with respect to the First Lien Obligations (other than repayments made in connection with a Refinancing permitted under this Agreement).

**"Closing Date"** means December 5, 2005.

**"Collateral"** means all of the assets and property of any Grantor, whether real, personal or mixed, constituting both First Lien Collateral and Second Lien Collateral.

**"Comparable Second Lien Collateral Document"** means, in relation to any Collateral subject to any Lien created under any First Lien Collateral Document, that Second Lien Credit Document which creates a Lien on the same Collateral, granted by the same Grantor.

**"Control"** means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through

the ability to exercise voting power, by contract or otherwise.  The terms "**Controlling**" and "**Controlled**" have meanings correlative thereto.

"**Discharge of First Lien Obligations**" means, except to the extent otherwise provided in Section 5.6, (a) payment in full in cash of the principal of and interest (including interest accruing on or after the commencement of any Insolvency or Liquidation Proceeding, whether or not such interest would be allowed in such Insolvency or Liquidation Proceeding) and premium, if any, on all Indebtedness outstanding under the First Lien Credit Documents, (b) payment in full in cash of all other First Lien Obligations that are due and payable or otherwise accrued and owing at or prior to the time such principal and interest are paid, and (c) termination, cash collateralization in an amount satisfactory to the First Lien Administrative Agent or other provision for in a manner satisfactory to the First Lien Administrative Agent and the issuing bank under the First Lien Credit Agreement of all letters of credit issued under the First Lien Credit Documents and (d) termination or expiration of all commitments to lend and all obligations to lend and all obligations to issue letters of credit under the First Lien Credit Documents.

"**First Lien Claimholders**" means, at any relevant time, the holders of First Lien Obligations at such time, including without limitation the First Lien Lenders and the agents under the First Lien Credit Agreement.

"**First Lien Collateral**" means all of the assets and property of any Grantor, whether real, personal or mixed, with respect to which a Lien is granted as security for any First Lien Obligations.

"**First Lien Collateral Documents**" means all agreements, documents and instruments pursuant to which a Lien is granted securing any First Lien Obligations or under which rights or remedies with respect to such Liens are governed.

"**First Lien Credit Documents**" means the First Lien Credit Agreement and the Loan Documents (as defined in the First Lien Credit Agreement) and each of the other agreements, documents and instruments providing for or evidencing any other First Lien Obligation, and any other document or instrument executed or delivered at any time in connection with any First Lien Obligations under the First Lien Credit Agreement and the Loan Documents (as defined in the First Lien Credit Agreement), including any intercreditor or joinder agreement among holders of First Lien Obligations, to the extent such are effective at the relevant time, in each case as each may be amended, restated, supplemented, modified, renewed, extended or Refinanced from time to time in accordance with the provisions of this Agreement.

"**First Lien Guarantee and Collateral Agreement**" means that certain Guarantee and Collateral Agreement dated as of the Closing Date pursuant to which a Lien is granted securing the First Lien Obligations.

"**First Lien Lenders**" means the "Lenders" under and as defined in the First Lien Credit Agreement.

3

"**First Lien Obligations**" means all Obligations outstanding under the First Lien Credit Agreement and the other First Lien Credit Documents, including, without limitation, (i) Specified Hedge Agreements and (ii) other additional Obligations designated by the First Lien Administrative Agent as "Obligations" under the First Lien Credit Agreement.  To the extent any payment with respect to the First Lien Obligations (whether by or on behalf of any Grantor, as proceeds of security, enforcement of any right of set-off or otherwise) is declared to be fraudulent or preferential in any respect, set aside or required to be paid to a debtor in possession, trustee, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied shall be deemed to be reinstated and outstanding as if such payment had not occurred.  "First Lien Obligations" shall also include all interest accrued or accruing (or which would, absent commencement of an Insolvency or Liquidation Proceeding, accrue) after commencement of an Insolvency or Liquidation Proceeding in accordance with the rate specified in the relevant First Lien Credit Document whether or not the claim for such interest is allowed as a claim in such Insolvency or Liquidation Proceeding. Notwithstanding the foregoing, if the sum of: (1) Indebtedness constituting principal outstanding under the First Lien Credit Agreement plus any undrawn portion of revolving commitments pursuant to the First Lien Credit Agreement; plus (2) the aggregate face amount of any letters of credit issued but not reimbursed under the First Lien Credit Agreement, is in the aggregate in excess of the Cap Amount, then only that portion of such Indebtedness and such aggregate face amount of letters of credit equal to the Cap Amount shall be included in First Lien Obligations and interest and reimbursement obligations with respect to such Indebtedness and letters of credit shall only constitute First Lien Obligations to the extent related to Indebtedness and face amounts of letters of credit included in the First Lien Obligations.

"**Governmental Authority**" means any federal, state, municipal, national or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof or any entity or officer exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state of the United States, the United States, or a foreign entity or government.

"**Grantors**" means the Company, Holdings and each of the Guarantor Subsidiaries that have executed and delivered, or may from time to time hereafter execute and deliver, a First Lien Collateral Document or a Second Lien Collateral Document.

"**Hedging Obligation**" of any Person means any obligation of such Person pursuant to any Specified Hedge Agreements.

"**Indebtedness**" means and includes all Obligations that constitute "Indebtedness" within the meaning of the First Lien Credit Agreement or the Second Lien Credit Agreement, as applicable.

"**Insolvency or Liquidation Proceeding**" means (a) any voluntary or involuntary case or proceeding under the Bankruptcy Code with respect to any Grantor, (b) any other voluntary or involuntary insolvency, reorganization or bankruptcy case or

proceeding, or any receivership, liquidation, reorganization or other similar case or proceeding with respect to any Grantor or with respect to a material portion of their respective assets, (c) any liquidation, dissolution, reorganization or winding up of any Grantor whether voluntary or involuntary and whether or not involving insolvency or bankruptcy or (d) any assignment for the benefit of creditors or any other marshalling of assets and liabilities of any Grantor.

"**Lien**" means any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing.

"**Obligations**" means any and all obligations with respect to the payment of (a) any principal of or interest or premium on any indebtedness, including any reimbursement obligation in respect of any letter of credit, or any other liability, including, without limitation, interest accruing after the filing of a petition initiating any proceeding under the Bankruptcy Code, (b) any fees, indemnification obligations, expense reimbursement obligations or other liabilities payable under the documentation governing any indebtedness, (c) any obligation to post cash collateral in respect of letters of credit or any other obligations or (d) any Hedging Obligations.

"**Person**" or "**Persons**" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and Governmental Authorities.

"**Pledged Collateral**" has the meaning set forth in Section 5.4 hereof.

"**Recovery**" has the meaning set forth in Section 6.5 hereof.

"**Refinance**" means, in respect of any indebtedness or other obligation, to refinance, extend, renew, defease, amend, amend and restate, modify, supplement, restructure, replace, refund or repay, or to issue other indebtedness or other obligation, in exchange or replacement for, such indebtedness or other obligation in whole or in part. "**Refinanced**" and "**Refinancing**" shall have correlative meanings.

"**Second Lien Claimholders**" means, at any relevant time, the holders of Second Lien Obligations at such time, including without limitation the Second Lien Lenders and the agents under the Second Lien Credit Agreement.

"**Second Lien Collateral**" means all of the assets and property of any Grantor, whether real, personal or mixed, with respect to which a Lien is granted as security for any Second Lien Obligations.

"**Second Lien Collateral Documents**" means all agreements, documents and instruments pursuant to which a Lien is granted securing any Second Lien Obligations or under which rights or remedies with respect to such Liens are governed.

"**Second Lien Credit Documents**" means the Second Lien Credit Agreement and the Loan Documents (as defined in the Second Lien Credit Agreement) and each of the other agreements, documents and instruments providing for or evidencing any other Second Lien Obligation, and any other document or instrument executed or delivered at any time in connection with any Second Lien Obligations under the Second Lien Credit Agreement and the Loan Documents (as defined in the Second Lien Credit Agreement), in each case as each may be amended, restated, supplemented, modified, renewed, extended or Refinanced from time to time in accordance with the provisions of this Agreement.

"**Second Lien Lenders**" means the "Lenders" under and as defined in the Second Lien Credit Agreement.

"**Second Lien Mortgages**" means a collective reference to each mortgage, deed of trust and any other document or instrument under which any Lien on real property owned by any Grantor is granted to secure any Second Lien Obligations or under which rights or remedies with respect to any such Liens are governed.

"**Second Lien Obligations**" means all Obligations outstanding under the Second Lien Credit Agreement and the other Second Lien Credit Documents.  To the extent any payment with respect to the Second Lien Obligations (whether by or on behalf of any Grantor, as proceeds of security, enforcement of any right of set-off or otherwise) is declared to be fraudulent or preferential in any respect, set aside or required to be paid to a debtor in possession, trustee, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied shall be deemed to be reinstated and outstanding as if such payment had not occurred.  "Second Lien Obligations" shall also include all interest accrued or accruing (or which would, absent commencement of an Insolvency or Liquidation Proceeding, accrue) after commencement of an Insolvency or Liquidation Proceeding in accordance with the rate specified in the relevant Second Lien Credit Document whether or not the claim for such interest is allowed as a claim in such Insolvency or Liquidation Proceeding.

"**Specified Hedge Agreement**" means the "Specified Hedge Agreements" under and as defined in the First Lien Guarantee and Collateral Agreement.

"**Standstill Period**" has the meaning set forth in Section 3.1 hereof.

"**Subsidiary**" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other

ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"**Uniform Commercial Code**" or "**UCC**" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in any applicable jurisdiction.

**1.2**  <u>Terms Generally</u>.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified, (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Exhibits or Sections shall be construed to refer to Exhibits or Sections of this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

**SECTION 2.  <u>Lien Priorities</u>.**

**2.1**  <u>Relative Priorities</u>.  Notwithstanding the date, manner or order of grant, attachment or perfection of any Liens securing the Second Lien Obligations granted on the Collateral or of any Liens securing the First Lien Obligations granted on the Collateral and notwithstanding any provision of the UCC, or any applicable law or the Second Lien Credit Documents or any other circumstance whatsoever, the Second Lien Administrative Agent, on behalf of itself and the Second Lien Claimholders, hereby agrees that:  (a) any Lien on the Collateral securing any First Lien Obligations now or hereafter held by or on behalf of the First Lien Administrative Agent or any First Lien Claimholders or any agent or trustee therefor, regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be senior in all respects and prior to any Lien on the Collateral securing any Second Lien Obligations; and (b) any Lien on the Collateral securing any Second Lien Obligations now or hereafter held by or on behalf of the Second Lien Administrative Agent, any Second Lien Claimholders or any agent or trustee therefor regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to all Liens on the Collateral securing any First Lien Obligations.  All Liens on the Collateral securing any First Lien Obligations shall be and remain senior in all respects and prior to all Liens on the

Collateral securing any Second Lien Obligations for all purposes, whether or not such Liens securing any First Lien Obligations are subordinated to any Lien securing any other obligation of the Company, any other Grantor or any other Person.

**2.2**   <u>Prohibition on Contesting Liens</u>.   Each of the Second Lien Administrative Agent, for itself and on behalf of each Second Lien Claimholder, and the First Lien Administrative Agent, for itself and on behalf of each First Lien Claimholder, agrees that it shall not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), the priority, validity or enforceability of a Lien held by or on behalf of any of the First Lien Claimholders in the First Lien Collateral or by or on behalf of any of the Second Lien Claimholders in the Second Lien Collateral, as the case may be; <u>provided</u> that nothing in this Agreement shall be construed to prevent or impair the rights of the First Lien Administrative Agent or any First Lien Claimholder to enforce this Agreement, including the priority of the Liens securing the First Lien Obligations as provided in Sections 2.1 and 3.1.

**2.3**   <u>No New Liens</u>.   So long as the Discharge of First Lien Obligations has not occurred, the parties hereto agree that the Company shall not, and shall not permit any Guarantor Subsidiary to, (a) grant or permit any additional Liens on any asset or property to secure any Second Lien Obligation unless it has granted a Lien on such asset or property to secure the First Lien Obligations, and (b) grant or permit any additional Liens on any asset or property to secure any First Lien Obligations unless it has granted a Lien on such asset or property to secure the Second Lien Obligations.  To the extent that the foregoing provisions are not complied with for any reason, without limiting any other rights and remedies available to the First Lien Administrative Agent and/or the First Lien Claimholders, Second Lien Administrative Agent, on behalf of Second Lien Claimholders, agrees that any amounts received by or distributed to any of them pursuant to or as a result of Liens granted in contravention of this Section 2.3 shall be subject to Section 4.2.

**2.4**   <u>Similar Liens and Agreements</u>.    The parties hereto agree that it is their intention that the First Lien Collateral and the Second Lien Collateral be identical.  In furtherance of the foregoing and of Section 8.10, the parties hereto agree, subject to the other provisions of this Agreement:

(a)   upon request by the First Lien Administrative Agent or the Second Lien Administrative Agent, to cooperate in good faith (and to direct their counsel to cooperate in good faith) from time to time in order to determine the specific items included in the First Lien Collateral and the Second Lien Collateral and the steps taken to perfect their respective Liens thereon and the identity of the respective parties obligated under the First Lien Credit Documents and the Second Lien Credit Documents; and

(b)   that the documents and agreements creating or evidencing the First Lien Collateral and the Second Lien Collateral and guarantees for the First Lien Obligations and the Second Lien Obligations shall be in all material respects the same

forms of documents other than with respect to the first lien and the second lien nature of the Obligations thereunder.

## SECTION 3.  Enforcement.

**3.1**  Exercise of Remedies.

(a)    Until the Discharge of First Lien Obligations has occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against the Company or any other Grantor, the Second Lien Administrative Agent and the Second Lien Claimholders:

(i)    will not exercise or seek to exercise any rights or remedies (including setoff and the right to credit bid their debt) with respect to any Collateral (including the exercise of any right under any lockbox agreement, control account agreement, landlord waiver or bailee's letter or similar agreement or arrangement to which the Second Lien Administrative Agent or any Second Lien Claimholder is a party) or institute any action or proceeding with respect to such rights or remedies (including any action of foreclosure);

(ii)    will not contest, protest or object to any foreclosure proceeding or action brought by the First Lien Administrative Agent or any First Lien Claimholder or any other exercise by the First Lien Administrative Agent or any First Lien Claimholder, of any rights and remedies relating to the First Lien Collateral or otherwise; or

(iii)    subject to their rights under clause (a)(i) above, will not object to the forbearance by the First Lien Administrative Agent or the First Lien Claimholders from bringing or pursuing any foreclosure proceeding or action or any other exercise of any rights or remedies relating to the First Lien Collateral;

provided that if an Event of Default (as defined in the Second Lien Credit Agreement (as in effect on the date hereof)) has occurred and for so long as such Event of Default is continuing, subject at all times to the provisions of Sections 2.1 and 4, after expiration of a 120-day period (the **"Standstill Period"**) which shall commence on the date of receipt by the First Lien Administrative Agent of the written declaration of the Second Lien Administrative Agent of such Event of Default and written demand by the Second Lien Administrative Agent to the Company for the accelerated payment of all Second Lien Obligations (unless any Grantor is subject to an Insolvency or Liquidation Proceeding by reason of which such declaration and the making of such demand is stayed, in which case, commencing on the date of the commencement of such Insolvency or Liquidation Proceeding), the Second Lien Administrative Agent may take action to enforce its Liens on the Second Lien Collateral (including the institution of any action or proceeding with respect to its rights or remedies with respect to any Second Lien Collateral) upon 10 days' prior written notice to the First Lien Administrative Agent (which notice may be given prior to the completion of such 120-day period, but not prior

to the 90th day of such period), but only so long as the First Lien Administrative Agent is not diligently pursuing in good faith the exercise of its enforcement rights or remedies against, or diligently attempting to vacate any stay on enforcement of its Liens on, all or any material portion of the Collateral that could reasonably be expected to yield proceeds sufficient to effect the Discharge of First Lien Obligations and repayment of outstanding Second Lien Obligations (including, without limitation, commencement of any reasonable action to foreclose its Liens on such Collateral, any reasonable action to take possession of such Collateral or commencement of any reasonable legal proceedings or actions against or with respect to such Collateral); after the expiration of the Standstill Period and after the Second Lien Administrative Agent has provided at least 10 days' prior written notice to the First Lien Administrative Agent (which may occur during the Standstill Period) that it intends to commence action to enforce its Lien and neither the First Lien Administrative Agent nor the First Lien Lenders have commenced any action to enforce their Lien on any Collateral within 10 days after receipt of such notice, in the event that and for as long as the Second Lien Administrative Agent shall have commenced any actions to enforce its Lien on any material portion of the Collateral to the extent permitted hereunder and is diligently pursuing such actions, neither the First Lien Administrative Agent nor the First Lien Claimholders shall take any action of a similar nature with respect to such Collateral; <u>provided</u> that all other provisions of this Intercreditor Agreement are complied with.

(b)    Until the Discharge of First Lien Obligations has occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against the Company or any other Grantor, the First Lien Administrative Agent and the First Lien Claimholders shall, except as otherwise expressly provided herein, have the exclusive right to enforce rights, exercise remedies (including set-off and the right to credit bid their debt) and make determinations regarding the release, disposition, or restrictions with respect to the Collateral without any consultation with or the consent of the Second Lien Administrative Agent or any Second Lien Claimholder.  The First Lien Administrative Agent shall provide at least 10 days notice to the Second Lien Administrative Agent of its intent to exercise and enforce its rights or remedies with respect to the Collateral.  In exercising rights and remedies with respect to the Collateral, the First Lien Administrative Agent and the First Lien Claimholders may enforce the provisions of the First Lien Loan Documents and exercise remedies thereunder, all in such order and in such manner as they may determine in the exercise of their sole discretion.  Such exercise and enforcement shall include the rights of an agent appointed by them to sell or otherwise dispose of Collateral upon foreclosure, to incur expenses in connection with such sale or disposition, and to exercise all the rights and remedies of a secured creditor under the UCC and of a secured creditor under Bankruptcy Laws of any applicable jurisdiction.

(c)    Notwithstanding the foregoing, the Second Lien Administrative Agent and any Second Lien Claimholder may:

(i)    file a claim or statement of interest with respect to the Second Lien Obligations; <u>provided</u> that an Insolvency or Liquidation

Proceeding has been commenced by or against the Company or any other Grantor;

(ii)    take any action (not adverse to the priority status of the Liens on the Collateral securing the First Lien Obligations, or the rights of any First Lien Administrative Agent or the First Lien Claimholders to exercise remedies in respect thereof) in order to create, perfect, preserve or protect its Lien on the Collateral;

(iii)    file any necessary responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any person objecting to or otherwise seeking the disallowance of the claims of the Second Lien Claimholders, including any claims secured by the Collateral, if any, in each case in accordance with the terms of this Agreement;

(iv)    vote on any plan of reorganization, file any proof of claim, make other filings and make any arguments and motions that are, in each case, in accordance with the terms of this Agreement, with respect to the Second Lien Obligations and the Collateral;

(v)    exercise any of its rights or remedies with respect to the Collateral after the termination of the Standstill Period to the extent permitted by Section 3.1(a); and

(vi)    present a cash bid at any Section 363 hearing or with respect to any other Collateral disposition.

The Second Lien Administrative Agent, on behalf of itself and the Second Lien Claimholders, agrees that it will not take or receive any Collateral or any proceeds of Collateral in connection with the exercise of any right or remedy (including set-off) with respect to any Collateral in its capacity as a creditor, unless and until the Discharge of First Lien Obligations has occurred, except as expressly provided in Section 3.1(a); *provided* that the provisions of this Section 3.1(c) shall not prevent any mandatory prepayment of the Second Lien Obligations under and in accordance with the terms of Section 2.13 of the Second Lien Credit Agreement made in compliance with Section 6.09(b) of the First Lien Credit Agreement.  Without limiting the generality of the foregoing, unless and until the Discharge of First Lien Obligations has occurred, except as expressly provided in Section 3.1(a), Section 6 and this Section 3.1(c), the sole right of the Second Lien Administrative Agent and the Second Lien Claimholders with respect to the Collateral is to hold a Lien on the Collateral pursuant to the Second Lien Collateral Documents for the period and to the extent granted therein and to receive a share of the proceeds thereof, if any, after the Discharge of First Lien Obligations has occurred.

(d)    Subject to Sections 3.1(a) and (c) and Section 6:

(i)    the Second Lien Administrative Agent, for itself and on behalf of the Second Lien Claimholders, agrees that the Second Lien Administrative Agent and the Second Lien Claimholders will not take any action

11

that would hinder any exercise of remedies under the First Lien Loan Documents or is otherwise prohibited hereunder, including any sale, lease, exchange, transfer or other disposition of the Collateral, whether by foreclosure or otherwise;

(ii)    the Second Lien Administrative Agent, for itself and on behalf of the Second Lien Claimholders, hereby waives any and all rights it or the Second Lien Claimholders may have as a junior lien creditor or otherwise to object to the manner in which the First Lien Administrative Agent or the First Lien Claimholders seek to enforce or collect the First Lien Obligations or the Liens securing the First Lien Obligations granted in any of the First Lien Collateral undertaken in accordance with this Agreement, regardless of whether any action or failure to act by or on behalf of the First Lien Administrative Agent or First Lien Claimholders is adverse to the interest of the Second Lien Claimholders; and

(iii)    the Second Lien Administrative Agent hereby acknowledges and agrees that no covenant, agreement or restriction contained in the Second Lien Collateral Documents or any other Second Lien Credit Document (other than this Agreement) shall be deemed to restrict in any way the rights and remedies of the First Lien Administrative Agent or the First Lien Claimholders with respect to the Collateral as set forth in this Agreement and the First Lien Credit Documents.

(e)    Except as otherwise specifically set forth in Sections 3.1(a) and (d), the Second Lien Administrative Agent and the Second Lien Claimholders may exercise rights and remedies as unsecured creditors against the Company or any other Grantor that has guaranteed or granted Liens to secure the Second Lien Obligations in accordance with the terms of the Second Lien Loan Documents and applicable law; provided that in the event that any Second Lien Claimholder becomes a judgment Lien creditor in respect of Collateral as a result of its enforcement of its rights as an unsecured creditor with respect to the Second Lien Obligations, such judgment Lien shall be subject to the terms of this Agreement for all purposes (including in relation to the First Lien Obligations) as the other Liens securing the Second Lien Obligations are subject to this Agreement.

(f)    Except as specifically set forth in Sections 3.1(a) and (d) and Section 4, nothing in this Agreement shall prohibit the receipt by the Second Lien Administrative Agent or any Second Lien Claimholders of the required payments of interest, principal and other amounts owed in respect of the Second Lien Obligations so long as such receipt is not the direct or indirect result of the exercise by the Second Lien Administrative Agent or any Second Lien Claimholders of rights or remedies as a secured creditor (including set-off) or enforcement in contravention of this Agreement of any Lien held by any of them.  Nothing in this Agreement impairs or otherwise adversely affects any rights or remedies the First Lien Administrative Agent or the First Lien Claimholders may have with respect to the First Lien Collateral.

(NY) 06216/188/CA/intercreditor.agt.posted.doc

## SECTION 4.  Payments.

**4.1**  Application of Proceeds.  So long as the Discharge of First Lien Obligations has not occurred, any proceeds of Collateral received in connection with the sale or other disposition of, or collection on, such Collateral upon the exercise of remedies, shall be applied by the First Lien Administrative Agent to the First Lien Obligations in such order as specified in the relevant First Lien Credit Documents. Upon the Discharge of the First Lien Obligations, the First Lien Administrative Agent shall deliver any proceeds of Collateral held by it in the same form as received to the Second Lien Administrative Agent, with any necessary endorsements to be applied by the Second Lien Administrative Agent to the Second Lien Obligations in such order as specified in the Second Lien Collateral Documents or as a court of competent jurisdiction may otherwise direct.

**4.2**  Payments Over.  So long as the Discharge of First Lien Obligations has not occurred, any Collateral or proceeds thereof (together with assets or proceeds subject to Liens referred to in the final sentence of Section 2.3) received by the Second Lien Administrative Agent or any Second Lien Claimholders in connection with the exercise of any right or remedy (including set-off) relating to the Collateral in contravention of this Agreement shall be segregated and held in trust and forthwith paid over to the First Lien Administrative Agent for the benefit of the First Lien Claimholders in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct.  The First Lien Administrative Agent is hereby authorized to make any such endorsements as agent for the Second Lien Administrative Agent or any such Second Lien Claimholders.  This authorization is coupled with an interest and is irrevocable until such time as this Agreement is terminated in accordance with its terms.

**4.3**  Certain Agreements with respect to Unenforceable Collateral.  In addition to the rights and obligations of the First Lien Administrative Agent, the Second Lien Administrative Agent, the First Lien Claimholders and Second Lien Claimholders set forth herein, in the event that in any Insolvency or Liquidation Proceeding a determination is made that Liens encumbering any Collateral are not enforceable for any reason, then the Second Lien Administrative Agent and the Second Lien Claimholders agree that, any distribution or recovery they may receive with respect to, or allocable to, the value of such Collateral or any proceeds thereof shall (for so long as the Discharge of the First Lien Obligations has not occurred) be segregated and held in trust and forthwith paid over to the First Lien Administrative Agent for the benefit of the First Lien Claimholders in the same form as received without recourse, representation or warranty (other than a representation of the Second Lien Administrative Agent that it has not otherwise sold, assigned, transferred or pledged any right, title or interest in and to such distribution or recovery) but with any necessary endorsements or as a court of competent jurisdiction may otherwise direct until such time as the Discharge of First Lien Obligations has occurred.  The First Lien Administrative Agent is hereby authorized to make any such endorsements as agent for the Second Lien Administrative Agent or any such Second Lien Claimholders.  This

13

authorization is coupled with an interest and is irrevocable until such time as this Agreement is terminated in accordance with its terms.

## SECTION 5.  Other Agreements.

**5.1**  Releases.

(a)  If in connection with the exercise of the First Lien Administrative Agent's rights and remedies in respect of the Collateral provided for in Section 3.1, the First Lien Administrative Agent, for itself or on behalf of any of the First Lien Claimholders, releases any of its Liens on any part of the Collateral or releases any Guarantor Subsidiary from its obligations under its guarantee of the First Lien Obligations, then the Liens, if any, of the Second Lien Administrative Agent, for itself or for the benefit of the Second Lien Claimholders, on such Collateral, and the obligations of such Guarantor Subsidiary under its guarantee of the Second Lien Obligations, shall be automatically, unconditionally and simultaneously released.   The Second Lien Administrative Agent, for itself or on behalf of any such Second Lien Claimholders, promptly shall execute and deliver to the First Lien Administrative Agent or such Guarantor Subsidiary such termination statements, releases and other documents as the First Lien Administrative Agent or such Guarantor Subsidiary may request to effectively confirm such release.

(b)  If in connection with any sale, lease, exchange, transfer or other disposition of any Collateral (collectively, a "**Disposition**") permitted under the terms of both the First Lien Loan Documents and the Second Lien Loan Documents (other than in connection with the exercise of the First Lien Administrative Agent's rights and remedies in respect of the Collateral provided for in Section 3.1), the First Lien Administrative Agent, for itself or on behalf of any of the First Lien Claimholders, releases any of its Liens on any part of the Collateral, or releases any Guarantor Subsidiary from its obligations under its guarantee of the First Lien Obligations, in each case other than (A) in connection with the Discharge of First Lien Obligations and (B) after the occurrence and during the continuance of any Event of Default under the Second Lien Credit Agreement, then the Liens, if any, of the Second Lien Administrative Agent, for itself or for the benefit of the Second Lien Claimholders, on such Collateral, and the obligations of such Guarantor Subsidiary under its guarantee of the Second Lien Obligations, shall be automatically, unconditionally and simultaneously released.   The Second Lien Administrative Agent, for itself or on behalf of any such Second Lien Claimholders, promptly shall execute and deliver to the First Lien Administrative Agent and the Grantor party to such Disposition or such Guarantor Subsidiary, as applicable, such termination statements, releases and other documents as the First Lien Administrative Agent or such Grantor or Guarantor Subsidiary may request to effectively confirm such release.   Notwithstanding the foregoing, neither the Second Lien Administrative Agent nor any Second Lien Claimholder waives any right that it may have under Section 9-610(b) of the Uniform Commercial Code that a sale or other disposition of Collateral must be commercially reasonable.

(NY) 06216/188/CA/intercreditor.agt.posted.doc

(c)     Until the Discharge of First Lien Obligations occurs, the Second Lien Administrative Agent, for itself and on behalf of the Second Lien Claimholders, hereby irrevocably constitutes and appoints the First Lien Administrative Agent and any officer or agent of the First Lien Administrative Agent, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of the Second Lien Administrative Agent or such holder or in the First Lien Administrative Agent's own name, from time to time in the First Lien Administrative Agent's discretion, for the purpose of carrying out the terms of this Section 5.1, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary to accomplish the purposes of this Section 5.1, including any endorsements or other instruments of transfer or release.

(d)     Until the Discharge of First Lien Obligations occurs, to the extent that the First Lien Administrative Agent or the First Lien Claimholders (i) have released any Lien on Collateral or any Guarantor Subsidiary from its obligation under its guarantee and any such Liens or guarantee are later reinstated or (ii) obtain any new Liens or additional guarantees from any Guarantor Subsidiaries, then the Second Lien Administrative Agent, for itself and for the Second Lien Claimholders, shall be granted a Lien on any such Collateral, subject to the lien subordination provisions of this Agreement, and an additional guarantee, as the case may be.

(e)     In the event that the principal amount of funded First Lien Obligations, <u>plus</u> the aggregate face amount of letters of credit, if any, issued under the First Lien Credit Agreement and not reimbursed, <u>plus</u> the aggregate principal amount of unfunded commitments under the First Lien Credit Agreement (collectively, the "**First Lien Obligations Amount**"), at any date of determination no longer constitute at least 15% of the sum of (i) the First Lien Obligations Amount and (ii) the principal amount of funded Second Lien Obligations, <u>plus</u> the aggregate principal amount of unfunded commitments under the Second Lien Credit Agreement (collectively, the "**Second Lien Obligations Amount**"), then any release provided for in Section 5.1(a) above shall require the consent of First Lien Claimholders and Second Lien Claimholders representing in the aggregate more than 50% of the sum of (i) the First Lien Obligations Amount and (ii) the Second Lien Obligations Amount.

**5.2**    <u>Insurance</u>.  Unless and until the Discharge of First Lien Obligations has occurred, the First Lien Administrative Agent and the First Lien Claimholders shall have the sole and exclusive right, subject to the rights of the Grantors under the First Lien Loan Documents, to adjust settlement for any insurance policy covering the Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding (or any deed in lieu of condemnation) affecting the Collateral.  Unless and until the Discharge of First Lien Obligations has occurred or to the extent provided in Section 2.13(g) of the First Lien Credit Agreement, and subject to the rights of the Grantors under the First Lien Loan Documents, all proceeds of any such policy and any such award (or any payments with respect to a deed in lieu of condemnation) if in respect to the Collateral shall be paid to the First Lien Administrative Agent for the benefit of the First Lien Claimholders pursuant to the terms of the First Lien Loan Documents (including for purposes of cash

collateralization of letters of credit) and thereafter, to the extent no First Lien Obligations are outstanding and subject to the rights of the Grantors under the Second Lien Loan Documents, to the Second Lien Administrative Agent for the benefit of the Second Lien Claimholders to the extent required under the Second Lien Collateral Documents and then, to the extent no Second Lien Obligations are outstanding, to the owner of the subject property, such other person as may be entitled thereto or as a court of competent jurisdiction may otherwise direct.  Until the Discharge of First Lien Obligations has occurred, if the Second Lien Administrative Agent or any Second Lien Claimholders shall, at any time, receive any proceeds of any such insurance policy or any such award or payment in contravention of this Agreement, it shall pay such proceeds over to the First Lien Administrative Agent in accordance with the terms of Section 4.2.

**5.3** <u>Amendments to First Lien Loan Documents and Second Lien Loan Documents</u>.

(a)    The First Lien Loan Documents may be amended, supplemented or otherwise modified in accordance with their terms and the First Lien Credit Agreement may be Refinanced, in each case, without notice to, or the consent of the Second Lien Administrative Agent or the Second Lien Claimholders, all without affecting the lien subordination or other provisions of this Agreement; <u>provided</u>, <u>however</u>, that the holders of such Refinancing debt bind themselves in a writing addressed to the Second Lien Administrative Agent and the Second Lien Claimholders to the terms of this Agreement and any such amendment, supplement, modification or Refinancing shall not:

(i)    contravene the provisions of this Agreement;

(ii)    increase the then outstanding aggregate principal amount of the loans under the First Lien Credit Documents plus any undrawn portion of revolving commitments pursuant to the First Lien Credit Agreement, plus the aggregate amount of any letters of credit issued but not reimbursed under the First Lien Credit Agreement, in excess of the Cap Amount;

(iii)    increase the yield by more than 3.00% per annum (excluding increases resulting from the accrual of interest at the default rate);

(iv)    extend the scheduled maturity of the First Lien Credit Agreement or any Refinancing thereof beyond the scheduled maturity of the Second Lien Credit Agreement or any Refinancing thereof; or

(v)    modify (or have the effect of a modification of) the mandatory prepayment provisions of the First Lien Credit Agreement in a manner adverse to the lenders under the Second Lien Credit Agreement.

(b)    The Second Lien Loan Documents may be amended, supplemented or otherwise modified in accordance with their terms and the Second Lien Credit Agreement may be Refinanced, in each case, without notice to, or the consent of

16

the First Lien Administrative Agent or the First Lien Claimholders, all without affecting the lien subordination or other provisions of this Agreement; provided, however, that the holders of such Refinancing debt bind themselves in a writing addressed to the First Lien Administrative Agent and the First Lien Claimholders to the terms of this Agreement and any such amendment, supplement, modification or Refinancing shall not:

(i)    contravene the provisions of this Agreement;

(ii)    increase the yield by more than 3.00% per annum (excluding increases resulting from the accrual of interest at the default rate);

(iii)    change (to earlier dates) any dates upon which payments of principal or interest are due thereon;

(iv)    change any default or Event of Default thereunder in a manner adverse to the loan parties thereunder;

(v)    change the redemption, prepayment or defeasance provisions thereof;

(vi)    change any collateral therefor (other than to release such collateral and other than to add Collateral that is also provided to the First Lien Administrative Agent),

(vii)    increase the obligations of the loan parties thereunder or confer any additional rights on the Second Lien Lenders which would be adverse to the First Lien Lenders, or

(viii)    in the case of a Refinancing, (A) contain terms and conditions applicable to such Refinancing debt that are less favorable in the aggregate to the loan parties and to the First Lien Lenders or the other holders of First Lien Obligations than the terms and conditions of the Second Lien Loan Documents (as determined in the reasonable opinion of the First Lien Administrative Agent, acting on behalf of the "Required Lenders" (as defined in the First Lien Credit Agreement)), (B) increase the outstanding aggregate principal amount of the Second Lien Credit Agreement (plus the amount of any premiums or penalties and accrued and unpaid interest paid thereon and reasonable fees and expenses associated with such Refinancing), (C) have an average life to maturity less than that of the Second Lien Credit Agreement or (D) contain any other terms and provisions that are not reasonably acceptable to the First Lien Administrative Agent.

(c)    The Company agrees that each Second Lien Collateral Document shall include the following language (or language to similar effect approved by the First Lien Administrative Agent):

"Notwithstanding anything herein to the contrary, the lien and security interest granted to the Second Lien Administrative Agent pursuant to this

17

Agreement and the exercise of any right or remedy by the Second Lien Administrative Agent hereunder are subject to the provisions of the Intercreditor Agreement, dated as of December 5, 2005 (as amended, restated, supplemented or otherwise modified from time to time, the "**Intercreditor Agreement**"), among RPG Acquisition Corp., Inc., Credit Suisse, Cayman Islands Branch, as First Lien Administrative Agent, and Credit Suisse, Cayman Islands Branch, as Second Lien Administrative Agent, and certain other persons party or that may become party thereto from time to time. In the event of any conflict between the terms of the Intercreditor Agreement and this Agreement, the terms of the Intercreditor Agreement shall govern and control."

In addition, the Company agrees that each Second Lien Mortgage covering any Collateral shall contain such other language as the First Lien Administrative Agent may reasonably request to reflect the subordination of such Second Lien Mortgage to the First Lien Collateral Document covering such Collateral.

(d)    In the event any First Lien Administrative Agent or the First Lien Claimholders and the relevant Grantor enter into any amendment, waiver or consent in respect of any of the First Lien Collateral Documents for the purpose of adding to, or deleting from, or waiving or consenting to any departures from any provisions of, any First Lien Collateral Document or changing in any manner the rights of the First Lien Administrative Agent, such First Lien Claimholders, the Company or any other Grantor thereunder, then such amendment, waiver or consent shall apply automatically to any comparable provision of the Comparable Second Lien Collateral Document without the consent of the Second Lien Administrative Agent or the Second Lien Claimholders and without any action by the Second Lien Administrative Agent, the Company or any other Grantor, provided that:

(i)    no such amendment, waiver or consent shall have the effect of: (A) removing assets subject to the Lien of the Second Lien Collateral Documents, except to the extent that a release of such Lien is permitted or required by Section 5.1 and provided that there is a corresponding release of such Lien securing the First Lien Obligations; (B) imposing duties on the Second Lien Administrative Agent without its consent; (C) permitting other Liens on the Collateral not permitted under the terms of the Second Lien Loan Documents or Section 6; or (D) being prejudicial to the interests of the Second Lien Claimholders to a greater extent than the First Lien Claimholders; and

(ii)    notice of such amendment, waiver or consent shall have been given to the Second Lien Administrative Agent within ten Business Days after the effective date of such amendment, waiver or consent.

(e)    Notwithstanding anything to the contrary in Section 5.3(d), in the event the First Lien Administrative Agent or the First Lien Claimholders and the relevant Grantors enter into any amendment of the First Lien Credit Agreement amending any Event of Default thereunder in a manner adverse to the loan parties thereunder or

18

adding one or more additional Events of Default thereunder, then the Second Lien Claimholders shall have the right to have such amendment apply to any comparable provision of, or have such additional Events of Default added to, the Second Lien Credit Agreement; provided that any thresholds contained in such amended or additional Events of Default may be increased to reflect the second lien status of the Second Lien Credit Agreement by an amount mutually agreed among the Company and the Second Lien Administrative Agent. Notice of such amendment shall be given to the Second Lien Administrative Agent within ten Business Days after the effective date of such amendment.

**5.4**    Bailee for Protection.

(a)    The First Lien Administrative Agent agrees to hold that part of the Collateral that is in its possession or control (or in the possession or control of its agents or bailees) to the extent that possession or control thereof is taken to perfect a Lien thereon by possession or control under the UCC (such Collateral being the "**Pledged Collateral**") as collateral agent for the First Lien Claimholders and as bailee on behalf of or for the benefit of the Second Lien Administrative Agent (such bailment being intended, among other things, to satisfy the requirements of Sections 8-301(a)(2) and 9-313(c) of the UCC) and any assignee solely for the purpose of perfecting by possession or delivery the security interest granted under the First Lien Loan Documents and the Second Lien Loan Documents, respectively, subject to the terms and conditions of this Section 5.4.

(b)    The First Lien Administrative Agent shall have no obligation whatsoever to the First Lien Claimholders, the Second Lien Administrative Agent or any Second Lien Claimholder to ensure that the Pledged Collateral is genuine or owned by any of the Grantors or to preserve rights or benefits of any person except as expressly set forth in this Section 5.4. The duties or responsibilities of the First Lien Administrative Agent under this Section 5.4 shall be limited solely to holding the Pledged Collateral as bailee in accordance with this Section 5.4 and delivering the Pledged Collateral upon a Discharge of First Lien Obligations as provided in paragraph (d) below.

(c)    The First Lien Administrative Agent acting pursuant to this Section 5.4 shall not have by reason of the First Lien Collateral Documents, the Second Lien Collateral Documents, this Agreement or any other document a fiduciary relationship in respect of the First Lien Claimholders, the Second Lien Administrative Agent or any Second Lien Claimholder.

(d)    Upon the Discharge of First Lien Obligations under the First Lien Loan Documents to which the First Lien Administrative Agent is a party, the First Lien Administrative Agent shall deliver the remaining Pledged Collateral (if any) together with any necessary endorsements, first, to the Second Lien Administrative Agent to the extent Second Lien Obligations remain outstanding, and second, to the Company to the extent no First Lien Obligations or Second Lien Obligations remain outstanding (in each case, so as to allow such person to obtain possession or control of such Pledged Collateral) unless and to the extent a court of competent jurisdiction shall otherwise

direct. The First Lien Administrative Agent further agrees to take all other action reasonably requested by the Second Lien Administrative Agent in connection with the Second Lien Administrative Agent obtaining a first-priority interest in the Collateral or as a court of competent jurisdiction may otherwise direct.

       **5.5**  <u>When Discharge of First Lien Obligations Deemed to Not Have Occurred</u>. If, at any time after the Discharge of First Lien Obligations has occurred, the Company thereafter enters into any Refinancing of any First Lien Loan Document evidencing a First Lien Obligation which Refinancing is permitted by the Second Lien Loan Documents and is permitted pursuant to Section 5.3(a)(ii), then such Discharge of First Lien Obligations shall automatically be deemed not to have occurred for all purposes of this Agreement (other than with respect to any actions taken as a result of the occurrence of such first Discharge of First Lien Obligations), and, from and after the date on which the New First Lien Debt Notice (as defined below) is delivered to the Second Lien Administrative Agent in accordance with the next sentence, the obligations under such Refinancing of the First Lien Loan Document shall automatically be treated as First Lien Obligations for all purposes of this Agreement, including for purposes of the Lien priorities and rights in respect of Collateral set forth herein, and the First Lien Administrative Agent under such First Lien Loan Documents shall be the First Lien Administrative Agent for all purposes of this Agreement. Upon receipt of a notice (the "**New First Lien Debt Notice**") stating that the Company has entered into a new First Lien Loan Document (which notice shall include the identity of the new first lien administrative agent, such agent, the "**New Agent**"), the Second Lien Administrative Agent shall promptly (a) enter into such documents and agreements (including amendments or supplements to this Agreement) as the Company or such New Agent shall reasonably request in order to provide to the New Agent the rights contemplated hereby, in each case consistent in all material respects with the terms of this Agreement and (b) deliver to the New Agent any Pledged Collateral held by it together with any necessary endorsements (or otherwise allow the New Agent to obtain control of such Pledged Collateral). The New Agent shall agree in a writing addressed to the Second Lien Administrative Agent and the Second Lien Claimholders to be bound by the terms of this Agreement. If the new First Lien Obligations under the new First Lien Loan Documents are secured by assets of the Grantors constituting Collateral that do not also secure the Second Lien Obligations, then the Second Lien Obligations shall be secured at such time by a second priority Lien on such assets to the same extent provided in the Second Lien Collateral Documents and this Agreement.

       **5.6**  <u>Purchase Right</u>.

       (a)    If all of the First Lien Obligations shall have been accelerated (including any automatic acceleration in connection with any Insolvency or Liquidation Proceeding with respect to the Company) or shall remain unpaid immediately following the Revolving Credit Maturity Date or Tranche B Maturity Date (as each is defined in the First Lien Credit Agreement (as in effect on the date hereof)), the Second Lien Claimholders shall have the option at any time upon at least five (5) Business Days' prior written notice by the Second Lien Administrative Agent to the First Lien Administrative Agent (with copies to Holdings and the Company) to purchase all, and not less than all,

of the First Lien Obligations from the First Lien Administrative Agent and the First Lien Claimholders.  Such notice from the Second Lien Administrative Agent to the First Lien Administrative Agent shall be irrevocable.

(b)    On the date specified by the Second Lien Administrative Agent in such notice (which shall not be less than five (5) Business Days after the receipt by the First Lien Administrative Agent of the notice from the Second Lien Administrative Agent of the election by the Second Lien Claimholders to exercise such option), the First Lien Administrative Agent and the First Lien Claimholders shall sell to the Second Lien Claimholders exercising such option, and such Second Lien Claimholders shall purchase from the First Lien Administrative Agent and the First Lien Claimholders, the First Lien Obligations without the prior written consent of Holdings or the Company.

(c)    Upon the date of such purchase and sale, the Second Lien Claimholders that have exercised such option shall, pursuant to documentation in form and substance reasonably satisfactory to the First Lien Administrative Agent, (i) pay to the First Lien Claimholders as the purchase price therefor the full amount of all the First Lien Obligations then outstanding and unpaid (including principal, reimbursement obligations in respect of, if any, letters of credit, the credit exposure of the First Lien Claimholders under all Specified Hedge Agreements, interest, fees and expenses, including reasonable attorneys' fees and legal expenses) at par, (ii) cash collateralize, if any, all letters of credit outstanding under the First Lien Credit Agreement in an amount reasonably satisfactory to the First Lien Administrative Agent but in no event greater than 102% of the aggregate undrawn face amount thereof, and (iii) agree to reimburse the First Lien Administrative Agent and the First Lien Claimholders for any checks or other payments provisionally credited to the First Lien Obligations, and/or as to which the First Lien Administrative Agent or any First Lien Claimholder has not yet received final payment.  Such purchase price and cash collateral shall be remitted by wire transfer in federal funds to such bank account of the First Lien Administrative Agent for the ratable account of the First Lien Administrative Agent and the First Lien Claimholders in New York, New York, as the First Lien Administrative Agent may designate in writing to the Second Lien Administrative Agent for such purpose.  Interest shall be calculated to but excluding the Business Day on which such purchase and sale shall occur if the amounts so paid by the Second Lien Claimholders that have exercised such option to the bank account designated by the First Lien Administrative Agent are received in such bank account prior to 1:00 p.m., New York City time and interest shall be calculated to and including such Business Day if the amounts so paid by such Second Lien Claimholders to the bank account designated by the First Lien Administrative Agent are received in such bank account later than 1:00 p.m., New York City time on such Business Day.

(d)    Such purchase shall be expressly made without recourse, representation or warranty of any kind by the First Lien Administrative Agent or any First Lien Claimholder as to the First Lien Obligations owed to such Person or otherwise, except that each such Person shall represent and warrant:  (i) the amount of the First Lien Obligations being sold by it, (ii) that such Person has not created any Lien on any First

(NY) 06216/188/CA/intercreditor.agt.posted.doc

Lien Obligation being sold by it and (iii) that such Person has the right to assign First Lien Obligations being assigned by it and its assignment is duly authorized.

(e)    The First Lien Administrative Agent agrees that prior to foreclosing upon, or selling or otherwise realizing upon, all or a material portion of the Collateral, it will provide the Second Lien Administrative Agent with at least ten (10) days' notice of its intent to commence such foreclosure, sale or other realization.  If the Second Lien Administrative Agent shall give the First Lien Administrative Agent written notice of any Second Lien Claimholder's intention to exercise the purchase option provided under this Section 5.6 prior to the foreclosure, sale or other realization by the First Lien Administrative Agent with respect to such Collateral, the First Lien Administrative Agent shall not continue such foreclosure action or initiate any other action to sell or otherwise realize upon any of the Collateral so long as the purchase and sale with respect to the First Lien Obligations provided for herein shall have closed within ten (10) Business Days thereafter and the First Lien Administrative Agent and the First Lien Claimholders shall have received payment in full of the First Lien Obligations as provided for herein within such ten (10) Business Day period.

## SECTION 6.  Insolvency or Liquidation Proceedings.

**6.1**  Finance and Sale Issues.    Until the Discharge of First Lien Obligations has occurred, if the Company or any other Grantor shall be subject to any Insolvency or Liquidation Proceeding and the First Lien Administrative Agent shall desire to permit the use of "Cash Collateral" (as such term is defined in Section 363(a) of the Bankruptcy Code), on which the First Lien Administrative Agent or any other creditor has a Lien or to permit the Company or any other Grantor to obtain financing, whether from the First Lien Claimholders or any other person under Section 364 of the Bankruptcy Code or any similar Bankruptcy Law ("**DIP Financing**"), then the Second Lien Administrative Agent, on behalf of itself and the Second Lien Claimholders, agrees that it will raise no objection to such Cash Collateral use or DIP Financing and to the extent the Liens securing the First Lien Obligations are subordinated to or pari passu with such DIP Financing, the Second Lien Administrative Agent will subordinate its Liens in the Collateral to the Liens securing such DIP Financing (and all obligations relating thereto) and will not request adequate protection or any other relief in connection therewith (except, as expressly agreed by the First Lien Administrative Agent or to the extent permitted by Section 6.3); provided that the foregoing shall not prevent the Second Lien Claimholders from (i) objecting to any DIP Financing relating to any provision or content of a plan of reorganization or (ii) proposing any other DIP Financing to the Company in any Insolvency or Liquidation Proceeding; provided further that (a)(1) the aggregate principal amount of the DIP Financing plus (2) the aggregate outstanding principal amount of the loans outstanding under the First Lien Credit Agreement and the other First Lien Loan Documents plus (3) the aggregate face amount of any letters of credit issued and not reimbursed under the First Lien Credit Agreement, in the case of clauses (a)(2) and (a)(3) after giving effect to the incurrence of such DIP Financing and the application of proceeds thereof, does not exceed (b)(1) the aggregate outstanding principal amount of the loans outstanding under the First Lien Credit Agreement and the other First Lien Loan Documents plus (2) the aggregate

face amount of any letters of credit issued and not reimbursed under the First Lien Credit Agreement, in the case of clauses (b)(1) and (b)(2) immediately prior to the incurrence of such DIP Financing, plus (3) $20,000,000 and the Second Lien Administrative Agent and the Second Lien Claimholders retain the right to object to any ancillary agreements or arrangements regarding Cash Collateral use or the DIP Financing that are materially prejudicial to their interests.   The Second Lien Administrative Agent on behalf of the Second Lien Claimholders, agrees that it will raise no objection or oppose a motion to sell or otherwise dispose of any Collateral free and clear of its Liens or other claims under Section 363 of the Bankruptcy Code if the requisite First Lien Claimholders have consented to such sale or disposition of such assets, and such motion does not impair the rights of the Second Lien Claimholders under Section 363(k) of the Bankruptcy Code.

**6.2**   Relief from the Automatic Stay.   Until the Discharge of First Lien Obligations has occurred, the Second Lien Administrative Agent, on behalf of itself and the Second Lien Claimholders, agrees that none of them shall seek (or support any other person seeking) relief from the automatic stay or any other stay in any Insolvency or Liquidation Proceeding in respect of the Collateral, without the prior written consent of the First Lien Administrative Agent, unless a motion for adequate protection permitted under Section 6.3 has been denied by the Bankruptcy Court.

**6.3**   Adequate Protection.

(a)   The Second Lien Administrative Agent, on behalf of itself and the Second Lien Claimholders, agrees that none of them shall contest (or support any other person contesting):

(i)   any request by the First Lien Administrative Agent or the First Lien Claimholders for adequate protection; or

(ii)   any objection by the First Lien Administrative Agent or the First Lien Claimholders to any motion, relief, action or proceeding based on the First Lien Administrative Agent or the First Lien Claimholders claiming a lack of adequate protection.

(b)   Notwithstanding the foregoing provisions in this Section 6.3, in any Insolvency or Liquidation Proceeding:

(i)   if the First Lien Claimholders (or any subset thereof) are granted adequate protection in the form of additional collateral in connection with any Cash Collateral use or DIP Financing, then the Second Lien Administrative Agent, on behalf of itself or any of the Second Lien Claimholders, may seek or request adequate protection in the form of a Lien on such additional collateral, which Lien will be subordinated to the Liens securing the First Lien Obligations and such Cash Collateral use or DIP Financing (and all Obligations relating thereto) on the same basis as the other Liens securing the Second Lien

23

Obligations are so subordinated to the First Lien Obligations under this Agreement; and

(ii)   in the event the Second Lien Administrative Agent, on behalf of itself or any of the Second Lien Claimholders, seeks or requests adequate protection in respect of Second Lien Obligations and such adequate protection is granted in the form of additional collateral, then the Second Lien Administrative Agent, on behalf of itself or any of the Second Lien Claimholders, agrees that the First Lien Administrative Agent shall also be granted a senior Lien on such additional collateral as security for the First Lien Obligations and for any Cash Collateral use or DIP Financing provided by the First Lien Claimholders and that any Lien on such additional collateral securing the Second Lien Obligations shall be subordinated to the Lien on such collateral securing the First Lien Obligations and any such DIP Financing provided by the First Lien Claimholders (and all Obligations relating thereto) and to any other Liens granted to the First Lien Claimholders as adequate protection on the same basis as the other Liens securing the Second Lien Obligations are so subordinated to such First Lien Obligations under this Agreement.  Except as otherwise expressly set forth in Section 6.1 or in connection with the exercise of remedies with respect to the Collateral, nothing herein shall limit the rights of the Second Lien Administrative Agent or the Second Lien Claimholders from seeking adequate protection with respect to their rights in the Collateral in any Insolvency or Liquidation Proceeding (including adequate protection in the form of a cash payment, periodic cash payments, cash payments of interest or otherwise).

**6.4**   No Waiver.  Subject to Sections 3.1(a) and (d), nothing contained herein shall prohibit or in any way limit the First Lien Administrative Agent or any First Lien Claimholder from objecting in any Insolvency or Liquidation Proceeding or otherwise to any action taken by the Second Lien Administrative Agent or any of the Second Lien Claimholders, including the seeking by the Second Lien Administrative Agent or any Second Lien Claimholders of adequate protection or the asserting by the Second Lien Administrative Agent or any Second Lien Claimholders of any of its rights and remedies under the Second Lien Loan Documents or otherwise.

**6.5**   Avoidance Issues.  If any First Lien Claimholder is required in any Insolvency or Liquidation Proceeding or otherwise to turn over or otherwise pay to the estate of the Company or any other Grantor any amount paid in respect of First Lien Obligations (a "**Recovery**"), then such First Lien Claimholders shall be entitled to a reinstatement of First Lien Obligations with respect to all such recovered amounts.  If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto from such date of reinstatement.

**6.6**   Reorganization Securities.  If, in any Insolvency or Liquidation Proceeding, debt obligations of the reorganized debtor secured by Liens upon any property of the reorganized debtor are distributed pursuant to a plan of reorganization

or similar dispositive restructuring plan, both on account of First Lien Obligations and on account of Second Lien Obligations, then, to the extent the debt obligations distributed on account of the First Lien Obligations and on account of the Second Lien Obligations are secured by Liens upon the same property, the provisions of this Agreement will survive the distribution of such debt obligations pursuant to such plan and will apply with like effect to the Liens securing such debt obligations.

**6.7** <u>Post-Petition Interest</u>.

(a)    Neither the Second Lien Administrative Agent nor any Second Lien Claimholder shall oppose or seek to challenge any claim by the First Lien Administrative Agent or any First Lien Claimholder for allowance in any Insolvency or Liquidation Proceeding of First Lien Obligations consisting of post-petition interest, fees or expenses to the extent of the value of any First Lien Claimholder's Lien, without regard to the existence of the Lien of the Second Lien Administrative Agent on behalf of the Second Lien Claimholders on the Collateral.

(b)    Neither the First Lien Administrative Agent nor any other First Lien Claimholder shall oppose or seek to challenge any claim by the Second Lien Administrative Agent or any Second Lien Claimholder for allowance in any Insolvency or Liquidation Proceeding of Second Lien Obligations consisting of post-petition interest, fees or expenses to the extent of the value of the Lien of the Second Lien Administrative Agent on behalf of the Second Lien Claimholders on the Collateral (after taking into account the First Lien Collateral).

**6.8** <u>Waiver</u>.  The Second Lien Administrative Agent, for itself and on behalf of the Second Lien Claimholders, waives any claim it may hereafter have against any First Lien Claimholder arising out of the election of any First Lien Claimholder of the application of Section 1111(b)(2) of the Bankruptcy Code, and/or out of any cash collateral or financing arrangement or out of any grant of a security interest in connection with the Collateral in any Insolvency or Liquidation Proceeding.

**6.9** <u>Separate Grants of Security and Separate Classification</u>.  The Second Lien Administrative Agent, for itself and on behalf of the Second Lien Claimholders, and the First Lien Administrative Agent for itself and on behalf of the First Lien Claimholders, acknowledges and agrees that:

(a)    the grants of Liens pursuant to the First Lien Collateral Documents and the Second Lien Collateral Documents constitute two separate and distinct grants of Liens; and

(b)    because of, among other things, their differing rights in the Collateral, the Second Lien Obligations are fundamentally different from the First Lien Obligations and must be separately classified in any plan of reorganization proposed or adopted in an Insolvency or Liquidation Proceeding.

To further effectuate the intent of the parties as provided in the immediately preceding sentence, if it is held that the claims of the First Lien Claimholders and the Second Lien

Claimholders in respect of the Collateral constitute only one secured claim (rather than separate classes of senior and junior secured claims), then each of the parties hereto hereby acknowledges and agrees that, subject to Sections 2.1 and 4.1, all distributions in respect of Collateral or the proceeds thereof shall be made as if there were separate classes of senior and junior secured claims against the Grantors in respect of the Collateral (with the effect being that, to the extent that the aggregate value of the Collateral is sufficient (for this purpose ignoring all claims held by the Second Lien Claimholders), the First Lien Claimholders shall be entitled to receive, in addition to amounts distributed to them in respect of principal, pre-petition interest and other claims, all amounts owing in respect of post-petition interest, including any additional interest payable pursuant to the First Lien Credit Agreement, arising from or related to a default, which is disallowed as a claim in any Insolvency or Liquidation Proceeding, before any distribution in respect of Collateral or the proceeds thereof is made in respect of the claims held by the Second Lien Claimholders, with the Second Lien Administrative Agent, for itself and on behalf of the Second Lien Claimholders, hereby acknowledging and agreeing to turn over to the First Lien Administrative Agent, for itself and on behalf of the First Lien Claimholders, amounts otherwise received or receivable by them to the extent necessary to effectuate the intent of this sentence, even if such turnover has the effect of reducing the claim or recovery of the Second Lien Claimholders).

## SECTION 7.  Reliance; Waivers; Etc.

**7.1**  Reliance.  Other than any reliance on the terms of this Agreement, the First Lien Administrative Agent, on behalf of itself and the First Lien Claimholders under its First Lien Credit Documents, acknowledges that it and such First Lien Claimholders have, independently and without reliance on the Second Lien Administrative Agent or any Second Lien Claimholders, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into such First Lien Credit Documents and be bound by the terms of this Agreement and they will continue to make their own credit decision in taking or not taking any action under the First Lien Credit Agreement or this Agreement.  The Second Lien Administrative Agent, on behalf of itself and the Second Lien Claimholders, acknowledges that it and the Second Lien Claimholders have, independently and without reliance on the First Lien Administrative Agent or any First Lien Claimholder, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into each of the Second Lien Credit Documents and be bound by the terms of this Agreement and they will continue to make their own credit decision in taking or not taking any action under the Second Lien Credit Documents or this Agreement.

**7.2**  No Warranties or Liability.  The First Lien Administrative Agent, on behalf of itself and the First Lien Claimholders under its First Lien Credit Documents, acknowledges and agrees that each of the Second Lien Administrative Agent and the Second Lien Claimholders have made no express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectibility or enforceability of any of the Second Lien Credit Documents, the ownership of any Collateral or the perfection or priority of any Liens

thereon.  The Second Lien Claimholders will be entitled to manage and supervise their respective loans and extensions of credit under the Second Lien Credit Documents in accordance with law and as they may otherwise, in their sole discretion, deem appropriate.  The Second Lien Administrative Agent, on behalf of itself and the Second Lien Claimholders, acknowledges and agrees that the First Lien Administrative Agent and the First Lien Claimholders have made no express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectibility or enforceability of any of the First Lien Credit Documents, the ownership of any Collateral or the perfection or priority of any Liens thereon.  The First Lien Claimholders will be entitled to manage and supervise their respective loans and extensions of credit under their respective First Lien Credit Documents in accordance with law and as they may otherwise, in their sole discretion, deem appropriate.  The Second Lien Administrative Agent and the Second Lien Claimholders shall have no duty to the First Lien Administrative Agent or any of the First Lien Claimholders, and the First Lien Administrative Agent and the First Lien Claimholders shall have no duty to the Second Lien Administrative Agent or any of the Second Lien Claimholders, to act or refrain from acting in a manner which allows, or results in, the occurrence or continuance of an event of default or default under any agreements with the Company or any Guarantor Subsidiary (including the First Lien Credit Documents and the Second Lien Credit Documents), regardless of any knowledge thereof which they may have or be charged with.

**7.3**  <u>No Waiver of Lien Priorities</u>.

(a)  No right of the First Lien Claimholders, the First Lien Administrative Agent or any of them to enforce any provision of this Agreement or any First Lien Credit Document shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of the Company or any other Grantor or by any act or failure to act by any First Lien Claimholder or the First Lien Administrative Agent, or by any noncompliance by any Person with the terms, provisions and covenants of this Agreement, any of the First Lien Credit Documents or any of the Second Lien Credit Documents, regardless of any knowledge thereof which the First Lien Administrative Agent or the First Lien Claimholders, or any of them, may have or be otherwise charged with;

(b)  Without in any way limiting the generality of the foregoing paragraph (but subject to the rights of the Company and the other Grantors under the First Lien Credit Documents and subject to the provisions of Section 5.3(b)), the First Lien Claimholders, the First Lien Administrative Agent and any of them may, at any time and from time to time in accordance with the First Lien Credit Documents and/or applicable law, without the consent of, or notice to, the Second Lien Administrative Agent or any Second Lien Claimholders, without incurring any liabilities to the Second Lien Administrative Agent or any Second Lien Claimholders and without impairing or releasing the Lien priorities and other benefits provided in this Agreement (even if any right of subrogation or other right or remedy of the Second Lien Administrative Agent or any Second Lien Claimholders is affected, impaired or extinguished thereby) do any one or more of the following:

(i)   change the manner, place or terms of payment or change or extend the time of payment of, or amend, renew, exchange, increase or alter, the terms of any of the First Lien Obligations or any Lien on any First Lien Collateral or guaranty thereof or any liability of the Company or any other Grantor, or any liability incurred directly or indirectly in respect thereof (including any increase in or extension of the First Lien Obligations, without any restriction as to the amount, tenor or terms of any such increase or extension) or otherwise amend, renew, exchange, extend, modify or supplement in any manner any Liens held by the First Lien Administrative Agent or any of the First Lien Claimholders, the First Lien Obligations or any of the First Lien Credit Documents;

(ii)   sell, exchange, release, surrender, realize upon, enforce or otherwise deal with in any manner and in any order any part of the First Lien Collateral or any liability of the Company or any other Grantor to the First Lien Claimholders or the First Lien Administrative Agent, or any liability incurred directly or indirectly in respect thereof;

(iii)   settle or compromise any First Lien Obligation or any other liability of the Company or any other Grantor or any security therefor or any liability incurred directly or indirectly in respect thereof and apply any sums by whomsoever paid and however realized to any liability (including the First Lien Obligations) in any manner or order; and

(iv)   exercise or delay in or refrain from exercising any right or remedy against the Company or any security or any other Grantor or any other Person, elect any remedy and otherwise deal freely with the Company, any other Grantor or any First Lien Collateral and any security and any guarantor or any liability of the Company or any other Grantor to the First Lien Claimholders or any liability incurred directly or indirectly in respect thereof.

(c)   The Second Lien Administrative Agent, on behalf of itself and the Second Lien Claimholders, also agrees that the First Lien Claimholders and the First Lien Administrative Agent shall have no liability to the Second Lien Administrative Agent or any Second Lien Claimholders, and the Second Lien Administrative Agent, on behalf of itself and the Second Lien Claimholders, hereby waives any claim against any First Lien Claimholder or the First Lien Administrative Agent, arising out of any and all actions which the First Lien Claimholders or the First Lien Administrative Agent may take or permit or omit to take with respect to: (i) the First Lien Credit Documents, (ii) the collection of the First Lien Obligations or (iii) the foreclosure upon, or sale, liquidation or other disposition of, any First Lien Collateral.  The Second Lien Administrative Agent, on behalf of itself and the Second Lien Claimholders, agrees that the First Lien Claimholders and the First Lien Administrative Agent have no duty to them in respect of the maintenance or preservation of the First Lien Collateral, the First Lien Obligations or otherwise; and

(NY) 06216/188/CA/intercreditor.agt.posted.doc

(d)    The Second Lien Administrative Agent, on behalf of itself and the Second Lien Claimholders, agrees not to assert and hereby waives, to the fullest extent permitted by law, any right to demand, request, plead or otherwise assert or otherwise claim the benefit of, any marshalling, appraisal, valuation or other similar right that may otherwise be available under applicable law with respect to the Collateral or any other similar rights a junior secured creditor may have under applicable law.

**7.4**    Obligations Unconditional.  All rights, interests, agreements and obligations of the First Lien Administrative Agent and the First Lien Claimholders and the Second Lien Administrative Agent and the Second Lien Claimholders, respectively, hereunder shall remain in full force and effect irrespective of:

(a)    any lack of validity or enforceability of any First Lien Credit Documents or any Second Lien Credit Documents;

(b)    except as otherwise set forth in the Agreement, any change in the time, manner or place of payment of, or in any other terms of, all or any of the First Lien Obligations or Second Lien Obligations, or any amendment or waiver or other modification, including any increase in the amount thereof, whether by course of conduct or otherwise, of the terms of any First Lien Credit Document or any Second Lien Credit Document;

(c)    any exchange of any security interest in any Collateral or any other collateral, or any amendment, waiver or other modification, whether in writing or by course of conduct or otherwise, of all or any of the First Lien Obligations or Second Lien Obligations or any guarantee thereof;

(d)    the commencement of any Insolvency or Liquidation Proceeding in respect of the Company or any other Grantor; or

(e)    any other circumstances which otherwise might constitute a defense available to, or a discharge of, the Company or any other Grantor in respect of the First Lien Obligations, or of the Second Lien Administrative Agent or any Second Lien Claimholder in respect of this Agreement.

## SECTION 8.  Miscellaneous.

**8.1**    Conflicts.  In the event of any conflict between the provisions of this Agreement and the provisions of the First Lien Credit Documents or the Second Lien Credit Documents, the provisions of this Agreement shall govern and control.

**8.2**    Effectiveness; Continuing Nature of this Agreement; Severability. This Agreement shall become effective when executed and delivered by the parties hereto.  This is a continuing agreement of lien subordination and the First Lien Claimholders may continue, at any time and without notice to the Second Lien Administrative Agent or any Second Lien Claimholder subject to the Second Lien Credit Documents, to extend credit and other financial accommodations and lend monies to or for the benefit of the Company or any Grantor constituting First Lien

Obligations in reliance hereof.  The Second Lien Administrative Agent, on behalf of itself and the Second Lien Claimholders, hereby waives any right it may have under applicable law to revoke this Agreement or any of the provisions of this Agreement. The terms of this Agreement shall survive, and shall continue in full force and effect, in any Insolvency or Liquidation Proceeding.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.   All references to the Company or any other Grantor shall include the Company or such Grantor as debtor and debtor-in-possession and any receiver or trustee for the Company or any other Grantor (as the case may be) in any Insolvency or Liquidation Proceeding. This Agreement shall terminate and be of no further force and effect, (i) with respect to the Second Lien Administrative Agent, the Second Lien Claimholders and the Second Lien Obligations, upon the later of (1) the date upon which the obligations under the Second Lien Credit Agreement terminate if there are no other Second Lien Obligations outstanding on such date and (2) if there are other Second Lien Obligations outstanding on such date, the date upon which such Second Lien Obligations terminate and (ii) with respect to the First Lien Administrative Agent, the First Lien Claimholders and the First Lien Obligations, the date of Discharge of First Lien Obligations, subject to the rights of the First Lien Claimholders under Section 6.5.

**8.3**   Amendments; Waivers.  No amendment, modification or waiver of any of the provisions of this Agreement by the Second Lien Administrative Agent or the First Lien Administrative Agent shall be deemed to be made unless the same shall be in writing signed on behalf of each party hereto or its authorized agent and each waiver, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the parties making such waiver or the obligations of the other parties to such party in any other respect or at any other time. Notwithstanding the foregoing, the Company shall not have any right to consent to or approve any amendment, modification or waiver of any provision of this Agreement except to the extent its rights are directly affected (which includes, but is not limited to any amendment to the Grantors' ability to cause additional obligations to constitute First Lien Obligations or Second Lien Obligations as the Company may designate). Neither the First Lien Administrative Agent or the Second Lien Administrative Agent shall agree to amend, waive or otherwise modify this Agreement without the written consent of the "Required Lenders" under (and as defined in) the First Lien Credit Agreement or the Second Lien Credit Agreement, as applicable.

**8.4**   Information Concerning Financial Condition of the Company and its Subsidiaries.  The First Lien Administrative Agent and the First Lien Claimholders, on the one hand, and the Second Lien Claimholders and the Second Lien Administrative Agent, on the other hand, shall each be responsible for keeping themselves informed of (a) the financial condition of the Company and its Subsidiaries and all endorsers and/or guarantors of the First Lien Obligations or the Second Lien Obligations and (b) all other circumstances bearing upon the risk of nonpayment of the First Lien Obligations or the Second Lien Obligations.  The First Lien Administrative Agent and the First Lien Claimholders shall have no duty to advise the Second Lien

Administrative Agent or any Second Lien Claimholder of information known to it or them regarding such condition or any such circumstances or otherwise. In the event the First Lien Administrative Agent or any of the First Lien Claimholders, in its or their sole discretion, undertakes at any time or from time to time to provide any such information to the Second Lien Administrative Agent or any Second Lien Claimholder, it or they shall be under no obligation (w) to make, and the First Lien Administrative Agent and the First Lien Claimholders shall not make, any express or implied representation or warranty, including with respect to the accuracy, completeness, truthfulness or validity of any such information so provided, (x) to provide any additional information or to provide any such information on any subsequent occasion, (y) to undertake any investigation or (z) to disclose any information which, pursuant to accepted or reasonable commercial finance practices, such party wishes to maintain confidential or is otherwise required to maintain confidential.

**8.5**  Subrogation.  The Second Lien Administrative Agent, on behalf of itself and the Second Lien Claimholders, hereby waives any rights of subrogation it may acquire as a result of any payment hereunder until the Discharge of First Lien Obligations has occurred.

**8.6**  Application of Payments.  All payments received by the First Lien Administrative Agent or the First Lien Claimholders may be applied, reversed and reapplied, in whole or in part, to such part of the First Lien Obligations provided for in the First Lien Credit Documents.  The Second Lien Administrative Agent, on behalf of itself and the Second Lien Claimholders, assents to any extension or postponement of the time of payment of the First Lien Obligations or any part thereof and to any other indulgence with respect thereto, to any substitution, exchange or release of any security which may at any time secure any part of the First Lien Obligations and to the addition or release of any other Person primarily or secondarily liable therefor.

**8.7**  SUBMISSION TO JURISDICTION; WAIVERS.  **(a)  ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST ANY PARTY ARISING OUT OF OR RELATING HERETO MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE, COUNTY AND CITY OF NEW YORK.  BY EXECUTING AND DELIVERING THIS AGREEMENT, EACH PARTY, FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, IRREVOCABLY (a) ACCEPTS GENERALLY AND UNCONDITIONALLY THE NONEXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS; (b) WAIVES ANY DEFENSE OF FORUM NON CONVENIENS; (c) AGREES THAT SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE APPLICABLE PARTY AT ITS ADDRESS PROVIDED IN ACCORDANCE WITH SECTION 8.8; AND (d) AGREES THAT SERVICE AS PROVIDED IN CLAUSE (c) ABOVE IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER THE APPLICABLE PARTY IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT.**

**(b)   EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER.   THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER HEREOF, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS.     EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS.   EACH PARTY HERETO FURTHER WAR-RANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.   THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 8.7(b) AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO.     IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.**

**8.8**   Notices.  All notices to the Second Lien Claimholders and the First Lien Claimholders permitted or required under this Agreement shall also be sent to the Second Lien Administrative Agent and the First Lien Administrative Agent, respectively.  Unless otherwise specifically provided herein, any notice hereunder shall be in writing and may be personally served, telexed or sent by telefacsimile or United States mail or courier service and shall be deemed to have been given when delivered in person or by courier service and signed for against receipt thereof, upon receipt of telefacsimile or telex, or three Business Days after depositing it in the United States mail with postage prepaid and properly addressed.  For the purposes hereof, the addresses of the parties hereto shall be as set forth below each party's name on the signature pages hereto, or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.

**8.9**   Further Assurances.  Each of the First Lien Administrative Agent, on behalf of itself and the First Lien Claimholders, and the Second Lien Administrative Agent, on behalf of itself and the Second Lien Claimholders, and the Company, agrees that each of them shall take such further action and shall execute and deliver such additional documents and instruments (in recordable form, if requested) as the First Lien Administrative Agent or the Second Lien Administrative Agent may reasonably request to effectuate the terms of and the lien priorities contemplated by this Agreement.

**8.10** <u>APPLICABLE LAW</u>. **THIS AGREEMENT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

**8.11** <u>Binding on Successors and Assigns</u>. This Agreement shall be binding upon the First Lien Administrative Agent, the First Lien Claimholders, the Second Lien Administrative Agent, the Second Lien Claimholders and their respective successors and assigns.

**8.12** <u>Specific Performance</u>. Each of the First Lien Administrative Agent and the Second Lien Administrative Agent may demand specific performance of this Agreement. The First Lien Administrative Agent, on behalf of itself and the First Lien Claimholders, and the Second Lien Administrative Agent, on behalf of itself and the Second Lien Claimholders, hereby irrevocably waives any defense based on the adequacy of a remedy at law and any other defense which might be asserted to bar the remedy of specific performance in any action which may be brought by any First Lien Administrative Agent or the Second Lien Administrative Agent, as the case may be.

**8.13** <u>Headings</u>. Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect.

**8.14** <u>Counterparts</u>. This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Agreement or any document or instrument delivered in connection herewith by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement or such other document or instrument, as applicable.

**8.15** <u>Authorization</u>. By its signature, each Person executing this Agreement on behalf of a party hereto represents and warrants to the other parties hereto that it is duly authorized to execute this Agreement.

**8.16** <u>No Third Party Beneficiaries</u>. This Agreement and the rights and benefits hereof shall inure to the benefit of each of the parties hereto and its respective successors and assigns and shall inure to the benefit of each of the First Lien Claimholders and the Second Lien Claimholders. No other Person shall have or be entitled to assert rights or benefits hereunder.

**8.17** <u>Provisions Solely to Define Relative Rights</u>. The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the First Lien Claimholders on the one hand and the Second Lien Claimholders on the other hand. None of the Company, any other Grantor or any other creditor thereof shall have any rights hereunder. Nothing in this Agreement is intended to or shall impair the obligations of the Company or any other Grantor, which are absolute and unconditional, to pay the First Lien Obligations and the Second Lien

Obligations as and when the same shall become due and payable in accordance with their terms.

[*Remainder of page intentionally left blank*]

IN WITNESS WHEREOF, the parties hereto have executed this Intercreditor Agreement as of the date first written above.

**First Lien Administrative Agent**

**CREDIT SUISSE, CAYMAN ISLANDS BRANCH**
as First Lien Administrative Agent,

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

**Second Lien Administrative Agent**

**CREDIT SUISSE, CAYMAN ISLANDS BRANCH**
as Second Lien Administrative Agent


By:_____
    Name:
    Title:


By:_____
    Name:
    Title:

**The Company**

**RPG ACQUISITION CORP**.


By:_____
    Name:
    Title:



Cal Data Systems, Inc. v. NCS Pearson, Inc.
S.D.Tex.,2008.
Only the Westlaw citation is currently available.
United States District Court,S.D. Texas,Houston
Division.
CAL DATA SYSTEMS, INC., Plaintiff,
v.
NCS PEARSON, INC., Defendant.
**Civil Action No. H-07-1390.**

April 10, 2008.

Harry Lloyd Scarborough, Faubus Taft Scarborough,
Houston, TX, for Plaintiff.
Peter S. Vogel, Gardere Wynne Sewell LLP, Dallas,
TX, for Defendant.

**MEMORANDUM AND ORDER**

LEE H. ROSENTHAL, District Judge.
**\*1** Cal Data Systems, Inc. sued NCS Pearson, Inc.
d/b/a Pearson School Systems in state court, alleging
breach of contract. Pearson timely removed the suit
to federal court on the basis of diversity jurisdiction.
(Docket Entry No. 1). Pearson counterclaimed for
fraud, negligent misrepresentation, and breach of
contract, (Docket Entry No. 4). Capital Bank, a
secured creditor of Cal Data, moved to intervene.
(Docket Entry No. 15). Pearson has responded,
opposing the intervention, (Docket Entry No. 19),
and Capital Bank has replied, (Docket Entry No. 20).
Capital Bank has moved for expedited consideration
of its motion to intervene and to compel mediation.
(Docket Entry No. 22). Pearson has responded.
(Docket Entry No. 23).

Based on the motions, responses, and replies and the
applicable law, this court denies Capital Bank's
motion to intervene. Capital Bank's motion for
expedited consideration and to compel mediation are
denied as moot. The reasons are explained below.

**I. Background**

Cal Data is a Texas corporation that provides a
variety of computer- and software-related services,
including software and systems consulting for

business and government agencies. Pearson is a
Minnesota corporation that sells school
administrators software for managing student
information and performance data. In 2005, Cal Data
and Pearson entered into three contracts under which
Cal Data was to develop software for Pearson and
Pearson was to use and distribute Cal Data software.
The three contracts are identified as the Benchmark
Contract, dated July 7, 2005; the SASI Contract,
dated October 4, 2005; and the Software Distribution
Agreement, dated October 19, 2005. (Docket Entry
No. 1, Ex. B, Attachments A, B, C).

Pearson canceled the SASI Contract on May 10,
2006. The parties dispute the reason for the
cancellation. Cal Data asserts that Pearson "elected to
forgo continued development of a centralized
database for its older SASI product" and owes more
than $250,000 for work Cal Data performed under
the SASI Contract. (Docket Entry No. 1, Ex. B at 4).
Pearson alleges that "Cal Data failed to develop and
deliver" the software contemplated under that
contract. (Docket Entry No. 19 at 4). Pearson argues
that Cal Data has failed to refund the $275,000 paid
for the SASI Contract. Pearson further contends that
Cal Data failed to comply with the Benchmark
Contract by refusing to fix defects in the software
that it had provided and failed to comply with the
Software Distribution Agreement by refusing to pay
Pearson licensing fees owed under that agreement.

On March 20, 2007, Cal Data sued Pearson in Texas
state court, alleging breach of contract and seeking
fees allegedly owed under the parties' agreements.
Pearson timely removed on April 23, 2007 and
counterclaimed for breach of contract on April 26,
seeking damages caused by Cal Data's defective
software. On May 14, 2007, Cal Data filed for
bankruptcy protection under chapter 7 of the
Bankruptcy Code. The parties jointly filed a motion
to stay this litigation on July 29, 2007, which this
court granted. The bankruptcy court appointed a
trustee and authorized the trustee to litigate this
action on behalf of Cal Data. The bankruptcy court
subsequently lifted the stay on Cal Data's claims and
Pearson's counterclaims. (Docket Entry No. 13, Exs.
A, B).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**\*2** Cal Data signed two promissory notes issued by Capital Bank in July 2006 and March 2007. The bankruptcy court found that Capital Bank "holds a valid blanket first lien in all of the accounts, rights to payment, furniture, fixtures, equipment, inventory and general intangibles of Cal Data Systems, Inc." (Docket Entry No. 19, Ex. A at 1). The bankruptcy court lifted the automatic stay imposed by 11 U.S.C. § 362 and allowed Capital Bank to "take possession of the Property, except the Pearson litigation, and sell ... such property and imply any proceeds to its indebtedness."(*Id.*, Ex. A at 2). The bankruptcy court also modified the stay to allow Capital Bank to move to intervene and take other action with respect to this litigation. (*Id.*, Ex. A at 2).

In this court, Capital Bank has moved to intervene as a matter of right under Federal Rule of Civil Procedure 24(a)(2). (Docket Entry No. 15 at 3). Capital Bank argues that it timely moved to intervene, that its intervention will not prejudice the parties, and that its interest "may not be protected if it is not allowed to intervene."(*Id.* at 4). Pearson opposes the intervention on the grounds that Capital Bank has no interest in the pending case, the trustee will adequately protect Capital Bank's interest, and resolution of this case action will not impair Capital Bank's legal rights.

Each argument and response is analyzed below.

## II. The Legal Standard

Rule 24 provides:

 (a) Intervention of Right. On timely motion, the court must permit anyone to intervene who:

  (1) is given an unconditional right to intervene by a federal statute; or

  (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

 (b) Permissive Intervention.

 (1) In General. On timely motion, the court may permit anyone to intervene who:

  (A) is given a conditional right to intervene by a federal statute; or

  (B) has a claim or defense that shares with the main action a common question of law or fact.

FED. R. CIV. P. 24. The courts have interpreted Rule 24(a)(2) to require that: (1) the intervention application must be timely; (2) the applicant must have an interest relating to the property that is the subject of the action; (3) the applicant must be so situated that the disposition may, as a practical matter, impair or impede his ability to protect that interest; and (4) the applicant's interest must be inadequately represented by the existing parties. *Sierra Club v. City of San Antonio*, 115 F.3d 311, 314 (5th Cir.1997) (citing *Sierra Club v. Glickman*, 82 F.3d 106, 108 (5th Cir.1996)).

"Rule 24(b)(2) provides for permissive intervention when (1) timely application is made by the intervenor, (2) the intervenor's claim or defense and the main action have a question of law or fact in common, and (3) intervention will not unduly delay or prejudice the adjudication of the rights of the original parties."*League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 884 F.2d 185, 189 n. 2 (5th Cir.1989). District courts considering whether to permit intervention should also consider whether the would-be intervenor is adequately represented by the existing parties and whether the intervenor's presence is likely to make a significant contribution to the development of the underlying factual issues. *Id.* at 189.While the discretion of district courts in granting motions to permissively intervene is wide, intervention should be allowed "where no one would be hurt and greater justice could be attained."*Sierra Club v. Espy*, 18 F.3d 1202, 1205 (5th Cir.1994) (quoting *McDonald v. E.J. Lavino Co. .*, 430 F.2d 1065, 1074 (5th Cir.1970)); *Clements*, 884 F.2d at 189.

## III. Analysis

**\*3** To intervene as of right under Rule 24(a)(2), the applicant must "point to an interest that is 'direct, substantial, and legally protectable." *Ross v. Marshall*, 426 F.3d 745, 757 (5th Cir.2005) (citing

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                          Page 3
Slip Copy, 2008 WL 1730539 (S.D.Tex.)

*New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co., 732 F.2d 452, 463 (5th Cir.1984)*) (internal punctuation omitted). "This requires a showing of something more than a mere economic interest; rather the interest must be 'one which the substantive law recognizes as belonging to or being owned by the applicant.' " *Id.* (quoting *United Gas Pipe Line, 732 F.2d at 464).* The potential intervenor must have an interest "that is related to the property or transaction that forms the basis of the controversy." *Saldano v. Roach, 363 F.3d 545, 551 (5th Cir.2004)* (citing *Doe v. Glickman, 256 F.3d 371, 375 (5th Cir.2001)*). Capital Bank has failed to show more than an economic interest in this litigation. Capital Bank's lien on Cal Data's accounts receivable and general intangibles arises from two promissory notes unrelated to the transactions between Cal Data and Pearson at issue in this case. Capital Bank's interest in this action "is in the prospective collectability of a debt." *United States v. Alisal Water Corp., 370 F.3d 915, 920 (9th Cir.2004)*; *see also Hawaii-Pac. Venture Capital Corp. v. H.B. Rothbard, 564 F.2d 1343, 1346 (9th Cir.1977)* (holding that the impaired ability to collect judgments that may arise from future claims does not give rise to a right of intervention). Capital Bank has failed to show that it has more than an economic interest relating to the transactions in dispute in this action. [FN1]

> [FN1.] Because Capital Bank's claim in this case is unrelated to the contracts in dispute between Cal Data and Pearson, Capital has failed to meet the requirements for permissive intervention under Rule 24(b)(2).Rule 24(b)(2) provides for permissive intervention only if the intervenor's claim or defense and the main action have a question of law or fact in common

Capital Bank's motion to intervene is denied.

**IV. Conclusion**

Capital Bank's motion to intervene is denied. Capital Bank's motion for expedited consideration and to compel mediation are denied as moot. The initial pretrial and scheduling conference is reset to **May 30, 2008, at 8:45 a.m.,** in Courtroom 11-B.

S.D.Tex.,2008.

Cal Data Systems, Inc. v. NCS Pearson, Inc.
Slip Copy, 2008 WL 1730539 (S.D.Tex.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.



Slip Copy                                                                                                    Page 1
Slip Copy, 2006 WL 2883010 (W.D.Wash.)

CPhiladelphia Indem. Ins. Co. v. Business Computer
Training Inst., Inc.
W.D.Wash.,2006.
Only the Westlaw citation is currently available.
United States District Court, W.D. Washington,
at Tacoma.
PHILADELPHIA INDEMNITY INSURANCE
COMPANY, Plaintiff,
v.
BUSINESS COMPUTER TRAINING INSTITUTE,
INC.; Thomas Jonez and Faye Jonez; Morrie Pigott
and Linda Pigott, Defendants.
No. C05-5706 RBL.

Oct. 10, 2006.

Michael P. Hooks, Forsberg & Umlauf, Seattle, WA,
for Plaintiff.
Kevin Arnold Bay, Rachel Y. Han, John T. Petrie,
Ryan Swanson & Cleveland, Seattle, WA, for
Defendants.

ORDER DENYING APPLICANTS' MOTION TO
INTERVENE

RONALD B. LEIGHTON, District Judge.

I. INTRODUCTION AND CONCLUSION

*1 This matter comes before the Court on a motion to
intervene by non-parties Kari L. Westfall, Shaun
Marolf, Jay Poe, Tony Nguyen and Janet Newton
(the "Applicants"). (Dkt. No. 16). Having reviewed
the parties' submissions and determining that oral
argument is not necessary for the disposition of this
motion, the Court hereby DENIES Applicants'
motion. The reasons for the Court's order are set forth
below.

II. BACKGROUND

On June 29, 2005, Business Computer Training
Institute, Inc. ("BCTI") was named as a defendant in
an Oregon class action. In that class action, plaintiff
students alleged BCTI breached its contract by failing
to provide promised graduation placement services.

On October 26, 2005, Plaintiff Philadelphia
Indemnity Insurance Company filed this declaratory
judgment against BCTI, seeking a declaration that its
insurance policy does not cover BCTI's alleged
breach of contract in the Oregon class action.

Applicants apparently have claims similar to the
Oregon plaintiffs and, on May 10, 2005, filed in
Pierce County Superior Court a complaint against
BCTI asserting claims arising from BCTI's "alleged
actions and omission." Pierce County Superior Court
Judge Thomas P. Larkin entered a $300,000 Writ of
Attachment in the Applicants' favor. Judge Larkin
then certified three separate classes based on each
student's enrollment period. According to Applicants,
BCTI claims it has insufficient assets to satisfy a
judgment or pay for their defense.

Applicants' counsel attempted unsuccessfully to
obtain details about the pending declaratory judgment
action between Philadelphia and BCTI. As a result,
on September 8, 2006, Applicants filed this motion to
intervene.

III. DISCUSSION

A. *Intervention as of Right*

To intervene as a matter of right under Fed.R.Civ.P.
24(a), four requirements must be met: (1) the motion
must be timely; (2) the applicant must claim a
significantly protectable legal interest relating to the
property or transaction which is the subject of the
action; (3) the applicant must be so situated that the
disposition of the action may, as a practical matter,
impair or impede its ability to protect that interest;
and (4) the applicant's interest must be inadequately
represented by the parties to the action.*Sierra Club v.
United States EPA, 995 F.2d 1478, 1481 (9th
Cir.1993)* (citations omitted). Although the party
seeking to intervene bears the burden of establishing
all four elements, the Ninth Circuit construes these
factors liberally in favor of the applicant, and review
is guided by practical and equitable considerations,
rather than technical distinctions. *See United States v.
Alisal Water Corp., 370 F.3d 915, 919 (9th
Cir.2004); Southwest Center for Biological Diversity*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*v. Berg,* 268 F.3d 810, 818 (9th Cir.2001); *Donnelly v. Glickman,* 159 F.3d 405, 409 (9th Cir.1998).

*1. Significant Protectable Interest*

Applicants argue intervention as of right is appropriate because not only do they have an interest in maximizing available insurance, but also they have an interest in BCTI's assets as a result of the $300,000 Writ of Attachment order. (Dkt. No. 16 at 7). Philadelphia responds Applicants lack a significant protectable interest because they only have a contingent economic interest in the underlying coverage limitation dispute. (Dkt. No. 19 at 6).

**\*2** In the Ninth Circuit, "[t]he requirement of a significantly protectable interest is generally satisfied when 'the interest is protectable under some law, and ... there is a relationship between the legally protected interest and the claims at issue.' " *Arakaki v. Cayetano,* 324 F.3d 1078, 1084 (9th Cir.2003) (citations omitted). The Ninth Circuit has made clear, however, that pure economic expectancy is not a legally protected interest for purposes of intervention.[FN1]

> [FN1.]*See, e. g., Alisal Water,* 370 F.2d at 920 (prospective collectability of debt insufficient interest that does not give rise to a right of intervention); *So. Cal. Edison Co. v. Lynch,* 307 F .3d 794, 803 (9th Cir.2002) (applicants' "contingent, unsecured claim against a third-party debtor" fell short of the 'direct, non-contingent, substantial and legally protectable' interest required for intervention as a matter of right.") (citations omitted); *Greene v. United States,* 996 F.2d 973, 976 (9th Cir.1993) ("movant must demonstrate a 'significantly protectable interest.' An economic stake in the outcome of the litigation, even if significant, is not enough.") (citations omitted); *see also HealthSouth Corp. Ins. Litig.,* 219 F.R.D. 688, 692 (N.D.Ala.2004) ("Here, Movants' interest in securing a pool of insurance money to draw upon is not only purely economic, but also theoretical, considering no judgments have been obtained against the insureds.")

Here, Applicants fail to allege any interest in the underlying coverage limitation dispute between Philadelphia and BCTI other than pure economic expectancy. It is true that, in a separate state action, Applicants attained a $300,000 Writ of Attachment against BCTI. (Dkt. No. 16 at 7). It is also true that Judge Larkin stated "it [is] likely that the plaintiffs in this case will prevail on some, if not all, of their claims."*Id.* A Writ of Attachment, however, is not a judgment. Accordingly, Applicants' economic interest in the underlying coverage limitation dispute is speculative because it hinges upon obtaining a state court judgment against BCTI. *See Alisal Water Corp.,* 370 F.3d at 919-20 (a "non-speculative, economic interest may be sufficient to support a right of intervention" but economic interest must be "concrete and related to the underlying subject matter of the action") (citations omitted).

In a similar case, *Hawaii-Pacific Venture Capital Corp. v. H.B. Rothbard,* 564 F.2d 1343, 1346 (9th Cir.1977), the Ninth Circuit held that the impaired ability to collect judgments that may arise from future claims does not give rise to a right of intervention. Indeed, "[t]o hold otherwise would create an open invitation for virtually any creditor of a defendant to intervene in a lawsuit where damages might be awarded."*See Alisal Water Corp.,* 370 F.3d at 919. *Hawaii-Pacific's* reasoning is applicable here because Applicants' sole interest in the present case is in the prospective collectability of a judgment. *See Glyn v. Roy Al Boat Mgmt. Corp.,* 897 F.Supp. 451, 453 (D.Haw.1995) ("Were this court to agree that [a lienholder] could intervene ... it would transform every civil suit before this court into a kind of exaggerated interpleader action where all potential creditors of all parties could assert their rights.").

Because Applicants' interest in the present case is not only purely economic, but also theoretical, Applicants lack a significantly protectable interest. And because Applicants lack a significantly protectable legal interest, it is unnecessary to consider the remaining prongs of Rule 24(a)(2).*See Portland Audubon Soc'y v. Hodel,* 866 F.2d 302 (9th Cir.1989), *cert denied,*492 U.S. 911 (1989) (citations omitted).

B. *Permissive Intervention*

Applicants alternatively argue permissive intervention is appropriate because, *inter alia,* they

Slip Copy

Slip Copy, 2006 WL 2883010 (W.D.Wash.)

are in the best position to explain the underlying lawsuit. (Dkt. No. 16 at 11). Philadelphia responds that the separate certified classes in the state court action reinforces the lack of commonality between Applicants and the underlying lawsuit. (Dkt. No. 19 at 10).

**\*3** Permissive intervention under Fed.R.Civ.P. 24(b) may be granted where the applicant demonstrates (1) independent grounds for jurisdiction; (2) the motion is timely; and (3) a common question of law or fact exists between the applicants' claim or defense and the main action. *League of United Latin American Citizens v. Wilson,* 131 F.3d 1297, 1308 (9th Cir.1997). To intervene under Rule 24(b)(2), the applicant need not have any direct or pecuniary interest in the subject of the litigation. *Kootenai Tribe of Idaho v. Veneman,* 313 F.3d 1094, 1108 (9th Cir.2002). Even if Rule 24(b)(2)'s requirements are satisfied, however, the court has discretion to deny intervention, considering such factors as whether the intervention would unduly delay the action or unfairly prejudice existing parties. *Donnelly,* 159 F.3d at 412. In addition, the court should consider whether the applicants' interest is adequately represented by the existing parties. *State of California v. Tahoe Regional Planning Agency,* 792 F.2d 775, 779 (9th Cir.1986).

No common questions of law or fact exist between Applicants' state class action suit against BCTI and the declaratory judgment action between Philadelphia and BCTI. The facts and law at issue in the present action involve whether Philadelphia must cover BCTI for the separate claims brought by the Oregon class action plaintiffs. Thus, while the underlying action takes root in BCTI's "alleged actions and omission," the declaratory judgment action depends on interpreting the coverage limitations contained in BCTI's insurance policy; the instant case has nothing to do with whether and how Applicants were affected by BCTI's "alleged actions and omission." Because Applicants lack a common question of law or fact between their state court class action and the underlying coverage limitation dispute, permissive intervention is inappropriate.

## IV. CONCLUSION AND ORDER

For the reasons discussed above, the Court DENIES Applicants' Motion to Intervene. (Dkt. No. 16).

W.D.Wash.,2006.

Philadelphia Indem. Ins. Co. v. Business Computer Training Inst., Inc.

Slip Copy, 2006 WL 2883010 (W.D.Wash.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                              Page 1
Not Reported in F.Supp.2d, 2006 WL 1582464 (C.D.Ill.)
**2006 WL 1582464 (C.D.Ill.)**

**H**Patridge v. J.K. Harris Co.
C.D.Ill.,2006.
Only the Westlaw citation is currently
available.Denny PATRIDGE and Judy Patridge,
Plaintiffs,
v.
J.K. HARRIS COMPANY, Bobbie Mickey, and
Larry Phillips, Defendants.
**No. 05-2172.**

May 31, 2006.

Jerold W. Barringer, Nokomis, IL, for Plaintiffs.
James C. Kearns, Heyl Royster Voelker & Allen,
Urbana, IL, for Defendants.
Hilary W. Frooman, US Atty., Urbana, IL, James A.
Lewis, US Atty., Springfield, IL, for Intervenor
Defendant.

OPINION

MICHAEL P. MCCUSKEY, Chief J.
*1 Currently pending before this court is the United
States' Amended Motion to Intervene (# 34) and the
United States' Motion for Partial Summary
Adjudication. For the reasons that follow, the Motion
to Intervene (# 34) is GRANTED and the Motion for
Partial Summary Adjudication (# 36) is DENIED.

AMENDED MOTION TO INTERVENE

On May 11, 2006, the Magistrate Judge filed a
Report and Recommendation (# 42) in the above
cause. The Magistrate Judge recommended that the
United States' Amended Motion to Intervene (# 34)
be GRANTED.

On May 25, 2006, Plaintiffs filed their Objection to
the Report and Recommendation (# 44) and the
United States has filed a Response (# 45). This court
has reviewed the Magistrate Judge's reasoning, the
Plaintiffs' Objection, and the United States' Response.
After a thorough and careful de novo review, this
court agrees with and accepts the Report and
Recommendation of the Magistrate Judge.
Accordingly, the United States' Amended Motion to
Intervene (# 34) is GRANTED.

MOTION FOR PARTIAL SUMMARY
ADJUDICATION

On April 21, 2006, the United States **filed a Motion
for Partial Summary Adjudication**, seeking a
preliminary ruling from this court that Defendant
Larry Phillips is entitled to absolute immunity with
regard to his testimony in the criminal prosecution of
Plaintiff Denny Patridge. In its motion, the United
States indicates it **filed this motion as a pleading
pursuant to Federal Rule of Civil Procedure
24( c) which requires that a motion to intervene
"shall be accompanied by a pleading setting forth
the claim or defense for which intervention is
sought.**"The United States correctly notes that a
ruling on this issue would not dispose of any counts
in this matter. Furthermore, Plaintiffs argue
Defendant Phillips is not entitled immunity by virtue
of the fact he was a complaining witness. After
reviewing the pleadings, the court finds it would be
more prudent to decide this issue in the context of a
dispositive motion which Defendant Phillips has had
the opportunity to brief along with the United States.
Thus, while **this court finds the motion is sufficient
to meet the requirement of Rule 24(c)** and without
ruling on the merits, the United States' Motion for
Partial Summary Adjudication is denied at this time.

IT IS THEREFORE ORDERED:

(1) The United States' Amended Motion to Intervene
(# 34) is GRANTED.

(2) The United States' Motion for Partial Summary
Adjudication (# 36) is DENIED at this time.

REPORT AND RECOMMENDATION

DAVID G. BERNTHAL, Magistrate J.
In August 2005, Plaintiffs Denny and Judy Patridge
filed a Complaint (# 1) against Defendants J.K.
Harris and Company (hereinafter "J.K. Harris"),
Bobbie Mickey, and Larry Phillips, alleging breach
of contract and fraud in connection with a contract
for legal representation. In November 2005, Plaintiffs
filed an Amended Complaint (# 20) and in March

Not Reported in F.Supp.2d                                                              Page 2
Not Reported in F.Supp.2d, 2006 WL 1582464 (C.D.Ill.)
**2006 WL 1582464 (C.D.Ill.)**

2006, Plaintiffs filed a 2d Amended Complaint (# 30). Federal jurisdiction is based on diversity pursuant to 28 U.S.C. § 1332.

**\*2** In November 2005, the United States filed a Motion To Intervene (# 17) as a party, which the Court denied for failure to comply with Federal Rule of Civil Procedure 24(c). In April 2006, the United States filed an Amended Motion To Intervene (# 34). After reviewing the parties' pleadings and memoranda, this Court recommends, pursuant to its authority under 28 U.S.C. § 636(b)(1)(B), that the United States' Amended Motion To Intervene (# 34) be GRANTED.

In its previous motion to intervene, the United States sought to intervene as a party and this Court recommended denying it for failure to articulate what claim or defense it was asserting related to its own interests. In its current motion, the United States asks to intervene "to assist in the protection of an independent witness" (# 35, p. 6), rather than to assert a claim or defense on its own behalf. The United States characterizes this role as a "lesser step" than direct representation of a cooperating witness. (# 35, p. 7.)

The United States argues that it has a right to intervene pursuant to 28 U.S.C. § 517 to assert its interest in protecting witnesses in federal court tax prosecutions against damage claims based on allegations of false testimony. In support, the United States cites several cases including *Brawer v. Horovitz,* 535 F.2d 830, 836 (3rd Cir.1976), and *Hall v. Clinton,* 285 F.3d 74, 78 (D.C.2002). In *Hall,* the court held that the United States had an interest in representing the former First Lady in litigation based on actions she allegedly undertook while at the White House. *Id.* at 80. In *Brawer,* the court ruled that the United States had legal authority to represent the interest of a cooperating witness. In affirming that ruling, the Third Circuit agreed with the government which had stated as follows:

The "interest of the United States" involved here is the assistance and protection of government informers and witnesses, so valuable in the prosecution of criminal actions. Public policy demands that government informers and witnesses should feel free to give complete and independent testimony in criminal prosecutions, unintimidated by

the threat of harassing, vexatious and frivolous civil suits against them due to their testimony.

*Brawer,* 535 F.2d at 836. This Court agrees that the United States can play a legitimate role in a situation such as this one where the United States seeks to assist in representing a party who testified in a federal tax prosecution. Accordingly, the Court recommends granting the United States' motion to intervene for the purpose of assisting with Defendants' representation as set forth in the United States' memorandum.

Summary

For the reasons stated above, this Court recommends that the United States' Amended Motion To Intervene (# 34) be GRANTED. The parties are advised that any objection to this recommendation must be filed in writing with the clerk within ten (10) working days after being served with a copy of this Report and Recommendation. *See* 28 U.S.C. § 636(b)(1). Failure to object will constitute a waiver of objections on appeal. *Video Views, Inc. v. Studio 21, Ltd.,* 797 F.2d 538, 539 (7th Cir.1986).

**\*3** ENTER this 11th day of May, 2006.

C.D.Ill.,2006.
Patridge v. J.K. Harris Co.
Not Reported in F.Supp.2d, 2006 WL 1582464 (C.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                              Page 1
Not Reported in F.Supp., 1992 WL 233903 (N.D.Ill.)
**1992 WL 233903 (N.D.Ill.)**

**H**Pittman v. Chicago Bd. of Educ.
N.D.Ill.,1992.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
Shirley PITTMAN, Bruce Berndt, Ralph Cusick,
David T. Peterson, Gwendolyn Steele-Boutte,
Fredrick Sears, individually and as class
representatives, Plaintiffs,
v.
The CHICAGO BOARD OF EDUCATION, Roland
W. Burris, Attorney General of the State of Illinois,
Richard M. Daley, Mayor of the City of Chicago,
Defendants.
**No. 92 C 2219.**

Sept. 15, 1992.

*MEMORANDUM OPINION AND ORDER*

ASPEN, District Judge:
**\*1** This prospective class action is brought by
principals of the Chicago Board of Education (the
"Board"), challenging the constitutionality of Public
Acts 86-1477, 87-454 and 87-455, which
cumulatively succeed the Chicago School Reform
Act, previously held unconstitutional by the Illinois
Supreme Court in *Fumarolo v. Chicago Board of
Education, 142 Ill.2d 54, 153 Ill.Dec. 177, 566
N.E.2d 1283 (1990).* The following membership
organizations and individuals seek leave to intervene
as defendants: Schools First, Chicago Urban League,
United Neighborhood Organization of Chicago,
Chicago Neighborhood Organizing Project, African
American Education Reform Institute, Citizens
Schools Committee, Near North Neighborhood
Network, The Woodlawn Organization, Parents
United for Responsible Education, North River
Commission, Ana Carlo-Benson, Julie Woestehoff,
Ophelia Askew, Walt Colton, Bettie Colley, Iva
Lane, Sokoni Karanja, Hector Gamboa, and Donald
Moore (collectively "movants"). For the reasons set
forth below, we deny both the motion to intervene as
a matter of right and the motion for permissive
intervention.

I.

As a preliminary matter, we observe that the movants'
filing of an **answer** along with their reply brief in
support of their motion to intervene fulfills the
requirement of **Federal Rule of Civil Procedure
24( c)** that a motion for intervention "be accompanied
by a **pleading** setting forth the claim or defense for
which the intervention is sought." Where the
necessary pleading is filed soon after the motion, and
there is no prejudice to the other parties, a strictly
textual interpretation of the rule is unwarranted.
*Shevlin v. Schewe,* 809 F.2d 447, 450 (7th Cir.1987);
*National Casualty Co. v. Davis,*1991 U.S.Dist.
LEXIS 7651, at \*2 (N.D.Ill. June 3, 1991).

Rule 24(a) of the Federal Rules of Civil Procedure
sets out four requirements for intervention as of right:
(1) timely application; (2) an interest relating to the
subject matter of the action; (3) potential impairment,
as a practical matter, of that interest by the
disposition of the action; and (4) lack of adequate
representation of the interest by the existing parties to
the action. Fed.R.Civ.P. 24(a); *see Southmark Corp.
v. Cagan, 950 F.2d 416, 418 (7th Cir.1991);
Meridian Homes Corp. v. Nicholas W. Prassas &
Co., 683 F.2d 201, 203 (7th Cir.1982).* The movants'
failure to prove any one of the four elements results
in the failure of the motion. *Keith v. Daley, 764 F.2d
1265, 1268 (7th Cir.),* cert. denied,474 U.S. 980, 106
S.Ct. 383, 88 L.Ed.2d 336 (1985).* In the instant case,
plaintiffs concede that the motion was presented in a
timely manner. Plaintiffs, however, contend that
movants do not possess a sufficient interest in the
subject matter of the case, and that movants' interests
are adequately represented by the existing
defendants.

Assuming the adequacy of movants' interests, we
conclude that those interests are adequately
represented by the named defendants in this case:
The Chicago Board of Education (the "Board"),
Roland W. Burris, Attorney General of the State of
Illinois, and Richard M. Daley, Mayor of the City of
Chicago. True, movants' burden of proof on the
inadequacy of representation is "minimal." *Trbovich
v. United Mine Workers, 404 U.S. 528, 538 n. 10, 92
S.Ct. 630, 636 n. 10, 30 L.Ed.2d 686 (1972); Pacific
Mut. Life Ins. Co. v. American Nat'l Bank & Trust*

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                           Page 2
Not Reported in F.Supp., 1992 WL 233903 (N.D.Ill.)
**1992 WL 233903 (N.D.Ill.)**

Co., 110 F.R.D. 272, 274 (N.D.Ill.1986). Nonetheless, it is a burden that must be met. *Zemaitis v. DuPage County Bd. of Election Comm'rs,* 1988 WL 89954, at *2 1988 U.S.Dist. LEXIS 9469, at *2 (N.D.Ill. Aug. 19, 1988). The Seventh Circuit has repeatedly stated that "[a]dequacy [of representation] can be presumed when the party on whose behalf the applicant seeks intervention is a governmental body or officer charged by law with representing the interests of the proposed intervenor.' " *American Nat'l Bank & Trust Co. v. City of Chicago,* 865 F.2d 144, 148 (7th Cir.1989) (citing *Keith,* 764 F.2d at 1270); *see also United States v. South Bend Community Sch. Corp.,* 692 F.2d 623, 628 (7th Cir.1982). Likewise, a presumption of adequate representation arises "where the proposed intervenors and a party to the suit have the same ultimate objective." *American Nat'l Bank & Trust Co.,* 865 F.2d at 148 n. 3; *Wade v. Goldschmidt,* 673 F.2d 182, 186 n. 7 (7th Cir.1982). Plaintiffs initiated this lawsuit to protect their constitutional rights, which they allege have been violated by the provisions of the newly revised Chicago School Reform Act. Movants seek to affirm the constitutionality of the Act. The Attorney General of the State of Illinois, however, is mandated by law to defend and enforce the Illinois law. Moreover, although movants argue that their interests are different than those of the defendants, they have not demonstrated that their ultimate objective is different. Consequently, this court must presume that the named defendants will adequately represent movants' interests.

**\*2** To rebut the presumption of adequate representation, movants' point to a divergence of interest that arose in *Fumarolo.*[FN1] In *Fumarolo,* all of the defendants argued that the mayor possessed ultimate authority under the previous Chicago School Reform Act to appoint members of the Board, regardless of whether the appointees were named on the list of candidates submitted by the Board Nominating Commission. To the contrary, the intervenors claimed that the Mayor must select Board members from the slate of candidates proposed by the Nominating Commission. We are not convinced, however, that this adversity of opinion in *Fumarolo* warrants intervention in the present case. First, plaintiffs in this case attack the constitutionality of the revised Act regarding tenure decisions, and not respecting the Mayor's discretion in appointing members to the Board. Second, and more importantly, a careful review of both defendants'

answers and movants' answer does not reveal such divergence of opinion on any issue likely to arise in this case. Accordingly, the motion to intervene as of right is denied.

Movants also seek permissive intervention under Rule 24(b) of the Federal Rules of Civil Procedure, which provides:

Upon timely application anyone may be permitted to intervene in an action: ... (2) when an applicant's claim or defense and the main action have a question of law or fact in common.... In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

At the outset, we note that " '[A]dditional parties always take additional time. Even if they have no witnesses of their own, they are the source of additional questions, objections, briefs, arguments, motions and the like which tend to make the proceeding a Donnybrook Fair.' " *Zemaitis,* 1988 WL 89954, at *6, 3 (quoting *United States v. American Inst. of Real Estate Appraisers,* 442 F.Supp. 1072, 1083 (N.D.Ill.1977)). Further, each of the affirmative defenses raised by movants in their answer has been raised by one or more of the defendants. Under such circumstances, "permissive intervention is rarely appropriate." *Id.* at 1988 WL 89954, at *2. Consequently, we deny movants' motion for permissive intervention.

## II.

For the reasons set forth above, we deny movants' motions to intervene as of right and for permissive intervention. However, movants will be granted leave to file amicus curiae briefs in accordance with the briefing schedules set by the court. *See Keith,* 764 F.2d at 1268. It is so ordered.

> FN1. It appears that several of the member organizations seeking to intervene in this matter were granted leave to intervene in *Fumarolo,* including Schools First, United Neighborhood Organization of Chicago, Chicago Neighborhood Organizing project, Near North Neighborhood Network, The Woodlawn Organization and Parents United for Responsible Education.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 233903 (N.D.Ill.)
**1992 WL 233903 (N.D.Ill.)**

N.D.Ill.,1992.
Pittman v. Chicago Bd. of Educ.
Not Reported in F.Supp., 1992 WL 233903 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.